**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| RICHARD ROSE, *et al.*<br><br>     *Plaintiffs,*<br><br>     v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia,<br><br>     *Defendant.* | CIVIL ACTION<br>CASE NO. 1:20-cv-2921-SDG |

## <u>BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

## INTRODUCTION

Plaintiffs have a novel theory—that they can transform statewide elected officials into officials elected by district by renaming statewide elections as an "at-large method of election" and alleging a violation of Section 2 of the Voting Rights Act (VRA). [Doc. 1, ¶ 3]. But whatever the Plaintiffs call a statewide election for a statewide office, it does not alter the fact that they have not sufficiently invoked the jurisdiction of this Court. Plaintiffs have no standing to bring this claim, have failed to state a claim because they seek an impermissible remedy, and should be barred by sovereign immunity. This Court should dismiss this case.

## FACTUAL BACKGROUND

### I.     The Georgia Public Service Commission.

Georgia's Public Service Commission (the "PSC") is created by the Constitution and consists of five members "who shall be elected by the people." Ga. Const. Art. IV, Sec. I, Par. I.  Members are elected statewide for six-year terms and "the election shall be held under the same rules and regulations as apply to the election of Governor." O.C.G.A. § 46-2-1(a). In 1998, the legislature added residency districts to be effective for the 2000 and 2004 elections, making some adjustments to the districts in 2002. *Cox v. Barber*, 275 Ga. 415, 415-16 (2002) (explaining history of PSC residency districts). Candidates must be a resident of the district for which they seek to run for one year prior to the election. O.C.G.A. § 46-2-1(b).

The Commission has a direct, statewide impact on every consumer in Georgia through its power to "determine what are just and reasonable rates" for any corporation subject to its jurisdiction, O.C.G.A. § 46-2-1(a), including the power to allocate utility services however it deems fit to "protect the public health, safety, or welfare," O.C.G.A. § 46-2-71(a). Entities under the Commission's jurisdiction include "all common carriers, express companies, railroad or street railroad companies, dock or wharfage companies, terminal

or terminal station companies, telephone companies,[1] gas or electric light and power companies, and persons or private companies who operate rapid rail passenger service lines within this state." O.C.G.A. §§ 46-2-20(a), 46-2-21. The Commission also has the statewide authority to set "rules and regulations for the safe installation and safe operation of all natural gas transmission and distribution facilities within this state, including, without limitation, all natural gas transmission and distribution facilities which are owned and operated by municipalities within this state." O.C.G.A. § 46-2-20(i).

If the Commission finds a company under its jurisdiction in violation of any law or order of the Commission, it has the power to require repayment for those injured. O.C.G.A. § 46-2-90. It also has the power to impose fines of up to $15,000 per violation and $10,000 per day while a violation continues. O.C.G.A. § 46-2-91(a).

## II.    Other states' utility commissions.

States use a variety of methods to choose commissioners that regulate utilities. Some states elect commissioners statewide, like Georgia. *See*, *e.g.*, Code of Ala. § 37-1-3(a) (Alabama); A.R.S. Const. Art. XV, § 1 (Arizona); N.D.

---

[1] The Commission once regulated telegraph companies, but the General Assembly disconnected that authority in 2012. 2012 Ga. Laws p. 847.

Const. Art. V, § 2 (North Dakota); Okl. Const. Art. IX, § 15 (Oklahoma); S.D. Codified Laws § 49-1-2 (South Dakota). Others elect commissioners from districts. *See*, *e.g.*, 69-1-103, MCA (Montana commissioners elected by district); Miss. Code Ann. § 77-1-1 (Mississippi commissioners elected from Supreme-Court districts). Others are appointed. *See*, *e.g.*, Alaska Stat. § 42.04.020 (Alaska commissioners appointed by Governor); S.C. Code Ann. § 58-3-20 (South Carolina commissioners appointed by General Assembly).

## II.    The Plaintiffs.

All of the Plaintiffs are voters living in Commission District 3. *Compare* [Doc. 1, ¶¶ 6-9] *with* O.C.G.A. § 46-2-1(c) (Fulton County entirely in District 3). Notwithstanding the fact that all Plaintiffs live in a single district, they, like every other eligible voter in Georgia, may cast their vote for each candidate running for a seat on the Commission regardless of where the candidate resides.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs' Complaint should be dismissed because this Court lacks jurisdiction and because Plaintiffs have failed to state a claim.

First, Plaintiffs do not have Article III standing under the United States Constitution. "Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a

4

dispute." *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1201 (11th Cir. 2020). This is a "bedrock requirement." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). As the Supreme Court has repeatedly instructed lower courts and the litigants before it, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37 (1976).

Where a motion to dismiss is brought pursuant to Fed. R. Civ. P. 12(b)(1), the Court is not limited to the four corners of the Complaint to adequately satisfy itself of jurisdiction over the matter. "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982). Moreover, the ordinarily charitable lens through which courts view allegations in a complaint at the motion-to-dismiss stage does not apply. In evaluating a 12(b)(1) motion, "**no presumptive truthfulness attaches to plaintiff's allegations**, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional

claims." *Id.* (emphasis added). The party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992). *See also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001).

Article III standing requires that each claim "clearly" establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)). To do this, Plaintiffs must demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Although each of the foregoing factors are necessary to adequately allege standing, Plaintiffs' Complaint fails to satisfy all three.

Second, Plaintiffs cannot state a claim because they have not alleged a sufficient remedy under controlling law. To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual

allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678-79.

In addition to the complaint, this Court may consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## I.    Plaintiffs lack standing.

### A.    *Plaintiffs have not alleged an injury-in-fact.*

Some federal courts have assumed that, when a complaint alleges a violation of a voter's right to vote, an injury in fact automatically exists. In *Jacobson*, for example, the district court felt the defendants' standing defense advanced a "cramped" and "jurisprudentially anomalous" view of the scope of its authority, and found the plaintiffs satisfied the requirements of Article III because "an impact on the right to vote" is "common to all election laws…" 411 F. Supp. 3d 1249, 1261 n. 10 (N.D. Fla. 2019). But on appeal, the Eleventh Circuit reversed, finding the district court "took its obligation to ensure jurisdiction far too lightly," and holding that "the district court acted ultra vires by ordering relief that [plaintiffs] had no standing to seek." *Jacobson*, 957 F.3d at 1201. The elements of standing "are not mere pleading requirements but rather an *indispensable* part of the plaintiff's case." *Lujan,* 504 U.S. at 561 (emphasis added).

Plaintiffs' sole alleged injury in this action is straightforward: "The at-large method of electing members of Georgia's Public Service Commission dilutes black voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301." [Doc. 1, ¶ 36]. On its face, this sounds like a traditional Section 2 challenge to an at-large system—such as a county commission:

> A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority. Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory.

*Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S. Ct. 1149, 1155 (1993). In situations where a county commission is elected at-large and minority voters could constitute a majority in a single-member district (and the other required factors exist), courts correct this violation of Section 2 of the VRA by moving from at-large elections to district elections. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018).

But this case is not a traditional Section 2 case. Instead of challenging a county government election practice, Plaintiffs challenge the decision of the

state legislature about how to structure its constitutional commissions. Plaintiffs also do not explain how a *statewide* election for a *statewide* office could result in any dilutive effect on their vote whatsoever. Plaintiffs' theory is that, because candidates for the Commission have residency requirements established by law, this automatically frustrates Plaintiffs' capacity to elect the candidate of their choice. [Doc. 1, ¶ 23] ("For example, in elections for members of the Public Service Commission between 2012 and 2018, white voters supported their preferred candidates with greater than 80 percent of their votes and were able to defeat the candidates preferred by black voters in every such election."). Plaintiffs ultimately claim that, as a result, the only explanation for their lack of electoral success is that the candidates they prefer are not winning because Plaintiffs' votes carry less weight than other voters. [Doc. 1, ¶¶ 21, 23, 27, 35].

The Eleventh Circuit recently grappled with a similar allegation and declined to find a judicially cognizable injury. "A candidate's electoral loss does not, by itself, injure those who voted for the candidate. **Voters have no judicially enforceable interest in the outcome of the election.**" *Jacobson,* 957 F.3d at 1202, citing *Raines v. Byrd,* 521 U.S. 811 (1997) (emphasis added). "Instead," the court continued, "they have an interest in

9

their ability to vote and their vote being given the same weight as any other."
*Id.*

Plaintiffs' Complaint challenges statewide elections. As a result, the sole possible injury is in the "outcome of the election." *Id*. Unlike in county elections, the alleged dilution of "black voting strength" on a statewide level is not an allegation that any individual vote is diminished—it is that the electoral system is not to Plaintiffs' liking because it does not give them the outcome they seek. And "absent any evidence of vote dilution or nullification, a citizen is not injured by the simple fact that a candidate for whom she votes loses or stands to lose an election." *Jacobson,* 957 F.3d at 1202. The question of injury is then whether a plaintiff can be injured when he or she is *able* to vote as part of the statewide election for a constitutional office with statewide authority but would *prefer* to vote in single-member districts.

Statewide elections for statewide offices are categorically different than elections for county offices and cannot result in vote dilution in violation of Section 2. Public Service Commissioners, once elected, exercise authority over the entire State of Georgia, not just the district in which they live. O.C.G.A. § 46-2-20, *et seq*. This is a crucial distinction, and it forecloses the injury-in-fact prong for Plaintiffs under a theory of vote dilution.

One helpful example is *Gill*, where a group of plaintiffs challenged an alleged partisan gerrymander, but alleged only statewide harms. *Gill v. Whitford,* 138 S. Ct. 1916 (2018). The *Gill* plaintiffs attempted to assert standing on the basis of a statewide harm caused by gerrymandering, but the Court was unpersuaded. "[O]ur cases to date have not found that this presents an individual and personal injury of the kind required for Article III standing." *Id.* at 1931. Indeed, the plaintiffs' claims were precisely "the kind of *undifferentiated, generalized grievance about the conduct of government* that we have refused to countenance in the past." *Id.,* quoting *Lance v. Coffman*, 549 U. S. 437, 442 (2007) (emphasis added).

While Plaintiffs wish that elections for Public Service Commission would be conducted by districts instead of statewide, they ask for more than just a change in method of election in a *county* government. Instead, they ask this Court to "force on the states a new model of government," *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994), by fundamentally altering the nature that a sovereign state has set up its constitutional commissions to govern utilities. This type of proposed injury is not an individual dilution of voting strength—it is an impermissible injury based on their preferred candidates losing statewide elections. *Jacobson,* 957 F.3d at 1202.

11

As a result, Plaintiffs have not shown injury-in-fact sufficient to accord Article III standing. Their Complaint should be dismissed.

### B.    Plaintiffs have not pleaded traceability.

As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson*, 957 F.3d at 1207 quoting *Lujan*, 504 U.S. at 560. "So for them to have standing, the [Commission Districts or statewide voting process] must be traceable to the Secretary – the only defendant in this action." *Id.*

The problem for Plaintiffs is that the Georgia legislature, not the Secretary, designs the Commission Districts by statute. O.C.G.A. § 46-2-1(c). Indeed, the Secretary has no say in the matter one way or another besides implementing the election—which is not the only way a seat on the Public Service Commission can be filled, as Plaintiffs acknowledge. [Doc. 1, ¶ 29]. To the extent Plaintiffs take issue with the statewide voting method for the Commission, their alleged harm also traces to the legislature, the Governor, and county election officials who operate elections. O.C.G.A. § 46-2-1(a). "Because the [Secretary] didn't do (or fail to do) anything that contributed to [Plaintiffs' alleged] harm, the voters… cannot meet Article III's traceability

12

requirement." *Jacobson,* 957 F. 3d at 1207, quoting *Lewis v. Governor of Ala.,* 944 F. 3d 1287, 1301 (11th Cir. 2019) (internal quotations omitted).

Plaintiffs' sole basis to sue the Secretary is that the Secretary is designated as Georgia's chief election officer for certain purposes. [Doc. 1, ¶ 10]. But that status, standing alone, is not sufficient to render the Plaintiffs' alleged injury fairly traceable to him. The Eleventh Circuit squarely rejected this generalized duty in *Jacobson* when the plaintiffs could not show the Secretary of State of Florida had any hand in the design of the ballots they claimed injured them. "In the absence of any evidence that the Secretary controls ballot order, the voters and organizations… cannot rely on the Secretary's general election authority to establish traceability." 957 F. 3d at 1208.

In *Lewis,* the Eleventh Circuit came to a similar conclusion. There, plaintiffs challenged a minimum-wage law promulgated by the State and sued the Alabama Attorney General because of "a host of provisions of the Alabama Code that generally describe the Attorney General's [enforcement] authority." *Lewis,* 944 F. 3d at 1300. But these generalized duties simply did not establish traceability to the plaintiffs' injuries, in part because the statute at issue in the plaintiffs' complaint "envisions no role for the Attorney General." *Id.* at 1299.

13

Plaintiffs here suffer a similar deficiency. The Plaintiffs don't like the combination of statewide voting for the Commission and the statutorily designed residency districts for candidates. The problem is the Secretary does not design the residency districts, does not control how vacancies are filled, and he does not mandate that Commission elections encompass a statewide electorate. Thus, Plaintiffs' alleged injuries are not fairly traceable to the only Defendant in this case. Accordingly, Plaintiffs' Complaint should be dismissed.

C.   *Plaintiffs have not sufficiently alleged redressability.*

"It must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis,* 944 F.3d at 1301 (internal quotations omitted). The Plaintiffs here seek a declaratory judgment that statewide voting for the PSC dilutes black voting strength, an injunction prohibiting the Secretary from administering elections with the statewide voting method, and an order that the Secretary comply with Section 2 of the Voting Rights Act. [Doc. 1, p. 10].

A declaratory judgment by this Court would not redress the Plaintiffs' alleged injuries as "it rests on the flawed notion that by declaring [a]… statute [unlawful], it eliminate[s] the legal effect of the statute in all contexts." *Jacobson,* 957 F. 3d at 1209. "But federal courts have no authority

14

to erase a duly enacted law from the statute books." *Id.* quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy,* 104 Va. L. Rev. 933, 936 (2018). And enjoining the Secretary from administering the PSC elections as required by law would not solve the Plaintiffs' purported harm. Because the law remains in effect with respect to all non-parties to this suit, the Governor would simply appoint a replacement to any election that is not administered by the Secretary pursuant to this Court's order. O.C.G.A. § 46-2-4. As a non-party, the Governor is not bound by what Plaintiffs accomplish here, if anything. "If a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable." *Jacobson*, 957 F. 3d at 1209. "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Lewis,* 944, F. 3d at 1305, quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment). Moreover, "Article III standing requires that the plaintiffs' injury be 'fairly traceable' to the defendant's action and redressable by relief against *that* defendant." *Jacobson,* 957 F. 3d at 1210 , citing *Lewis,* 944 F. 3d at 1298, 1301.

15

## II.   Plaintiffs have failed to state a claim upon which relief can be granted.

Apart from the general Article-III-redressability issues associated with the parties to this case, Plaintiffs' Complaint suffers from a more specific deficiency because it does not allege a permissible remedy—even if fully realized, the requested relief is beyond the capacity of federal courts to fashion and therefore it does not pass the first *Gingles* requirement.[2] "Implicit in th[e] first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system." *Nipper*, 39 F.3d at 1531. See also *Ala. State Conference of the NAACP v. Alabama*, No. 2:16-CV-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938, *53 (M.D. Ala. Feb. 5, 2020). Plaintiffs' proposed remedy is to eliminate statewide elections for members of the PSC and replace them with district-based elections. [Doc. 1, p. 10] (requesting

---

[2] As the Supreme Court summarized, "In *Thornburg v. Gingles*, this Court held that plaintiffs claiming vote dilution through the use of multimember districts must prove three threshold conditions. First, they must show that the minority group is sufficiently large and geographically compact to constitute a majority in a singlemember district. Second, they must prove that the minority group is politically cohesive. Third, the plaintiffs must establish that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Voinovich*, 507 U.S. at 157 (internal citations and quotations omitted). Failing on any one of these threshold findings means a plaintiff cannot obtain relief. *Nipper*, 39 F.3d at 1524.

order enjoining "any future elections for members of the Public Service Commission using the at-large method of election"). But this remaking of Georgia's governmental structure for regulating utilities is not "a permissible remedy," *Nipper*, 39 F.3d at 1524, and therefore this case should be dismissed because Plaintiffs cannot cross the first *Gingles* requirement.

This case bears a remarkable similarity to a Section 2 challenge to Alabama's method of electing its judges statewide. The district judge in that case found that "[t]he state at large is decidedly not a districting plan, nor is it a district of anything. Unlike a county, city, state legislature, or school board, the state is itself sovereign." *Ala. State Conference of the NAACP,* 2020 U.S. Dist. LEXIS 18938 at *38. Put differently, statewide electoral challenges under Section 2 invite the federal judiciary to intrude upon a state's inherent right to decide its form of government, which enjoys special protection from federal judicial usurpation under our Constitution. *See Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281, 1296 (11th Cir. 1995) (finding changing judicial elections to districts was not appropriate remedy). At bottom, Plaintiffs here request a fundamentally different remedy than requiring a county to alter its method of electing commissioners. *Ala. State Conference of the NAACP,* 2020 U.S. Dist. LEXIS 18938 at *38.

Moreover, as the state's chosen form of government, a challenge to the method of electing the PSC is beyond the reach of Section 2. The district court in *Ala. State Conference of the NAACP,* confronted with a similar issue*,* highlighted the tension caused by the unique circumstance of a statewide election challenged under Section 2:

> Plaintiffs assume § 2 applies because subsection (a) addresses a voting "standard, practice, or procedure . . . imposed or applied by any State" § 10301. The court has serious concerns about this assumption. Alabama's at-large, statewide system is a fundamental choice of the form of its judicial branch of government. That it involves procedures is of no moment; all forms of government involve procedures.

*Id.* Because neither party in *NAACP* raised the issue in brief, the court never considered it any further. *Id.* But this Court suffers from no such deficiency, and it should decline to award relief under Section 2 for a challenge predicated upon the federal judiciary usurping the constitutional right of a sovereign state to choose its form of government.

Plaintiffs' proposed remedy also lacks a "reasonable alternative practice as a benchmark against which to measure the existing voting practice." *Holder v. Hall*, 512 U.S. 874, 880, 114 S. Ct. 2581, 2585 (1994). In *Holder*, the Supreme Court determined that challenges to the size of a governing authority lacked a reasonable alternative benchmark and thus could not be challenged under Section 2. *Id.* at 885. Similarly, there is no basis by which

18

this Court could determine the appropriate method of election for PSC members. They have been elected statewide since at least 1906 and became a constitutional body in 1943. *See Ga. Pub. Serv. Com. v. Atl. Gas Light Co.*, 205 Ga. 863, 870, 55 S.E.2d 618, 623 (1949); *An Introduction to Your Georgia Public Service Commission*, Ga. Public Service Commission, https://psc.ga.gov/about-the-psc/#introduction (last visited August 13, 2020).

In his concurring opinion in *Holder v. Hall,* Justice Thomas highlighted the dangers of pursuing the kind of journey Plaintiffs invite this Court to embark upon:

> We would be mighty Platonic guardians indeed if Congress had granted us the authority to determine the best form of local government for every county, city, village, and town in America. But under our constitutional system, this Court is not a centralized politburo appointed for life to dictate to the provinces the "correct" theories of democratic representation, the "best" electoral systems for securing truly "representative" government, the "fairest" proportions of minority political influence… We should be cautious in interpreting any Act of Congress to grant us power to make such determinations.

512 U.S. at 913 (Thomas, J., concurring in the judgment). Because Plaintiffs have not alleged a sufficient remedy, this Court should dismiss this case.

## III.    **This case is barred by sovereign immunity.**

The Eleventh Amendment generally prohibits nonconsenting states from being sued in federal court. *Summit Med. Assocs., P.C. v. Pryor*, 180

19

F.3d 1326, 1336 (11th Cir. 1999). Congress is permitted to abrogate state sovereign immunity under certain circumstances. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000).

While the majority disagreed, as Judge Branch recently explained in dissent, the text of Section 2 does not support the conclusion that Congress intended to abrogate state sovereign immunity for private plaintiffs. *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 656-57 (11th Cir. 2020) (Branch, J., dissenting). Effectively abandoning the doctrine of abrogation has massive implications for our system of government. "The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity." *Alden v. Maine*, 527 U.S. 706, 715, 119 S. Ct. 2240 (1999).

In addition to the other reasons for dismissing this case, if this case is construed as an action against the State of Georgia, this Court should find that, while the Attorney General could bring suit against Georgia under Section 2, this case is barred by sovereign immunity.

## CONCLUSION

Plaintiffs ask this Court to join them on a journey to creatively rewrite the law of Section 2 of the Voting Rights Act, applying decisions about county governments to state governments. This Court should decline the invitation.

Plaintiffs cannot assert an injury or causation related to statewide elections and fail to provide a remedy that does not intrude on Georgia's sovereign decisions of how to structure its government. The Court should dismiss this case.

Respectfully submitted this 14th day of August, 2020.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com

21

Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: (678) 336-7249

*Counsel for Defendant*

22

23

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan P. Tyson
Bryan P. Tyson