IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD ROSE, *et al.*,

    Plaintiffs,

         v.

BRAD RAFFENSPERGER, in his capacity as
Secretary of State of the State of Georgia,

    Defendant.

Civil Action No.
1:20-cv-02921-SDG

## <u>OPINION AND ORDER</u>

The Georgia Public Service Commission is responsible for supervising and regulating common carriers, railroads, and public utilities. Plaintiffs are African-American voters registered to vote in the State of Georgia.[1] They bring this official-capacity suit against the Georgia Secretary of State, challenging the state-wide, at-large method of electing members of the Commission. Plaintiffs assert that system inhibits black voters' ability to elect their preferred candidates and dilutes black voting strength in violation of Section 2 of the Voting Rights Act. The Secretary moved to dismiss [ECF 22]. After full briefing, and with the benefit of oral argument, the Court concludes that Plaintiffs' detailed allegations are sufficient at

---

[1] The Complaint appears to use the terms "black" and "African American" interchangeably. *See generally* ECF 1. As a result, this Order employs both terms in the same manner.

this stage of the litigation to demonstrate standing and state a claim. The Secretary's motion is therefore **DENIED**.

## I.     Background

At the motion to dismiss stage, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of Plaintiffs.[2] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999). Accordingly, the following factual description is drawn from the Complaint's well-pleaded allegations.

Plaintiffs are four residents of Fulton County who are registered Georgia voters.[3] They are all African American.[4] On July 14, 2020, they filed suit under Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301.[5] This section states, in part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." The only Defendant is Brad Raffensperger, who is sued solely in his official

---

[2]    The Secretary argues that this precept does not apply to his contention that Plaintiffs lack standing. This issue is discussed *infra* at Section III.B.1.

[3]    ECF 1, ¶¶ 6–9.

[4]    *Id.*

[5]    *Id.*

capacity as the Georgia Secretary of State.[6] The Secretary is "the chief election official" for Georgia and "is responsible for administering elections for members" of the Commission.[7]

The existence of the Commission is enshrined in the Georgia Constitution: "There shall be a Public Service Commission for the regulation of utilities which shall consist of five members who shall be elected by the people." Ga. Const. art. IV, § 1, ¶ I(a).[8] Relevant to this litigation, the Georgia Constitution also dictates that "[t]he filling of vacancies and manner and time of election of members of the [C]ommission shall be as provided by law." *Id.* ¶ I(c).[9] The "manner and time" of such elections is dictated by statute. O.C.G.A. § 46-2-1, *et seq.*[10] Commissioners have been selected through state-wide elections since 1906.[11] That same year, the successful gubernatorial candidate ran on a platform of "reforming the railroad commission and disenfranchising" black voters.[12]

---

[6]  *Id.* ¶ 10

[7]  *Id.* (citations omitted).

[8]  *Id.* ¶ 11.

[9]  *Id.* ¶ 13.

[10]  *Id.*

[11]  *Id.* ¶ 2.

[12]  *Id.* ¶ 25.

Commissioners are elected "at large" by all Georgia voters in partisan elections; they serve six-year staggered terms.[13] Among their other duties, the commissioners regulate the rates that electric, natural gas, and telephone companies may charge in Georgia.[14] Even though the commissioners are elected at-large, they must be residents of one of five Commission districts prescribed by statute:[15]

> [M]embers elected to the commission shall be required to be residents of one of five Public Service Commission Districts as hereafter provided, but each member of the commission shall be elected state wide by the qualified voters of this state who are entitled to vote for members of the General Assembly.

O.C.G.A. § 46-2-1(a). A commissioner must continue to live in the district from which that person was elected throughout the six-year term. *Id.* § 46-2-1(b).

Plaintiffs contend that there is an "informal slating process" for membership on the Commission "that operates by gubernatorial appointment."[16] Save for the

---

[13]  *Id.* ¶ 11 (citing Ga. const. art. IV, § 1, ¶ I; O.C.G.A. § 46-2-1).

Although not spelled out in the Complaint, "at large" means "[e]lected officials chosen by the voters of the State as a whole rather than from separate congressional or legislative districts." *At large*, BLACK'S LAW DICTIONARY (6th ed.))

[14]  ECF 1, ¶ 13.

[15]  *Id.* ¶ 12.

[16]  *Id.* ¶ 29.

three-year period between 1999 and 2002, African Americans have allegedly been denied access to that slating process.[17] To date, the only African American ever to have served as a commissioner—David L. Burgess—was appointed in 1999 by then-governor Roy Barnes.[18] With the benefit of incumbency resulting from that appointment, Burgess was elected to the position in 2000.[19] He served only one full term before being defeated in the 2006 election.[20] In part as a result of this history, Plaintiffs plead that the Commission "has not been responsive to the particularized needs of African American residents of Georgia."[21]

Plaintiffs claim that the staggered terms, a majority-vote requirement, and "unusually large voting districts" (that is to say, no voting districts save for the entire State of Georgia) exacerbate the opportunities for discrimination against African Americans in elections for commissioners.[22] The Complaint is not entirely

---

[17]   *Id.*

[18]   *Id.* ¶¶ 2, 31–33.

[19]   *Id.* ¶ 33.

[20]   *Id.*

[21]   *Id.* ¶ 34.

[22]   *Id.* ¶ 28.

During oral argument, counsel for Plaintiffs made clear that they are not challenging the residency requirements for candidates to the Commission. ECF 35, at 20–21 (indicating Plaintiffs are not alleging the residency districts dilute their votes).

clear about whether this alleged discrimination is against voters like Plaintiffs, or black candidates who run for a position on the Commission, or both.[23] Given that this case is at the motion to dismiss stage, and interpreting the Complaint in the light most favorable to Plaintiffs, the Court treats the allegation as referring to discrimination against black voters (including Plaintiffs).

Plaintiffs also make the following relevant allegations:

- As of the 2010 Census, Georgia's voting-age population was 62.3% white, 29.7% black, and 8% members of other racial groups.[24] The percentage of black voting-age residents had increased to 32.3% as of a 2018 survey.[25]

- If elections for commissioner were based on five single-member districts rather than at-large, African Americans would be "sufficiently numerous and geographically compact" to make up "a majority of the voting-age population in at least one single-member district."[26]

- African American voters are "politically cohesive" when voting for members of the Commission: They supported "their preferred candidates with greater than 80 percent of their votes" in every election between 2012 and 2018.[27]

---

[23]   ECF 1, ¶ 28.

[24]   *Id.* ¶ 15.

[25]   *Id.* ¶ 16.

[26]   *Id.* ¶ 18.

[27]   *Id.* ¶¶ 20–21.

- Conversely, white voters voted sufficiently as a block to generally enable them to defeat the candidate preferred by black voters in every election for members of the Commission between 2012 and 2018.[28]

- In addition to Georgia's "long and extensive history of voting discrimination against African Americans," these numerical disparities in voting preferences reflect that "[v]oting in elections for members of the Public Service Commission is polarized along racial lines."[29]

Although Plaintiffs do not expressly plead that they have been unable to elect their preferred candidates, they do contend that their votes have been and will continue to be improperly diluted because of the at-large method of electing Commission members.[30] They therefore seek a judgment declaring that this method of electing members of the Commission violates Section 2 of the Voting Rights Act of 1965, as amended (the VRA), and an order enjoining the Secretary from employing this method in future elections and directing him to administer such elections in a manner that complies with Section 2.[31]

---

[28]   *Id.* ¶¶ 22–23.

[29]   *Id.* ¶ 24 (quoting *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) ("Georgia's history of [racial] discrimination has been rehashed so many times that the Court can all but take judicial notice thereof.") (alteration in original) (internal quotation marks omitted)), ¶ 26.

[30]   *Id.* ¶ 36 (Claim One).

[31]   *Id.* at 10–11 (*ad damnum* clause).

On August 14, 2020, the Secretary moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1), arguing that Plaintiffs lack standing, and under Rule 12(b)(6), for failure to state a claim.[32] Plaintiffs opposed the motion on August 27, 2020.[33] The Secretary filed his response on September 10, 2020.[34] The Court heard argument on December 8, 2020. The Secretary's motion is thus ripe for consideration.

## II.    Standard of Review

### A.    Rule 12(b)(1)

Rule 12(b)(1) permits a party to raise the defense of lack of subject matter jurisdiction by motion. This includes a challenge to standing. "'Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).'" *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). Article III of the Constitution limits federal courts to consideration of cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing "is an essential and

---

[32]   ECF 22.

[33]   ECF 23.

[34]   ECF 26.

unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has held that standing contains three elements: (1) an actual or imminent injury-in-fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by the court. *Id.* at 560–61. The Secretary asserts that Plaintiffs have failed to establish all three aspects.[35]

### B.      Rule 12(b)(6)

The Secretary also argues that Plaintiffs have failed to state a claim.[36] Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must [ ] contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna*

---

[35]   ECF 22-1, at 4–15.

[36]   *Id.* at 16–19.

*Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). A complaint fails to state a claim when it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted) (citation omitted). *See also Iqbal*, 556 U.S. at 680–85; *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1187–88 (11th Cir. 2002) (stating that "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts will not prevent dismissal") (citation omitted).

A complaint must present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 556). While well-pleaded facts are accepted as true at this stage, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011), this principle does not apply to legal conclusions, *Iqbal*, 556 U.S. at 678.

## III. Discussion

Because of the inquiry applicable to claims made under the VRA, the Secretary's standing and failure-to-state-a-claim arguments are not entirely analytically distinct. For instance, redressability is a necessary element of standing, but showing that the claimed injury has a remedy is also an element of stating a claim for violation of Section 2. Accordingly, the Court first addresses the

framework for establishing a VRA claim and then proceeds to assess whether Plaintiffs have standing and have satisfied Rule 12(b)(6) under that framework.

**A.     The Voting Rights Act**

Subsection (a) of Section 2 of the VRA prohibits (among other things) standards, practices, and procedures that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* at § 10301(b). The statute does not, however, create an entitlement to proportional representation for members of a protected class. *Id.*

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first interpreted Section 2 after Congress amended it in 1982. The amendment emphasized that the focus must be on the *results* of the challenged standards, practices, and procedures—not on whether those processes had been adopted

because of discriminatory intent. *Id.* at 35–36.[37] Under *Gingles*, plaintiffs must show

that they have satisfied three prerequisites to make out a vote dilution claim:

> First, the minority group must be able to demonstrate
> that it is sufficiently large and geographically compact to
> constitute a majority in a single-member district. If it is
> not, as would be the case in a substantially integrated
> district, the *multi-member form* of the district cannot be
> responsible for minority voters' inability to elect its
> candidates. Second, the minority group must be able to
> show that it is politically cohesive. If the minority group
> is not politically cohesive, it cannot be said that the
> selection of a multimember electoral structure thwarts
> distinctive minority group interests. Third, the minority
> must be able to demonstrate that the white majority votes
> sufficiently as a bloc to enable it — in the absence of
> special circumstances, such as the minority candidate
> running unopposed — usually to defeat the minority's
> preferred candidate.

*Id.* at 50–51 (emphasis in original) (footnotes omitted) (citations omitted). Despite

*Gingles*'s focus on multi-member districts, in *Voinovich v. Quilter*, 507 U.S. 146, 153

(1993), the Supreme Court made clear that single-member districts can also dilute

minority voting strength and thereby violate Section 2. And, while at-large

---

[37] "Under the results test, the inquiry is more direct: past discrimination can
severely impair the present-day ability of minorities to participate on an equal
footing in the political process. Past discrimination may cause blacks to register
or vote in lower numbers than whites. Past discrimination may also lead to
present socioeconomic disadvantages, which in turn can reduce participation
and influence in political affairs." *United States v. Marengo Cnty. Comm'n*, 731
F.2d 1546, 1567 (11th Cir. 1984) (footnote omitted) (citation omitted).

elections do not *per se* violate Section 2, they can do so if (under the totality of the circumstances) they "result in unequal access to the electoral process." *Gingles*, 478 U.S. at 46.

In addition to applying the *Gingles* factors, courts generally must also consider several factors—identified in the Senate Report accompanying the 1982 VRA amendment—that can be relevant to Section 2 claims. *Gingles*, 478 U.S. at 44–45. As later explained by the Eleventh Circuit, the Senate Report factors that will "typically establish" a violation of Section 2 are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,[38] or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

---

[38] "Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles*, 478 U.S. at 38 n.5 (internal quotation marks omitted) (citations omitted).

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990). Further, two additional circumstances may be probative of a Section 2 violation:

[W]hether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

[W]hether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 1016. The *Gingles* court concluded that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims." 478 U.S. at 45 (footnote omitted). The Eleventh Circuit has emphasized that Section 2, as amended, is "a constitutional exercise of congressional enforcement power

under the Fourteenth and Fifteenth Amendments." *Marengo Cnty. Comm'n*, 731 F.2d at 1550.

####    B.    Standing

Because a challenge to standing implicates the Court's subject matter jurisdiction, such a challenge can be brought under Rule 12(b)(1). *Stalley*, 524 F.3d at 1232. Here, the Secretary asserts that, under this rule, the Court "is not limited to the four corners of the Complaint" in determining whether standing exists.[39] He also argues that the Court need not treat Plaintiffs' well-pleaded allegations as true under 12(b)(1).[40] While this may be true when a defendant raises a *factual* challenge to pleading, the same is not the case when only a *facial* challenge has been made.

"A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Stalley*, 524 F.3d at 1232. The Eleventh Circuit has described the difference between the two types of challenges:

> A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, ***and the allegations in his complaint are taken as true for the purposes of the motion***. By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction

---

39   ECF 22-1, at 5.

40   *Id*. at 5–6.

> using material extrinsic from the pleadings, such as
> affidavits or testimony.

*Id.* at 1232–33 (internal quotation marks omitted) (citations omitted) (emphasis

added). Thus, a factual attack is a jurisdictional challenge based on extrinsic

evidence. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003)

("Appellees' motion to dismiss was a factual attack because it relied on extrinsic

evidence and did not assert lack of subject matter jurisdiction solely on the basis

of the pleadings."). A facial attack is subject to the familiar maxim that a

complaint's well-pleaded allegations be accepted as true. *Am. Dental Ass'n,* 605

F.3d at 1289 (citing *Twombly*, 550 U.S. at 570).

> ### 1. The Secretary makes a facial challenge to Plaintiffs' alleged lack of standing.

Here, the Secretary has not supplied any declarations or pointed to any

extrinsic evidence suggesting that Plaintiffs lack standing. He instead leans only

on the allegations in the Complaint to make his arguments.[41] Despite his insistence

---

[41] *Id.* at 5–6; ECF 26, at 2–3.

During oral argument, counsel for the Secretary attempted to clarify that this point was limited to his arguments concerning the history of the Commission. ECF 35, at 5. If so, the Secretary's briefing did not make that clear—something counsel acknowledged during argument. *Id.* at 11–12. The Court does not construe the Secretary's factual descriptions of Georgia's and other states' public service commissions as resorting to extrinsic evidence. Rather, they are

that the Court not treat Plaintiffs' well-pleaded allegations as true for purposes of assessing standing, there is no basis for the Court to adopt this position when the Secretary has only made a facial challenge to the Complaint. *Id.*

Moreover, even if the Secretary had pointed to extrinsic evidence, the Court still would not be required to adopt the analysis he proposes. When a movant raises a factual attack on subject matter jurisdiction, the district court can dismiss based on any of the following grounds: "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981)). Accordingly, the Court looks only to the Complaint and assumes the truth of its well-pleaded allegations for purposes of the Secretary's challenge to Plaintiffs' standing. *FindWhat Inv'r Grp.*, 658 F.3d at 1296; *Bryant*, 187 F.3d at 1274.

### 2.    Injury-in-Fact

The first element of standing requires plaintiffs to show that they have suffered (or are about to suffer) an injury-in-fact. *Lujan*, 504 U.S. at 560. Plaintiffs

---

all based on state constitutions, statutes, and case law — legal authorities on which courts regularly rely.

allege that they have been, and will continue to be, injured because of the dilution of their votes through Georgia's use of at-large elections for members of the Commission.[42] Plaintiffs assert that this method impairs their ability (and that of other African Americans) to elect their preferred candidates as commissioners.[43] The Secretary argues that this is insufficient to establish an injury-in-fact because commissioners are elected on a state-wide basis rather than from specific districts.[44] He describes the Complaint as a "challenge [to] the decision of the state legislature about how to structure its constitutional commissions. Plaintiffs also do not explain how a *statewide* election for a *statewide* office could result in any dilutive effect on their vote whatsoever."[45]

Plaintiffs respond that they have adequately pleaded injury because they have "suffered the personal harm of having their voting strength diluted on account of their race."[46] They contend that Georgia's at-large election of commissioners is a "standard, practice, or procedure" that denies or abridges their

---

[42]   *See generally* ECF 1.

[43]   *See, e.g., id.* ¶¶ 20–23.

[44]   ECF 22-1, at 8–12.

[45]   *Id.* at 8–9.

[46]   ECF 23, at 7.

right to vote because of their race—in violation of Section 2.[47] The Secretary replies that district residency requirements apply only to candidates for election to the Commission, not voters.[48] Since, in his view, voters themselves have not been "cracked" or "packed" into districts that result in the dilution of their votes, Plaintiffs have not suffered any injury.[49]

### i.    Aggrieved persons

Under the VRA, an "aggrieved person" may initiate a statutory action to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. 52 U.S.C. § 10302. To demonstrate an injury-in-fact for purposes of a vote dilution claim, Plaintiffs must show that they (1) reside and are registered voters in districts where alleged dilution occurred, and (2) are members of a protected class whose voting strength was diluted. *Broward Citizens for Fair Dists. v. Broward Cnty.*, No. 12-60317-CIV, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012) (collecting cases).

---

[47] *Id.*

[48] ECF 26, at 4.

[49] *Id.* at 4–5.

"Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins." *Gill v. Whitford*, 138 S. Ct. 1916, 1924 (2018) (internal quotation marks omitted) (citations omitted).

Plaintiffs here easily meet these criteria. They are all African Americans who reside and are registered to vote in Fulton County, Georgia.[50] They assert that black voting strength throughout the State of Georgia is diluted because of the at-large system used to elect members of the Commission.[51] At the motion to dismiss stage, this is sufficient to establish constitutional standing.

### ii.    State-wide, at-large elections

During oral argument, counsel for the Secretary urged that sovereigns (*i.e.*, states) are different from political subdivisions, such as districts, when it comes to the VRA.[52] Counsel also asserted that the Supreme Court has not held that state-wide, at-large, non-districted elections are covered by Section 2. But the cases the Secretary points to cannot support his conclusion that such election systems are automatically exempt from Section 2's prohibition against vote dilution.[53] Nor is there anything in the language of Section 2 itself that prohibits

---

[50]   ECF 1, ¶¶ 6–9.

[51]   *See generally* ECF 1.

[52]   *See, e.g.*, ECF 35, at 4, 13–17.

[53]   ECF 22-1, at 7–12 (citing, *inter alia*, *Gill*, 138 S. Ct. 1916 (alleged partisan gerrymander in legislative districting); *Voinovich*, 507 U.S. 146 (challenge to redistricting plan that allegedly packed black voters into legislative districts); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) (challenge to order in which candidates appear on ballot in a state's general elections); *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (vote dilution claim concerning election of county and circuit judges); and *Wright v. Sumter Cnty. Bd. of Elections*

the type of claim Plaintiffs are bringing. That is, nothing in the VRA suggests that a party challenging the at-large election of candidates to a board or commission lacks standing when the election is conducted on a state-wide basis rather than at the level of a district or county, or other political subdivision. In fact, Section 2's prohibitions expressly apply to standards, practices, and procedures "imposed or applied" by any *State*. 52 U.S.C. § 10301(a). As counsel for Plaintiffs emphasized during oral argument, if Congress had intended to exempt an entire category of voting procedures from scrutiny under the VRA, it could have done so.[54] Counsel for the Secretary acknowledged that the express question of whether state-wide, at-large elections can cause impermissible vote dilution appears to be one of first impression.[55] This is not to suggest that Plaintiffs will necessarily succeed on their

---

*& Registration,* 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018) (concluding after bench trial that at-large districts for county board of education diluted black voting strength in violation of Section 2).

In *Nipper*, the Eleventh Circuit concluded that the plaintiffs' claims were not redressable since a remedy would have impaired Florida's interest in maintaining its judicial election scheme. Accordingly, this case is discussed further below in connection with the Secretary's failure to state a claim arguments. *See infra* Section III.C.2.

[54]   ECF 35, at 18.

[55]   *Id.* at 11.

claim. Rather, this simply reflects the Court's conclusion that there is nothing in the statute or relevant case law that dooms Plaintiffs' case at its inception.

In *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994), a significant Eleventh Circuit VRA case, the plaintiffs challenged the system used to elect county and circuit court judges in a specific Florida judicial circuit. They argued that the use of an at-large election system diluted their voting strength in violation of Section 2 and the Fourteenth and Fifteenth Amendments. After a five-day bench trial, the district court dismissed the plaintiffs' VRA and constitutional claims. Plaintiffs appealed only with regard to the Section 2 claim. In a fractured, *en banc* opinion,[56] the Court of Appeals affirmed. The dissent noted that *all* of the judges participating in the decision agreed that black voters were unable to elect candidates of their choice — *i.e.*, that they had sustained an injury under Section 2 — while a majority of those judges concluded that harm could not be redressed. *Nipper*, 39 F.3d at 1547 (Hatchett, J., dissenting). Here, Plaintiffs have similarly identified an injury-in-fact. Whether they have sufficiently alleged that this injury is redressable is discussed further below.[57]

---

[56] Four judges concurred in parts of the lead opinion written by then-Chief Judge Tjoflat. Two judges dissented. Three recused themselves from consideration of the case.

[57] *See infra* Section III.B.3.

### *iii.*   Claims of vote dilution and racial gerrymandering require distinct analyses.

The Secretary's argument that Plaintiffs cannot attack the state-wide, at-large Commissioner-election system also conflates two separate lines of analysis without providing any authority for this Court to apply the theories of one to the facts of the other. It is therefore important to be clear about what, exactly, Plaintiffs have alleged. They do not claim that the State of Georgia has improperly subjected them to racial classifications in violation of equal protection or any other principal (one line of analysis). They are not making a claim about racial gerrymandering. Instead, Plaintiffs contend that, by failing to conduct elections for members of the Commission based on single-member districts, the strength of their votes has been diluted in violation of Section 2 (a separate line of analysis).

This distinction between racial gerrymandering cases and vote dilution claims matters for two reasons. First, and as discussed above, the *Gingles* and Senate Report factors applicable to vote dilution claims **require** that the State consider race to some extent when evaluating electoral procedures so that the voting rights of protected classes are not denied or abridged. 52 U.S.C. § 10301(a). *See also, e.g.*, *Gingles*, 478 U.S. 30; *Voinovich*, 507 U.S. 146; *Solomon*, 899 F.2d 1012; *Marengo Cnty. Comm'n*, 731 F.2d at 1561 ("Section 2 is not meant to create race-

conscious voting but to attack the discriminatory results of such voting where it is present."). The failure to satisfy those factors results in the injury of vote dilution.

Second, if Plaintiffs' claim were that they had improperly been subject to a racial gerrymander, it is clear that they would *not* have standing. That is because an improper gerrymander can *only* exist where voters have been drawn into districts. As the Supreme Court has noted, "[w]ith respect to racial gerrymandering . . . electoral districting violates the Equal Protection Clause when (1) race is the dominant and controlling or predominant consideration in deciding to place a significant number of voters within or without a particular district." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015) (internal quotation marks omitted) (citations omitted). As such, a racial gerrymandering claim can only apply "to the boundaries of individual districts. . . . It does not apply to a State considered as an undifferentiated 'whole.' We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id.* at 262–63 (emphasis in original) (citations omitted). *See also United States v Hays*, 515 U.S. 737, 744–45 (1995) (discussing harm suffered by voter placed in a racially gerrymandered district as denial of equal treatment because of "the legislature's reliance on racial criteria"). But the Secretary has not pointed to any case law

applying a similar conclusion to dispose of a vote-dilution claim—particularly at the motion to dismiss stage.

It is also clear that plaintiffs who allege their votes have been diluted because of at-large elections at a district level do have standing. *See generally Broward Citizens*, 2012 WL 1110053, at *2–*3. *See also Solomon*, 899 F.2d at 1018 n.7 ("So long as the potential exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act.") (Kravitch, J. specially concurring) (citing *Gingles*, 478 U.S. at 50 n.17). At the motion to dismiss stage, at least one district court has held that allegations of vote dilution because of state-wide, at-large elections were sufficient to show standing. *Ala. State Conference of the NAACP v. Alabama* (hereinafter, *Alabama NAACP*), Case No. 2:16-cv-731-WKW-SMD, ECF 45, Mem. Op. & Order at 16–17 (M.D. Ala. Aug. 31, 2017) (addressing motion to dismiss challenge to at-large election of Alabama appellate judges; finding allegations that the plaintiffs were residents of and registered voters in Alabama and members of a protected class, who had alleged their electoral strength had been diluted, were sufficient to plead an injury-in-fact).

> **iv.** **The cases on which the Secretary relies are not controlling at the motion to dismiss stage.**

The Secretary also relies on the recent Eleventh Circuit case, *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), to argue that "the alleged dilution of 'black voting strength' on a statewide level is not an allegation that any individual vote is diminished."[58] This Court does not read *Jacobson* quite so broadly. In that case, the Court of Appeals considered a challenge, brought by various voters and organizations, to a Florida law dictating the order in which candidates appear on the ballot in the state's general elections. The district court enjoined Florida's secretary of state from preparing ballots in compliance with the law. The appellate court concluded—after the district court had conducted a bench trial—that the voters and organizations lacked standing because they had not *proved* an injury-in-fact. *Id.* at 1241.[59]

The Eleventh Circuit noted that two of the three plaintiff voters did not provide any testimony at all, let alone testimony about their alleged injuries. *Id.* at

---

[58] ECF 22-1, at 10.

The Secretary's opening brief cites the original version of the Court of Appeals' decision, which was later withdrawn and replaced with the version cited in this Order.

[59] The *Jacobson* court alternatively held that the case presented a non-justiciable political question. 974 F.3d at 1242.

1246. The voter who did testify did not identify "any difficulty in voting for her preferred candidate or otherwise participating in the political process." *Id.* The plaintiff organizations did not show that they had been injured because they did not provide evidence that one of their members would be injured by the statute or show how they were forced to divert resources away from anything in order to combat the effects of the statute. *Id.* at 1249–50. This failure of proof by itself supports the Court's conclusion that it should not rely on *Jacobson* to dispose of this action at the motion to dismiss stage. *Id.* at 1247 ("Insofar as Jacobson argues that the ballot statute will injure her by diluting her vote relative to the votes of Republicans, she failed to prove any such injury.").

The Court does, however, have some doubt about Plaintiffs' ultimate ability to *prove* that they have suffered an injury-in-fact (for many of the reasons articulated by the Secretary). But, even counsel for the Secretary conceded during oral argument that VRA claims are consistently viewed as mixed questions of law and fact.[60] The Secretary also acknowledges that, under *Jacobson*, vote dilution can be an injury.[61] Accordingly, it is not appropriate to dispose of this case at its infancy. Viewing the well-pleaded allegations in the Complaint in the light most

---

[60]   ECF 35, at 5.

[61]   *Id.* at 6.

favorable to Plaintiffs, the Court concludes that they have sufficiently alleged that they suffered an injury-in-fact. If Plaintiffs fail to adduce evidence in support of those allegations, the Secretary remains free to reassert his standing arguments at a later stage of the case. *Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.") (citations omitted).

### 3.    Traceability and redressability

The remaining elements of the standing analysis are traceability and redressability. Traceability refers to the "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560 (indicating that, for standing, a plaintiff's "injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court") (alterations and omissions in original) (internal quotation marks omitted) (citation omitted). Closely related is the concept of redressability. To show redressability, "it must be likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted) (citation omitted).

The Secretary contends that Plaintiffs' injuries are not traceable to him because the Commission districts are designed by the Georgia General Assembly.[62] Plaintiffs counter that the Secretary is responsible for administering the offending elections and certifying their results, thereby establishing causation.[63]

The Secretary also attacks the remedy Plaintiffs seek as part of both his standing argument and his failure to state a claim argument. In connection with redressability for standing purposes, the Secretary argues that the declaratory judgment and injunction Plaintiffs seek would not remedy their alleged harm because Georgia's governor "would simply appoint a replacement to any election that is not administered by the Secretary."[64] Plaintiffs respond that the Secretary is Georgia's "chief election official" and is responsible for administering elections for

---

[62]   ECF 22-1, at 12.

[63]   ECF 23, at 11.

[64]   ECF 22-1, at 15 (citing O.C.G.A. § 46-2-4).

members of the Commission.[65] They thus assert that the Secretary is the proper defendant.

Here, although the governor could appoint a person to fill a vacancy (or vacancies) on the Commission, Georgia law dictates that such appointment extends only to the "next regular general election." O.C.G.A. § 46-2-4. The Secretary is the chair of the State Election Board, which has responsibility to "formulate, adopt, and promulgate such rules and regulations, *consistent with law*, as will be conducive to the fair, legal, and orderly conduct of primaries and elections . . . ." O.C.G.A. §§ 21-2-30(d), -31(2) (emphasis added). This includes, as it must, compliance with Section 2. Since the Secretary is the person responsible for administering elections, O.C.G.A. § 21-2-50(b), Plaintiffs' injuries are traceable to him and injunctive relief directed against him concerning the administration of elections for the Commission consistent with Section 2 would redress the harm Plaintiffs have allegedly suffered. At the pleading stage, this is enough.

In *Grizzle v. Kemp*, the Court of Appeals considered a challenge to a Georgia anti-nepotism law that (among other things) prohibited immediate family of members of local boards of education from also serving as members of that board.

---

[65]   ECF 23, at 10–11.

634 F.3d 1314 (11th Cir. 2011). The plaintiffs asserted that the law violated their First and Fourteenth Amendment rights. *Id.* at 1317. The district court entered a preliminary injunction against the Secretary and the Republican Party, prohibiting them from enforcing a portion of the law. *Id.* at 1318. The Secretary asserted that he was an improper party to the case because he was not responsible for qualifying, challenging, or certifying candidates for local boards of education. *Id.* The court disagreed:

> As the Secretary of State is the chairperson of the State Election Board and the State Election Board is charged with enforcing Georgia's election code under state law, we conclude that the Secretary of State is a proper party in this action for injunctive and declaratory relief pursuant to *Ex Parte Young*.

*Id.* at 1316. Further, "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Id.* at 1319 (citing *Ex Parte Young*, 209 U.S. 123, 161 (1908)).

That is precisely the situation here. Plaintiffs seek prospective declaratory and injunctive relief against the Secretary.[66] Further support for Plaintiffs' assertion that the Secretary is the correct defendant comes from *Alabama NAACP*. There, the district court, in discussing the State of Alabama's sovereign immunity

---

[66] *See generally* ECF 1, at 10–11 (*ad damnum* clause).

argument, indicated that the Alabama Secretary of State was still an appropriate

defendant against whom the plaintiffs could maintain the action:

> There is no question that the Attorney General may sue
> on behalf of voters under the enforcement provision of
> the VRA, and it is clear that other state defendants may
> be sued for prospective, injunctive relief under *Ex Parte
> Young*, 209 U.S. 123 (1908). Because the Secretary of State
> has been named, the suit will proceed regardless of the
> outcome of this discussion. The sole question here is
> whether the State of Alabama may be sued by a private
> litigant under Section 2 of the VRA.

M.D. Ala. Case No. 2:16-cv-731-WKW-SMD, ECF 45, at 18 n.7. Plaintiffs here have

adequately alleged that their injuries are traceable to the Secretary.

In contesting redressability, the Secretary relies heavily on *Jacobson* and

*Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019), arguing that ordering

relief against him would do nothing because "the law remains in effect with

respect to all non-parties to this suit."[67] He has not, however, stated that he lacks

the authority to ensure that elections for members of the Commission take place

consistent with Section 2. In *Jacobson*, the Florida Secretary of State could not

redress the plaintiffs' alleged injuries because she was not responsible for

enforcing the challenged law. 974 F.3d at 1241–42 (noting county officials

---

[67] ECF 22-1, at 15. *See generally id.* at 14–15.

independent of the secretary were responsible for placing candidates on the ballot in the prescribed order). *Lewis* is not even a voting rights case—it dealt with an equal protection challenge to minimum-wage rates in Alabama. There, the harm the plaintiffs allegedly suffered was not traceable to the Alabama Attorney General or redressable through the declaratory and injunctive relief they sought against him. 944 F.3d at 1292. The Court does not, therefore, find *Jacobson* or *Lewis* persuasive at this stage and reiterates that Plaintiffs have adequately pleaded traceability and redressability. However, they must still adduce competent evidence of those elements in order to survive summary judgment or a directed verdict at trial. *Lujan*, 504 U.S. at 561.

### C.      Failure to State a Claim

In addition to the redressability issues discussed above, the Secretary asserts that Plaintiffs have failed to state a claim because they cannot satisfy the first *Gingles* requirement. Similar to his redressability argument, he states that the "requested relief is beyond the capacity of federal courts to fashion."[68] Plaintiffs respond that the remedy to their injuries is employment of a single-member districting system for elections to the Commission.[69] In fact, they assert that such

---

[68]   *Id.* at 16.

[69]   ECF 23, at 14.

a system is the *required* remedy for the harm they have suffered.[70] The Secretary

counters that the Court does not have the power to order relief affecting

"a sovereign power's right to choose its form of government."[71]

As the Eleventh Circuit has noted,

> [v]oting rights cases are inherently fact-intensive,
> particularly those section 2 vote dilution claims alleging
> that, due to the operation of a challenged voting scheme,
> minority voters are denied an equal opportunity to
> participate in the political process and to elect
> representatives of their choice. In such cases, courts must
> conduct a "searching practical evaluation of the 'past and
> present reality'" of the electoral system's operation.

*Nipper*, 39 F.3d at 1498 (Tjoflat, J. opinion) (quoting *Gingles*, 478 U.S. at 45). This

makes disposition of Plaintiffs' claim at this stage inappropriate.

### 1.     The relief Plaintiffs seek is not prohibited as a matter of law.

Under *Nipper,* the relief Plaintiffs seek for violations of Section 2 is part of

the *prima facie* case they must make. 39 F.3d at 1530–31 ("The inquiries into remedy

and liability, therefore, cannot be separated: A district court must determine as

part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy

in the particular context of the challenged system."). Based largely on cases

---

[70]   *Id*.; ECF 35, at 27–28.

[71]   ECF 26, at 7.

involving judicial elections, the Secretary asserts that the Court lacks the authority to require Georgia to employ single-member districts for elections to the Commission.

### i.   Judicial elections

To support his argument, the Secretary relies on *Nipper* itself. 39 F.3d 1494. There, the allegations about the method of electing circuit and county judges were similar to those made here: the judges were elected through a county- or circuit-wide, at-large process; the judges had to reside in the county or circuit they represented; the judges' terms were staggered; and the governor had the authority to appoint someone to fill a mid-term vacancy. *Id.* at 1498–99 (Tjoflat, J., opinion). No black person had ever served on one of the relevant courts without first having been appointed to fill a vacancy. *Id.* at 1499. Distinctively, however, Florida employed a merit selection system to fill vacancies for trial judges. This process was enacted through changes to the Florida constitution that

> were clearly designed to eliminate the vices of partisan, electoral politics from the process of selecting state court judges. The goal of merit selection of judges, naturally, is to insulate them from popular pressure and to make them more willing to decide an unpopular case fairly and impartially while, at the same time, raising the level of qualifications of judicial officers.

*Id.* at 1501. Thus, "[t]he maintenance of the linkage between a trial court judge's territorial jurisdiction and electoral base serves to preserve judicial accountability" and helps preserve judicial independence. *Id.* at 1543, 1544.

It is clear that Section 2 applies to judicial elections, even if federal courts' power to fashion appropriate remedies may be more limited than in other vote dilution contexts. *Chisom v. Roemer*, 501 U.S. 380, 384 (1991) ("We hold that the coverage provided by the 1982 amendment is coextensive with the coverage provided by the [VRA] prior to 1982 and that judicial elections are embraced within that coverage."). Given the particularities tied to the election of judges, and the states' interest in maintaining judicial independence and accountability, *see, e.g.*, *Nipper*, 39 F.3d at 1542–47,[72] the Court does not consider *Nipper* to foreclose its authority at the motion to dismiss stage to award the type of remedy Plaintiffs seek. Although the Commission is established in the Georgia constitution, elections for its members are governed by statute. The Secretary has not put

---

[72] This portion of Chief Judge Tjoflat's *Nipper* opinion was endorsed in the four-judge concurrence written by Judge Edmondson. 39 F.3d at 1547 ("I understand Part V of the Chief Judge's opinion to conclude that each of the remedies discussed is precluded given the State's interest in and right to formulate its own judicial system. I concur in this conclusion, which I see as the holding of this case.") (Edmondson, J. concurring in opinion in part and concurring in judgment).

forward any argument that would permit the Court to conclude *as a matter of law* that Georgia has the same type of interest in the structure of an administrative agency as it does in one of the three primary branches of government—despite counsel's suggestion during argument that the Commission has both quasi-judicial and quasi-legislative functions.[73]

The Secretary also relies on the district court's opinion in *Alabama NAACP*—issued after a six-day bench trial—to support his contention that the Court cannot grant Plaintiffs the relief they seek.[74] Case No. 2:16-cv-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938 (M.D. Ala. Feb. 5, 2020). In *Alabama NAACP*, the plaintiffs challenged Alabama's method of conducting state-wide, at-large elections for appellate court judges. *See generally id.* Moreover, the judicial elections system was "[a]t its core . . . about Alabama's choice of the form of its government, specifically the judicial branch." *Id.* at *36. At the pleading stage, however, the district court denied the defendants' Rule 12(b)(6) motion and concluded that a plaintiff need only show the facial plausibility of the sought-after remedy, consistent with

---

[73] *See, e.g.*, *Nipper*, 39 F.3d at 1534–35 ("Trial court judges, on the other hand [in contrast to legislators], are neither elected to be responsive to their constituents nor expected to pursue an agenda on behalf of a particular group.") (Tjoflat, J., opinion) (footnote omitted).

[74] ECF 22-1, at 16–18.

traditional pleading standards. M.D. Ala. Case No. 2:16-cv-731-WKW-SMD, ECF 45, Aug. 31, 2017 Mem. Op. & Order at 6–7 (citing *Iqbal*, 556 U.S. at 678). *See generally id.* at 6–14. The court further noted:

> Defendants may very well prove that subdistricting cannot work in this context. But dismissing Plaintiffs' case, without giving them a chance to conduct discovery and adduce evidence, would require the authority of nothing less than a spotted-dog case. Because no such case exists, the court cannot conclude, as a matter of law, that subdistricting *never* can be employed as a remedy in a vote dilution challenge to a state system of appellate judicial elections.

*Id.* at 13–14.[75] Here, counsel for the Secretary conceded during oral argument that the single-member districts proposed by Plaintiffs would be "very compelling evidence" if the Court had the power to award such relief.[76] *See, e.g., Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (where "the challenged system is at-large voting, just as in *Gingles*[,] the adequate alternative electoral system is simply single-member districting, which is a workable regime and an available remedy.").

---

[75]   According to that most trusted of reference resources, Wikipedia, a "spotted dog case" is a term used in Alabama to refer to "a precedent whose facts are 'on all fours' with the case at hand." *Commanding precedent*, https://en.wikipedia.org/wiki/Commanding_precedent (last visited Dec. 17, 2020).

[76]   ECF 35, at 40.

Thus, even in the cases on which the Secretary relies, judicial elections were treated somewhat differently from vote-dilution challenges concerning other elected offices.[77] Both *Nipper* and *Alabama NAACP* were decided after bench trials. *Nipper*, 39 F.3d at 1497 (five-day bench trial); *Alabama NAACP*, 2020 U.S. Dist. LEXIS 18938, at *10 (six-day bench trial). And, in *Alabama NAACP*, the district court, after extensive analysis, rejected the very argument the Secretary urges this Court to adopt.

Based on the allegations in the Complaint and at this stage of the litigation, the Court finds more persuasive the factual parallels between the instant action and *Solomon*, 899 F.2d 1012. There the plaintiffs challenged the method of electing county commission and school board members as violative of Section 2. The officials served staggered terms and had to run from the district in which they lived, but the elections were on a county-wide, at-large basis. *Id.* at 1013–14. The plaintiffs asserted that the court should direct the county to be divided into five single-member districts for voting purposes, so that African Americans would be a majority in one of the districts. *Id.* at 1014. An *en banc* Eleventh Circuit concluded that the plaintiffs had satisfied the three *Gingles* factors, but were equally divided

---

[77] Counsel for Plaintiffs also made note of this point during oral argument. ECF 35, at 22–23.

on the "legal effect of proving those factors," and remanded the case to the district court with instructions. *Id.* at 1013.

Similarly here, Plaintiffs allege that members of the Commission are elected "at large" by all Georgia voters in partisan elections; serve six-year staggered terms; and must be residents of one of five districts.[78] These factors, according to Plaintiffs, contribute to the dilution of their votes, which is prohibited by Section 2.[79] The Court of Appeals' decision in *Solomon* makes clear that such allegations can state a claim.

What's more, and as counsel for the Secretary noted during oral argument, the *Gingles* factors present mixed questions of law and fact.[80] *See also Solomon*, 899 F.2d at 1017 n.6. This makes it particularly inappropriate to foreclose at the pleading stage Plaintiffs' opportunity to prove their claims. Section 2 expressly requires the Court to consider the "totality of the circumstances" in determining whether a violation has occurred. 52 U.S.C. § 10301(b). Without a factual record, the Court declines the Secretary's invitation to hold that, because elections for the

---

[78]   ECF 1, ¶¶ 11–12.

[79]   *See generally* ECF 1.

[80]   ECF 35, at 5.

Commission purportedly implicate Georgia's chosen form of government, the Court lacks the power to award the relief Plaintiffs seek.

### ii.   Sovereigns v. subdivisions

During oral argument, counsel for the Secretary emphasized that "sovereigns" (*i.e.*, the State of Georgia) must be treated differently from political subdivisions for purposes of Section 2 claims.[81] But, as noted above and by counsel for Plaintiffs, nothing in the language of Section 2 itself supports that position.[82] On its face, the statute applies equally to *states* and their political subdivisions. 52 U.S.C. § 10301. The adoption of the Fourteenth and Fifteenth Amendments overrode any sovereign immunity to which states themselves might otherwise have been constitutionally entitled—and Section 2 is a valid expression of congressional enforcement power under those amendments. *Marengo Cnty. Comm'n*, 731 F.2d at 1557–61.

Thus, the suggestion that the Court lacks the power to remedy the harm Plaintiffs allegedly suffered cannot pass muster at this stage. "No government entity has a 'vested right' to continue practices validly prohibited by Congress." *Id.* at 1554. The Secretary has not presented any basis for why—especially at the

---

[81]   *See, e.g.*, *id.* at 13–17.

[82]   *Id.* at 24.

motion to dismiss stage—this Court should essentially exempt "sovereigns" from the same vote dilution analyses that clearly apply to their political subdivisions.

> The states have an important interest in determining their election practices. But Congress could reasonably conclude that practices with discriminatory results had to be prohibited to reduce the risk of constitutional violations and the perpetuation of past violations. . . .
>
> The Voting Rights Act does not conflict with any provision of the Constitution that protects individual rights from impairment by Congress and the states. The only interests that section 2 arguably impairs are the states' interests in adopting electoral practices that have a discriminatory result. Such a state interest is a contradiction in terms.

*Id.* at 1561, 1562 n.27.

The Court does have concerns about its ability to impose on the State of Georgia the remedy Plaintiffs seek.[83] But, Plaintiffs have sufficiently alleged that their proposed remedy is facially plausible and that is all that is required at this point. *Iqbal*, 556 U.S. at 678.

### 2.     The remaining *Gingles* and Senate Report factors

Because the Secretary has only challenged Plaintiffs' purported inability to satisfy the first *Gingles* factor, the Court does not extensively address the second

---

[83]   *See, e.g., id.* at 26–30.

and third factors or the Senate Report factors. Some mention of them is, however, warranted.

Plaintiffs allege that black voters are politically cohesive and that white-majority votes are sufficient to block them from electing their candidates of choice to the Commission.[84] *Gingles*, 478 U.S. 50–51. They plead that they are a sufficiently compact and numerous group and that they would constitute a majority in one district (which proposed district encompasses the county where Plaintiffs reside).[85] Plaintiffs' additional allegations line up with the Senate Report factors as well.[86] Sitting by designation and writing for the unanimous panel in *Marengo County Commission*, Judge John Minor Wisdom wrote that "[t]he history of discriminatory voting practices is far too complex for any court to conclude that a statute was ***not*** enacted with discriminatory intent simply because blacks could not vote when the statute was adopted." 731 F.2d at 1552 n.10 (emphasis added).[87] While intent is not a necessary component of Plaintiffs' claim, it can serve as

---

[84] ECF 1, ¶¶ 20–23.

[85] *Id.* ¶¶ 18–19; ECF 1-3 (illustrative districting plan showing one majority-minority district).

[86] *Compare* ECF 1, ¶¶ 11–35 *with Solomon*, 899 F.2d at 1015–16.

[87] At the time of the *Marengo County Commission* decision, Judge Wisdom was a Senior Circuit Judge for the Fifth Circuit Court of Appeals.

circumstantial evidence when the voting procedure at issue has a discriminatory result. *Id.* (citation omitted). Given Plaintiffs' allegations about the timing of the shift to the state-wide election of members of the Commission, the Complaint plausibly suggests that the change was made with the intent to discriminate.

The *Gingles* factors are necessary prerequisites to proving a vote dilution claim. *Nipper*, 39 F.3d at 1513. That said, the Complaint contains sufficient factual allegations to plausibly demonstrate the existence of the remaining *Gingles* factors and many of the Senate Report factors. *Twombly*, 550 U.S. at 570; *Am. Dental Ass'n*, 605 F.3d at 1289. This does not, however, diminish Plaintiffs' obligation to come forward with sufficient evidence at the summary judgment stage and trial to prove those factors.

### D.     Sovereign Immunity

Finally, the Secretary asserts that, if this action is construed as one against the State of Georgia, Plaintiffs' claims should be barred by sovereign immunity.[88] The Eleventh Amendment to the United States Constitution prohibits, among other things, suits against a State by a citizen of that state. *See, e.g.*, *Ala. NAACP*, 949 F.3d 647, 649 (11th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890)).

---

[88]     ECF 22-1, at 19–20.

Under the Fourteenth Amendment, however, Congress can abrogate states' sovereign immunity to redress discriminatory state action when it unequivocally expresses the intent to do so. *Id.* at 649–50.

In his opening brief, the Secretary argues that Section 2 should not be interpreted to abrogate Georgia's immunity from suit because that would have "massive implications for our system of government."[89] In support of his contention, the Secretary points to the recent Eleventh Circuit decision in *Alabama NAACP*.[90] The problem with this argument—as counsel for the Secretary has acknowledged—is that it relies on the *dissenting* opinion. The majority in *Alabama NAACP* clearly held that Section 2 abrogates the states' sovereign immunity:

> By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial discrimination in voting. Because the Fifteenth Amendment permits this intrusion, Alabama is not immune from suit under § 2 of the VRA. Nor is § 2 any great indignity to the State. Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process."

*Id.* at 655 (footnote omitted) (citing *Marengo Cnty. Comm'n*, 731 F.2d at 1561). This holding is consistent with that court's earlier decision in *Marengo County*

---

[89]   *Id.* at 20.

[90]   *Id.*

*Commission*. 731 F.2d at 1560–61 ("The Civil War Amendments overrode state autonomy apparently embodied in the Tenth and Eleventh Amendments."). Accordingly, the Secretary's sovereign immunity argument is foreclosed by binding Eleventh Circuit precedent that this Court must follow.

## IV.   Conclusion

The Secretary's motion to dismiss [ECF 22] is **DENIED**. The Secretary is **DIRECTED** to answer the Complaint within 21 days after entry of this Order. The parties shall conduct their Rule 26(f) conference within 14 days after the Secretary answers. Discovery shall commence and the parties shall serve their initial disclosures and submit a Joint Preliminary Report and Discovery Plan within 30 days after the Secretary files his answer. Plaintiffs' request that discovery begin notwithstanding the pendency of the Secretary's motion to dismiss, which was submitted to Chambers pursuant to the Court's Standing Order, is **DENIED AS MOOT**. If the parties are unable to agree on a proposed timeline for discovery and

dispositive motions, they should memorialize their respective positions in the Joint Preliminary Report and Discovery Plan.

**SO ORDERED** this the 5th day of January 2021.

Steven D. Grimberg
United States District Court Judge