IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICHARD ROSE, *et al.*<br><br>       *Plaintiffs,*<br><br>   v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia,<br><br>       *Defendant.* | CIVIL ACTION<br>CASE NO. 1:20-cv-2921-SDG |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs want to convert statewide elected officials into district-based officials using Section 2 of the Voting Rights Act. As this Court recognized, that is a new and novel claim, but one that stated enough to get to discovery. And now that discovery in this case is complete, the undisputed material facts demonstrate that the Secretary is entitled to judgment as a matter of law on Plaintiffs' sole claim.

There are three independent reasons why this Court should grant summary judgment to the Secretary. First, Plaintiffs have not adduced

evidence of any actual harm to themselves—indeed, one of the Plaintiffs testified that she was benefited from contacting members of the Public Service Commission ("PSC") beyond just those for the same district in which she lives—and the only evidence of an injury is to Plaintiffs' partisan interests, not to the weight of their votes. Second, Plaintiffs have not adduced evidence demonstrating that the Secretary can redress their injuries because enjoining the Secretary will effectively turn the Commission into a gubernatorially appointed body. Third, even if Plaintiffs have shown they have standing, the undisputed evidence demonstrates the State has a strong interest in maintaining its form of government for the PSC as a statewide elected body and Plaintiffs have thus failed to demonstrate they have a sufficient remedy for purposes of meeting the test outlined in *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L.Ed.2d 25 (1986).

This Court should grant the Secretary's Motion for Summary Judgment and dismiss this case. Because of the unique mixture of law and facts presented by Section 2 cases, this brief discusses the relevant facts in the appropriate sections below.

## ARGUMENT AND CITATION OF AUTHORITY

**I.    Standard of review at summary judgment.**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb County, Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In this case, Plaintiffs make one claim: that the State violates Section 2 of the Voting Rights Act by using a statewide method of election for members of the PSC.

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b). That analysis begins with the three preconditions in *Gingles*, 478 U.S. at 30. If Plaintiffs cannot prove any one of the three preconditions, their claim fails and no further analysis is necessary.

## II.   Plaintiffs have not adduced evidence of a judicially cognizable injury.

As this Court is aware, "Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). This is because "Federal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc).

Article III standing requires that each claimant "clearly" establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 519 (1975)). To do this, Plaintiffs must demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Although each of the foregoing factors are necessary to adequately allege standing, Plaintiffs have failed to adduce evidence on any of these three requirements.

### A.   Plaintiffs have not been injured by statewide elections for PSC and, at most, have a partisan injury.

When this Court considered the Secretary's motion to dismiss, it reviewed the standing regime articulated in *Jacobson*, 974 F.3d at 1236. In

that case, the *Jacobson* district court earlier found that the government defendants' standing defense advanced a "cramped" and "jurisprudentially anomalous" view of the scope of the court's authority, and found the plaintiffs satisfied the requirements of Article III because "an impact on the right to vote" is "common to all election laws…" 411 F. Supp. 3d 1249, 1261 n. 10 (N.D. Fla. 2019). But on appeal, the Eleventh Circuit reversed, finding the district court "took its obligation to ensure jurisdiction far too lightly," and holding that "the district court acted ultra vires by ordering relief that [plaintiffs] had no standing to seek." *Jacobson*, 974 F.3d at 1245. The elements of standing "are not mere pleading requirements but rather an *indispensable* part of the plaintiff's case." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (emphasis added).

When considering the Secretary's motion to dismiss, this Court correctly noted that, "whether state-wide, at-large elections can cause impermissible vote dilution appears to be one of first impression." [Doc. 36, p. 21]. And despite having "doubt about the Plaintiffs' ultimate ability to prove that they have suffered an injury-in-fact," *id.* at 27, the Court was reluctant to terminate the case "in its infancy," *id.*, opting instead to allow the case to continue so that the parties might have an opportunity through discovery to demonstrate an injury

5

in fact. That discovery period has now ended, and Plaintiffs have failed to make such a demonstration.

Plaintiffs' sole alleged injury in this action is straightforward: "The at-large method of electing members of Georgia's Public Service Commission dilutes black voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301." [Doc. 1, ¶ 36]. On its face, this sounds like a traditional Section 2 challenge to an at-large system—such as a county commission:

> A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority. Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory.

*Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S. Ct. 1149, 1155 (1993). In situations where a county commission is elected at-large and minority voters could constitute a majority in a single-member district (and the other required factors exist), courts correct this violation of Section 2 of the VRA by moving from at-large elections to district elections. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018). But this case is not a traditional Section 2 case.

6

Plaintiffs' theory is that, because candidates for the Commission are elected statewide, this *automatically* frustrates Plaintiffs' capacity to elect the candidate of their choice. [Doc. 1, ¶ 23] ("For example, in elections for members of the Public Service Commission between 2012 and 2018, white voters supported their preferred candidates with greater than 80 percent of their votes and were able to defeat the candidates preferred by black voters in every such election."). Plaintiffs ultimately claim that, as a result, the only explanation for their lack of statewide electoral success is that the candidates they prefer are not winning because Plaintiffs' votes carry less weight than other voters. [Doc. 1, ¶¶ 21, 23, 27, 35].

But that claim cannot stand in the face of the evidence now before this Court. Because Plaintiffs challenge statewide elections, the sole possible injury is the *outcome* of the election. Unlike in county elections, where county-wide elections can dilute votes by submerging them, the alleged dilution of "black voting strength" on a statewide level is not an allegation that any *individual vote* is diminished—it is that the *electoral system* is not to Plaintiffs' liking because it does not give them the outcome they seek.[1] And "absent any

---

[1] Section 2 cases that reviewed statewide vote dilution used that metric for the purpose of assessing proportionality as a defense, not as a basis for an injury. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438 (2006); *Earl Old Person v. Brown*, 312 F.3d 1036, 1045 n.8 (9th Cir. 2002).

evidence of vote dilution or nullification, a citizen is not injured by the simple fact that a candidate for whom she votes loses or stands to lose an election." *Jacobson,* 974 F.3d at 1247. The question of injury is then whether a plaintiff can be injured when he or she is *able* to vote as part of the statewide election for a constitutional office with statewide authority, but would *prefer* to vote in single-member districts. *See also Brnovich v. Democratic Nat'l Committee*, 594 U.S. ___, slip op. at 15 (2021) (if election system is "equally open" to minority and non-minority groups, there is no violation of Section 2).

And Plaintiffs are clearly able to vote and do so regularly. No Plaintiff has ever been prohibited from voting based on their race. Statement of Material Facts ("SMF") ¶ 1. Several Plaintiffs testified that they have never had trouble participating in the political process or that any trouble participating was unrelated to their race. SMF ¶ 2.

Plaintiffs also can show no such injury in this case because their sole injury is a partisan one—their preferred candidates have been successful in some, but not all, statewide races. Several Plaintiffs acknowledged that Black voters in Georgia typically support Democratic candidates. SMF ¶ 3. Plaintiff Richard Rose agreed that there are situations where Black-preferred candidates can succeed in statewide elections. SMF ¶ 4. And that is a conclusion that is hard to disagree with—the results of the 2020 elections (of

which this Court can take judicial notice) have demonstrated that black-preferred candidates can succeed statewide. In the 2020 general election and 2021 runoff, candidates supported by black voters were successful in the presidential race and two U.S. Senate races. SMF ¶ 5. Dr. Barber concluded that the only reason that the Black-preferred candidate was unsuccessful in 2021 was due to Black voters not voting all the way down the ballot. SMF ¶ 6.

Thus, the evidence shows that the lack of electoral success of Black-preferred candidates appears to be tied more to partisanship than to racial vote dilution. Indeed, Dr. Barber found that partisanship was the key predictor of vote choice, regardless of the race of the candidate. SMF ¶ 7. Plaintiffs' experts do not disagree that partisanship plays a role, but believe that partisanship and race cannot be untangled. SMF ¶ 8.

As a result, Plaintiffs cannot show an injury from vote dilution based on their race—the sole basis for any injury must be based on lack of success of partisan candidates they prefer. *Jacobson,* 974 F.3d at 1247; *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019). Despite the opportunity offered in this case, Plaintiffs have not adduced evidence supporting a cognizable injury and this Court should grant the Secretary's motion and dismiss this case. [Doc. 36, p. 28].

**B.    Plaintiffs have not adduced evidence supporting redressability.**

In addition to injury, "[i]t must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Gov. of Ala.,* 944 F.3d 1287, 1301 (11th Cir. 2019) (internal quotations omitted). Plaintiffs here seek a declaratory judgment that statewide voting for the PSC dilutes black voting strength, an injunction prohibiting the Secretary from administering elections with the statewide voting method, and an order that the Secretary comply with Section 2 of the Voting Rights Act. [Doc. 1, p. 10]. But the Court cannot redress the Plaintiffs' purported injuries because the effect of an Order by this Court on the Secretary will not provide the relief Plaintiffs seek.

A declaratory judgment and injunction by this Court would not redress the Plaintiffs' alleged injuries as "it rests on the flawed notion that by declaring [a]… statute [unlawful], it eliminate[s] the legal effect of the statute in all contexts." *Jacobson,* 974 F. 3d at 1255. "But federal courts have no authority to erase a duly enacted law from the statute books." *Id.* quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy,* 104 Va. L. Rev. 933, 936 (2018). Instead, federal courts enjoin particular officials from carrying out particular statutes. *Id.*

Enjoining the Secretary from administering the PSC elections as required by law would not solve the Plaintiffs' purported harm. Because the law remains in effect with respect to all non-parties to this suit, the Governor could simply appoint a replacement when any election is not administered by the Secretary pursuant to this Court's order. O.C.G.A. § 46-2-4. As a non-party, the Governor is not bound by what Plaintiffs accomplish here, if anything. "If a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable." *Jacobson*, 974 F. 3d at 1255. "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Lewis,* 944 F.3d at 1305, quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment). Moreover, "Article III standing requires that the plaintiffs' injury be 'fairly traceable' to the defendant's action and redressable by relief against *that* defendant." *Jacobson,* 974 F. 3d at 1256, citing *Lewis,* 944 F.3d at 1298, 1301.

In ruling on the more-lenient standard of a motion to dismiss, this Court found this argument unpersuasive as a reason to stop this case from moving to discovery, saying that, "although the governor could appoint a person to fill a

vacancy (or vacancies) on the Commission, Georgia law dictates that such appointment extends only to the 'next regular general election.'" [Doc. 36, p. 30] citing O.C.G.A. § 46-2-4. The Court further relied on the pre-*Jacobson* holding in *Grizzle v. Kemp* for the proposition that, "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." [Doc. 36, pp. 30-31]. But being "subject to suit" at the pleading stage is not the same as being able to redress a plaintiff's particular claim by complying with a court order after the close of evidence. Moreover, the Eleventh Circuit squarely considered and rejected this "general authority" theory of liability in the redressability context:

> Contrary to the reasoning of the district court, the Secretary's position as "the chief election officer of the state..." with "general supervision and administration of the election laws..." does not make the order in which candidates appear on the ballot traceable to her... Because the Secretary will not cause any injury the voters or organizations might suffer, relief against her will not redress that injury—either "directly or indirectly."

*Jacobson,* 974 F. 3d at 1254. Further, *Grizzle v. Kemp* relied in part on *Ex Parte Young,* which dealt not with Article III standing, but rather whether the Defendant was a "proper party." But an Article III analysis is treated differently than a proper-party analysis for purposes of the Eleventh Amendment:

> To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar to suit—a state official need only have "some connection" with the enforcement of the challenged law. 209 U.S. at 157. In contrast, Article III standing requires that the plaintiff's injury be "fairly traceable" to the defendant's actions and redressable by relief against that defendant.

*Id*. at 1256. Ultimately, the propriety of an order from this Court on the relief requested depends on whether the Court (i) may enjoin the appropriate officials; (ii) who also must be party to this suit; (iii) from executing an official act; and (iv) that the injunction will redress the Plaintiffs' purported injury. It is clear now that the Court cannot.

This Court earlier found the Secretary's general authority over elections and the fact that the Governor could only appoint a PSC commissioner "until the next regular election" was sufficient to establish traceability and redressability against the Secretary at the pleading stage. [Doc. 36, p. 30]. But if the Court were to, as Plaintiffs request, enjoin the Secretary from administering the PSC elections in a statewide manner, this would not resolve the Plaintiffs' alleged harm based on the evidence now before the Court.

If the Secretary could not certify PSC elections, then it falls to the Governor to appoint commissioners to fill vacancies on the Commission. O.C.G.A. § 46-2-4. There is nothing in the law that would limit the Governor's appointment authority to just the next election. *Id*. Indeed, that next election

13

would also be enjoined by this Court's Order, and it would once again fall to the Governor to appoint someone to fill the vacancy, likely with the same individual who was holding the office previously. *Id*. This process would continue indefinitely until the legislature created a new system for PSC elections, assuming it found the new gubernatorial appointment method of selecting PSC commissioners objectionable. And this effective appointment system is directly contrary to Ga. Const. Art. IV, Sec. I, Par. I, which requires Public Service Commissioners to be elected "by the people."

Thus, the question, as it relates to Article III standing, is whether this outcome *is likely to redress the Plaintiffs' purported injuries — directly or indirectly?* The answer to this is emphatically: "no." Not only would an order lead to violations of the provisions of the Georgia Constitution by creating a revolving door of gubernatorial appointments to the PSC, despite the constitutional requirement that commissioners be chosen "by the people," but this outcome essentially creates a statewide PSC commissioner election by proxy. As a statewide elected official, the Governor would be acting indirectly on behalf of the State's electors, instead of having the statewide direct election of commissioners. This does not satisfy the redressability requirement of Article III and is an independent basis for granting judgment as a matter of law to the Secretary.

III.   **Plaintiffs cannot show evidence of a remedy that overcomes the state's interests in statewide elections for PSC.**

In order to show a Section 2 violation, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions :

> Specifically, plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate.

*Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994), quoting *Gingles*, 478 U.S. at 50-51. Only after establishing the three preconditions does a court begin a review of the so-called "Senate Factors" to assess the totality of the circumstances. *Id*. at 1512; *Gingles*, 478 U.S. at 79; *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S.Ct. 2647 (1994). Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1567 (11th Cir. 1997).

As this Court noted in its ruling on the Secretary's motion to dismiss, part of the inquiry into liability requires a determination whether the district

court can "fashion a permissible remedy in the particular context of the challenged system." [Doc. 36, p. 34] (quoting *Nipper*, 39 F.3d at 1530-31). Despite opportunities to do so, Plaintiffs cannot demonstrate a remedy given the unique interests of the State in the design of the PSC—features that make the sovereign different than a political subdivision. The evidence demonstrates that members of the PSC are unique in their role and their responsiveness to constituents, in ways different than typical legislators or trial judges. *Nipper*, 39 F.3d at 1501. This unique structure counsels against any changes to Georgia's chosen system of utility regulation, with regulators elected "by the people." Ga. Const. Art. IV, Sec. I, Par. I; 1934 Ga. AG LEXIS 45; O.C.G.A. § 46-2-1.

     1.    *The structure and nature of the PSC.*

Public Service Commissioners, once elected, exercise authority over the entire State of Georgia, not just the district in which they live. O.C.G.A. § 46-2-20, *et seq.* While Plaintiffs would prefer that elections for PSC be conducted by districts instead of statewide, they ask for more than just a change in the method of election in a *county* government. Instead, they ask this Court to "force on the states a new model of government," *Nipper*, 39 F.3d at 1531, by fundamentally altering the nature that a sovereign state has set up its constitutional commissions to govern utilities.

The PSC regulates utilities in different ways. SMF ¶ 9. Commissioners must constantly weigh the reliability of a solid, secure system with the price of operating that system. SMF ¶ 10. Decisions about rates affect all ratepayers across the state. SMF ¶ 11. Commissioners also take calls from constituents across the state of Georgia—not just in their districts. SMF ¶ 12.

Commissioners function as a quasi-judicial body, hearing rate cases as a group, taking witnesses, and weighing testimony from the public and parties. SMF ¶ 13. The PSC can assess fines and administers federal funds for pipeline safety across the State of Georgia. SMF ¶¶ 14-15.

This statewide structure has also benefitted Plaintiff McCorkle, who testified that a Commissioner from a different district was willing to talk and meet with her when the Commissioner who lives in her district would not. Under Plaintiffs' proposed scheme, Ms. McCorkle would not be able to vote for the Commissioner who assisted her. SMF ¶ 16-17.

> 2. *Statewide elections further the state's interests in utility regulation.*

As the Supreme Court recently noted in a vote-denial case under Section 2, the state's interests are an important factor that must be taken into account in weighing the totality of the circumstances. *Brnovich*, 594 U.S. ___, slip op.

at 19. The unique nature of the structure and purpose of the PSC is furthered by its statewide elections.

Again, this is an issue of first impression—whether Section 2 can force the conversion of statewide officials into district-based officials—and is "an exceptionally poor conceptual vehicle to travel the vote dilution highway." *Ala. State Conference of the NAACP v. Alabama*, 2020 U.S. Dist. LEXIS 18938, at *36 (M.D. Ala. Feb. 5, 2020) (hereafter, "*Alabama NAACP*"). That court explained that "subdivisions are not sovereign," as it discussed the differences. *Id.* The form of government at issue in *Alabama NAACP*, like Georgia's PSC districts, was one that had long been established and had no alternative benchmark from which to measure the efficacy or propriety of any proposed remedy the Court might fashion. That is sharply different from having alternative benchmarks to use in assessing statewide officials. *Id.* at *37.

This case is far more like *Holder* than prior decisions about county forms of government. In *Holder,* the Supreme Court held that "a plaintiff cannot maintain a § 2 challenge to the size of a government body." *Holder v. Hall*, 512 U.S. 874, 885, 114 S. Ct. 2581, 2588 (1994). That conclusion was rooted in the alteration of the form of government and the resulting "standardless" decisions that would be required. *Id.*; *see also Alabama NAACP*, 2020 U.S. Dist. LEXIS 18938, at *37. Essentially, the county commission at issue in *Holder* had no

18

districts and "a federal court could not require the governing authority to change to a district form of government by calling it an increase in the size of its 'commission.'" *Id*. Plaintiffs' challenge is far more like *Holder* for several reasons.

First, like the county commission in *Holder,* the PSC has no *voting* districts. It is true that there are certain residency requirements *of the candidates,* but that does not impact the right of the voters to vote statewide for each of the commissioners as they have for well over 100 years. Although residency districts *for candidates* were added roughly twenty years ago, that did not change the *voting rights* of any Georgians. Thus, quite unlike most vote-dilution cases, the Court here has no "reasonable alternative benchmark" against which to weigh the existing voting practice. *Holder*, 512 U.S. at 885. Put differently, the Court cannot determine whether voters were "packed or cracked" into districts in order to diminish the value of black votes, or privilege some votes over theirs, because *they have always cast their votes on a statewide basis*. And the State is not a district.

Second, and like the county commission in *Holder,* the intervention by this Court sought by Plaintiffs would constitute an invasion into the State's right to choose its form of government. The PSC, no less than the form of the county commission in *Holder,* is a chosen form of government by a sovereign

19

for the specific purpose of utility regulation and rate setting. SMF ¶¶ 9-15. As Justice O'Connor defined it in *Gingles*, vote dilution is "the impermissible discriminatory effect that a multimember or other ***districting plan*** has when it operates 'to cancel out or minimize the voting strength of racial groups.'" *Gingles*, 478 U.S. at 87 (O'Connor, J., concurring in the judgment) (emphasis added). But "[t]he state at large is decidedly not a districting plan, nor is it a district of anything. Unlike a county, city, state legislature, or school board, ***the state is itself a sovereign***." *Alabama NAACP,* 2020 U.S. Dist. LEXIS 18938, at *38 (emphasis added). The imposition by the legislature of residency requirements for candidates after nearly 100 years of statewide voting does not remove this sovereign authority from the state and subject it to oversight by Congress or the federal courts.

Thus, even if Plaintiffs have established all three *Gingles* factors, the undisputed facts demonstrate the unique nature of the structure of the PSC indicates that the "legal effects of proving those factors" should be to leave the statewide nature of the elections untouched. *Solomon v. Liberty Cty.*, 899 F.2d 1012, 1013 (11th Cir. 1990). Utility regulation is a specialized area requiring specialized skill and commissioners are responsive to individuals from across the entire State of Georgia. SMF ¶¶ 9-15. Altering that structure is altering a

decision made by a sovereign state about how to regulate utilities. Therefore, this Court should deny the relief sought because of this unique structure.

## CONCLUSION

On this issue of first impression—whether Section 2 extends to forcing statewide elected officials to be elected from districts merely because there is more than one member of the Commission—Plaintiffs have had the opportunity to provide facts to support their claims and failed. They have not adduced facts to support their purported injuries and, even if they had, have not shown traceability and redressability. They have also failed to provide a remedy that is legally sufficient given the unique nature of rate regulation in the State of Georgia. The undisputed facts demonstrate that the legal effect of any proved *Gingles* factors is that the Commission should remain elected statewide. This Court should grant judgment as a matter of law to the Secretary.

Respectfully submitted this 9th day of July, 2021.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard

21

Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
40 Capitol Square, S.W.
Atlanta, Georgia 30334

**TAYLOR ENGLISH DUMA LLP**

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 770.434.6868

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson