# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

RICHARD ROSE et al.,

        Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia,

        Defendant.

Civil Action No. 1:20-cv-02921-SDG

## **<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**INTRODUCTION**

Defendant moves this Court for reconsideration of the same three issues he lost on at the motion-to-dismiss stage. Since that time, however, Plaintiffs have adduced competent evidence substantiating the allegations in their Complaint—and then some. Plaintiffs' evidence of injury, redressability, and the need for a remedy has only gotten stronger. Their experts have shown, among other findings, that Black voters in Georgia would have been able to elect at least one candidate of their choice to the Public Service Commission but for the at-large method of election and racial bloc voting that dilute their voting strength. Plaintiffs are entitled to present this evidence at trial.

Defendant, on the other hand, regurgitates many of the same legal arguments that this Court rejected months ago. He cites no new law and presents no new facts that would entitle him to judgment as a matter of law on any of the three issues he re-raises now. The Court should deny his motion for summary judgment.

**ARGUMENT**

**I.      Plaintiffs have demonstrated a cognizable injury.**

The injury here is nothing new. Defendant does not dispute that members of the Public Service Commission are elected on an "at-large" basis. (ECF No. 80-1 at 5-6.) And, as Defendant admits, courts have long held that at-large elections can

1

injure members of a cohesive racial minority group by "submerging" their votes when a white majority routinely outvotes them. (*Id.* at 7.) *See also, e.g.*, *Hous. Laws.' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 423 (1991) (cited with approval in *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 n.5 (2021)); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1303 (11th Cir. 2020); *Meek v. Metro. Dade Cnty., Fla.*, 985 F.2d 1471, 1480-81 (11th Cir. 1993) (per curiam), *overruled on other grounds by Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1331-32 & n.4 (11th Cir. 2007) (per curiam); *Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012 (11th Cir. 1990) (en banc) (per curiam); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1575 (11th Cir. 1984).

Indeed, this form of racial vote dilution was the exact injury in the seminal Section 2 case, *Thornburg v. Gingles*, where the plaintiffs challenged the use of at-large elections within multi-member districts for North Carolina's state legislature. 478 U.S. 30, 34-35 (1986). The essence of this kind of injury, as Justice Brennan explained, "is that minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure with a white majority that votes as a significant bloc for different candidates." *Id.* at 68 (plurality opinion); *see also id.* at 48-51.

There is no dispute that Plaintiffs have properly established this kind of injury. Each Plaintiff is a Black resident and registered voter in the area from which members of the Public Service Commission are elected at large, and each has voted in recent elections for members of the Public Service Commission. (Pls.' SUMF ¶ 1 (ECF 56-3).) They have alleged (and Defendant has now admitted) the three *Gingles* preconditions necessary to establish a claim of racial vote-dilution through the use of at-large elections. (Pls.' 2nd SUMF ¶¶ 5-7 (ECF 79-5).) That is more than enough to satisfy the injury-in-fact requirement in a Section 2 vote-dilution case challenging the at-large method of electing members of the Public Service Commission for the reasons cited in the Court's ruling on the motion to dismiss. (ECF 36 at 17-28.)

Defendant argues, however, that the usual injury is not enough to establish constitutional standing here because Plaintiffs challenge at-large *statewide* elections. (ECF 80-1 at 7-8.) But this is a distinction without a difference. Defendant fails to explain why it matters or how the injury in this case is conceptually any different from the plaintiffs' injuries in *Gingles*, *Wright*, *Meek*, *Solomon*, or *Marengo County*. And the evidence Plaintiffs have adduced here confirms that there is no difference: But for the at-large method of election and white bloc voting, Black voters in Georgia could have elected at least one

candidate of their choice to serve on the Public Service Commission throughout 2012 to the present. (Pls.' Stmnt. of Add'l Facts (SAF) ¶¶ 16-18.)

None of Defendant's cases even suggests there is a difference. Defendant again relies on *Jacobson v. Florida Secretary of State*, 974 F.3d 1236, 1247 (11th Cir. 2020), to support his argument, but that was not a racial vote-dilution case. The Court has already indicated that it "does not read *Jacobson* quite so broadly," (ECF 36 at 26), and that, even under *Jacobson*, vote-dilution of the kind shown here is a cognizable injury (*id.* at 27). Defendant also cites *Brnovich*, but that decision only addressed the application of Section 2 to "generally applicable time, place, or manner voting rules." 141 S. Ct. at 2333. It did not purport to say anything about vote-dilution cases like this one.

Defendant argues further that the usual injury is not enough here because Plaintiffs' "sole injury is a partisan one." (ECF 80-1 at 8.) Not so. He offers no authority for the proposition that partisanship—or the lack thereof—has any bearing on the racial vote-dilution injury identified in *Gingles*, *Wright*, *Meek*, *Solomon*, or *Marengo County*. The two cases on which he relies, *Jacobson* and *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), are not racial vote-dilution cases. They don't change the standards set out in *Gingles* and its progeny. The injury here is not, as he suggests, that Plaintiffs' preferred candidates lose. (ECF

4

80-1 at 9.) It is that Plaintiffs' votes are submerged because of the interaction of at-large elections with white bloc voting.

The role of partisanship in this case is also very much in dispute as a matter of fact. While Defendant's expert claims that partisanship explains why Black-preferred candidates lose (ECF 80-1 at 9), Plaintiffs' expert disagrees (Pls.' SAF ¶¶ 3-8). And the record shows that Black-preferred candidates for the Public Service Commission lose not only when those candidates are Democrats *but also when Black voters prefer non-Democrats*. (Pls.' SAF ¶¶ 1-2.) This factual dispute would preclude summary judgment in Defendant's favor even if there were authority to support his legal argument.

Plaintiffs here are Black voters who have shown that they prefer certain candidates for the Public Service Commission and could elect those candidates were it not for the interaction of at-large elections with white bloc voting. That is textbook racial vote dilution at any level of government.

## II.  Plaintiffs have established redressability.

Plaintiffs have adduced sufficient evidence to warrant summary judgment in their favor on the issue of redressability. As Plaintiffs explained in their motion seeking that relief (ECF 79 at 9-10), the undisputed evidence is that Defendant administers elections for members of the Public Service Commission; that he

qualifies candidates for those elections; and that he counts the votes and certifies the results of those elections, among other duties (Pls.' 2nd SUMF ¶ 2 (ECF 79-5)). He must carry out those duties "consistent with law," O.C.G.A. § 21-2-31(2), which, as this Court found, "includes, as it must, compliance with Section 2," (ECF 36 at 30). Defendant does not dispute any of this. And in the months since this Court rejected the same argument Defendant re-raises here, (*id.* at 28-33), the case for redressability has only become stronger.

Defendant nonetheless asks this Court to reconsider its prior ruling. But he offers no basis in law or in fact to do so. Defendant recycles the same points and authorities—verbatim, at times—from his failed motion to dismiss. He cites no new law and presents no facts sufficient to avoid summary judgment in Plaintiffs' favor, much less warranting that relief in his.

Instead, Defendant conjures up a hypothetical scenario in which the Governor (and presumably his successors) would defy a ruling of this Court, act "directly contrary" to law, and impose "indefinitely" an "effective appointment system" that Defendant admits would "violat[e]" the Georgia Constitution. (ECF 80-1 at 14.) But summary judgment does not issue on a movant's imagination. Plaintiffs need only show it is "likely" that their injuries would be redressed by a favorable decision of this Court—a burden they have met. *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted). They need not defeat every hypothetical Defendant can muster, no matter how far-fetched.

Regardless, and as this Court has already found, Defendant's speculation depends on a misreading of Georgia law, which "dictates" that gubernatorial appointments to the Commission "extends only to the 'next regular general election.'" (ECF 36 at 30 (quoting O.C.G.A. § 46-2-4).) Ignoring the statute's plain text, Defendant asserts, "There is nothing in the law that would limit the Governor's appointment authority to just the next election." (ECF 80-1 at 13.) Georgia law does just that.

Defendant compounds that error when he claims, "that next election would also be enjoined by this Court's Order." (*Id.* at 13-14.) It would not. Were Plaintiffs to prevail at trial, the next election for the Public Service Commission would have to be administered (by Defendant) consistent with Section 2. The typical process in a Section 2 case would afford Georgia's General Assembly the first opportunity to devise a remedy allowing Defendant to lawfully administer the ensuing election. Failing that, this Court would have the "unwelcome obligation" of crafting an interim remedy for use until the legislature adopted a lawful replacement for Defendant to administer. *Perry v. Perez*, 565 U.S. 388, 392 (2012) (per curiam) (internal quotation marks omitted); *see also, e.g., Ga. State Conf. of*

*NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d. 1353, 1370 (N.D. Ga. 2014) (ordering county defendants to implement court-ordered interim remedy for Section 2 violation). The point is: there would be no indefinite vacancies for the Governor to fill.

Defendant's speculation otherwise is as flawed as it is fanciful. This Court should reject it as a basis for summary judgment.

## III.    Plaintiffs have shown a plausible remedy.

This Court has already held that "[t]he relief Plaintiffs seek is not prohibited as a matter of law." (ECF 36 at 34.) And this Court acknowledged that single-member districting is the standard remedy for a Section 2 violation caused by at-large voting. (*Id.* at 38.) This is also clear in case law. *See Gingles*, 478 U.S. at 50 n.17; *Wise v. Lipscomb*, 437 U.S. 535, 540-41 (1978); *E. Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636, 639 (1976) (per curiam); *Chapman v. Meier*, 420 U.S. 1, 21 (1975); *Connor v. Johnson*, 402 U.S. 690, 692 (1971) (per curiam); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013).

Yet, without citing any evidence, Defendant again argues that the State's interests somehow prohibit the remedy that Plaintiffs seek. They do not. Aside from lacking supporting evidence and relying on inapposite case law, Defendant

also asks the Court to forgo the required totality of circumstances analysis and look only at the ninth factor identified in the Senate Report accompanying the 1982 amendments to the Voting Rights Act—whether the policy justification for the challenged law is tenuous. (ECF 36 at 13-14 (listing the Senate Report factors).) The Court should reject these arguments for a second time.

### A. The structure and nature of the Public Service Commission do not prohibit Plaintiffs' remedy.

Defendant's brief does nothing to prove that the structure or nature of the Public Service Commission requires that its members be chosen by an at-large voting system despite the system's discriminatory effects. First, Defendant lists several attributes of the Commission (e.g., "Decisions about rates affect all ratepayers across the state." (ECF 80-1 at 17)), but he offers no authority or explanation for why these attributes prohibit the remedy Plaintiffs seek here. A commission is a commission, and Defendant has not shown through undisputed evidence that the Public Service Commission is different in any meaningful way from any other elected commission in the State of Georgia.

Second, Defendant has not shown that the remedy Plaintiffs seek—use of single-member districts in elections—would hinder the structure or the nature of the Commission. Plaintiffs' remedy would not change the number of Commissioners. The remedy would not alter the Commission's jurisdiction or

change the territory over which the Commission governs. Each Commissioner already comes from one of five residential districts: Plaintiffs' remedy does not even require the redrawing of those districts. (Pls.' SAF ¶¶ 16-18.)

Nor would Plaintiffs' remedy change the Commissioners' work demands. Commissioners would still be able to "weigh the reliability of a solid, secure system with the price of operating that system." (ECF No. 80-1 at 17.) The Commission would still make decisions as a whole and on behalf of the entire State. And Commissioners would still hear from voters, witnesses, and other groups from around the State for perspective. At best, the impact on the Commission of moving to single-member districts is a disputed fact that precludes summary judgment.

Defendant's assertion that Chuck Eaton's—the Commissioner for Ms. McCorkle's district (District 3) at the time—refusal to talk to constituents from his own District is somehow a benefit of the current system, (ECF No. 80-1 at 17), is exactly backwards. Instead, it shows the flaw of using statewide elections for Commissioners and the diluting effects of Mr. Eaton representing a District that voted in the overwhelming majority for a different candidate. (Pls.' SAF ¶¶ 17-18.)

Lastly, Defendant's assertion that the Commission is a quasi-judicial body is of no consequence. Defendant cites no legal support for the proposition that a

quasi-judicial executive body is any less susceptible to a challenge under Section 2 than any other body. *See, e.g.*, *Hous. Laws.' Ass'n*, 501 U.S. at 426 ("the coverage of the Act encompasses the election of executive officers"). Defendant only cites cases involving ***purely***-judicial bodies, and the Public Service Commission is not purely judicial. (Pls.' SAF ¶ 19.) And unlike in many judicial elections, which are treated differently under Section 2, the Commissioners still run under a party designation and are intended to be held accountable by constituents. *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1534-35, 1544 (11th Cir. 1994) (en banc) ("Trial court judges, on the other hand [in contrast to legislators], are neither elected to be responsive to their constituents nor expected to pursue an agenda on behalf of a particular group. … [A]ny districting remedy imposed by the district court would, by its very nature, alter this course and encourage greater 'responsiveness' of judges to the special interests of the people who elected them. Such a remedy would reintroduce the very vices from which the state and its citizens have sought to insulate the judiciary.").

Thus, this case is much closer to *Gingles* and other cases involving statewide or countywide legislative bodies than it is to cases involving judicial elections.

**B. Defendant offers no evidence of a state interest prohibiting Plaintiffs' remedy.**

Defendant's argument that Georgia's state interests prohibit the remedy Plaintiffs seek fails for several reasons.

First, even if Defendant *were* able to show a non-tenuous state interest for the Commission's statewide election structure—which Defendant has failed to do here—it would still not justify summary judgment in his favor. Consideration of the state's interests alone is not enough to satisfy the totality of the circumstances analysis or to prohibit the remedy Plaintiffs seek. *See* S. Rep. No. 97-417 at 29 n.117 (1982) ("[E]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process."); *Hous. Laws.' Ass'n*, 501 U.S. at 427 ("Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution."); *accord Marengo Cnty. Comm'n*, 731 F.2d at 1571.

Here, Plaintiffs have adduced competent evidence of the three *Gingles* preconditions (Pls.' 2nd SUMF ¶¶ 5-7 (ECF 79-5)) and many of the Senate Report factors (Pls.' SAF ¶¶ 9-15). Defendant fails to address how the totality of the

12

circumstances nonetheless justify summary judgment in Defendant's favor. In a racial vote dilution case like this one, each Senate factor is potentially applicable and important. *See Brnovich*, 141 S. Ct. at 2340. Yet Defendant asks this Court to forgo the totality of circumstances analysis and, instead, consider only one of the Senate Factors—whether the State's policy justification is tenuous. Such an approach would be improper.

Second, Defendant's reliance on *Holder v. Hall*, 512 U.S. 874 (1994), is misplaced. The *Holder* decision addressed the feasibility of altering a commission's size—a change Plaintiffs do not seek here—not the conversion of an at-large election method to a single-member district election method. *Id.* at 874-75. Further, unlike in *Holder*, here there is an alternative benchmark for comparison. *Id.* That benchmark is a five-member commission elected from single-member districts.

In fact, the evidence in this case shows that if Georgia used single-member districts in electing Commissioners, the majority-Black District 3 would have successfully elected the Black-preferred candidate in the last three general and runoff elections. (Pls.' SAF ¶¶ 16-18.) Instead, the former Commissioner for District 3, Chuck Eaton, was elected to the Commission for three terms, through five total general and runoff elections, without ***ever*** winning a single county in his

District. (Pls.' SAF ¶ 20.) This is a clear benchmark showing the effectiveness of Plaintiffs' proposed remedy versus the current election method.

Defendant's reliance on *Alabama State Conference of the NAACP v. Alabama*, No. 2:16-cv-731-WKW, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020), is also misplaced. First, the *Alabama NAACP* case addressed judicial elections, which are treated differently than legislative or administrative elections. Despite Defendant's conclusory statement that "[u]tility regulation is a specialized area requiring specialized skill," he cites no evidence that Commissioners are required to meet any specific degree or work-history requirement—unlike judges, who are typically lawyers. (ECF 80-1 at 20.)

And unlike the present case, in *Alabama NAACP* there was no residential district requirement for judicial candidates or existing districts to analyze. The *Alabama NAACP* court, itself, acknowledged that the Supreme Court has applied Section 2 to vote-dilution cases involving at-large elections of judges elected from districts. 2020 WL 583803, at *11 (citing *Chisom v. Roemer*, 501 U.S. 380 (1991), and *Hous. Laws.' Ass'n*, 501 U.S. 419 (1991)). Here, each Commissioner already comes from one of five residential districts—the same five districts that could be used in Plaintiffs' remedy.

Lastly, this Court has already rejected Defendant's argument that Section 2 of the Voting Rights Act must be applied differently to a sovereign. (ECF 36 at 41 ("Secretary emphasized that 'sovereigns' (*i.e.*, the State of Georgia) must be treated differently from political subdivisions for purposes of Section 2 claims. But … nothing in the language of Section 2 itself supports that position. On its face, the statute applies equally to *states* and their political subdivisions. … 'No government entity has a "vested right" to continue practices validly prohibited by Congress.'" (footnotes omitted) (quoting *Marengo Cnty. Comm'n*, 731 F.2d at 1554)).) Neither the text of Section 2 nor the case law on this issue has changed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for summary judgment.

Dated: July 23, 2021

/s/ *Bryan L. Sells*
Attorney Bar No. 635562
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

Nicolas L. Martinez (*pro hac vice*)
Wesley A. Morrissette (*pro hac vice*)
Bartlit Beck LLP
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654
Telephone: (312) 494-4400
Email: nicolas.martinez@bartlitbeck.com
Email: wesley.morrissette@bartlitbeck.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan L. Sells
Bryan L. Sells