**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| RICHARD ROSE, *et al.* | |
|     *Plaintiffs,* | |
| v. | CIVIL ACTION |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, | FILE NO. 1:20-cv-2921-SDG |
|     *Defendant.* | |

**SECRETARY OF STATE BRAD RAFFENSPERGER'S RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs seek to use the Voting Rights Act (VRA) to force the State of Georgia to abandon its statewide method of electing utility regulators to create a district-based system that will elect a Democratic member of the Public Service Commission. While the Supreme Court recently recognized that "partisan motives are not the same as racial motives," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021), Plaintiffs here continue to conflate the two—claiming that these motives cannot be separated and thus they can achieve their preferred partisan outcome

through the VRA. As explained below, Plaintiffs are not entitled to judgment as a matter of law on any of the points they raise in their Second Partial Motion for Summary Judgment [Doc. 79].

First, Plaintiffs are not entitled to summary judgment on the Secretary's affirmative defenses because they cannot use the VRA and the federal courts to force a preferred partisan outcome by creating a majority-minority district instead of a statewide method of election. The VRA is a shield that protects voters from disenfranchisement, not a sword for enterprising plaintiffs to use federal courts to force individual voters' preferred electoral outcomes in particular races.[1]

Second, significant disputes of fact remain about the meaning of the evidence presented by Plaintiffs in support of the three *Gingles* prongs. They have not shown a remedy that this Court can order. And the only point of agreement among the experts on statistical evidence is that voting in Georgia is polarized—but Plaintiffs' experts claim it is racial; the Secretary's expert

---

[1] The relief Plaintiffs request reduces the number of PSC commissioners each citizen may vote for from five to one. Thus, it effectively requires the Court to disenfranchise millions of Georgians from voting for four of the five PSC commissioners. While courts may order these types of changes when they are altering countywide at-large districts, federal courts should exercise caution when remaking a state's chosen form of government *and* preventing millions of voters from participating in the process of electing commissioners. Federalism concerns abound.

finds it is partisan. This dispute of fact alone precludes summary judgment in favor of Plaintiffs at this stage of the proceedings, in addition to the Plaintiffs' failure to carry their burden in proving that partisanship is not the cause of the polarization, as required by the Eleventh Circuit.

### ADDITIONAL RELEVANT FACTS

All the experts agree that the appropriate method of calculating the polarization numbers is through a statistical estimating method called Ecological Inference (EI). SAMF[2] ¶ 1. All the experts likewise agree that the EI estimates show significant polarization in Georgia elections. SAMF ¶ 2.

But then the opinions diverge significantly. Dr. Barber sees the clear explanation for the polarization as partisanship: "[A] voter's partisanship is a much stronger predictor of their vote choice than is a voter's race." SAMF ¶ 3. He concludes that partisan polarization better explains the numbers, in large part because the race of the candidate is irrelevant—Black voters support Democratic (or at least non-Republican) candidates regardless of the candidate's race, just as white voters support Republican candidates regardless of their race. SAMF ¶ 4. An exchange with one of Plaintiffs' experts, Dr. Popick, shows Plaintiffs are unable to refute this conclusion:

---

[2] "SAMF" refers to the Secretary's Statement of Additional Material Facts that Present a Genuine Issue for Trial that is attached to this brief.

Q. In looking at the 2020 District 1 election [for PSC], the Black-preferred candidate was Bryant, and he was a Black individual, and his Black support was 94.46 percent. Are you with me on there?

A. Yes, I see that.

Q. Okay. And then right underneath that, 2018 District 5, candidate Randolph was a white candidate, had Black support of 96.03% percent. Do you see that?

A. Yes, I see that.

Q. And so in reaching your conclusion that voting is racially polarized, we have a white candidate getting a higher degree of Black support than a Black candidate. And, I guess, what I'm a little bit confused about... [is] it doesn't appear that the race of the candidate has any impact on your conclusion about whether voting is racially polarized. Is that correct?

A. I was not specifically analyzing whether the race of a particular candidate had any effect on a racial polarization...

\* \* \*

Q. So when we say, at the end of the page there, white voters support for the Black-preferred candidate is insufficient to elect the black-preferred candidate, that's primarily speaking about democrats, possibly some libertarians, *but it would be correct to replace Black-preferred with the not-republican candidate; right?*

A. One could do that.

SAMF ¶ 5, (quoting Popick Dep. 59:4–64:6 (emphasis added)).

Plaintiffs' experts also seemingly admit there is at least some merit in the partisan-polarization theory because they consistently put on blinders to

4

avoid knowing the answer. Dr. Popick had no opinion about whether race or partisanship explained the polarization, instead limiting his opinion to the existence of the race polarization alone. "I conducted no analysis of any sort of partisan identification or factoring." SAMF ¶ 6. And Plaintiffs' other expert, Dr. Fraga, concludes that race and politics are too closely connected: "it's very difficult to separate race and ethnicity from, I mean, the electoral process in general…" SAMF ¶¶ 7-8. At minimum, Dr. Barber's conclusion that partisanship is a bigger motivator of polarization than race is unrebutted by Plaintiffs' experts—meaning either there is a lack of any response to Dr. Barber's conclusions or at the very least, a significant dispute of fact with respect to *Gingles* prongs two and three. SAMF ¶ 9.

## ARGUMENT AND CITATION OF AUTHORITY

As explained by all parties, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions to show a Section 2 violation. *Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so-called "Senate Factors" to assess the totality of the circumstances. *Id.* at 1512; *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). Plaintiffs have not moved for summary judgment on the Senate Factors, and

the only questions presented by their current motion are the *Gingles* preconditions and the Secretary's defenses.

In general, grants of summary judgment to plaintiffs in Section 2 cases are "unusual." *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F. 3d 1336, 1345 (11th Cir. 2015) ("*Fayette Cty. Bd. of Comm'rs*"). The Eleventh Circuit observed that "[n]ormally," Section 2 claims "are resolved pursuant to a bench trial." *Id.* at 1343. Granting summary judgment to a plaintiff is rarely appropriate "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Id.* at 1348. This remains true even when the parties agree on many basic facts:

> Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.

*Burton v. City of Belle Glade*, 178 F. 3d 1175, 1187 (11th Cir. 1999) (quoting *Clemons v. Dougherty Cty., Ga.*, 684 F. 2d 1365, 1369 (11th Cir. 1982)).

Courts considering Section 2 claims must conduct an "intensely local appraisal" of the facts in the local jurisdiction, which is not generally amenable to resolution as a matter of law, especially in favor of plaintiffs. *De Grandy*, 512 U.S. at 1020-21 (no statistical shortcuts to determining vote

6

dilution); *Gingles*, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); *White v. Regester*, 412 U.S. 755, 769-70 (1983) (assessing the impact "in light of past and present reality, political and otherwise"); *see also Brnovich*, 141 S. Ct. at 2338 (discussing totality-of-the-circumstances nature of Section 2 claims).

As discussed below, this Court should deny Plaintiffs' Motion because disputes of fact remain about the proposed remedy and the nature of voting polarization. The Court should also deny Plaintiffs' request for summary judgment on the Secretary's third and eighth affirmative defenses.

## I.   Plaintiffs are not entitled to summary judgment on the Secretary's affirmative defenses.

The Plaintiffs moved for summary judgment on the Secretary's affirmative defenses 3 and 7-10. Plaintiffs are not entitled to summary judgment on affirmative defenses 3 or 8.[3]

### A.   The Secretary's third affirmative defense.

The Secretary's third affirmative defense states that Plaintiffs lack constitutional standing to bring their claim. Plaintiffs' current motion claims

---

[3] The Secretary does not contest Plaintiffs' motion as to affirmative defenses seven, nine, and ten.

they have a right to summary judgment on that very issue. [Doc. 79 pp. 8–10]. But as the Secretary already established in his Response to Plaintiffs' first motion for partial summary judgment, "standing is something that must continuously exist in federal court…" [Doc. 62, p. 7]. "Standing cannot be waived or conceded by the parties, and it may be raised (even by the court sua sponte) ***at any stage of the case***." *Anderson v. Raffensperger*, 497 F. Supp. 1300, 1307 (2020) (*quoting A&M Gerber Chiropractic, LLC v. GEICO Gen. Ins.* Co., 925 F. 3d 1205, 1210 (11th Cir. 2019)) (emphasis added). This reality is no less true now than it was when the Secretary first raised this defense.

Moreover, the Secretary's Motion for Summary Judgment, [Doc. 80], sets out the reasons why the Secretary, not Plaintiffs, is entitled to summary judgment on constitutional standing. But even if the Court disagrees with the Secretary on this point, a party invoking the Court's jurisdiction cannot be awarded summary judgment on the issue of having *established* standing because at any moment a party may lose constitutional standing. It is an inquiry the Court must revisit throughout the entirety of the case and, if standing is ever lost, the Court may not continue the action because "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez,* 594 U.S. ___ (2021) slip op. at 7, (quoting *Casillas v. Madison*

*Avenue Assocs., Inc.,* 926 F. 3d 329, 333 (CA7 2019)) (Barrett, J.). This is true for practical reasons as well as structural ones. "The legitimacy of an unelected, life tenured judiciary in our democratic republic is bolstered by the constitutional limitation of that judiciary's power in Article III to actual 'cases' and 'controversies.'" Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1220 (1993). For this reason, "[t]he party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing]…with the manner and degree of evidence required ***at the successive stages of the litigation***." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added). In light of the constitutional requirement that federal courts look to standing on an ongoing basis, Plaintiffs are precluded from summary judgment on the issue altogether.

## B.    The Secretary's eighth affirmative defense.

The Secretary's eighth affirmative defense states "Plaintiffs' Complaint requests relief that will result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the alteration of the form of government of the State of Georgia." [Doc. 37, p. 3]. Plaintiffs claim that "none of [the Secretary's] legal arguments has merit, and Plaintiffs are therefore entitled to summary judgment on Defendant's eighth affirmative defense." [Doc. 79, p. 11]. The Secretary argued his position on this issue at length in his Motion

9

for Summary Judgment, which is incorporated by reference, [Doc. 80], and will not repeat those arguments here in the interests of judicial economy.

And while the Secretary obviously disagrees with Plaintiffs' characterization of the applicable statutory and state constitutional law at issue, even if the Court were persuaded by Plaintiffs, the issue would still not be ripe for summary judgment because it involves a question of first impression that should first be considered by the state courts of Georgia. Thus, to the extent the Court intends to rely on either Plaintiffs' interpretation of the interplay between the relevant Georgia statutory and constitutional provisions, the Court should certify the question for resolution by the Georgia Supreme Court: "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 79 (1997). *See also Forgione v. Dennis Pirtle Agency, Inc.,* 93 F.3d 758, 761 (11th Cir. 1996) ("When substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court

the opportunity to explicate state law."). This Court should deny Plaintiffs' partial motion for summary judgment on the Secretary's eighth affirmative defense or, at the very least, certify the question to the Georgia Supreme Court.

## II. The undisputed evidence demonstrates that Plaintiffs are not entitled to summary judgment on *Gingles* prong one because they cannot demonstrate a proper remedy.

Plaintiffs reduce the legal requirements of *Gingles* prong one to a mechanistic recitation that "Black voters in Georgia are 'sufficiently large and geographically compact to constitute a majority in a single-member district.'" [Doc. 79, p. 15]. Because the Secretary admits that such a district can be drawn, and because Plaintiffs attached a hypothetical district satisfying that criteria to their Complaint, they claim to have satisfied prong one sufficient to be granted summary judgment on the issue. *Id.*

But this is incorrect. The undisputed evidence shows that Plaintiffs are unable to create their proposed majority-African-American district without fundamentally altering the statewide nature of PSC elections. SAMF ¶ 10. *Gingles* prong one requires more than just a district—it requires that the Court be able to "fashion a permissible remedy in the particular context of the challenged system." [Doc. 36, p. 34] (quoting *Nipper*, 39 F.3d at 1530-31). As explained in the Secretary's Motion for Summary Judgment, [Doc. 80], the

11

Georgia Constitution chose to make commissioners elected statewide as chosen "by the people." And since at least 1906, long before the ratification of Georgia's most recent constitution, "the people" have constituted the entirety of the State of Georgia, not just some identifiable subsection. [Doc. 80-1, pp. 16]. Thus, while the Secretary admits that Black voters are sufficiently large and geographically compact to create a district in which they represent a voting majority, Plaintiffs have not demonstrated that they are entitled to summary judgment on *Gingles* prong one because they cannot fashion the relief they seek without altering Georgia's form of government in violation of the Constitution and, by extension, Section 2 of the VRA.

**III.  There remains a significant dispute of fact about the nature of the polarization found by the experts in their analysis of the second and third *Gingles* prongs.**

As noted above, the experts disagree about the cause of the polarization the statistical analyses show—Plaintiffs' experts see racial polarization, while the Secretary's expert sees partisan polarization. SAMF ¶¶ 3-9. And, as also previously referenced, courts tend to disfavor summary-judgment resolutions in favor of plaintiffs in Section 2 cases because of the "inherently fact-intensive" nature of vote dilution cases, especially where complex issues

of politics and race are involved.[4] *See, e.g., Nipper*, 39 F. 3d at 1498, 1527 ("[c]ourts must consider all relevant evidence" and "the types of evidence that would be relevant under [the *Gingles*] standard plainly defy categorization"); *McIntosh Cty. Branch of the NAACP v. City of Darien*, 605 F. 2d 753, 757 (5th Cir. 1979) (requiring that findings of fact and conclusions of law with sufficient detail to enable appellate review of the factual and legal basis for the court's ultimate conclusion). Indeed, the Eleventh Circuit in *Nipper* had difficulty conceiving how any dispute about whether racial or partisan patterns explained electoral losses could ever be conclusively determined at any phase before trial. *See Nipper*, 39 F. 3d at 1525 n.61 (discussing how to practically approach trial on vote-dilution claims).

Recent Eleventh Circuit decisions in Section 2 cases affirm that summary judgment should not be granted to plaintiffs especially when partisanship-versus-race issues are raised. In two cases, the court reversed summary-judgment decisions, explaining that the trial courts improperly weighed evidence and made credibility determinations on issues virtually

---

[4] The second and third *Gingles* prongs require: "Second, the minority group must be able to show that it is politically cohesive . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (cleaned up).

identical to those raised by Plaintiffs' motion. The Eleventh Circuit explained that it was improper at summary judgment to (1) make determinations about the *reason* minority candidates had not been elected to office (*i.e.*, on account of partisanship or race), (2) weigh the Senate factors to determine the totality of the evidence, and (3) find the evidence supported racially polarized voting. *See Fayette Cty. Bd. of Comm.*, 775 F. 3d at 1347-48; *Wright v. Sumter Cty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016). For these same reasons, Plaintiffs are not entitled to summary judgment here.

Section 2 plaintiffs bear the burden of proving that electoral losses are the result of racial bias—not partisan voting patterns.[5] *Nipper*, 39 F. 3d at 1494; *Solomon v. Liberty County*, 220 F. 3d 1218 (11th Cir. 2000) (*en banc*); *League of United Latin Am. Citizens v. Clements*, 999 F. 2d 831 (5th Cir. 1993) (*en banc*) (*LULAC*). In other words, Plaintiffs must demonstrate, at the summary-judgment stage, that there is no genuine issue of material fact that polarization in voting patterns was caused by racial rather than partisan considerations. As the Eleventh Circuit explained:

> Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of "partisan politics" *or* "racial vote dilution," "political defeat" *or* "built-in bias." It is only upon

---

[5] This makes sense, because the Voting Rights Act is designed to protect minority voters—not to require partisan outcomes.

Case 1:20-cv-02921-SDG   Document 85   Filed 07/23/21   Page 15 of 21

concluding that a minority group's failure to prevail at the polls ... was the "result" or "function" of "racial vote dilution" or "built-in bias," that a court may find that minority plaintiffs have suffered "a denial or abridgement of the right ... to vote on account of race or color."

"Electoral losses that are attributable to partisan politics" the court concluded, "do not implicate the protections of Section 2."

*Nipper*, 39 F. 3d at 1525 (quoting *LULAC*, 999 F. 2d at 853-854) (quotes and emphasis in original). Where partisanship causes the defeat of minority-preferred candidates, it is reversible error to find a Section 2 violation: "The standard we articulate today simply allows a defendant to rebut proof of vote dilution by showing that losses by minority-preferred candidates are attributable to non-racial causes." *Nipper*, 39 F.3d at 1526.

This interpretation of Section 2 by both the Eleventh Circuit in *Nipper* and the Fifth Circuit in *LULAC* is based on the purpose and legislative history of the VRA itself:

[S]ection 2 . . . prohibits voting practices that deny minority voters equal access to the political process *on account of race*. Indeed, "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory,' and any distinction between deprivation and mere losses at the polls becomes untenable."

\* \* \*

Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by

15

> minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution.

39 F. 3d at 1523-24 (citations omitted) (emphasis in original). This is so because of the far more benign but "inescapable fact that, in a majoritarian system, numerical minorities lose elections." *Holder v. Hall*, 512 U.S. 874. 901 (1994) (O'Connor, J., concurring).

This connection to racial bias is key, because Plaintiffs must prove "objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process is due to the interaction of *racial bias in the community* with the challenged voting scheme." 39 F. 3d at 1524 (emphasis added). The voting community must be "driven by racial bias" which allows the bias "dilute the minority population's voting strength." *Id.* at 1524-25; *see also Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1330 (11th Cir. 2021) (emphasizing that the challenged law must have "*caused* the denial or abridgement of the right to vote on account of race" (emphasis in original)). And it is worth noting that an allegation of racial bias in a statewide contest, like the PSC, is an allegation that the voters in *the entire State of Georgia* are driven by racial bias. And this seems like an unlikely reality given the

16

statewide results of the 2020 elections and the hotly contested 2018 gubernatorial race.[6]

The Supreme Court also reemphasized this point in *Brnovich*, explaining that Section 2 "requires consideration of 'the totality of circumstances' in each case and demands proof that 'the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation' by members of a protected class '*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice.'" 141 S. Ct. at 2322 (quoting 52 U.S.C. §10301(b)). Plaintiffs must demonstrate that racial polarization is, in fact, racial—not merely political.

This is true because, if the evidence demonstrates that racial bias "does not play a major role in the political community, and the plaintiff cannot overcome that proof, then obviously [Congress] did not intend the plaintiff to win, *even if the plaintiff has proven bloc voting.*" *Nipper*, 39 F. 3d at 1524 n.60 (emphasis in original). Plaintiffs' evidence does not demonstrate that there is racial bias present in the voting patterns they identify because their experts *specifically ignored* the possibility that other factors may be the cause of the

---

[6] Governor Kemp also appointed a Black Republican to the PSC this week to fill the vacancy created by the resignation of Commissioner Chuck Eaton. SAMF ¶ 11.

polarization found by their statistics. SAMF ¶ 12. This dearth of analysis fails to undermine the conclusion of Dr. Barber that the polarization between white and Black voters in Georgia is the result of partisanship, not racial bias. SAMF ¶ 13. Thus, Plaintiffs have submitted no convincing evidence—and certainly not undisputed evidence—of a statewide voting community "driven by racial bias." *Nipper*, 39 F. 3d at 1524–25.

Facing this evidentiary problem in light of *Nipper*, Plaintiffs attempt to use their experts to modify their burden. Dr. Fraga, for example, implies that Plaintiffs do not have to refute evidence of partisan politics, because establishing racial polarization is sufficient and "no separation [of the two categories] is necessary." SAMF ¶ 14. These assertions are incorrect and directly contradict the plain language of *Nipper* and *LULAC*, which demonstrate that the question of racial or partisan polarization is relevant to whether legally significant bloc voting exists. At the very least, this demonstrates that Plaintiffs are not entitled to summary judgment: courts repeatedly find that totality-of-the-circumstances inquiries are not appropriate for summary judgment to plaintiffs. See, e.g., *Fayette Cty. Bd. of Comm.*, 775 F. 3d at 1347-48; *McNeil v. Springfield Park Dist.*, 851 F. 2d 937, 940-43 (7th Cir. 1988); *Johnson v. DeSoto Cty. Bd. of Comm'rs*, 868 F. Supp.

18

1376, 1382 (M.D. Fla. 1994), *rev'd on other grounds*, 72 F. 3d 1556 (11th Cir. 1996).

*Nipper* clearly sets forth Plaintiffs' affirmative burden to prove race—not partisan politics—caused the electoral defeats of the minority-preferred candidates that they identified. And having not even considered a political explanation for the polarization they find, Plaintiffs cannot carry their burden. On the present record, Plaintiffs have not met their burden to demonstrate the absence of disputed facts regarding whether the defeats of minority-preferred candidates were due to race and thus are not entitled to summary judgment on *Gingles* prongs two and three.

## CONCLUSION

This Court need not reach the issues raised by Plaintiffs' second motion for summary judgment because Section 2 does not extend to changing the statewide nature of the election of Public Service Commissioners, as outlined in the Secretary's motion for summary judgment, [Doc. 80]. But if it does, Plaintiffs have not shown that the undisputed material facts support a grant of summary judgment on the Secretary's third and eighth affirmative defenses or on any of the *Gingles* prongs. This Court should deny Plaintiffs' motion and grant judgment as a matter of law to the Secretary.

19

Respectfully submitted this 23rd day of July, 2021.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
40 Capitol Square, S.W.
Atlanta, Georgia 30334


**TAYLOR ENGLISH DUMA LLP**

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 770.434.6868

*Counsel for Defendant Secretary of State Brad Raffensperger*

20

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing SECRETARY OF STATE BRAD RAFFENSPERGER'S RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT was prepared double-spaced in 13-point Century Schoolbook pursuant to Local Rule 5.1(C).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411