IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICHARD ROSE, *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al.,*<br><br>      Defendant. | Civil Action No. 1:20-cv-02921-SDG |

**STATEMENT OF INTEREST OF THE UNITED STATES
UNDER THE VOTING RIGHTS ACT**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." This case presents important questions regarding enforcement of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section 2"). Congress has vested the Attorney General with authority to enforce this provision on behalf of the United States. *See* 52 U.S.C. §§ 10101(c), 10308(d). Accordingly, the United States has a substantial interest in ensuring Section 2's proper interpretation.

The Plaintiffs' complaint alleges that the at-large method of electing the members of Georgia's Public Service Commission dilutes black voting strength in violation of Section 2.  Compl. ¶¶ 1, 36, ECF No. 1.  On July 9, 2021, Plaintiffs filed a motion for partial summary judgment arguing, among other things, that they are entitled to summary judgment as to several of Defendant's affirmative defenses.  Pls.' Second Mot. Partial Summ. J. 1, ECF. No. 79 ("Pls.' Second Mot.").  On that same day, the Defendant, Georgia Secretary of State Brad Raffensperger, filed a motion arguing that he is entitled to summary judgment as a matter of law on Plaintiffs' sole claim under Section 2.  Secretary of State's Mot. Summ. J. 1, ECF No. 80.

The United States files this limited Statement of Interest to address two specific arguments the Defendant makes which are central to this case and that incorrectly interpret Section 2—namely, that a plaintiff cannot assert a vote-dilution injury based on a statewide electoral scheme and that remedying the alleged injury through the use of single-member districts would be unworkable in this context.  The United States does not address any other issue pending before this Court.

## I. BACKGROUND

The government body at issue in this litigation is the Georgia Public Service Commission. Compl. ¶ 1. The Georgia Constitution establishes the Commission, providing that it "shall consist of five members who shall be elected by the people." Ga. Const. art. IV, § I, para. 1(a). The Georgia Constitution specifies that the Commission's members serve for terms of six years and that the "manner and time of election of members of the commission shall be as provided by law." *Id.*, § I, paras. 1(a), 1(c). The implementing statute provides that each member is elected at large, by all Georgia voters, to staggered terms in partisan elections. Ga. Code Ann. § 46-2-1. The provision further mandates that each member must reside in one of five residency districts prescribed by statute. *Id.*

All four of the plaintiffs in this case are African-American registered voters who reside in Fulton County, Georgia. Compl. ¶¶ 6-9. Georgia's Secretary of State, who is sued in his official capacity, serves as the state's chief election official and is responsible for administering Georgia's elections for members of the Public Service Commission. *See, e.g.*, Ga. Code Ann. §§ 21-2-50, 21-2-154(a), 21-2-132(d)(2), 21-2-499(a), 21-2-502(c).

## II. DISCUSSION

Although Defendant characterizes Plaintiffs' claim as "new and novel," Br. Supp. Def.'s Mot. Summ. J. 1, ECF. No. 80-1 (Def.'s Br.), at bottom, this case involves a relatively straightforward application of Section 2 of the Voting Rights Act. Four African-American registered voters, all of whom reside in a geographic area with a significant black population, allege that because of the interaction between the electoral system used by the state in which they reside and racial bloc voting, they "have less opportunity than other members of the electorate . . . to elect representatives of their choice," 52 U.S.C. § 10301(b). Specifically, Plaintiffs contend that the at-large method of electing Georgia's Public Service Commission—that is, using a single voting district for all voters in the state to elect all five of the Commission's members—dilutes black voting strength in violation of Section 2. Compl. ¶ 36. In his motion for summary judgment, Defendant argues that Plaintiffs have failed to allege a cognizable injury under the Voting Rights Act because their claim involves a statewide commission, Def.'s Br. at 4-9, and that Plaintiffs have failed to provide the necessary benchmark against which

any remedy could be evaluated, Def.'s Br. at 18-20.  Defendant is wrong on both fronts.[1]

### A. Plaintiffs' alleged injury, which stems from their claim of statewide vote dilution, is judicially cognizable.

Plaintiffs' complaint—that their votes have been diluted as a result of an allegedly discriminatory electoral practice adopted by the jurisdiction in which they vote—is a cognizable injury under Section 2 of the Voting Rights Act. Defendant incorrectly argues that Plaintiffs' alleged injury is not cognizable under Section 2 simply because it involves a statewide election.  Def.'s Br. at 7-8; *see also* Secretary of State's Resp. Opp. Pls.' Second Mot. Partial Summ. J. 19, ECF No. 85 ("Def.'s Resp.").

---

[1] Both parties agree that summary judgment regarding the issue of whether partisan politics causes black-preferred candidates to lose is a factual dispute and not appropriate for summary judgment.  Pls.' Resp. Opp. Def.'s Mot. Summ. J. 5, ECF No. 84; Secretary of State's Resp. Opp. Pls.' Second Mot. Partial Summ. J. 12-13, ECF No. 85.  Therefore, the United States will not discuss the abstract issue of how race and partisanship interact.  Whatever the answer to that question, it does not go to whether a plaintiff has met the second and third *Gingles* preconditions.  The effect of partisanship is considered in weighing the totality of the circumstances. *See Nipper v. Smith*, 39 F.3d 1494, 1524-25 (11th Cir. 1994) (en banc).

The text of Section 2 itself defeats Defendant's argument. Section 2 specifically prohibits "any *State* or political subdivision" from imposing a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race . . . ." 52 U.S.C. § 10301(a) (emphasis added); *see also id.* § 10301(b) (requiring, to establish a violation, a showing that "the political processes leading to nomination or *election in the State* or political subdivision are not equally open to participation" by minority citizens (emphasis added)). As this Court already has determined, the statute "applies equally to *states* and their political subdivisions." Op. and Order at 41, ECF. No. 36.

Indeed, federal courts routinely have evaluated statewide redistricting claims under Section 2 without any indication that an injury based on a statewide practice is not cognizable under Section 2. *See., e.g.*, *Abbott v. Perez*, __ U.S. at __, 138 S. Ct. 2305, 2330-31 (2018) (reviewing under Section 2's "effects" test a three-judge panel's determination concerning, among other things, the "district lines" Texas used for state legislative plans); *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 425 (2006) ("*LULAC*") ("The question we address is whether [the congressional districting plan adopted by Texas] violates § 2 of the Voting

Rights Act."). In such redistricting cases, the cognizable injury stemmed from a claim of vote dilution on a statewide basis, with resident minority voters alleging an unequal opportunity to elect their preferred candidates because of a districting scheme the state had adopted. *E.g.*, *LULAC*, 548 U.S. at 437-38 (acknowledging that plaintiffs "alleged statewide vote dilution based on a statewide plan").[2]

The fact that this case involves a single, statewide voting district does not change the analysis. Section 2 carves out no exemption for particular statewide practices or schemes. Nor is there a reason for this Court to do so here. Indeed, Plaintiffs' challenge to a statewide at-large election is conceptually no different from cases involving countywide at-large elections. As Defendant readily admits, "[i]n situations where a county commission is elected at large and minority voters could constitute a majority in a single-member district (and the other required

---

[2] Defendant's reliance on *Jacobson v. Florida Secretary of State*, 974 F.3d 1236, 1247 (11th Cir. 2020), to support his lack-of-injury argument is misplaced. Most notably, that case concerned a partisan challenge to Florida's ballot order statute for general elections under the First and Fourteenth Amendments to the U.S. Constitution, as interpreted in the *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), line of cases. *Jacobson*, 974 F.3d at 1242. It did not, as here, involve a claim of racial vote dilution under Section 2 of the Voting Rights Act.

factors exist), courts correct this violation of Section 2 of the [Voting Rights Act] by moving from at-large elections to district elections." Def.'s Br. at 6 (citing, as an example, *Wright v. Sumter Cnty. Bd. of Elections & Registrations*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018)). *See also, e.g., United States v. Charleston Cnty.*, 365 F.3d 341 (4th Cir. 2004); *United States v. Osceola Cnty*, 475 F. Supp. 2d 1220 (M.D. Fla. 2006). So, too, where a state commission is elected at large and minority voters could constitute a majority in a single-member district—and the other required factors exist—a court could remedy that violation of Section 2 of the Voting Rights Act by moving from at-large elections to elections using single-member voting districts.

Thus, contrary to Defendant's arguments, Plaintiffs have alleged a cognizable injury under Section 2, as required to establish standing. Most importantly, Plaintiffs "reside in the area directly affected by the allegedly illegal voting scheme"—the "essential point" of standing. *Wilson v. Minor*, 220 F.3d 1297, 1303 n.11 (11th Cir. 2000). And "their voting powers plainly are affected by that scheme." *Id.* No more is required for these Plaintiffs to have standing to challenge the at-large scheme. *Cf. Lopez v. Abbott*, 339 F. Supp. 3d 589, 599-600 (S.D. Tex. 2018) (holding that three voters "of Hispanic descent" who resided in

parts of Texas included within proposed Hispanic-majority remedial districts had standing to challenge the "statewide, at-large elections of all justices to the Supreme Court of Texas and judges to the Texas Court of Criminal Appeals under Section 2 of the Voting Rights Act").[3]

At base, this case is a traditional Section 2 case to which the traditional Section 2 analysis applies.[4] Plaintiffs here claim that, in conjunction with white bloc voting, the method of election (at-large) and district lines (a single voting

---

[3] Similarly, in *Alabama State Conf. of the NAACP v. Alabama*, the district court found, and the parties jointly stipulated, that plaintiffs had standing to bring their vote dilution claim against Alabama's at-large method of electing appellate judges. No. 2:16-CV-731-WKW, 2020 WL 583803, at *4, 2020 U.S. Dist. LEXIS 18938, at *11 (M.D. Ala. Feb. 5, 2020). In that case, in response to the defendants' motion to dismiss, the court held that the individual plaintiffs' allegations that they reside in affected Alabama counties and are "members of a protected class whose electoral strength has been diluted . . . are enough to establish standing." Memorandum Opinion and Order, No. 2:16-cv-00731-WKW-CSC, at 16-17 (M.D. Ala. Aug. 31, 2017).

[4] This analysis, established in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), looks at whether plaintiffs have satisfied the three *Gingles* preconditions for vote-dilution claims and, if so, examines the totality of the circumstances to determine whether the practice has an impermissible discriminatory effect, *see Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). As part of that analysis, one especially significant factor is whether there is proportionality between the number of districts in which minority voters have the opportunity to elect candidates of their choice and the minority group's share of the relevant statewide population. *See LULAC*, 548 U.S. at 436-37.

district) that Georgia uses to elect the members of its Public Service Commission impermissibly dilutes black voting strength, infringing Plaintiffs' opportunity to elect their preferred candidates and thereby abridging their right to vote.  *Cf. Thornburg v. Gingles*, 478 U.S. 30, 68 (1986) (plurality opinion) (recognizing the injury caused by vote dilution where "minority group members prefer certain candidates whom they could elect were it not for the interaction of the challenged electoral law or structure with a white majority that votes as a significant bloc for different candidates").  Such harm is precisely the type against which Section 2 protects and, on that basis, this Court must reject Defendant's argument that Plaintiffs' alleged injury is not cognizable as a matter of law.

### B. The Supreme Court's decision in *Holder v. Hall* does not preclude the imposition of a remedy in this case.

Defendant also argues that he is entitled to summary judgment as a matter of law because there is no appropriate remedy available to Plaintiffs in this case. Def.'s Br. at 15-21.  He once again attempts to characterize the situation surrounding Georgia's Public Service Commission as something "unique" and "specialized," *id.* at 20, thereby placing elections for its members outside the purview of Section 2.  But Defendant misunderstands the Supreme Court's

decision in *Holder v. Hall*, 512 U.S. 874 (1994), in incorrectly arguing it precludes the imposition of a remedy in this case.

In *Holder v. Hall*, the plaintiffs brought a Section 2 vote dilution claim against a single-member county commission. The question before the Court was "whether the size of a governing authority is subject to a vote dilution challenge under § 2 of the Voting Rights Act." *Id.* at 876. The Court did not reject the Section 2 claim on the merits, but instead held, as a categorical matter, that plaintiffs "cannot maintain a [Section] 2 challenge to the *size* of a government body." *Id.* at 885 (emphasis added). Justice Kennedy's opinion announcing the Court's judgment offers only the unremarkable observation that "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2." *Id.* at 881.

Applying that principle to the challenge to the size of the governing body at issue in *Holder*, the Justices concluded that "[t]he wide range of possibilities" with respect to size "makes the choice inherently standardless." *Id.* at 889 (O'Connor, J., concurring in the judgment). On that basis, "[a] federal court cannot modify the size of an elected governing body in order to remedy a section 2 violation because

- 11 -

there is no principled reason to choose a legislative body of one size over one of a different size for the purposes of determining whether there has been vote dilution." *Wilson*, 220 F.3d at 1305; *see also Nipper v. Smith*, 39 F.3d 1494, 1532 (11th Cir. 1994) (en banc) ("[U]nder *Holder*, federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies.");[5] *White v. Alabama*, 74 F.3d 1058, 1072-73 (11th Cir. 1996) (drawing from *Holder* and vacating the district court's approval of settlement agreement which included an increase to the size of Alabama courts of appeals).

Here, Plaintiffs do not challenge the size of Georgia's Public Service Commission. Instead, they take the size of that body—five members—as a given and challenge only the method of electing its five members. Pls.' Second Mot. at 14. Simply put, this Court must decide "whether the . . . at-large system—compared to a system of single-member districts that the plaintiffs advocate—results in vote dilution." *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1022 n.23

---

[5] Further opining on *Holder v. Hall*, the court in *Nipper* recognized: "Implicit in [its] holding, however, is a broader concern. Federal courts may insist that a state or political subdivision operate a governmental structure fairly, thereby allowing all groups equal access to the political process." *Nipper*, 39 F.3d at 1532.

(2d Cir. 1995). Plaintiffs are not asking the court to increase or decrease the size of the Commission. It currently has five members, and Plaintiffs' claim of vote dilution can be measured against that benchmark. Further, in support of their Section 2 claim, Plaintiffs have presented an illustrative plan that includes five single-member districts, and they also point to the five existing residency districts as a possible way to provide an opportunity to elect at least one preferred candidate were those districts also used for voting. Pls.' Second Mot. at 15-16; *see also* Pls.' Resp. Opp. Def.'s Mot. Summ. J. 13-14, ECF No. 82. As those plans demonstrate, this Court need not alter the size of the Commission to remedy the vote dilution alleged by Plaintiffs, and *Holder v. Hall* poses no bar to their claim under Section 2.[6]

---

[6] In fact, there is nothing to prevent Georgia from using single-member districts to elect the members of its Public Service Commission. At least four other states—Louisiana, Mississippi, Montana, and Nebraska—currently use single-member voting districts to elect the members of their Public Service Commissions. *See* La. Const. art. IV, § 21; Miss. Code Ann. § 77-1-1; Mont. Code Ann. § 69-1-103; Neb. Const. art. IV, § 20.

## III. CONCLUSION

For the foregoing reasons, this Court should reject Defendant's argument that Plaintiffs' alleged injury under Section 2 of the Voting Rights Act is not cognizable because it stems from a claim of statewide vote dilution. The Court also should reject Defendant's argument that *Holder v. Hall* precludes any Section 2 relief in this case.

Respectfully submitted,

Date:  July 28, 2021

| | |
|---|---|
| KURT R. ERSKINE<br>Acting United States Attorney<br>Northern District of Georgia | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| LORI BERANEK<br>Civil Chief, Civil Division<br>Northern District of Georgia | PAMELA S. KARLAN<br>Principal Deputy Assistant<br>Attorney General |
| */s/ Aileen Bell Hughes*<br>_____<br>AILEEN BELL HUGHES<br>Georgia Bar No. 375505<br>Assistant U.S. Attorney<br>Office of the United States Attorney<br>600 U.S. Courthouse<br>75 Ted Turner Drive, SW<br>Atlanta, GA 30303<br>Phone: (404) 581-6000<br>Fax: (404) 581-6181<br>aileen.bell.hughes@usdoj.gov | */s/ Janie Allison (Jaye) Sitton*<br>_____<br>T. CHRISTIAN HERREN, JR.<br>TIMOTHY F. MELLETT<br>JANIE ALLISON (JAYE) SITTON<br>Attorneys, Voting Section<br>Civil Rights Division<br>U.S. Department of Justice<br>4 Constitution Square<br>150 M Street NE, Room 8.135<br>Washington, D.C. 20530<br>Phone: (202) 305-4143<br>Fax: (202) 307-3961<br>timothy.f.mellett@usdoj.gov<br>jaye.sitton@usdoj.gov |

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies, pursuant to LR 7.1.D, N.D. Ga., that the foregoing Statement of Interest of the United States under the Voting Rights Act of 1965 was prepared in Times New Roman 14-point font.

July 28, 2021

*/s/ Janie Allison (Jaye) Sitton*
JANIE ALLISON (JAYE) SITTON
Attorney, Voting Section

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and therefore will be sent electronically to counsel.

July 28, 2021

                                          */s/ Janie Allison (Jaye) Sitton*
                                          JANIE ALLISON (JAYE) SITTON
                                          Attorney, Voting Section