## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RICHARD ROSE et al., | |
| Plaintiffs | |
| v. | Civil Action No. 1:20-cv-02921-SDG |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, | **EXPEDITED CONSIDERATION REQUESTED** |
| Defendant. | |

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs respectfully move for a preliminary injunction enjoining Defendant from qualifying candidates for the 2022 elections for the Georgia Public Service Commission until a final judgment in this action has been issued. Plaintiffs' request is limited but necessary to maintain the status quo pending a trial on the merits and to avoid the irreparable harm Plaintiffs would suffer if the 2022 elections were allowed to proceed using a method that violates Section 2 of the Voting Rights Act.

Plaintiffs are entitled to this limited relief. The Court ruled at summary judgment that Plaintiffs have established the three *Gingles* preconditions. (ECF 97 at 36.) And binding circuit precedent recognizes that "it will be ***only the very***

***unusual case*** in which a plaintiff can establish the existence of the three *Gingles* factors," as Plaintiffs have here, "but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020) (emphasis added) (internal quotation marks omitted). This is not "the very unusual case" because most if not all the Senate Factors guiding the totality of circumstances analysis weigh in Plaintiffs' favor, and there is no legal bar to the relief Plaintiffs seek. Plaintiffs are therefore likely to succeed on the merits of their claim.

Plaintiffs will suffer irreparable injury far outweighing any damage to Defendant's interests if the Court does not grant the limited relief sought here. Defendant's position is that the Court cannot rule on the merits in time to affect the 2022 elections. Plaintiffs disagree, and the Court entered a trial schedule that Plaintiffs believe would allow the Court sufficient time. But Plaintiffs also recognize that the Court has a busy docket, and that the general election is scheduled for just a few months after trial, with many pre-election deadlines arriving even sooner.

To maintain the parties' positions, then, the Court should press pause on this year's PSC elections pending a trial on the merits. The best way to do that, in Plaintiffs' view, is to enjoin qualification, the deadline for which is March 11,

2022. That limited injunction would serve the public interest and be far less disruptive than the alternative whereby election officials, candidates, and voters would be proceeding under a Sword of Damocles that could fall at any moment.

The far better course for both sides and the general public would be to pause the election now before any candidates have been qualified, before the primaries, and before campaigns begin in earnest. That way the Court can take the time it needs to rule on the merits, at which point the parties and the general public will have clarity as to how and when the next PSC election should proceed. If the timeline for resolving the merits extends beyond this year's November general election date for Districts 1 and 3, the governor would simply appoint individuals (likely the incumbents) to fill those vacancies until the Court lifts the injunction and the next election can take place, either under a district-based remedial plan if Plaintiffs prevail or under the existing at-large system if Defendant does. Whichever way the Court ultimately rules, an injunction now would avoid irreparable harm to Plaintiffs, minimize any harm to Defendant, and further the public's interest in the certainty of their elections.

## BACKGROUND

This action challenges the method of electing members of Georgia's Public Service Commission (the "Commission" or "PSC"). The Commission consists of

five members elected at-large by all Georgia voters in partisan elections to serve staggered six-year terms. Ga. const. art. IV, § 1, ¶ I; O.C.G.A. § 46-2-1. Among many other duties, the Commission regulates the rates that electric, natural gas, and telephone companies can charge Georgia's consumers. O.C.G.A. § 46-2-1 *et seq*.

Plaintiffs are four Black residents of Fulton County. Each Plaintiff is a registered voter, and each has voted in recent elections for members of the Commission. Defendant Brad Raffensperger is the Georgia Secretary of State. He administers the elections for members of the Commission, and he is sued in his official capacity only.

Plaintiffs filed this action on July 14, 2020. They claim that the at-large method of electing members of the Commission dilutes Black voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

On May 27, 2021, Plaintiffs moved for partial summary judgment on certain of Defendant's affirmative defenses. After the close of discovery, on July 9, Plaintiffs filed a second motion for partial summary judgment on Defendant's remaining affirmative defenses and the three *Gingles* preconditions. The same day, Defendant filed his own motion for summary judgment. On July 28, the United States filed an amicus brief opposing Defendant's motion. The Court heard argument on the summary judgment motions on November 8, 2021.

On January 24, 2022, the Court issued its opinion and order deciding the Parties' cross-summary judgment motions (the "SJ Order"). In its SJ Order, the Court denied Defendants' motion for summary judgment in total and granted Plaintiffs' motions in part, holding that Plaintiffs had satisfied the three *Gingles* preconditions of (1) geographic compactness, (2) political cohesiveness, and (3) racial bloc voting. (ECF 97 at 36.) The Court left the totality of circumstances analysis for trial, including the strength of any state interest in the current method of election, and whether there is a non-racial explanation for the racial-bloc voting present in elections for the Commission.

## ARGUMENT

A preliminary injunction shall issue if the moving party shows (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm without injunctive relief; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs meet this burden.

## I.    Plaintiffs Are Likely to Succeed on the Merits

To succeed in a Section 2 claim, Plaintiffs must first show the three *Gingles* preconditions that: (1) the minority group is "sufficiently large and geographically

compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). Once Plaintiffs meet this threshold, the Court must then examine "the totality of circumstances"—including the nine factors identified in the Senate report that accompanied the 1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44.

Because this Court has already held that Plaintiffs have satisfied the *Gingles* preconditions, the strong inference is that Plaintiffs will succeed on the merits at trial. As the Eleventh Circuit recently affirmed, "it will be only the very unusual case in which a plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright*, 979 F.3d at 1304 (internal quotation marks omitted); *accord Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). This is not the "very unusual case."

To the contrary, the totality of circumstances analysis here shows that the statewide at-large method of electing commissioners to the Public Service Commission denies Black Georgians an equal opportunity to elect their preferred candidates. The totality of circumstances analysis includes the following nine non-exclusive "Senate Factors":

1.  "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"

2.  "the extent to which voting in the elections of the state or political subdivision is racially polarized"

3.  "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group"

4.  "if there is a candidate slating process, whether the members of the minority group have been denied access to that process"

5.  "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"

6.  "whether political campaigns have been characterized by overt or subtle racial appeals"

7.  "the extent to which members of the minority group have been elected to public office in the jurisdiction"

8.      "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"

9.      "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous"

*Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417 at 28–29). There is no minimum number of factors that must be proven nor is there any requirement "that a majority of them point one way or the other." *Id.* at 45 (internal quotation marks omitted).

"Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006) ("LULAC"); *accord Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994). When a plaintiff alleges vote dilution "based on a statewide plan," the proportionality analysis ordinarily is statewide. *LULAC*, 548 U.S. at 437–38.

Here, most if not all of the Senate Factors, and the proportionality factor, weigh in favor of Plaintiffs.

## A.    Senate Factor One – History of Discrimination

Georgia's long history of racial discrimination in voting is not in dispute (Def.'s Answer ¶ 24 (ECF 37)) and is so well documented that federal courts routinely take judicial notice of it. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) ("Georgia's history of [racial] discrimination has been rehashed so many times that the Court can all but take judicial notice thereof." (cleaned up)); *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379 (S.D. Ga. 1994) (per curiam) ("we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases"); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (noting "Georgia's long, well-documented history of past discrimination in voting") (Breyer, Stevens, Souter, and Ginsburg, J.J., dissenting). This factor weighs heavily in Plaintiffs' favor.

**B.     Senate Factor Two – Racial Polarization**

The second Senate Factor captures the reality that an environment characterized by racially polarized voting allows politicians to manipulate elections to "minimize or cancel out minority voters' ability to elect their preferred candidates." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011) (cleaned up). Indeed, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984). Plaintiffs have provided ample evidence showing that this is exactly what occurs in elections for the Public Service Commission.

As explained by Plaintiffs' expert, Dr. Stephen Popick, Black voters have been highly cohesive in general and runoff elections for members of the Public Service Commission between 2012 and the present, often supporting their preferred candidates with more than 90 percent of their votes. Yet and still, white voters have voted sufficiently as a bloc to defeat the Black-preferred candidates in every single one of those elections. Dr. Popick, who has analyzed thousands of elections, concluded that "this pattern of racial polarization is among the clearest I have seen in my professional career." (Popick Expert Report (ECF 79-4) at 20.)

**Table 1: Summary of Election Analyses (Black-Preferred Candidate)**

| Election | Black-Preferred Candidate | Race of Candidate | Outcome | Black Support | White Support |
|---|---|---|---|---|---|
| 2021 - District 4 Runoff | Blackman | Black | LOST | 96.08% | 17.62% |
| 2020 - District 4 | Blackman | Black | RUNOFF | 94.33% | 14.83% |
| 2020 - District 1 | Bryant | Black | LOST | 94.46% | 14.47% |
| 2018 - District 5 | Randolph | White | LOST | 96.03% | 14.40% |
| 2018 - District 3 Runoff | Miller | White | LOST | 97.84% | 20.13% |
| 2018 - District 3 | Miller | White | RUNOFF | 96.55% | 14.83% |
| 2016 - District 2 | Hoskins | White | LOST | 79.18% | 14.64% |
| 2014 - District 4 | Blackman | Black | LOST | 81.29% | 24.28% |
| 2014 - District 1 | Monds | Black | LOST | 82.44% | 12.49% |
| 2012 - District 5 | Staples | White | LOST | 80.57% | 15.36% |
| 2012 - District 3 | Oppenheimer | White | LOST | 89.43% | 21.47% |

**Table 2: Summary of Election Analyses (White-Preferred Candidate)**

| Election | White-Preferred Candidate | Race of Candidate | Outcome | Black Support | White Support |
|---|---|---|---|---|---|
| 2021 - District 4 Runoff | McDonald | White | WON | 3.25% | 80.64% |
| 2020 - District 4 | McDonald | White | RUNOFF | 3.57% | 77.47% |
| 2020 - District 1 | Shaw | White | WON | 5.19% | 78.19% |
| 2018 - District 5 | Pridemore | White | WON | 2.82% | 79.69% |
| 2018 - District 3 Runoff | Eaton | White | WON | 1.87% | 78.97% |
| 2018 - District 3 | Eaton | White | RUNOFF | 3.67% | 78.01% |
| 2016 - District 2 | Echols | White | WON | 20.82% | 85.36% |
| 2014 - District 4 | McDonald | White | WON | 18.71% | 75.72% |
| 2014 - District 1 | Everett | White | WON | 17.56% | 87.51% |
| 2012 - District 5 | Wise | White | WON | 19.43% | 84.64% |
| 2012 - District 3 | Eaton | White | WON | 10.57% | 78.53% |

(*Id.* at 11-12.) Defendant does not dispute Dr. Popick's statistical analysis and concedes, as he must, that voting in these elections is "polarized along racial lines." (Def's Resp. to Pls' SUMF (ECF 85-1) at 4.)

The fact that voting in Georgia is racially polarized has also been repeatedly acknowledged by the courts. *See, e.g.*, *Fayette Cnty.*, 775 F.3d at 1340 (noting that Fayette County "[v]oters' candidate preferences in general elections were racially polarized"); *Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360

(N.D. Ga. 2018) (three-judge panel) (concluding that "voting in Georgia is highly racially polarized"); *Wright*, 301 F. Supp. 3d at 1319 (finding "Sumter County's voters to be highly polarized"). This factor, which is one of the most important considerations in the totality of circumstances, *see Gingles*, 478 U.S. at 48-49 n.15, weighs heavily in Plaintiffs' favor.

### C.    Senate Factor Three – Voting Practices

Plaintiffs have provided evidence that elections for members of the Public Service Commission feature at least three practices that enhance the opportunity for discrimination against Black voters. These methods include staggered terms, a majority-vote requirement, and unusually large voting districts. (Fraga Expert Report (ECF 84-2) at 5; Eaton Dep. (ECF 72) 73:11-14.) Notably, potential Black voters make up less than a majority of Georgia's population, but more than one fifth (20%) of the state's potential voting electorate. Black voters also make up a majority in residency District 3 but have consistently been unable to elect the candidate of their choice in that district because of the current at-large voting method. Indeed, as former District 3 Commissioner Chuck Eaton admitted at his deposition, "I would not have won reelection [in 2012] if it was just District 3 voters." (Eaton Dep. (ECF 72) 70:14-20.) As a result, if the Public Service Commission elections were shifted to a more commonly used single-member

district system using the current sufficiently compact residency districts, at least

one district would have a Black citizen voting-age majority today, and the power to

elect its candidate of choice. (Fraga Expert Report (ECF 84-2) at 5.)

Defendant objected to the consideration of this evidence at summary

judgment but has not disputed it. (Def's Resp. Pls.' SAF ¶ 10 (ECF 88-1).) This

factor weighs heavily in Plaintiffs' favor.

### D.    Senate Factor Four – Denial of Access to Slating Process

Under Senate Factor Four, the Court considers the extent to which the

minority group is denied access to the formal or informal slating process. As

detailed in the report of Plaintiffs' expert, Dr. Bernard Fraga, Black Georgians are

excluded from the informal slating process and benefits of incumbency provided

by being appointed to the Public Service Commission.

The Georgia Governor appoints commissioners in the event of a vacancy.

That appointee can then seek election as an incumbent in the next even-numbered

election year. As detailed by Dr. Fraga, incumbents typically enjoy "personal

returns to incumbency" that help them in elections, including "increased name

recognition, media exposure, campaign resources, previous constituency service,

experience from having held office, institutional privileges, improved ability to

fend off high-quality challengers, and many other factors." (Fraga Report (ECF 84-2) at 14-15 (internal quotation marks omitted).)

Candidates already serving on the Commission enjoy a fundraising advantage specific to their role as regulators, further diminishing the lesser influence Black donors already have in PSC elections and increasing the importance of gubernatorial appointments for PSC election prospects.

At the time of filing this action, only one African American, David Burgess, had ever been appointed to the Commission in its 142-year history. But during the summary judgment phase of this case, in July 2021, the Governor appointed the second ever African American to the Commission, Fitz Johnson, to fill the vacancy left by former District 3 commissioner, Chuck Eaton. Yet and still, this only raises the total to two African American appointees in 142 years—showing that African Americans are far less likely than whites to be appointed to the Commission. And under *Gingles*, it is appropriate for courts to discount the weight of minority candidates elected or appointed during the pendency of Section 2 litigation. *See* 478 U.S. at 75-76 (1986). Further, even with the benefit of incumbency, Burgess lost reelection in 2006 in a runoff election to a white candidate, the only time an appointee to the Commission has lost reelection in the last 26 years. (Fraga Expert Report (ECF 84-2) at 13-15.)

Defendant objected to the consideration of this evidence at summary judgment but has not disputed it. (Def's Resp. Pls.' SAF ¶ 11 (ECF 88-1).)

### E.   Senate Factor Five – Effects of Discrimination

Black citizens in Georgia bear the effects of discrimination in such areas as housing, employment, and health, which hinder their ability to participate effectively in the political process. (Fraga Expert Report (ECF 84-2) at 5-11; Pls.' Mot. Jud. Not. of Census Data (ECF 57) at ¶¶ 3-10.) Defendant objected to the consideration of this evidence at summary judgment but has not disputed it. (Def's Resp. Pls.' SAF ¶ 12 (ECF 88-1).)

### F.   Senate Factor Six – Racial Appeals

In support of their claim, Plaintiffs have also submitted evidence showing that there have been racial appeals in recent elections in Georgia, including the 2020 elections for U.S. Senator. (ECF 84-3.) Defendant objected to the consideration of this evidence at summary judgment but has not disputed it Defendant has not disputed this evidence. (Def's Resp. Pls.' SAF ¶ 13 (ECF 88-1).)

### G.   Senate Factor Seven – Election of Minority Group Members

Senate Factor Seven—the extent to which members of the minority group have been elected to public office in the jurisdiction—also supports Plaintiffs'

case. In the 140+ years of the Public Service Commission's existence, only two Black people have ever served as a commissioner; both joined the Commission as gubernatorial appointments. And one of those appointments did not come until after the close of discovery in this case. Further, even as an incumbent, the first African American commissioner, David Burgess, only won one subsequent election. Such area- and office-specific evidence is especially powerful evidence in favor of Plaintiffs. *See Wright*, 979 F.3d at 1305-06.

Looking at all statewide offices further drives home this point. As of 2021, only 4 Black candidates, including David Burgess, have ever been elected to statewide office in general elections in Georgia. (Fraga Expert Report (ECF 84-2) at 11.) And in the 164 general elections for statewide office in Georgia conducted from 1972-2020, Black candidates have only won 8 (4.9%) of those. (*Id.* at 11-12.) This number is smaller than the share of the population that is Black in Georgia today, or in any period in the state's history. (*Id.* at 12.)

### H.   Senate Factor Eight – Lack of Responsiveness

In support of Senate Factor Eight, Plaintiffs have provided evidence in the form of voters' testimony demonstrating that the Public Service Commission has shown a significant lack of responsiveness in addressing the concerns of African American voters in Georgia. (McCorkle Dep. 34:23-40:14, & McCorkle Dep.

Ex. 6 at PDF pg. 76 (ECF 74); Rose Dep. 19:15-21:4, 23:6-15, & Rose Dep. Ex. 8 at PDF pg. 56 (ECF 75); Woodall Dep. 35:8-39:6, & Woodall Dep. Ex. 4 at PDF pg. 76 (ECF 76); Mosley Dep. 34:15-40:3, & Mosley Dep. Ex. 2 at PDF pg. 80 (ECF 77).) Defendant objected to the consideration of this evidence at summary judgment but has not disputed it. (Def's Resp. Pls.' SAF ¶ 14(2) (ECF 88-1).)

## I.    Senate Factor Nine – Tenuous State Interest

Despite Defendant's argument that the State's interest weighs against the use of single-member districts, the evidence thus far supports the conclusion that any such state interest is tenuous. The attributes that Defendant has previously cited in his summary judgment briefing on this issue, (e.g., "Decisions about rates affect all ratepayers across the state." (ECF 80-1 at 17)), fail to draw a link to why a statewide election format is necessary, or why Plaintiffs' proposed single-member district plan would hinder these attributes.

Plaintiffs' remedy would not change the number of Commissioners. The remedy would not alter the Commission's jurisdiction or change the territory over which the Commission governs. Each Commissioner already comes from one of five residential districts: Plaintiffs' remedy does not even require the redrawing of those districts. (Pls.' SAF ¶¶ 16-18 (ECF 84-5).)

Nor would Plaintiffs' remedy change the Commissioners' work demands. Commissioners would still be able to "weigh the reliability of a solid, secure system with the price of operating that system." (ECF 80-1 at 17.) The Commission would still make decisions as a whole and on behalf of the entire State. And Commissioners would still hear from voters, witnesses, and other groups from around the State for perspective.

Defendant's assertion that Chuck Eaton's—the Commissioner for Ms. McCorkle's district (District 3) at the time—refusal to talk to constituents from his own District is somehow a benefit of the current system, (ECF 80-1 at 17), is exactly backwards. Instead, it shows the flaw of using statewide elections for Commissioners and the diluting effects of Mr. Eaton representing a District that voted in the overwhelming majority for a different candidate. (Pls.' SAF ¶¶ 17-18 (ECF 84-5).)

Lastly, Defendant's assertion that the Commission is a quasi-judicial body is of no consequence. Defendant has cited no legal support for the proposition that a quasi-judicial executive body is any less susceptible to a challenge under Section 2 than any other body. *See, e.g.*, *Houston Lawyers' Ass'n v. Atty. Gen. of Tex.*, 501 U.S. 419, 426 (1991) ("the coverage of the Act encompasses the election of executive officers"). Defendant has only cited cases involving ***purely***-judicial

bodies, and the Public Service Commission is not purely judicial—it is also "quasi-legislative." (Pls.' SAF ¶ 19 (ECF 84-5).) And unlike in many judicial elections, which are treated differently under Section 2, the Commissioners still run under a party designation and are intended to be held accountable by constituents. *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1534-35, 1544 (11th Cir. 1994) ("Trial court judges, on the other hand [in contrast to legislators], are neither elected to be responsive to their constituents nor expected to pursue an agenda on behalf of a particular group. . . . [A]ny districting remedy imposed by the district court would, by its very nature, alter this course and encourage greater 'responsiveness' of judges to the special interests of the people who elected them. Such a remedy would reintroduce the very vices from which the state and its citizens have sought to insulate the judiciary.").

### J.   Proportionality

Looking at the statewide election method of the Public Service Commission, it is apparent that the number of majority-Black seats on the Commission is not proportional to the percentage of the Georgia voting population that is Black. According to the 2020 U.S. Census, Black people make up 31.73% of the Georgia population. *See* U.S. Census Bureau Website, available at: https://data. census.gov/cedsci/table?q=p3&g=0400000US13&y=2020&tid=DECENNIALPL2

020.P3. Yet, under the current statewide election, there are no majority-Black seats on the Commission. Thus, proportionality heavily weighs in favor of Plaintiffs.

## II.   <u>Plaintiffs Will Suffer Irreparable Harm Unless the Injunction Issues</u>

Because the current at-large election method dilutes the voting strength of Black Georgians in violation of the Voting Rights Act, Plaintiffs (and all other Black voters in the state) will be harmed in the absence of the limited injunctive relief they seek here. *See NAACP*, 118 F. Supp. 3d at 1347-48. Such injury is irreparable because "it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted). Courts in this Circuit have repeatedly held that conducting elections that would infringe on voting rights results in irreparable injury. *See, e.g.*, *Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1344 (N.D. Ga. 2012); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005); *accord Adamson v. Clayton Cnty. Elections & Registration Bd.*, 876 F. Supp. 2d 1347, 1358 (N.D. Ga. 2012).

Here, too, Plaintiffs will suffer irreparable harm if elections are conducted pursuant to the current at-large voting method because that scheme dilutes Black Georgians' votes in violation of the Voting Rights Act. No amount of money can undo the harm caused by this vote dilution. *See NAACP*, 118 F. Supp. 3d at 1347-

48 ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." (cleaned up)).

## III.   **The Balance of Hardships Favors Issuing a Preliminary Injunction**

Conducting the 2022 elections using the unlawful at-large voting method would irreparably harm Plaintiffs, outweighing any burden an injunction might impose upon the Defendant. As one court in this District has recognized in a similar case, any "additional effort" the State must expend to implement a new voting method is outweighed by harm to the fundamental right to vote. *NAACP*, 118 F. Supp. 3d at 1348. Further, any administrative burdens that the State may claim will result from an injunction "cannot begin to compare with the further . . . denial of [Plaintiffs'] right[] to full and equal political participation." *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (N.D. Ala. 1986). The limited injunction requested here at this early stage of the 2022 election process would merely preserve the status quo until this Court can resolve this matter on the merits.

Nor would enjoining the Secretary of State from qualifying candidates for the 2022 election be "impossible or unduly burdensome." *NAACP*, 118 F. Supp. 3d at 1348. Plaintiffs seek to have a trial and decision in time to conduct the 2022

election under a single-member district election system that would comply with the Voting Rights Act. The Court entered a schedule that makes this possible, at least in Plaintiffs' view. But even if that does not occur, the Commission would continue to function under the ordinary operation of state law. The Governor has the power to appoint commissioners to fill any vacancies and then the appropriate voting system can be implemented in accordance with the state's ordinary election calendar once the Court resolves the case.

## IV.   Injunctive Relief is in the Public Interest

Where the government is the opposing party in a motion for injunctive relief, the balance of the equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And where, as here, "Plaintiffs have established a substantial likelihood of success on the merits," courts have repeatedly held that "the public interest is best served by . . . ensuring that all citizens . . . have an equal opportunity to elect the representatives of their choice." *NAACP*, 118 F. Supp. 3d at 1348-49. And the public interest would most certainly be disserved by an election conducted under an unlawful districting scheme. *See Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004) (per curiam) (three-judge panel). It would also be disserved by having an election proceed through qualification, primaries, and campaigns at the risk of having the rug pulled out from underneath

at any moment. The far better course for the public—including election officials, candidates, and voters—would be to pause the election now pending a trial and the Court's considered resolution of it. Doing so would give everyone much-needed certainty until a final judgment has issued.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and enjoin Defendant from qualifying candidates for the 2022 elections for the Public Service Commission.

Dated: February 3, 2022

/s/ *Bryan L. Sells*
Attorney Bar No. 635562
The Law Office of Bryan L. Sells, LLC
P.O. Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

Nicolas L. Martinez (*pro hac vice*)
Wesley A. Morrissette (*pro hac vice*)
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Telephone: (312) 494-4400
Email: nicolas.martinez@bartlitbeck.com
Email: wesley.morrissette@bartlitbeck.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

document has been prepared in Times New Roman 14, a font and type selection

approved by the Court in L.R. 5.1(B).


*/s/ Bryan L. Sells*
Bryan L. Sells