**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| RICHARD ROSE, *et al.* <br><br>     *Plaintiffs,* <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, <br><br>     *Defendant.* | CIVIL ACTION <br><br> FILE NO. 1:20-cv-2921-SDG |

## SECRETARY RAFFENSPERGER'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

As this case proceeded, Plaintiffs moved for summary judgment on several elements of their claims, including the three *Gingles* preconditions. [Doc. 79]. But they never moved for summary judgment on the totality of the circumstances test under Section 2 of the Voting Rights Act (VRA) that ultimately governs their claims. *Id.* And despite knowing for more than six months that an election for Public Service Commission (PSC) District 3 would be held this year, Plaintiffs now move for a preliminary injunction—facing an even higher burden than for summary judgment—seeking to cancel the 2022 primary because they say they are likely to succeed on all aspects of their

1

claims. And they do so only after this Court declined to grant summary judgment on several of the key issues applicable to Plaintiffs' claims.

Specifically, Plaintiffs move for a "preliminary injunction enjoining Defendant from qualifying candidates for the 2022 elections for the Georgia Public Service Commission until a final judgment in this action has been issued." [Doc. 101, p. 1] (Plaintiffs' Motion). Not only does this indicate a flawed understanding of the Secretary's role in qualifying, but as this Court already pointed out in its Order on the competing summary-judgment motions, [Doc. 97], a trial is needed to resolve the merits of this case. As discussed below, Plaintiffs cannot satisfy the high bar required to obtain preliminary injunctive relief.

Plaintiffs have not shown there is any reason to throw the election process into confusion by cancelling primary elections for the Public Service Commission until further notice. Plaintiffs' Motion does not merely attempt to maintain the status quo, but instead interrupt the election process before a final judgment is issued in this case. This Court should decline the invitation to interfere with the ongoing election process and should not craft a remedy until after deciding the merits of Plaintiffs' claims following the already-scheduled trial.

2

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Applicable legal standards.

#### A.    Plaintiffs' burden to obtain a preliminary injunction.

Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1306 (11th Cir. 1998) (cleaned up). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

A preliminary injunction is never granted as a matter of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While it is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public interest in orderly elections and election integrity. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5 (2006); *see also Merrill v. Milligan*, No. 21A375 (21-1086), 595 U.S. ___, slip op. at 5, 2022 U.S. LEXIS 760, at *6 (Feb. 7, 2022) (Kavanaugh, J. concurring) (attached as Ex. A) ("[T]he *Purcell* principle is

probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply **heightens the showing necessary** for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." (emphasis added)).

Further, when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Repub. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence in filing their request for relief, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944. As discussed below, Plaintiffs have not shown this kind of diligence here.

### B.   Standard for Section 2 cases.

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

4

To prove a violation of Section 2, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions. *Nipper v. Smith*, 39 F. 3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so-called "Senate Factors" to assess the totality of the circumstances. *Id.* at 1512; *Thornburg v. Gingles*, 478 U.S. 30, 79, 106 S. Ct. 2752 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S. Ct. 2647 (1994). Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met in their entirety. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F. 3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F. 3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach, Fla.*, 113 F. 3d 1563, 1567 (11th Cir. 1997).

## II.   Plaintiffs cannot demonstrate a likelihood of success on the merits as to *Gingles* I.

In ruling on the parties' respective motions for summary judgment, this Court found that Plaintiffs had satisfied the "three ***basic*** *Gingles* factors," including as to *Gingles* prong one: "geography and compactness." [Doc. 97, p. 32] (emphasis added). The Court also clearly acknowledged that *Gingles* I involves both (1) a "geography and compactness" component and (2) a remedy component. As the Court noted elsewhere in the Order, "[t]he Eleventh Circuit

5

has, however, cautioned that '[i]mplicit in th[e] first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government…." *Id.* at 16. The Court further concluded "that summary judgment on matters related to Plaintiffs' proposed remedy is inappropriate." *Id.* at 17.

In short, this Court held just weeks ago that Plaintiffs' remedy is not appropriate for summary judgment, and thus they have failed to demonstrate compliance with the *entirety* of the requirements related to the first prong of *Gingles*. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F. 3d 1282, 1302 (11th Cir. 2020). And because Plaintiffs' Motion simply assumes they have been granted summary judgment on the entirety of the first prong of *Gingles*, and not just the geography and compactness portions, it offers no basis for this Court to determine that their proposed remedy satisfies this dispositive prong. That alone precludes a finding of likelihood of success on the merits and this Court can deny Plaintiffs' Motion solely on that basis.

### III.    The extraordinary nature of Plaintiffs' proposed remedy merits extraordinary restraint from the judiciary.

But even if this Court were to find that Plaintiffs established all of *Gingles* I, including proof of a viable remedy, the Court should still decline Plaintiffs' request for a preliminary injunction due to the novelty of the case.

6

Plaintiffs make the conclusory statement that "[t]his is not [a] very unusual case." [Doc. 101, p. 6]. But, from the beginning, this Court has acknowledged that Plaintiffs' claims involve "questions of first impression on Georgia law." [Doc. 97, p. 20]. Indeed, the Court has signaled this case is so unusual that it may need to certify questions of interpretation for the Georgia Supreme Court following the upcoming trial on the merits. *Id.* at 22. And apart from the thorny questions related to Georgia's constitutional provisions, this case presents challenging and thinly explored questions about the scope of authority of the federal judiciary, the limits of the Voting Rights Act, and the extent to which states may choose their form of government in our constitutional system. *See, e.g., Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-01239-LPR, 2022 U.S. Dist. LEXIS 29037, at *12–16 (E.D. Ark. Feb. 17, 2022) (discussing federalism concerns while finding no private right of action to enforce Section 2).

This case is anything *but* usual, and it is because of this unusual posture that the Court has thus far proceeded circumspectly on the key issues. Plaintiffs offer no reason for the Court to depart from that path. Moreover, the very same issues on the merits that the Court determined needed to be resolved at the upcoming trial on the Senate Factors remain. And Plaintiffs' Motion does not suddenly make clear what the Court found to be in dispute at

summary judgment just a few weeks ago. But even if the Court were to reconsider the Senate Factors in light of the preliminary-injunction motion, they do not weigh in Plaintiffs' favor.

## IV.    Plaintiffs are not likely to succeed on the merits with respect to the Senate Factors.

This Court is well aware of the Senate Factors and "totality of circumstances" inquiry conducted for Section 2 claims, and they need not be repeated here. *See, e.g.,* [Doc. 97, pp. 6-8]. But Plaintiffs now claim "most if not all of the Senate Factors" weigh in their favor. [Doc. 101, p. 8]. Putting aside that the Court expressly declined to rule on the totality of the issues raised by the Secretary until a full trial on the merits, a closer examination of the Senate Factors shows Plaintiffs have not carried the heavy burden required to persuade this Court to grant a preliminary injunction based on the totality of the circumstances—especially when they never sought summary judgment on those very factors.

First, the analytical process for considering the totality of circumstances favors Plaintiffs is particularly ill-suited to preliminary injunctive relief, because the totality is generally weighed after significant discovery ***and*** a bench trial. *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F. 3d 1336, 1343 (11th Cir. 2015). Ordering relief for Plaintiffs earlier in a case

is problematic "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Id.* at 1348. This remains true even when the parties agree on many basic facts at stages before a bench trial. *See Burton,* 178 F. 3d at 1187 (quoting *Clemons v. Dougherty Cty., Ga.,* 684 F. 2d 1365, 1369 (11th Cir. 1982)).

Second, an examination of the Senate Factors shows that the Court should deny Plaintiffs' Motion because they have offered no new evidence and cannot show they are likely to succeed on any of these factors.

### A.    Senate Factor One – history of discrimination.

Plaintiffs first urge this Court to brush aside the history-of-discrimination factor by taking judicial notice of the sad, past history of Georgia. But Plaintiffs' proposed approach is at odds with the "intensely local appraisal" of the facts that is required of this Court. *De Grandy*, 512 U.S. at 1020–21 (no statistical shortcuts to determining vote dilution); *Gingles*, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); *White v. Regester*, 412 U.S. 755, 769–70 (1983) (assessing the impact takes place "in light of past and present reality, political and otherwise"). Plaintiffs also offer no evidence in support of this factor beyond cited cases and the Eleventh Circuit has

9

cautioned "against allowing the old, outdated intentions of previous generations to taint [a jurisdiction's] ability to enact voting legislation." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F. 3d 1299, 1332 (11th Cir. 2021). Without further evidence or something more recent to show how the history of discrimination affects current election practices, Plaintiffs cannot show they are likely to succeed on this factor.

### B.    Senate Factor Two – racial polarization in voting.

When it considered the issue of racial polarization on the Parties' respective summary judgment motions, the Court noted—and the Secretary does not dispute—that Plaintiffs' expert reports show "significant polarization" in Georgia's elections. [Doc. 97, p. 30]. But the Court also explicitly stated it drew "no conclusions or inference about *why* candidates of choice [of Black Georgia voters] were not elected, the causes of polarization, nor even the relevancy of these facts given the functions of the Commission." *Id.* at 29 (emphasis added). This was because the Court only examined these questions with respect to the second and third *Gingles* prongs, and not as they relate to the Senate Factors. In their Motion, Plaintiffs merely rehash their prior argument that their experts found significant polarization among Black and white voters in Public Service Commission (PSC) elections. But—again—they make no effort to explain *why* such polarization exists, only *that* it exists. This

10

head-in-the-sand approach to polarization does not result in a finding of Senate Factor Two in their favor, especially when the text of Section 2 requires any denial or abridgement of the right to vote be "on account of race or color" and not for some other reason. 52 U.S.C. § 10301(a). *See also* [Doc. 97, p. 28] ("[The] Supreme Court and Eleventh Circuit have not yet determined under a totality analysis 'whether section 2 plaintiffs... must demonstrate that their diminished opportunity to participate in the political process and to elect representatives of their choice is being caused by the interaction of racial bias in the voting community and the challenged scheme," citing *Nipper v. Smith,* 39 F. 3d 1494, 1497 (11th Cir. 1994)).

### C.    Senate Factor Three – voting practices.

The third Senate Factor does not weigh in favor of granting Plaintiffs' Motion for several reasons. First, Plaintiffs identify just three election practices that purportedly "enhance the opportunity of for discrimination of Black voters," but none of these practices works the nefarious end Plaintiffs claim. The first practice Plaintiffs identify is the "staggered terms" of office for Commissioners. A far-more-benign explanation for staggered terms is that it is a practical method for selecting commissioners that enjoy lengthy, six-year terms, while maintaining continuity of the body so that a single election does not unduly disrupt the regulatory work of the Commission. O.C.G.A. § 46-2-

2(d). And there is good precedent for this, as staggered elections for six-year terms are exactly the method chosen by the drafters of the Constitution to elect United States Senators. U.S CONST. Art. I, Sec. III, Para. 2.

The next voting practice Plaintiffs take issue with is the majority-vote requirement, which has been previously flagged as a possible discriminatory practice. *Solomon v. Liberty Cty. Comm'rs*, 221 F. 3d 1218, 1225–26 (11th Cir. 2000). But a majority-vote requirement is the only way that Sen. Warnock and Sen. Ossoff—candidates preferred by Black voters in Georgia—succeeded in their recent elections. In Georgia in the year 2022, it is difficult to see how this constitutes evidence of discrimination and at the very least does not clearly favor Plaintiffs.

Plaintiffs also flag what they describe as "unusually large voting districts." But they offer no evidence in support of their position that the *state itself* constitutes an unusually large voting district. And as other courts have already noted, "[t]he state at large is decidedly not a… district of anything. Unlike a county, city, state legislature, or school board, the state is itself a sovereign." *Ala. State Conference of the NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 U.S. Dist. LEXIS 18938, at *38 (M.D. Ala. Feb. 5, 2020).

Finally, Plaintiffs' quote from Commissioner Eaton's deposition that he "would not have won reelection in 2012 if [his district] was just District 3

12

voters." [Doc. 101, p. 12]. But relying on this makes no more sense than saying President Trump would have been re-elected in 2020 if California and New York's electoral votes were excluded from the total in the Electoral College. It's a statement that may be true but provides nothing of value. Campaign tactics change based on the size and makeup of the district a candidate finds him- or herself in. And it is unclear whether Commissioner Eaton's opponent would have even survived a party primary if voters were limited to the geographic boundaries of District 3. It is utterly useless—and certainly not probative of Plaintiffs' claims—to speculate on how the 2012 election might have turned out under different circumstances. But even if that kind of speculation has some use, it only demonstrates that polarized voting in Georgia is "on account of" party and not "on account of race or color," because it assumes a Republican could not win a majority-Black district.

### D.    Senate Factor Four – denial of access to slating process.

Governor Kemp recently appointed a Black Commissioner, Fitz Johnson, to the PSC, as Plaintiffs acknowledge. [Doc. 101, p. 14]. Commissioner Johnson will have the benefits of incumbency in his upcoming election. While Plaintiffs waive away this appointment as an outlier, it nevertheless demonstrates that, to the extent some kind of informal slating process exists (and the Secretary does not concede that it does), at least some Black candidates have access to it.

13

### E.    Senate Factor Five – effects of discrimination.

Plaintiffs offer only their experts in support of the effects of discrimination, but ignore the record-breaking Black voter turnout in 2021.[1] This Senate factor requires that the effects of discrimination hinder Black voters' ability to participate in the political process—something that does not appear true given massive voter turnouts. And several Plaintiffs testified that they had never had trouble participating in the political process. [Doc. 80-2, ¶¶ 1, 2].

### F.    Senate Factor Six – racial appeals

Plaintiffs also offer scant evidence for racial appeals, identifying only two possible examples from exogenous elections for U.S. Senate in 2020. [Doc. 84-3]. Moreover, the purported racial appeals Plaintiffs identify were carried out by unsuccessful candidates, which hardly would indicate that racism permeates Georgia political campaigns.[2] And nothing Plaintiffs offer indicates that racial appeals "characterize" Georgia elections, as this Senate factor requires.

---

[1] *See, e.g.*, Fair Fight Action, *ICYMI: "Sky-High" Black Turnout Fueled Ossoff, Warnock Victories*, https://fairfight.com/icymi-sky-high-black-turnout-fueled-ossoff-warnock-victories/ (February 2, 2021) (collecting articles).
[2] Indeed, Herschel Walker's equally anecdotal but widely reported frontrunner status as the Republican nominee for U.S. Senate tends to demonstrate a lack of racism in Georgia politics, not its resurgence.

### G. Senate Factor Seven – election of minority group members.

The Secretary acknowledges that Georgia has not elected a significant number of Black individuals to statewide offices. That being said, Black candidates have won judicial offices statewide and Senator Warnock's election in 2021 likewise demonstrates that Black candidates are able to win statewide elections in Georgia, at least raising questions about whether the lack of electoral success is based on race or politics. Further, Plaintiff Rose agreed that Black-preferred candidates can succeed in statewide elections. [Doc. 80-2, ¶ 4].

### H. Senate Factor Eight – lack of responsiveness.

With respect to Senate Factor Eight, the record at minimum does not demonstrate this factor clearly favors Plaintiffs. Plaintiffs struggle to identify any particularized needs of the Black community in the context of utility regulation, given the statewide nature of the Commission's operations. [Doc. 101, pp. 16-17]. And, despite Plaintiffs' attempts to minimize it, the statewide nature of the Commission resulted in one of the Plaintiffs having her problems addressed even though she was not satisfied with the responsiveness of the Commissioner who lived within her geographic district. [Doc. 80-2, ¶ 16].

### I. Senate Factor Nine – state interest.

The State's interest in maintaining its chosen form of government for a constitutionally designated office is anything but "tenuous." And the Secretary

disagrees with Plaintiffs' assertion that the State has "fail[ed] to draw a link to why a statewide election format is necessary…" [Doc. 101, p. 17]. To the contrary, Defendants have been clear that the statewide format is of paramount importance to the interests of the State. [Doc. 37, p. 2; Doc. 85-1, ¶ 4]. This format places each Georgia voter on equal footing and necessarily provides *all* voters with an equally weighted vote for *each* commissioner on the PSC, considering the statewide nature of utility regulation. [Doc. 80-2, ¶¶ 9–17]. And maintaining residency districts for *candidates* ensures that more rural voters are not perpetually overruled by the rapidly growing metro-Atlanta area. This method of voting preserves the statewide composition of the PSC, while simultaneously permitting each Georgia voter to have an equal say in each Commissioner's selection.

This Court has also noted the possible need for certification of a constitutional question to the Georgia Supreme Court, while reflecting that "Plaintiffs' briefing does not tackle this issue head on…" [Doc. 97, pp. 20-21]. Nevertheless, the certification question bears on a totality-of-circumstances analysis. "Whether the at-large election of members of the Commission is required by the Georgia Constitution… could affect, for example, the weight the Court should place on the State's interests in maintaining its current form of election members of the Commission." *Id*.

16

As a result of all of these issues, the Senate Factors do not clearly weigh in Plaintiffs' favor and thus they cannot show they will likely succeed on the totality of the circumstances.

## V.    The equities and the public interest counsel weigh heavily against any injunctive relief.

Plaintiffs' proposed injunction is not in the public interest because the granting of such an injunction—and the confusion that would follow—would likely harm candidates who have announced a run for office, negatively affect the voting rights of the public, and predictably result in voter frustration and disenfranchisement. Moreover, the specific injunction Plaintiffs request would do little to address any purported harm to Plaintiffs.

First, under Georgia law, the Secretary does not qualify candidates for partisan office—that is the role of the political parties, which are not parties in this case. O.C.G.A. § 21-2-153(b), (e). The Secretary's role in qualifying for statewide partisan elections is to receive the lists provided by each political party. O.C.G.A. § 21-2-153(d)(1). While the Court could enjoin the Secretary and his staff from building ballots containing the PSC races for the primary, it seems doubtful it could enjoin the political parties from receiving qualifying paperwork. *Jacobson v. Fla. Sec'y of State*, 974 F. 3d 1236, 1254 (11th Cir. 2020).

Second, as two Justices of the U.S. Supreme Court recently explained, overcoming the *Purcell* principle that refines the already-high bar of preliminary injunctive relief in the context of elections requires, "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." Ex. A at 5. None of these factors favor Plaintiffs here.

## A.    The merits are not entirely clearcut in Plaintiffs' favor.

In light of the foregoing argument as to both *Gingles* I and the Senate Factors, Plaintiffs have not established the underlying merits are "entirely clearcut" in their favor. To the contrary, the Secretary has established that much of the merits analysis weighs in *his* favor.

## B.    Plaintiffs have not demonstrated irreparable harm.

Plaintiffs also have failed to demonstrate that they will suffer irreparable harm without an injunction. Instead, the injunctive relief they now seek could lead to precisely the hypothetical outcome the Secretary flagged for this Court during summary judgment, which would effectively replace statewide elections with a gubernatorial-appointment process. [Doc. 80-1, pp. 13-14]. And to ensure Plaintiffs are not operating under the misapprehension

18

that this Court might quickly order a special election following a gubernatorial appointment, Georgia law is clear that gubernatorial appointments last until the next *regularly scheduled* election, or November 2024 for appointees in January 2023. O.C.G.A. § 46-2-4. Because injunctive relief ordered by this Court following a trial must be *prospective,* the Court could only provide relief (at the earliest) for the 2024 election cycle. One struggles to see how a preliminary injunction ordered now that effectively entrenches a statewide appointment system for PSC for another two years could possibly remedy Plaintiffs' purported irreparable harm.

### C.     Plaintiffs have unduly delayed in bringing their request for an injunction.

Plaintiffs have also unduly delayed in bringing this request for injunctive relief. As noted earlier, this action first came before the Court in an entirely different election year, and no injunctive relief was sought then. During discovery, Plaintiffs moved for partial summary judgment and did not seek injunctive relief. After discovery, Plaintiffs again moved for partial summary judgment and did not seek injunctive relief. Nearly two years passed litigating the case to this point, and Plaintiffs finally brought this request for preliminary injunctive relief before a trial that they always knew would take

place (if they did not lose at summary judgment) because Plaintiffs never moved for summary judgment on the Senate Factors.

Further, the Governor appointed Commissioner Fitz Johnson to the PSC on July 21, 2021. *See* Press Release, *Gov. Kemp Appoints Fitz Johnson to Public Service Commission* (July 21, 2021), *available at* https://gov.georgia.gov/press-releases/2021-07-21/gov-kemp-appoints-fitz-johnson-public-service-commission   Plaintiffs have thus been on notice that primary and general elections would be held in 2022 for District 3 for more than six months before they requested injunctive relief. O.C.G.A. § 46-2-4.

Plaintiffs' timing and injunctive relief sought is all the more curious in light of this Court's acknowledgement that it may need to certify a question of law to the Georgia Supreme Court *after* a trial, but *before* ruling on the merits. [Doc. 97, p. 22]. With the trial now set for June 27, 2022, if Plaintiffs prevail, this Court may not certify that question to the Supreme Court until later this year. [Doc. 100]. The Georgia Supreme Court then will have until the summer of 2023 to decide if it receives the request after the first Monday in December. See GA. CONST. Art. II, Sec. IX, Para. II (requiring the Supreme Court to "dispose of every case at the term for which it is entered on the court's docket for hearing or at the next term") and GA. SUP. CT. R. 3 (setting the respective terms of the Supreme Court).

Depending on the content of the Georgia Supreme Court's decision on the certified question, this Court may again need to revisit the merits and/or alter the current PSC district maps. Suffice it to say, the *Purcell* problem Plaintiffs now face for 2022 may re-emerge ahead of the 2024 elections under Plaintiffs' proposed preliminary injunction, further compounding the balance of equities problems. Plaintiffs seem prepared for this outcome, noting the need for gubernatorial appointments until this case is resolved under their approach. [Doc. 101, p. 3]. And the Governor appointing Commissioners would mean those Commissioners may not stand for election until "the next regularly scheduled election," O.C.G.A. § 46-2-4, which could be 2026. If this hypothetical seems absurd, the Court need only consider that Plaintiffs are now seeking injunctive relief along the very lines that Plaintiffs once dismissed as an absurd hypothetical posed by the Secretary. *See* [Doc. 84, pp. 6–7] (discussing redressability issues). If anything, the ongoing "parade of horribles" described above demonstrates the wisdom behind Justice Kavanaugh's admonition that "judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." Ex. A at 4.

Plaintiffs' litigation strategy is their own, and they have a right to structure it as they see fit. But their lengthy delay in bringing this request for

injunctive relief bars any recovery they may have otherwise been entitled to. This is particularly true in the context of elections, and especially given that the method of elections Plaintiffs now challenge has been on the books for over one hundred years. Rushing to stop qualifying now does not serve the interests of democracy or Georgia voters.

**D.    The changes requested are not feasible before the election without significant cost, confusion, or hardship.**

Finally, Plaintiffs' request would impose significant cost, confusion, and hardship on the state, the voters, and the candidates for the PSC. As the testimony before Judge Jones in the preliminary-injunction hearing on the redistricting cases demonstrates, the Center for Election Systems in the Secretary's office has already begun building ballots for use in the 2022 primary elections. Vol. II Tr. of Preliminary Injunction Hearing in *Alpha Phi Alpha/Grant/Pendergrass*, Feb. 8, 2022 (attached as Ex. B) 70:4–7. Qualifying is currently set to begin on March 7, 2022, with absentee ballots sent to overseas and military voters by April 9, 2022. O.C.G.A. §§ 21-2-153(c)(1)(A) (qualifying); 21-2-384(a)(2) (UOCAVA deadline). Once qualifying occurs, the Center for Election Systems adds candidate names to the relevant contests and begins preparing proofing packages to send to counties. Ex. B at 70:8–71:2. County election officials then proof those drafts, identify errors, and return

those to the Center for Election Systems for corrections to the databases. Ex. B at 71:3–6. The Center for Election Systems then makes those corrections, generates a revised proofing package, and then creates print files for absentee ballots and final project files for programming the voting machines. Ex. B at 71:7–23. This entire process occurs for all 159 counties between the close of qualifying on March 11 and the deadline for sending ballots for overseas voters on April 9. Ex. B at 71:24–72:4, 87:14–88:8.

Further, the public interest also does not favor Plaintiffs because voters who expect to cast their vote for the Public Service Commission will be deprived of that right if this Court grants an injunction, instead ceding their vote to a potential appointment by the Governor. And candidates who seek to gain statewide office and begin their respective six-year terms will be held in suspension by an order from this Court. Moreover, the Governor may have political prerogatives that do not exactly mirror the results of a statewide election. If the injunctive relief requested is ordered by the Court, it would not only deprive the people of their voice, but potentially even a rightful candidate of his or her office. Thus, even if the changes are feasible, voters would still face "significant cost, confusion, or hardship," Ex. A at 5, which indicates this Court should deny the relief sought.

23

## CONCLUSION

Plaintiffs have not shown they can succeed on the merits of their potential remedy or the totality of the circumstances. But even if they could, the balance of equities and the public interest weigh in favor of denying Plaintiffs' effort to stop qualifying for the 2022 primary election.

Respectfully submitted this 23rd day of February, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
**STATE LAW DEPARTMENT**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise

24

Georgia Bar No. 382202
lparadise@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678.336.7249

*Counsel for Defendant Secretary of State
Brad Raffensperger*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing SECRETARY RAFFENSPERGER'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION was prepared double-spaced in 13-point Century Schoolbook pursuant to Local Rule 5.1(C).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411

26