**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| RICHARD ROSE et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-02921-SDG |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, | |
| Defendant. | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

Because Section 2 cases involve mixed questions of fact and law, *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015); *Ala. State Conference of the NAACP v. Alabama*, No. 2:16-CV-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938, at *21 (M.D. Ala. Feb. 5, 2020) ("*Alabama NAACP*"), there will be some overlap between the findings of fact and conclusions of law to avoid needless repetition. Each proposed finding is set out with particularity.

For reference, the following citations are used for support for each of the findings below:

| Citation | Document Type |
|----------|---------------|
| ECF ___ | Docket entry |
| Tr. ___ | Transcript of the trial held June 27 through July 1, 2022 and filed at ECF 139–143. |
| DX | Defendants' Exhibits |
| PX | Plaintiffs' Exhibits |
| Joint Stip. | Joint stipulated facts filed at ECF 121-3 |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      PROCEDURAL HISTORY**

1.      Plaintiffs filed the complaint in this action on July 14, 2020. ECF 1.

2.      On August 14, 2020, Defendant moved to dismiss Plaintiffs' complaint. ECF 22.

3.      Following briefing by the Parties, the Court held oral argument on December 8, 2020. ECF 33.

4.      On, January 5, 2021 the Court denied Defendant's Motion to Dismiss. ECF 36.

5.      While discovery was still ongoing, Plaintiffs filed a Motion for Partial Summary Judgment on May 27, 2021. ECF 56.

6.     After the close of discovery, on July 9, 2021, Plaintiffs filed a Section Motion for Partial Summary Judgment, ECF 79, and Defendant filed a Motion for Summary Judgment. ECF 80.

7.     After briefing and argument, the Court denied Defendant's Motion for Summary Judgment, and denied in part and granted in part Plaintiffs' Motion for Summary Judgment on January 24, 2022. ECF 97.

8.     Plaintiffs then filed a Motion for Preliminary Injunction on February 3, 2022, seeking to enjoin the 2022 elections for Public Service Commission which the Court denied on March 7, 2022, following briefing and argument by the parties. ECF 112.

9.     The Court held a five-day trial on the merits from June 27, 2022 through July 1, 2022.

## II.     PARTIES TO THE CASES

### a.  Defendant

10.     Brad Raffensperger is the Georgia Secretary of State and is named as a defendant in his official capacity in all three cases. He is the chief election official in the State of Georgia. ECF 37, ¶ 10.

### b.  Plaintiffs

11.     Plaintiff Richard Rose is the current president of the Atlanta Branch of the NAACP and is a Black registered voter in Fulton County, which is contained in current residency District 3 for the Public Service Commission. Tr. 466:21-25, 469:12-13; Joint Stip. ¶ 2.

12.     Plaintiff James Woodall is a former president of the Georgia NAACP and is a Black registered voter in DeKalb County, which is contained in current residency District 3 for the Public Service Commission. Tr., 57:12-58:2; Joint Stip. ¶ 2

13.     Plaintiff Brionte McCorkle is the executive director of Georgia Conservation Voters and is a Black registered voter in Fulton County, which is contained in current residency District 3 for the Public Service Commission. Tr., 261:3-20; 320:5-12; Joint Stip. ¶ 2.

14.     Plaintiff Wanda Mosley is the National Field Director for Black Voters Matter Fund and is a Black registered voter in Fulton County, which is contained in current residency District 3 for the Public Service Commission. Tr., 517:1-2, 520:22-521:3, 543:11-22; Joint Stip. ¶ 2.

III.    EXPERTS

    a.  **Defendant's Expert**

15.     Defendant presented the expert testimony of Dr. Michael Barber, who is an associate professor of political science at Brigham Young University. Tr. 622:9-12.[1]

16.     Dr. Barber holds graduate degrees from Princeton University in American politics and quantitative methods and has extensively published peer-reviewed articles about the nature and causes of political polarization in elections and a variety of statistical techniques, including Bayesian Improved Surname Geocoding, which was used by Plaintiffs' expert in this case. Tr. 622:13-623:5.

17.     Dr. Barber has testified as an expert in the past and has testified on behalf of Republican and Democratic election officials. Tr. 624:15-19.

18.     Plaintiffs did not object to Dr. Barber being qualified as an expert in political science, the interplay between racial and political polarization, and statistical analysis and the Court so qualified him. Tr. 625:7-13, 627:22-628:1.

19.     The Court had the opportunity to observe Dr. Barber's testimony and found him to be highly credible. He was forthright in his answers, provided helpful insight for the Court, and was honest about the difficulties in interpreting the differences in partisan and racial polarization. *See, e.g.*, Tr. 742:16-743:11. The

---

[1] Plaintiffs moved to exclude Dr. Barber's testimony on ballot rolloff, claiming he improperly used Citizen Voting Age Population. ECF 116. The Court denied the motion, finding the questions raised went to the weight, not the admissibility, of the testimony.

Court credits his testimony and acknowledges the helpful information he provided as an expert witness in this proceeding.

20.     Dr. Barber provided two reports in this case, both of which were admitted as DX 28 and DX 49 without objection. Tr. 635:12-18; 635:20-636:3, 636:17-637:5.

21.     Dr. Barber did not disagree that voting in Georgia is polarized, but reached different conclusions than Dr. Popick about the nature and causes of the polarization. Tr. 637:20-638:2.

22.     Dr. Barber's analysis found a consistent pattern of partisan polarization in Georgia elections, with Black voters consistently preferring Democratic candidates, or at least non-Republican candidates, regardless of the race of the candidate. DX 28, pp. 6-10; Tr. 639:2-14.

23.     Dr. Barber used a method called Multiple Regression to assess the impact of race and party on voter behavior. DX 28, pp. 8-10; Tr. 640:12-641:6.

24.     Multiple regression models are widely used in political science and Dr. Barber testified credibly about their use. Tr. 641:22-642:2. While Dr. Fraga criticized Dr. Barber's use of a multiple regression model, as explained further below, his criticism is rooted in a fundamental disagreement about the way that race and party interact. Dr. Barber's use of multiple regression was designed to

explain essentially what Dr. Fraga believes cannot be explained: the variable that best predicts how voters will behave. And the Court agrees with Dr. Barber's approach to analyzing voter behavior, rather than Dr. Fraga's method of assessing the impact of race on party identification.

25.     The multiple regression model demonstrated that the key fact for predicting voter behavior was the partisanship of the voter, not the voter's race. In fact, holding the voter's race constant, the estimate of the voter's behavior would shift by about 90% depending on whether you explained the individual voter was a Republican or a Democrat. Tr. 642:9-643:24.

26.     Thus, if you were presented with a Black individual and told that individual was a Republican, then you would have a high degree of certainty that the individual would vote for Republican candidates, regardless of his or her race. Similarly, if you were presented with a white individual and told that individual was a Democrat, then you would have a high degree of certainty that the individual would vote for Democratic candidate, regardless of his or her race. Tr. 643:3-24.

27.     Plaintiffs' primary criticism of Dr. Barber's multiple regression model is the lack of a mediation analysis. Tr. 771:10-772:21 (Fraga); Tr. 644:6-12 (Barber acknowledging). But Plaintiffs never performed a mediation analysis of

their own to demonstrate any flaws in Dr. Barber's approach and based their criticism on the belief that it is impossible to disentangle race and party. Tr. 761:4-762:3 (Fraga).

28.     The Court credits Dr. Barber's approach, even without a mediation analysis. The experts agree that partisan identity and race are highly connected. But the key question for the Court relates to voter *behavior*, not to why individuals choose to identify with a particular political party. The Court finds Dr. Barber's analysis provides the best tools for the Court to assess the nature of the polarized voting in Georgia.

29.     Dr. Barber then reviewed the fact that the race of a candidate did not change Black or white voter behavior. DX 28, p. 10; Tr. 645:9-646:5.

30.     The regression analysis and the behavior of voters when the race of the candidate is changed supports Dr. Barber's opinion that partisanship, not race, is driving the polarization in Georgia elections, and this conclusion aligns with the current state of political science literature indicating voters are becoming increasingly loyal to their respective parties. Tr. 646:6-647:11.

31.     The Court credits Dr. Barber's findings and finds that his opinions are credible and reliable in this context. Voting in Georgia is polarized. But it is polarized primarily on the basis of partisan preferences, not racial ones. As

discussed further below, while Plaintiffs have provided evidence that polarization exists, Defendant has provided significant evidence that provides an alternative explanation for that polarization. Plaintiffs' response is to simply say we ultimately cannot know the answer and that merely showing the fact of polarization is sufficient for them to carry their burden.

32.   Dr. Barber also analyzed the competitiveness of Georgia elections and concluded that statewide elections in Georgia and particularly elections for the Public Service Commission are extremely competitive. DX 28, p. 12; Tr. 647:15-648:16.

33.   Plaintiffs' expert Dr. Fraga agreed, having recognized in another case where he served as an expert that elections in Georgia have become more competitive from 2010 to 2018 when compared with the period from 1970 to 2008. Tr. 599:24-600:5.

34.   Political science literature generally agrees that more competitive elections are good for democracy, because it brings more accountability and a higher degree of responsiveness of elected officials to their constituents. DX 28, p. 13; Tr. 648:17-649:4.

35.   Significantly, both Plaintiffs and Defendant's experts agree that converting Public Service Commissioners from statewide to district-based

officials would result in reduced competition and that districts would primarily represent partisan interests. DX 28, p. 14; Tr. 649:5-650:12.

36. Dr. Barber testified credibly that the political science literature generally suggests that there would be less responsiveness on the part of members of the Public Service Commission to their constituents. DX 28, pp. 13-15; Tr. 650:13-651:3. While this is not dispositive, it is an important factor to the Court's analysis of the totality of the circumstances on the specific relief Plaintiffs seek.

37. Finally, Dr. Barber addressed the lack of electoral success of Democratic candidates for Public Service Commission in past elections. Of particular note is two candidates of choice of Black voters winning election to the U.S. Senate in the 2021 runoff elections, while the Democratic candidate did not win election to the Public Service Commission on the same ballot. Tr. 653:3-654:11, 655:8-17.

38. Dr. Barber and Dr. Fraga disagree as to the potential cause of the lack of electoral success. Dr. Barber ascribes the lack of success of Black-preferred PSC candidates to ballot rolloff, a phenomenon where voters vote in races nearer to the top of the ballot, like President and U.S. Senate, but "roll off" and do not vote in less-visible down-ballot races. Tr. 653:3-654:11.

39.     Dr. Barber's review is based in part on the academic literature that nonwhite voters, who also tend to support Democratic candidates, roll off at higher rates than white voters. Tr. 654:12-21.

40.     Dr. Fraga's criticism is largely based on Dr. Barber failing to perform a "ticket splitting" analysis, whereby one would review the ballots cast by each voter to see if the voter is splitting his or her ticket, by voting for one party's candidate in higher-profile races and another party in lower-profile races. Tr. 773:9-774:8. But this criticism is not helpful to the Court because Dr. Fraga performed no such analysis. Tr. 791:24-792:2. Thus, the only evidence before the Court is Dr. Barber's analysis of rolloff.

41.     Further, Dr. Fraga relied exclusively on analysis prepared by Dr. Popick and which Dr. Fraga did not himself perform. Tr. 784:16-785:5; 795:10-25. And there is no evidence that Dr. Fraga used any confidence intervals or other methods to measure error in the statistical estimates provided. This lack of evidence does not support Plaintiffs' position that ticket splitting explains the lack of electoral success. Further, as discussed below, whether the cause of lack of electoral success is rolloff or ticket splitting, the data do not demonstrate that voters choosing to vote in particular manners—which Dr. Fraga never

considered, Tr. 606:24-607:14—means that the electoral system in Georgia PSC elections is not equally open to all voters.

42.    Using his statistical expertise and history of utilizing Bayesian Improved Surname Geocoding, or BISG, Dr. Barber also analyzed the racial impact data that Dr. Popick prepared regarding utility shutoffs. Tr. 655:22-25.

43.    As discussed in more detail below, Dr. Popick was attempting to provide racial information for files that do not contain racial data.

44.    After hearing both experts and considering the manner in which they testified, this Court credits Dr. Barber's testimony and discounts Dr. Popick's on this issue. While Dr. Popick certainly has experience with statistical analysis and testified that some of his current work involves the use of BISG, he is not a political scientist and does not have the recent experience with BISG that Dr. Barber does.

45.    Further, Dr. Popick admitted the key criticism Dr. Barber has of his statistical method—that BISG corrects itself when considered in the aggregate, but may have errors in subsets. *Compare* Tr. 208:8-23 (Popick on baseball analogy) *with* 745:24-746:12 (Barber on baseball analogy). The Court particularly credits Dr. Barber's testimony about how an estimating model that gets wrong every single individual in particular rooms but is still correct in the aggregate would be

incredibly inaccurate when analyzing only a subset of a broader dataset. Tr. 746:6-12.

46.    The problem with Dr. Popick's statistical analysis is that he admits that he relies on a subset of data—only individuals who were disconnected, which must be disproportionately lower-income individuals. Tr. 746:13-17. Dr. Barber testified credibly that the extreme error rates in identification of individuals could vastly overstate the Black proportion of those files, further undermining the claim that the lifting of the disconnection moratorium was a particularized need of Black voters to which the PSC had been unresponsive. Tr. 747:2-8.

47.    Likewise, the Court credits Dr. Barber's testimony that Dr. Popick's exact matching process, or what he called Method 1, is not a representative sample from which any conclusions can be drawn. Tr. 744:4-20.

### b.  Plaintiffs' Experts

48.    Dr. Stephen Popick was tendered as an expert in the area of statistics and statistical analysis of election data. Tr. 165:3-6.

49.    Dr. Popick has a Bachelor's in economics from the Georgia Institute of Technology and a Master's Degree in economics from George Mason

University. Dr. Popick received his PhD in economics from George Washington University. Tr. 159:1-4.

50.     Dr. Popick worked at the Department of Justice in the Voting Rights Section of the Civil Rights Division from 2006-2012. Tr. 160:8-12.

51.      Dr. Popick provided an initial report and supplemental report for use in this case, as well as an analysis of Dr. Barber's Expert Report, which was provided to Plaintiffs' other expert, Dr. Fraga. Tr. 166:15-167:21.

52.     In his first report, Dr. Popick was asked to conduct a racial bloc voting analysis of the Georgia Public Service Commission general election contests from 2012 to 2020 to ascertain whether there was racial bloc voting. Tr. 166:17-20.

53.     The initial report also contained an analysis as to whether Black-preferred candidates could be successful in certain districts in the Plaintiffs' proposed remedial plans. Tr. 166:21-25.

54.     In addition to his first report, Dr. Popick filed a supplemental report in which he analyzed disconnect and shutoff lists as well as the payment plan lists of Georgia Power and Atlanta Gas Light customers to determine the racial composition of those lists. Tr. 167:7-11.

55.    In his supplemental report, Dr. Popick also analyzed whether residency District 2 represented another PSC district in which the Black-preferred candidate could be successful under the old PSC district plan, the current PSC district plan, and a proposed district plan from the Georgia House Democratic Caucus. Tr. 167:12-17.

56.    In his first report, Dr. Popick "concluded that voting was racially polarized in Georgia Public Service Commission contest[s] between 2012 and 2020." Tr. 168: 16-18. He further concluded that "black voters were cohesive in in their support of the same candidate in each election," and "white voters were cohesive around a different candidate in each election, and that the candidate preferred by white voters won 11 out of 11 times." Tr. 168:16-22.

57.    Dr. Popick defines racial polarization as when voters of different racial or ethnic groups prefer different candidates. He refers to this as the "separate electorates test," which describes a voting outcome in which Black voters would have elected a different candidate solely amongst themselves if the election were held only amongst Black voters as opposed to Black and white voters together. Tr. 182:17-21.

58.    Dr. Popick looked at all general elections and general runoff elections from 2012 through 2020, including the 2021 runoff. Tr. 189:11-13.

59.     He concluded that Black voters cohesively support a candidate of choice at high levels in all elections analyzed from 2012 to 2020, and that white voters supported a different candidate at high levels in all elections that he analyzed. Tr. 197:14-18.

60.     Finally, Dr. Popick concludes that the Black-preferred candidate lost in all elections despite the Black-preferred candidate going to a runoff in two of those elections. Tr. 197:18-20.

61.     But Dr. Popick studiously avoided reviewing exogenous elections with a statewide electorate containing the exact same pool of voters as the Public Service Commission. Tr. 190:9-20.

62.     Recent exogenous elections reveal that black-preferred candidates can and do win in statewide elections in Georgia. Tr. 229:25 – 230:15.

63.     And Dr. Popick did not investigate alternative outcomes for the polarization his analysis revealed, including whether such polarization might be better explained by partisan reasons rather than racial reasons.  Tr. 230:16-231:6.

64.     Plaintiffs also presented the expert testimony of Dr. Bernard Fraga, an associate professor of political science at Emory University. Tr. 567:19-21. Dr. Fraga had never testified as an expert witness before, but was qualified as an

expert witness in political science and data analysis without objection by Defendant. Tr. 571:23-572:3.

66. While the Court appreciates Dr. Fraga's desire to answer questions precisely, the Court observed that he often evaded questions on even relatively simple topics and frequently required the same question to be asked several times to get a straight answer. This contrasted with Dr. Barber's forthrightness on the topics on which he testified.

66. Dr. Fraga first testified as to Senate Factor 3, that Georgia's Public Service Commission elections utilize several policies mentioned in the Senate Report accompanying the 1982 renewal of the Voting Rights Act, including a statewide method of election, a majority-vote requirement, a runoff requirement, and residency districts with staggered terms, which relate to an anti-single shot provision. Tr. 574:3-9.

67. While recognizing this Senate factor is important, the Court does not provide much weight to Dr. Fraga's testimony on these issues. First, the continuing impact of the practices that were identified by the Senate Committee 40 years ago is questionable at best. For example, Georgia only has two Senators who were preferred by Black voters elected statewide because of Georgia's majority-vote requirement. Tr. 606:4-23. Second, Dr. Fraga never examined the

method of election of other states' utility commissions as part of his analysis, Tr. 602:24-603:1, and Plaintiffs' closing slides indicated that 7 of the 12 states that elect utility commissioners used a statewide method of election to do so.[2] Further, Dr. Fraga could not answer whether Georgia's system would be less discriminatory if the residency districts were removed, for example. Tr. 603:17-604:11, 615:13-616:4. Ultimately, the practices utilized by Georgia tell the Court little about the potential discriminatory effect from the use of these election practices and Plaintiffs presented no evidence that any of these practices (aside from the addition of candidate residency districts in the late 1990s) have not been in place for the entirety of the PSC's existence.

68.     Dr. Fraga also opined about Senate Factor 5, which looks at the history of discrimination that impacts the present-day ability of racial minorities to participate in the political process. Tr. 579:8-15.

69.     Dr. Fraga reached his conclusions about this Senate Factor involving two particular areas—overall voter turnout and campaign contributions. Tr. 579:16-20.

70.     Regarding voter turnout, Dr. Fraga testified that the lower turnout rates of Black voters tended to show Senate Factor 5 was met because it

---

[2] Defendant's counsel did not contest this number and relied on it in closing argument.

manifested a lack of participation due to lingering effects of discrimination. Tr. 583:24-584:4.

71.    Dr. Fraga never examined why voters do not vote as part of his turnout analysis, instead only observing there was a different turnout rate. Tr. 607:5-14.

72.    Dr. Fraga also ran calculations showing that the rate of individual donations by Black voters to candidates for the Public Service Commission was lower than donations by white voters. Tr. 584:5-12.

73.    Neither of Dr. Fraga's areas of opinion and analysis assist the Court much in determining this Senate factor. First, despite the language of the factor clearly requiring a connection between the historic effects of discrimination, which are undeniable, and the present-day reduced ability to participate in the political process, Dr. Fraga did not present evidence of a connection, instead relying on the statistics themselves. Tr. 606:24-607:14. This was true of both his turnout analysis and his campaign donation analysis.

74.    Second, his campaign donation analysis excluded a significant source of contributions in Georgia politics—corporate and PAC donations. Tr. 613:5-9. Dr. Fraga drew conclusions about the racial makeup of political donors without considering that number in the context of the entirety of the political

donations to PSC campaigns. Tr. 613:10-17. And the evidence before the Court showed that candidates of choice of Black voters were able to raise funds. Ms. Miller, who was a Democratic candidate in 2018 against then-Commissioner Eaton for the District 3 position, testified that she outraised an incumbent by more than three-to-one. ECF 130-3, 46:10-21. Likewise, Ms. Farley testified that she has been able to obtain statewide endorsements and raise tens of thousands of dollars for her campaign. Tr. 133:16-134:10.

75.     Finally, Dr. Fraga testified about the extent of election of Black officials. Tr. 585:19-586:3. This Senate factor is an unusual one because the rest of Section 2 focuses on Black voters which candidates they prefer, apart from race. But this prong looks specifically at the race of the candidates. And Dr. Fraga is correct that, among statewide elected officials, no Black candidate has been elected statewide from 2010 through Sen. Warnock's election in 2021. But this was also a time of Republican dominance of state politics, which raises the obvious question of whether the losses were due to politics or due to some kind of racial motivation of the electorate.

76.     The Court also recognizes that Dr. Fraga specifically excluded state judicial races from his analysis, and that Georgia has several statewide elected Black judges and justices. Tr. 586:14-15.

77.     The Court further takes judicial notice that one of the U.S. Senators from Georgia will be Black in 2023, with the contest between Sen. Warnock and Herschel Walker, and that the District 3 Public Service Commissioner will also be Black in 2023, with the contest between Commissioner Johnson and Sheila Edwards.

78.     Dr. Fraga also testified that several other statewide offices had larger margins of victory than Public Service Commission in past elections. Tr. 600:6-601:4.

79.     Finally, Dr. Fraga testified about what he called the slating process of conferring incumbency advantage on chosen candidates. Tr. 589:22-590:8.

80.     Dr. Fraga's testimony provided little support for Plaintiffs' case. First, Dr. Fraga admitted on cross-examination that his report incorrectly stated that only one of five appointed Commissioners in the last 25 years had been defeated in their elections. The actual number was three of five. Tr. 610:21-611:19. Second, Dr. Fraga admitted that incumbency advantage is actually decreasing. Tr. 611:23-612:10.

81.     On rebuttal, Dr. Fraga provided context for the debate about the interplay of race and politics, but primarily concluded that, because race and party are so closely connected, it is impossible to separate racial identification

from partisan identification because "everything related to party is, in part, due to race, not the other way around." Tr. 760:20-761:3.

82.     While the Court appreciates this debate in the political science community, the key question for this Court is whether the vote dilution Plaintiffs allege is occurring is happening "on account of race or color" or for some other reason. The general allegation that "race might cause party," Tr. 761:17-20, is not necessarily relevant to the question of whether voters are having their votes diluted by the behavior of other voters related to race. Plaintiffs' theory seems to be that as long as vote dilution is happening—even if it is due to Black voters independently deciding, while fully able to participate in the political process, to vote for one party over the other—then this Court should find for Plaintiffs.

83.     Beyond offering opinions that Dr. Barber's analysis could not consider race because it is so intertwined with party, Dr. Fraga also criticizes the methods Dr. Barber uses. But in doing so, Dr. Fraga never conducts the mediation analysis he says Dr. Barber should have conducted because—again— he does not believe someone can separate race and party. Tr. 789:16-18; 771:22-772:18, 779:1-9, 779:23-780:4.

84.     The inclusion of Republican-Libertarian races does not alter the major conclusion about Black voter behavior in Georgia. Black voters

consistently prefer candidates who are not Republicans—none of the data offered by Plaintiffs demonstrated Black voters supporting Republicans in any significant way. Tr. 764:14-24.

85.    In fact, Dr. Fraga agreed that partisanship is the single most significant predictor of vote choice in general elections. Tr. 782:25-783:3.

## IV.    THE GEORGIA PUBLIC SERVICE COMMISSION

86.    The Public Service Commission ("PSC") was created in 1879 and is both a "quasi-legislative" body and a "quasi-judicial" body, hearing rate cases as a group, taking witnesses, making evidentiary rulings, and weighing testimony from the public and parties. The PSC can also assess fines and administer federal funds for pipeline safety across the State of Georgia and decides utility rates that affect all ratepayers throughout Georgia. Joint Stip. ¶¶ 1, 14-17, 19.

87.    The PSC is a "quasi-judicial, quasi-legislative" body of "five commissioners" who set utility policy for the State of Georgia as set forth in the Georgia Constitution and laws of the state. Tr. 412:3-4, 430:17-18.

88.    The PSC consists of five members elected statewide who represent all voters in the State of Georgia. Tr. 386:5-15, 387:7.

89.    In considering the role of the PSC, the Court heard the testimony of PSC Chairman Tricia Pridemore. Chairman Pridemore testified credibly as to her

role on the Commission and was forthright in her answers. The Court notes her willingness to serve and appreciates the information she provided to the Court regarding the function and role of the Commission. The Court notes that the only testimony to respond to Chairman Pridemore about the role and function of the PSC came from the Plaintiffs themselves or by individuals who lead groups that advocate before the PSC.

90.    According to the testimony of current PSC Chairman Tricia Pridemore, one of the State's interest in electing members to the PSC statewide is to "provide centralization of thought for energy and utility policy." Tr. 386:23-287:6.

91.    Statewide elections rather than district elections enable commissioners to avoid fighting over where to locate new plants and energy facilities or which districts receive broadband or lower pole attachment rates, for example. Tr. 387:7-12.

92.    All members of the Commission look at the state as a whole and do not fight over more or less favorable rates according to districts. Tr. 387:12.

93.    The statewide election structure of the PSC and importance of non-district rate setting allows commissioners to "work in the best interest of the whole state" and to utilize the existing transmission, pipeline, and

telecommunication systems to "maximize the needs of the entire state." Tr. 387:13-17.

94.     Setting energy policy on a statewide basis is the primary way Georgia has been able to keep utility rates 16% below the national average while still being a leader in clean energy and transition the State's fleet on the electric side in a way that does not place unnecessary burden on individual ratepayers. Tr. 387:17-22.

95.     The statewide management of energy policy is also, in Chairman Pridemore's opinion, "a primary reason that Georgia has been so successful at economic development." Tr. 388:23-24.

96.     Chairman Pridemore also believes and testified credibly that statewide representation enables the PSC to get the best rates and the best outcome for all of the citizens of the state knowing that a rising tide lifts all ships. Tr. 388:6-9.

97.     The PSC has three primary roles, which are ensuring the "safety, reliability and affordability of utilities." Tr. 388:19-21.

98.     The testimony at trial indicated that the scope of the PSC's responsibilities is broad.

99.     On the electricity side, the PSC regulates aspects of Georgia Power related to finances and what they charge customers along with regulating electric energy generation and transmission. Tr. 388:24-389:2.

100.    On the natural gas side, PSC does not have the authority to directly oversee the forty-one Electrical Membership Cooperatives ("EMCs") in the state but can regulate their ability to borrow money. Tr. 389:3-7.

101.    On the municipal side, the PSC has authority over "who and what cities cover and serve what customers for electric usage." Tr. 389:8-10.

102.    On the telecommunications side, the PSC regulates pole attachments and landline telephones and has some jurisdiction over connectivity and rural broadband, internet connectivity particularly. Tr. 389:18-21.

103.    The PSC sets rates based on residential, commercial and industrial rates sets and have a variety of income-qualified programs to assist low-income ratepayers. Tr. 390:2-6.

104.     The PSC has a consumer affairs group that works for all five commissioners handling constituent issues the PSC receives. Tr. 391:5-6, 11-12.

105.    Having one consumer affairs group prevents preferential treatment to some commissioners over others which would lead to preferential treatment for certain districts under a district-based system. Tr. 393:18-24.

106.   When executing authority to oversee state and federal pipeline safety programs, Chairman Pridemore testified that it is nearly impossible to divide up pipeline safety elements into districts. Tr. 391:13-25.

107.   From a staff deployment standpoint, Chairman Pridemore testified credibly that it would "not be prudent" to align pipeline safety inspectors with districts rather than the entire state. Some parts of the state would necessarily "be overburdened and other parts of the state would not be." Tr. 395:12-16.

108.   This is particularly evident with respect to Georgia 811 calls for utility locates or what is referred to as "call before you dig." Chairman Pridemore testified credibly that if commissioners were elected and responsive to one district only, some districts would get more locates and at a rate faster than others. Tr. 395:17-396:2.

109.   For all these reasons, Chairman Pridemore believes that it would be "detrimental to how the state operates and oversees utility regulation" for the commissioners to be elected by district instead of statewide. Tr. 396:13-14.

110.   Chairman Pridemore further testified credibly about her beliefs that district-based elections would introduce favoritism and politics into utility regulation. Tr. 397:19-21.

111.   There are at least 12 states that have elected utility regulatory commissions. Tr. 398:16-17.

112.   If PSC elections were changed to district elections, Chairman Pridemore believes there would also have to be a change in the law requiring the commissioners to set rates on a statewide basis because each commissioner would not be prohibited from setting rates on a district basis. Tr. 399:2-9, 19-23.

113.   The meetings of the Public Service Commission are conducted like court proceedings. The PSC hears testimony and makes rulings on the evidence. Tr. 409:11-13.

114.   Witnesses can be cross examined by "intervenors or commission advocacy staff." Tr. 409:11-15.

115.   The PSC's policy staff is split into two groups for significant cases. One is the advocacy staff who take a litigation position in cases against Georgia Power, for example, in rate cases. The other group is the advisory staff who advise the commissioners on policy issues and provide information to enable the commissioners to make informed decisions. Tr. 409:18-410:5.

116.   Anyone can intervene in PSC cases with 25 signatures supporting the intervention. There is no filing fee or charge to intervene. The intervenors do

not have to be attorneys and can cross-examine utility officials and experts testifying before the commission in rate cases. Tr. 410:6- 18.

117.    The PSC also takes public comment, both written and oral. Tr. 410:21-22.

118.    The PSC does not bar anyone from public comment and has never taken steps to eliminate public comment in IRP cases or rate cases. Tr. 410:23-25, 411:1-3.

119.    In fact, for the most recent integrated resource plan case, the PSC held a one-day public comment session which was unprecedented. Despite the limited space in the small hearing room and social distancing concerns from COVID, one representative from each of the utilities was present to answer questions all day. Tr. 426:20-24,427:4-8,428:16-17.

120.    The public comment day was publicized in a "big media push" on television and radio. Tr. 428:12-17.

121.    Public comment in cases is not limited to the public comment day. The public could attend committee hearings as aspects of the IRP are taken up at committee meetings or submit comments in writing. Tr. 428:21-25,429:3-6.

122.    The recent IRP had more intervenors than any IRP in PSC history. Tr. 426:25-427:2.

123.    Despite having the choice to do so, the Georgia Conservation Voters, the organization headed by Plaintiff McCorkle, has never intervened in rate cases. Tr. 411:4-7, 13-15.

124.    The PSC gets hundreds of comments in typical rate cases and cannot always accommodate all the requests they receive. Tr. 411:16-24.

125.    Commissioners do not consider race when considering the impact of rates on consumers, because income makes the difference in rates, not the race of the individuals. Tr. 412:21-413:8; 422:20-21.

126.    It takes a majority vote of the commissioners to raise utility rates and decide Integrated Resource Plan cases. Tr. 135:6-9; 400:21-23; 412:5-8; 412:13-14.

127.    The PSC also oversees Plant Vogtle, which consists of four nuclear units in Burke County with two operational since the 1990s  Tr. 413:24-414:2. The two other units are under construction. Tr. 414:3-5. When completed, the additional units at Plant Vogtle will generate 540 megawatts per unit, each with an 80-year lifespan which is over four times the lifespan of solar or gas plants. Tr. 414:6-12.

128.    According to Chairman Pridemore, Plant Vogtle has brought 7,000 jobs to the state and is now the number one job-creator in the country. Tr. 414:23-25.

129.   Right now, the average Georgia Power customer pays $3.23 a month for Plant Vogtle. Tr. 415:1-3.

130.   On March 15, 2020, recognizing the worldwide impact of the COVID-19 pandemic, the PSC ordered the utilities to not shut off power for people not paying their bills. This moratorium was in effect until the middle of July, 2020. Tr. 415:21-416:6.

131.   When the moratorium was lifted, payment plans were set up for customers to pay their arrears in installments and a "host of consumer information" was provided concerning Project Share at the Salvation Army, Hopeworks, as well as energy assistance teams at Atlanta Gas Light, Georgia Power and the 18 gas marketers to provide a path for ratepayers to pay their bills. Tr. 416:3-17, 418:13.

132.   A "litany of income-qualified programs" exist for providing assistance in paying utility bills for people of all races. Tr. 422:17-20.

133.   Atlanta Gas Light customers were extended an additional grace period due to staff shortages at the company. Tr. 417:7-11.

134.   Chairman Pridemore received as many emails thanking the PSC for the moratorium as she heard in opposition to lifting the moratorium.  Tr. 417:21-24.

135.   Chairman Pridemore testified that the PSC's decision to lift the moratorium did not have a racial component. Tr. 418:15-20.

136.   It is Chairman Pridemore's belief that Black ratepayers do not have different needs than white ratepayers—it is income that makes the difference for her considerations. Tr. 418:21-419:1; 422:20-21.

137.   Chairman Pridemore voted in favor of lifting the moratorium because the health of the utilities is important to the state economy and it is important to the employees that work in the utilities industry and to the hundreds of thousands of people that hold those utilities as their retirement. It is also important that ratepayers not fall too far in arrears and have the option of utilizing one of these programs set forth by the PSC after having worked with the utilities. Tr. 417:25-418:14.

138.   The Court notes that all of the testimony regarding the disconnection moratorium shows that the decision to lift the moratorium involved complicated policy questions.

139.   The PSC has nothing to do with where coal ash is disposed of because they are not an environmental regulator. Rather, the Commission is a financial regulator. Tr. 419:5-8.

140.    The PSC's constituents are statewide and if someone calls for help, they are never asked what district they are from. Tr. 419:16-21.

141.    Chairman Pridemore's primary concern is the way the State administers utility service and not politics. Georgia is the number one state for business in large part because of the way utilities are regulated and the way the PSC oversees how electricity is provided across the state. Tr. 420:7-14.

142.    Chairman Pridemore also believes that statewide elections for PSC are important for utilities to work together and so there is no duplication in effort and so everyone statewide get the same service and pay the same amount, regardless of their geography. Tr. 420:15-25.

143.    Chairman Pridemore considers all Georgians her constituents. Tr. 430:22.

V.    **GEORGIA DEMOGRAPHICS**

144.    Based on the 2020 Census, the State of Georgia has a total population of 10,711,908 persons, of whom 5,362,156 (50.1%) are non-Hispanic White alone, 3,538,146 (33.0%) are Black alone or in combination with some other race, 3,320,513 (31.0%) are Black alone, and 1,811,606 (16.9%) are members of other racial groups. Joint Stip. ¶ 4.

145.    Per the 2020 Census, Georgia has a total voting age population of 8,220,274 persons, of whom 4,342,333 (52.8%) are non-Hispanic White alone, 2,607,986 (31.7%) are any-part Black, 2,488,419 (30.3%) are single-race Black, and 1,269,955 (15.4%) are members of other racial groups. Joint Stip. ¶ 5.

146.    According to data from the Secretary of State, Georgia had a total of 7,004,034 active voters as of December 2021. Of those, 3,716,904 (53.1%) self-identified as White, 2,058,705 (29.4%) self-identified as Black, 260,631 (3.7%) self-identified as Hispanic, 189,814 (2.7%) self-identified as Asian or Pacific Islander, 138,553 (2.0%) are self-identified as members of another racial group, and for 616,879 (8.8%) their race is unknown. Joint Stip. ¶ 6.

## VII. FACTS ABOUT THE TOTALITY OF THE CIRCUMSTANCES

### a. Factor 1: History of discrimination

147.    Defendants do not deny Georgia's past history of official, state-sponsored racism. Joint Stip. ¶ 8; Tr. 842:15-17.

148.    Plaintiff Woodall described Georgia's history of discrimination as a legacy of dehumanization. Tr. 63:1-7 (Woodall).

149.    Plaintiff Rose recounted his involvement in the Civil Rights movement and his efforts to dismantle Confederate States' enactment of policies enshrining principles of white supremacy. Tr. 481:6-19 (Rose).

150.   Plaintiff's witness Chandra Farley described the link between historically racist policies such as redlining and energy inefficiency, which results in a disproportionate impact on Black Georgians. Tr. 140:12-23 (Farley).

151.   Plaintiff Woodall and Plaintiff Rose have never been prohibited from registering to vote based on their race. Tr. 96-97:24-1 (Woodall); Tr. 502:6-11 (Rose).

152.   Plaintiff Woodall and Plaintiff Rose have never been prohibited from casting a vote in Georgia based on their race. Tr. 97:2-4 (Woodall); Tr. 502:12-14 (Rose).

153.   Plaintiff Woodall is not aware of any pending preliminary injunctions related to SB 202. Tr. 95-96:25-12.

154.   Although Plaintiff Woodall and Plaintiff Rose testified about the substances and impact of SB 202, their testimony was offered in their personal capacity and was their personal opinion rather than an expert opinion. Tr. 65-68:18-9 (Woodall); 501:3-10 (Rose).

155.   In Plaintiffs Rose's view, a 4-1 Republican State Election Board is "4-1 anti-Black." Tr. 487:6-8

### b. Factor 2: Racially polarized voting

156.   All of the analysis of this Senate Factor duplicates the analysis provided above based on the expert reports and testimony of Drs. Popick, Fraga, and Barber.

### c.  Factor 3: Discriminatory voting practices

157.   Plaintiffs argue that a majority vote requirement, runoff requirements, staggered terms, numbered seats for the PSC, and what they deem as an "unusually large" voting district in a statewide at-large election system, constitutes discriminatory voting practices under Senate Factor 3. Tr. 23:16-24:1; 573: 12-20; 574:3-9; 615:13-616:4.

158.   However, despite a majority vote and runoff requirement, along with statewide elections, Plaintiffs' witnesses testified that Senators Warnock and Ossoff received a significant amount of support from Black voters and were successful in their statewide election campaigns. Tr. 88:2-8; 89:19-90:1; 606:4-23; 793:13-16; Joint Stip. ¶ 11.

159.   Additionally, the Black-preferred candidate for the 2020 election of President of the United States, Joe Biden, also won statewide in Georgia. Joint Stip. ¶ 11.

160.   Plaintiff Woodall confirmed that Georgia's statewide election districts were not unusually large such that they would enhance the opportunity

for discrimination against the minority group, as evidenced by the recent successes of Black-preferred candidates, Senator Warnock and Senator Ossoff, and the loss of Senator Loeffler. Tr. 87:19-88:14.

161.   In fact, Plaintiff Woodall testified that black voters were primarily responsible for the victories of Senators Warnock and Ossoff in the 2020 general elections and runoff contests. Tr. 89:19-23.

162.   Furthermore, Plaintiff's expert witness, Dr. Fraga, concluded that recent statewide elections in Georgia were significantly more competitive than the those occurring in the 1970s to early 2000s. Tr. 599:24-600:5.

163.   The margin of victory in Georgia's statewide elections in 2018 demonstrated that there was a closer margin of victory for Public Service Commissioner seats than those of Commissioner of Labor, Commissioner of Agriculture, and State School Superintendent seats. Tr. 600: 15-601:4.

164.   Furthermore, despite Plaintiffs residency concerns, Plaintiffs are not challenging the law requiring candidates to reside in a residential district.  Mot. to Dis. Tr. [ECF 35] 20:21-21:7

### d. Factor 4: Candidate slating process

165.   There is no candidate slating process in Georgia and Plaintiffs' expert incorrectly stated that the appointment process required by Georgia law

to fill vacancies on the PSC was a kind of "informal slating process" that confers a sort of "incumbency advantage" on candidates who are first appointed to the position. Tr. 590:6-8, 18-22.

166.   Dr. Fraga admitted that incumbency advantage has decreased over time. Tr. 611:20–612:7.

167.   Three of the five commissioners appointed to the PSC referenced in Dr. Fraga's report were defeated in their reelections.  Tr. 611:13-16.

168.   Plaintiffs presented no evidence that access to the ballot is the same as access to incumbency.

169.   Although Dr. Fraga referred to "shenanigans" involved in the recent appointment of PSC Commissioner Johnson and that he was chosen after Dr. Fraga gave his deposition, he has no evidence whatsoever of why the Governor chose Commissioner Johnson or that the appointment decision had any connection whatsoever to this litigation. Tr.  610:3-13.

170.   The evidence in the record concerning Black candidates' ability to raise money for their campaigns shows that two of the most recent Black-preferred candidates for the PSC, Lindy Miller and Chandra Farley were able to raise campaign funds and obtain endorsements.

171.    Ms. Lindy Miller, who was the Black-preferred candidate in 2018 for PSC District 3 outraised her incumbent opponent 3-1. ECF 130-3, 46:10–21.

172.    Ms. Farley, who is Black, raised more money than her Black opponent in the Democratic primary and she received numerous endorsements. Tr. 133:23-134:10.

e.   **Factor 5: Effects of discrimination on ability to participate in political process**

173.    Census data from the 2020 Census shows that 33.0% of the population of Georgia are Black alone or in combination with another race and 31.0% are Black alone.  Joint Stip. ¶ 4.

174.    According to data of the Georgia Secretary of State's office as of December 2021, 29.4% of registered voters self-identified as Black. Joint Stip. ¶ 6.

175.    Plaintiffs have all been able to participate in the political process and even if they are not successful in the electoral process, none of them have been prohibited from voting based on their race. Joint Stip. ¶ 3, Tr. 58:3-5, 96:24–97:12 (Woodall); 502:6-14 (Rose).

176.    And to the extent increasing voter turnout rate among all aspects of the population is deemed indicative of an inability of Black voters to participate

effectively in the political process, the analysis by Dr. Fraga did not consider why a voter may choose not to vote. Tr. 606:24–607:14.

177.    With respect to candidate contributions as an indicator for Black Georgians to participate effectively, Dr. Fraga only considered individual contributions and did not consider corporate contributions or PAC contributions making is analysis on the issue, at best, incomplete. Tr. 613:5-9.

### f.   Factor 6: Racial appeals in campaigns

178.    Senate Factor 6 asks "whether political campaigns have been characterized by overt or subtle racial appeals." S. Rep. No. 17-497, at 29.

179.    The lack of racial appeals is not held against Plaintiffs, *United States v. Marengo County*, 731 F.2d 1546, 1569 (1984), but the Court can weigh the lack of racial appeals or conclude that appeals strike a more partisan appeal than a racial appeal. *See*, *Alabama NAACP*, 2020 U.S. LEXIS at *179  at n. 55 ("[S]ince *Marengo* and *Village of Arlington Heights*, bigoted racial behavior has been supplanted by bitter partisan behavior. That is a topic that eludes a consensus, reasoned explanation. But it tends to support a finding that partisanship has much to do with recent election outcomes generally.").

180.    Plaintiffs did not present any evidence of racial appeals in campaigns for the Public Service Commission and did not present any expert

40

testimony regarding what a subtle racial appeal is during a campaign. While Dr. Fraga mentioned racial appeals on rebuttal, it was only accepted as lay opinion, not expert testimony. Tr. 768:17-769:7.

181.  Instead, Plaintiffs relied on their own testimony and personal opinions about what was a racial appeal. While the Court certainly does not question the sincerity of Plaintiffs' own beliefs about racial appeals, the testimony of Plaintiffs alone is of limited utility in demonstrating this Senate prong is met.

182.  The admitted evidence of what Plaintiffs called racial appeals fell into several categories.

183.  First, Plaintiffs provided examples of racial appeals as part of campaigns for candidates who were unsuccessful. These examples included comments made by Sen. David Perdue (PX 24) and Sen. Loeffler (PX 21, 25, 30), both of whom lost their general elections in 2021. Sen. Perdue also lost the Republican primary for Governor in 2022 by a wide margin. Plaintiffs provided an example of a racial appeal involving immigration[3] from Michael Williams, who finished last in the Republican gubernatorial primary in 2018. The Court finds that racial appeals from unsuccessful candidates are of very limited utility

---

[3] The only testimony tying Black voters to immigration was from Plaintiff McCorkle. Tr. 326:16-25.

in determining that campaigns are "characterized by" these types of messages. If anything, they demonstrate that racial campaigns do not work in elections in Georgia.

184.   The next category of racial appeals were statements made by Congresswoman Marjorie Taylor Greene (PX 11, 21, 26). Not only is it not entirely clear that all of these statements were made in the course of a political campaign, as required by the Senate Factors,  but even if they were, the Court determines that racial appeals made by candidates subject to a more limited geographic area like a congressional district, are not useful in determining if statewide campaigns are characterized by racial appeals. Thus, the Court finds these statements of limited weight.

185.   The testimony of several plaintiffs indicated that contested issues related to public policy are, to them, racial appeals. These included use of the word "patriot," and calls to lower or reduce government spending and regulations. Tr. 321:22-329:18. The Court finds that comments made during a campaign about an issue of public importance does not weigh as a racial appeal because otherwise campaigns could never speak about any subject of importance.

186.   Plaintiffs presented a single example of an anti-Semitic appeal regarding Sen. Ossoff (PX 27). But the only testimony that anti-Semitic appeals are relevant to racial appeals regarding Black voters was Ms. Miller's testimony that there is no connection between the two. ECF 130-3, 42:10-15; 43:6-44:23.

187.   Thus, the Court finds the evidence does not show that anti-Semitic appeals are racial appeals for purposes of this Senate factor when the relevant racial minority is Black voters.

188.   Plaintiffs also presented evidence of a robocall by an individual attempting (badly) to impersonate Oprah Winfrey (PX 33). Setting aside the ridiculous and racist nature of the call, Plaintiffs only presented evidence that individuals in Georgia heard the call, Tr. 83:15-24, and provided no evidence that the call originated from a political campaign in Georgia or even that it originated in Georgia at all. Without more, this Court cannot presume that this type of appeal characterizes political campaigns in Georgia without more clarity.

189.   Finally, Plaintiffs presented evidence from Governor Kemp's campaigns against Stacey Abrams in 2018 and 2022 as racial appeals (PX 12, 32, 95, 96). In context these appeals do not rise to the level of demonstrating that racial appeals characterize political campaigns in Georgia.

190.    The speech of Governor Kemp was not attacking minority voters but rather urging Republicans to emulate Democratic efforts, as one of the Plaintiffs agreed. Tr. 566:5-7.

191.    The other advertisements, while Plaintiffs testified they believed they were racial in nature, are all about issues of public importance—government regulations, spending, immigration, and funding levels for law enforcement. This Court cannot construe that all of the statements by a candidate on issues of public importance are automatically racial appeals if said by a white candidate when opposing a Black candidate.

192.    After carefully weighing this factor, the Court finds this factor does not favor Plaintiffs. While they have presented some evidence of racial appeals, they have not demonstrated by the evidence admitted at trial that racial appeals characterize political campaigns in Georgia.

### g.  Factor 7: Extent of election of minority candidates

193.    For purposes of Senate Factor 7, the State of Georgia is the relevant jurisdiction. This Senate factor is of limited utility because it looks to the race of the candidate, when other evidence in this case demonstrates that partisanship is a key driver of voter behavior, not racial animus.

194.    While minority candidates may have experienced limited success in elections for statewide office, that can just as easily be attributed to Black voters in Georgia looking for the "right Black candidate," Tr. 565:2, apparently referring to a Democratic Black candidate, rather than simply looking at the candidate's skin color and casting their vote on that basis.

195.    Further, as noted above, regardless of whether Democrat Raphael Warnock or Republican Herschel Walker wins the election for United States Senate in November, Georgia will be represented by a Black Senator unless, as Dr. Fraga intimated, some unknown and unprecedent occurrence takes place that might result in neither Mr. Warnock nor Mr. Walker winning the election. Tr. 608:21-609:8.

196.    Additionally, Georgia's Public Service Commission District 3 will be represented by a Black candidate, either by incumbent Republican Fitz Johnson, or one of two Black Democratic challengers, Chandra Farley or Sheila Edwards. Tr. 132:1-21 (Farley); 759:5-11 (Rose).

### h.  Additional Factor: Lack of responsiveness of officials

197.    Plaintiffs produced no evidence of particularized needs of Black Georgians with respect to the PSC and only produced evidence that all

Georgians with lower incomes suffer similar challenges, regardless of race. Tr. 412:11-12 (Pridemore); 91:20-23 (Woodall); 563:20-23 (Mosley).

198.   An increase in rates affects low-income individuals regardless of race. Tr. 509:11-18 (Rose); 135:2-5 (Farley)

199.   Plant Vogtle is being paid for by every ratepayer, regardless of race. Tr. 92:7-10 (Woodall); 92:7-10 (Rose); 344:15-20 (Pridemore); 413:22-24 (Rose).

200.   Energy burden falls more heavily based on income. Tr. 109:9-10 (Farley); 300:7-15 (McCorkle); 415:8-16 (Pridemore).

201.   There was testimony that coal ash ponds might negatively affect Black Georgians in higher proportions based on where they reside, but testimony also revealed that the PSC does not regulate environmental issues, including the placement of coal ash ponds. Tr. 419:2–15 (Pridemore); 92:11-20 (Woodall)

202.   Plaintiffs attempted to produce expert evidence through Dr. Popick's supplemental report showing that the elimination of COVID disconnection moratorium disproportionately affected Black Georgians, but Dr. Barber's testimony and rebuttal report analyzing Dr. Popick's use of Bayseian Improved Surname Geocoding ("BISG") on a non-representative subset of data ultimately skewed the model toward over-reporting Black individuals as

disconnects, and is not reliable. Tr. 745:5–746:13; *see also*, discussion of Dr. Barber's analysis above).

203.    Chairman Pridemore testified credibly that the decision to lift the moratorium was a difficult decision with a number of competing policy interests involved. Tr. 416:17–418:23.

204.    Further, the testimony indicated that the PSC provides a number of programs to assist ratepayers with their bills based on income. See, *supra,* ¶¶ 103, 132-133.

### i.    Additional Factor: Tenuous policy underlying practice

205.    Senate factor 9 asks whether the State's policy behind its system "is tenuous." S. Rep. No. 97-417, at 29.

206.    "[E]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 161 (1892).

207.    As discussed above and explained below, Defendant provided evidence to show clear policy reasons for the use of statewide election for utility regulators. *See* Section IV above.

208.   Moreover, this Court particularly credits Dr. Barber's testimony about decreased competitiveness affecting representation and overall responsiveness of elected officials as a compelling state interest. Tr. 648:17–651:3.

## VI.   THE 2022 ELECTION TIMELINE

209.   Mr. Barnes is the Director of the Secretary of State's Center for Election Systems. Tr. 437:6-8.

210.   He has been with the Center of Election Systems for 17 years. Tr. 437:13-15.

211.   Since 2018, the Center of Election Systems has been a division of Georgia's Secretary of State's Office. Tr. 437:16-18.

212.   Mr. Barnes testified by Zoom and the Court had the opportunity to consider his credibility. The Court finds Mr. Barnes highly credible. He was forthright and honest with his answers, explained the processes for elections in Georgia, and provided helpful context.

213.   The Court further notes that Plaintiffs offered no testimony contradicting or questioning Mr. Barnes.

214.   The Court recognizes public servants like Mr. Barnes who provide a valuable service to all Georgians with their work in elections.

48

215.   Mr. Barnes explained that if the Court were to cancel the elections for Public Service Commission for Seats 2 and 3, scheduled for Fall 2022, it would need to do so by August 12, 2022. Tr. 443:18-442:4.

216.   Mr. Barnes further explained at trial, and in the preliminary injunction hearing, that the ballot building phase for when the Secretary could issue a directive canceling the Public Service Elections, rather than the counties, would be middle of August to early September. Tr. 442:5-443:12.

217.   Mr. Barnes also stated that his August 12, 2022 deadline was based on the State's experience in Dekalb County involving the balloting issues in a county commission race that resulted in a full hand recount when the state attempted to delete information from a ballot due to the withdrawal of a candidate with insufficient time.  Tr. 452:7-454:1.

## VII.   STANDARD OF REVIEW

### a.  Trial on the Merits

218.   "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).

219.   In the context of Section 2 claims, the Eleventh Circuit has explained, "[b]ecause the resolution of a voting dilution claim requires close analysis of

unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the rule 52(a) requirements in voting dilution cases and have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning." *Johnson v. Hamrick*, 196 F.3d 1216, 1223 (11th Cir. 1999) (quoting *Cross v. Baxter*, 604 F.2d 875, 879 (5th Cir. 1979)).

220.   And, in a bench trial, "it is the exclusive province of the judge . . . to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).

221.   Additionally, "[a] trial judge sitting without jury is entitled to great latitude concerning the admission or exclusion of evidence." *Wright v. Southwest Bank*, 554 F.2d 661, 663 (5th Cir. 1977).

### b. Claims under Section 2 of the VRA

222.   Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

223.   To prove a violation of Section 2 in a vote-dilution case, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions: "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district'; (2) that the minority group is 'politically cohesive'; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." *Nipper v. Smith*, 39 F. 3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so–called "Senate Factors" to assess the totality of the circumstances. *Id.* at 1512; *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

224.   Additionally, failure to establish one of the Gingles preconditions is fatal to a Section 2 claim because each of the three prongs must be met. *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F. 3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F. 3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach, Fla.*, 113 F. 3d 1563, 1567 (11th Cir. 1997).

225.   Further, when considering a challenge under Section 2, this Court must determine whether the alleged vote dilution is "on account of race or color," 52 U.S.C. § 10301(a), or caused by some other factor. This is because "[u]nless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics–based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

226.   Further, the Eleventh Circuit requires evidence necessary to demonstrate a "causal connection between racial bias and disparate effect" in the vote-denial context, relying on the text of Section 2. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1330-31 (11th Cir. 2021).

## VIII.  PLAINTIFFS DO NOT PREVAIL ON THE MERITS

227.   Based on the totality of the circumstances, Plaintiffs have not carried their burden to prevail.

228.   Additionally, Plaintiffs have not proven that the statewide method of election is a "standard, practice, or procedure" and have not demonstrated that the statewide method of election causes illegal vote dilution in violation of Section 2. Even if they could make this showing, their proposed remedy is

beyond the power of the Court to order because it requires altering the form of state government.

229.   The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F. 3d at 1530–31; *see also Burton*, 178 F. 3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); *accord Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F. 3d 1282, 1302 (11th Cir. 2020). Whatever proposed remedy is used to demonstrate a violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F. 3d at 1530–31. In short, if a plaintiff cannot show that the proposed remedy used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Wright*, 979 F. 3d at 1302.

230.   Moreover, as this Court has already recognized, "a viable remedy is necessary for Plaintiffs to have constitutional standing. If the remedy is not feasible, Plaintiffs have not suffered an injury that gives them standing to sue." ECF 112, p. 5, citing *Davis v. Chiles,* 139 F. 3d 1414, 1419-20 (11th Cir. 1998).

231.   Plaintiffs' proposal to convert Public Service Commissioners from statewide officials to district-based officials is not a proper remedy.

232.   First, intuition suggests—and cursory examination confirms—that "[t]he state at large is decidedly not a districting plan, nor is it a district of anything. Unlike a county, city, state legislature, or school board, the state is itself a sovereign." *Ala. State Conference of the NAACP*, 2020 U.S. Dist. LEXIS 18938, at *38

233.   This makes statewide elections for statewide office a particularly "poor conceptual vehicle to travel the vote dilution highway," *id*. at 36, because statewide boundaries cannot be modified by the State itself.

234.   Unlike the nefarious redrawing of municipal or county boundaries, where we find the "inescapable human effect… is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights," *Chisom v. Roemer*, 501 U.S. 380, 390 (1991), State boundaries are all but etched in stone.

235.   Given the permanence and non-negotiability of statewide boundaries, vote dilution is a difficult claim to apply in the statewide electoral context because the claim suggests a departure from some longstanding norm that results in the dilution of votes. As the Supreme Court has long noted, "[t]he phrase vote dilution itself suggests a norm with respect to which the fact of dilution may be ascertained." *Gingles*, 478 U.S. at 88 (internal brackets omitted)

(quoting *Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002, 1012 (1984) (Rehnquist, J., dissenting from summary affirmance)).

236.   And where, as here, statewide elections have been carried out for a particular office for well over a century, the boundaries of the State are the norm, not a departure from it.

237.   Put differently, "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2." *Holder v. Hall*, 512 U.S. 874, 881 (1994). And it also follows that Plaintiffs cannot have an injury.

> **i.   Plaintiffs have not established that voting in Georgia is polarized by race and not on some other basis (<u>Gingles</u> 2 and 3)**

238.   Plaintiffs also cannot succeed on their Section 2 claims because they have not shown causation behind polarized voting—they have only showed that voting is polarized.

239.   In order to succeed, Plaintiffs do not just have to show that voting is racially polarized—they have to prove that electoral losses are "on account of race or color" and not partisan voting patterns. 52 U.S.C. § 10301(a); *Solomon v. Liberty County*, 221 F. 3d 1218, 1225 (11th Cir. 2000) (en banc); *Greater Birmingham*

*Ministries*, 992 F. 3d at 1330-31 (vote-denial case); *see also League of United Latin Am. Citizens v. Clements*, 999 F. 2d 831, 854 (5th Cir. 1993) (en banc) ("failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief").

240.    This matters because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F. 3d at 1225. This is why Section 2 claims present an "often–unstated danger": "Unless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper*, 137 S. Ct. at 1490 (Alito, J., concurring in part) (quoting *Miller*, 515 U.S. 916) (cleaned up).

241.    The testimony and reports of Drs. Popick and Fraga carefully avoided any causal determination. In contrast, the testimony and report of Dr. Barber indicated that partisanship explains voter behavior better than race. In every general election contest analyzed, the only determining factor for whether the Black and white voters supported a candidate was the party of the candidate.

242.   As discussed above, the Court credits the testimony of Dr. Barber. While Plaintiffs presented evidence of polarization, Defendant provided credible evidence of an alternative explanation which Plaintiffs were unable to rebut— their only response was to say this Court is required to find such a close connection as to render race and politics inseparable.

243.   While Defendant may not have shown partisanship explains every outcome, Defendant has presented credible evidence that any vote dilution is not occurring on account of race or color.

244.   Further, an interpretation of Section 2 that requires partisan outcomes would raise significant questions about the constitutionality of that law. *City of Boerne v. Flores*, 521 U.S. 507, 530 (1997).

245.   The Court finds that Plaintiffs have not established evidence required to show that the polarized voting that is occurring in Georgia is "on account of race or color" as required by Section 2.

**ii.   Plaintiffs have not established that the totality of the circumstances clearly favors a finding of vote dilution.**

246.   Only after Plaintiffs show the first three *Gingles* requirements does the Court "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to

elect representatives of their choice.'" *Abrams*, 521 U.S. at 91 (quoting Section 2); *De Grandy*, 512 U.S. at 1011 (*Gingles* factors are not "sufficient in combination" to prove a violation of Section 2).

247.   Further, "[t]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom*, 501 U.S. at 397. This is because "in a majoritarian system, numerical minorities lose elections." *Hall*, 512 U.S. at 901 (Thomas, J., concurring).

248.   Even though Plaintiffs have failed to show the first three prongs of *Gingles*, their claims still fail on the record if the Court were to continue to the weigh the totality of the circumstances because the record before the Court does not indicate that the statewide method of election for PSC presents "an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F. 3d 1336, 1342 (11th Cir. 2015).

249.   This Court is required to conduct an "intensely local appraisal" of the facts for the totality of the circumstances. *De Grandy*, 512 U.S. at 1020–21 (no

statistical shortcuts to determining vote dilution); *Gingles*, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); *White v. Regester*, 412 U.S. 755, 769–70 (1983) (assessing the impact takes place "in light of past and present reality, political and otherwise"). And through the benefit of almost two years of pre-trial litigation and a five-day trial on the merits, the Court is comfortable that it has done exactly that. Through this lens, the Court may weigh the totality of the circumstances.

250.  The *Gingles* court listed the Senate factors as follows:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles*, 478 U.S. at 36–37.

251.   In light of the Court's findings of fact, listed in detail above, the Court assesses the Senate Factors based on the evidence before it as follows.

252.   First, the history of discrimination. All parties agree that Georgia has a terrible past history of state-sponsored racism. But the Eleventh Circuit has cautioned against "allowing the old, outdated intentions of previous generations to taint [a jurisdiction's] ability to enact voting legislation." *Greater Birmingham Ministries*, 992 F. 3d at 1332. Despite providing some testimony about Georgia's

history, Plaintiffs have not provided evidence of examples in recent history that are relevant to the method of election to the PSC.

253.   Plaintiffs' primary evidence on SB 202 is not probative of the issues here and Plaintiffs have provided no expert testimony regarding continuing discrimination—only past examples and personal opinions.

254.   The Court finds that this prong, while recognizing Georgia's history, does not weigh in favor of Plaintiffs.

255.   Second, racially polarized voting. As discussed above under *Gingles* prongs two and three, this factor does not weigh in favor of Plaintiffs because of the lack of evidence of whether the polarized voting is due to partisanship or some other factor. At trial, Plaintiffs must prove that vote dilution is "on account of race or color" and the evidence before the Court following a full trial on the merits only demonstrates that voting is polarized in Georgia. Plaintiffs' strategic decision not to analyze causation as a part of their experts' analysis does not give rise to an inference in their favor. As a result, the Court finds this factor weighs heavily in favor of Defendant.

256.   Third, historical voting practices that discriminate. While Georgia has several practices that have been used as discriminatory devices in the past, it is unclear how these apply in the present. For example, the majority-vote

requirement operated in the 2020 general election to create an opportunity to the Black-preferred U.S. Senate candidates to win. Thus, this factor does not strongly favor either party at this stage.

257.   Fourth, despite Plaintiffs' efforts to convert incumbency and the gubernatorial appointment process into an "informal" slating process, the Court finds that Georgia does not have a candidate slating process. Senate Factor 4 refers to a minority candidate's ability to run for office and not incumbency advantage. *United States v. Marengo County*, 731 F.2d 1546, 1569 (1984). Thus, Senate Factor 4 weighs in favor of the Defendant.

258.   Fifth, the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, "which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. Plaintiffs presented Census data on this point, but this Court takes judicial notice of record-breaking Black voter turnout in the 2020 election. This factor is particularly salient when considered in conjunction with the fact that it took place after the passage and implementation of SB 202, which Plaintiffs spent significant time at trial portraying as a novel iteration of the old practice of voter suppression. Given that Black voters do not appear to be hindered from

participating in the electoral process based on any disparities in education, employment, and health, this factor weighs in favor of Defendant.

259. Sixth, racial appeals in campaigns. Plaintiffs presented several examples of racial appeals, which regrettably remain part of political discourse. But the Court takes a measure of relief in the fact that most of those highlighted by Plaintiffs came from unsuccessful candidates, and some of the most abhorrent examples examined at trial could not be confirmed as coming from Georgia at all, leading this Court to the conclusion that a few scattered examples does not demonstrate these kinds of appeals characterize Georgia political campaigns. Further, Plaintiffs presented no evidence that racial appeals occur in PSC elections and several Plaintiffs agreed that no racial appeals have occurred on those elections. As a sister district court in this Circuit put it, "[A few] bricks does not a house make." *Alabama NAACP*, 2020 U.S. Dist. LEXIS 18938, *174. As a result, this factor weighs in favor of Defendants.

260. Seventh, the extent of election of Black officials. Georgia has had few non-judicial statewide elected Black officials,[4] but the relevant comparison is for the State or political jurisdiction. 52 U.S.C. § 10301(b). Plaintiffs agreed that

---

[4] The Court notes the upcoming statewide election for incumbent Public Service Commissioner Fitz Johnson and Herschel Walker as the Republican nominee for U.S. Senate, which could alter this dynamic after the 2022 election.

Black-preferred candidates can succeed in statewide elections for other offices. The Court notes the unusual nature of this Senate factor, which expressly considers the race of the candidate, with the general *Gingles* factors, which specifically do not consider the race of the candidate. Thus, this factor does not weigh clearly in favor of either party at this stage.

261.   On the additional factors, Plaintiffs have not provided evidence that there are particularized needs of Black voters in the arena of utility regulation to which members of the PSC have been unresponsive. Neither the anecdotal testimony of Plaintiffs nor the unsound analysis of Plaintiffs' expert, Dr. Popick, fills the gap in evidence this Court flagged on this issue in its Order on Plaintiffs' Motion for Preliminary Injunction. ECF 112, p. 8. To the contrary, the consistent evidence at trial shows that income, not race, plays the primary role in utility regulation. The Court does not find any connection to the disconnection moratorium that is unrelated to income. Thus, the Court finds this factor weighs heavily in favor of Defendant.

262.   Finally, this Court notes that the State has strong interests in maintaining the statewide method of election for utility regulation and this factor weighs heavily in favor of Defendant. As discussed above, Chairman Pridemore provided a significant amount of credible testimony explaining the state's

interests in maintaining a statewide system that are far from tenuous. This factor weighs heavily in favor of Defendant. "As extensively discussed…[Georgia's] well-established policy of at-large, statewide, numbered-place elections for [PSC Commissioners] is the very opposite of tenuous: It is weighty." *Ala. State Conference of the NAACP*, 2020 U.S. Dist. LEXIS 18938, at *189

263.   One additional factor as part of the totality of the circumstances is a proportionality analysis for the statewide method of election. This factor weighs slightly in favor of Plaintiffs but largely overlaps with the electoral success analysis discussed above.

264.   Thus, the Senate factors do not weigh in favor of Plaintiffs and they cannot succeed on the merits of their Section 2 claims.

## IX.    TIMING ISSUES COUNSEL AGAINST FURTHER CHANGES.

265.   This Court has recognized the importance of the so-called *Purcell* principle to the issues involved in this case. *See, e.g.* ECF 112, p. 12 ("The Court scheduled trial sufficiently in advance of the election for the very purpose of entering a ruling on a complete record").

266.   The testimony of Mr. Barnes showed that the potential for cost, confusion, and hardship would attend any changes in election ballot design past

August 12, 2022. This Court issues its order before that deadline, recognizing those interests.

267.   Further, the State of Georgia has significant interests in "in conducting an efficient election [and] maintaining order," because "'[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.'" *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (quoting *Purcell*, 549 U.S. at 4).

## X.   CONCLUSION

For the reasons stated herein, this Court **FINDS IN FAVOR OF AND ENTERS JUDGMENT FOR DEFENDANT** on the entirety of Plaintiffs' case. The clerk is **ORDERED** to close this case.

This 11th day of July, 2022.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280

Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336–7249

*Counsel for Defendant Secretary of State Brad*
*Raffensperger*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Proposed Findings of Fact and Conclusions of Law have been prepared in Book Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan P. Tyson
Bryan P. Tyson