## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD ROSE, BRIONTÉ MCCORKLE,
WANDA MOSLEY, and JAMES WOODALL,

    Plaintiffs,

               v.

BRAD RAFFENSPERGER, *in his official capacity
as Secretary of State of the State of Georgia*,

    Defendant.

Civil Action No.
1:20-cv-02921-SDG

### <u>OPINION AND ORDER</u>

Since 1906, commissioners on the Public Service Commission for the State of Georgia have been elected on a statewide, at-large basis. Today, the Court finds that this method of election unlawfully dilutes the votes of Black citizens under Section 2 of the Voting Rights Act of 1965 and must change.

The Secretary of State is hereby **ENJOINED** from preparing ballots for the November 8, 2022 election that include contests for Districts 2 and 3 of the Public Service Commission (PSC); from administering any future elections for vacancies on the PSC using the statewide, at-large method; and from certifying the election of any PSC commissioner who is elected using such method.

## I.      Procedural Posture

Plaintiffs filed this lawsuit against the Georgia Secretary of State in July 2020, alleging a violation of Section 2 under the Voting Rights Act (VRA), 52 U.S.C. § 10301. In January 2022, the Court ruled on the parties' competing motions for summary judgment. In its order, the Court concluded that the totality-of-the-circumstances analysis necessary to resolve Plaintiffs' Section 2 claim, including the feasibility of their proposed remedy, required factual findings to be made after a trial.[1]

The Court therefore conducted a five-day bench trial, from June 27 to July 1, 2022. Following the trial, and at the Court's direction, each side filed Proposed Findings of Fact and Conclusions of Law.[2] In a bench trial, this court "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). In vote dilution cases, the Eleventh Circuit has further required that district courts "explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning." *Johnson v. Hamrick*, 196 F.3d 1216, 1223 (11th Cir. 1999) (quoting *Cross v. Baxter*, 604 F.2d 875, 879 (5th Cir. 1979)). Having presided over the bench trial, evaluated the credibility of the witnesses,

---

[1]   *See generally* ECF 97 (Summary Judgment Motions (SJM) Order).

[2]   ECF 144 (Def.'s proposed findings); ECF 145 (Pls.' proposed findings).

and carefully considered the evidence and the record in its entirety, the Court makes the following factual findings and legal conclusions.

## II.   Factual Findings

### A.   The Structure and Function of the PSC

The Court finds it necessary, as a preliminary matter, to explain how the PSC developed over the last 140 years. That history not only underscores the importance of Plaintiffs' claim, but it also provides context for the Court's conclusion that their proposed remedy is feasible.

The 1877 Georgia Constitution conferred "[t]he power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs" on the Georgia General Assembly. GA. CONST. art. IV, § 2, ¶ I (1877). In 1879, the General Assembly adopted an act concerning the regulation of railroad freight and passenger tariffs, which created the Railroad Commission and provided that three commissioners—appointed by the governor and confirmed by the state senate—would carry out the act's provisions. 1878 Ga. Laws 125 (Law No. 269, *Reg. of Freight & Passenger Tariffs*). Commissioners served a six-year term, and appointments were staggered to ensure that a new commissioner would be appointed every two years. *Id.* § I.

In 1906, the General Assembly changed the method of selecting commissioners to require that they be "elected by the electors of the whole State, who are entitled to vote for members of the General Assembly." 1906 Ga. Laws 100, § 1 (Law No. 453, *Election of R.R. Comm'rs*) (the 1906 Act). The following year, the General Assembly added two commissioners, bringing the total to five. 1907 Ga. Laws 72, § 1 (Law No. 223, R.R. *Comm'n, Membership, Powers, etc.*) (the 1907 Act). The commissioners were to be "elected by the qualified voters of Georgia as prescribed" in the 1906 Act. *Id.*

The General Assembly changed the name of the Railroad Commission to the Public Service Commission in 1922 and expanded its powers and duties. 1922 Ga. Laws 143 (Law No. 539, *R.R. Comm'n Changed to Pub. Serv. Comm'n*). In 1945, the Georgia Constitution was amended to confer on the General Assembly, among other things, the "power and authority of regulating . . . public utilities." GA. CONST. art. IV, § I, ¶ I (1945). The amendment enshrined members of the PSC as constitutional officers who "shall be elected by the people." GA. CONST. art. IV, § IV, ¶ III (1945). The terms of the commissioners remained six years and staggered, as they always had been. *Id.* It was left to the General Assembly to determine the "manner and time of election" of commissioners. *Id.*

Prior to 1998, the Georgia Code provided that any voter in Georgia entitled to vote for members of the General Assembly could vote for members of the PSC, and that election procedures were to be held "under the same rules and regulations as apply to the election of the Governor." 1998 Ga. Laws 1530 (Law No. 978, *Pub. Util. & Pub. Transp.—Pub. Serv. Comm'n; Election of Members; Dist.*) (amending O.C.G.A. § 46-2-1). This formulation of who was entitled to vote for members of the PSC was consistent with the structure employed in the 1906 and 1907 Acts: "elected by the electors of the whole State" and "elected by the qualified voters of Georgia."

In 1998, the General Assembly amended the Georgia Code to require members of the PSC to reside in one of five districts, but the members would continue to be elected by statewide vote. *Id.* at 1531 (adding O.C.G.A. § 46-2-1(a)). Commissioners' terms remained six years and were staggered as prescribed by the State Constitution, although the code amendment altered the method applied to create the stagger. *Id.* (adding O.C.G.A. § 46-2-1(d)). There is no indication from the revision to the statute that the General Assembly intended any change to who would be permitted to vote for PSC members.

Thus, while the Georgia Constitution guarantees that PSC commissioners must be elected by popular vote, what constitutes an election "by the people" is

left to the discretion of the General Assembly. By statute, the General Assembly has decided that PSC elections are to be held using the same rules and regulations applied to gubernatorial elections; that general elections must take place every two years; and that one commissioner must live in each of the five residency districts for which they are seeking office for at least 12 months prior to the election and throughout the six-year term. O.C.G.A. § 46-2-1.

The seats from PSC Districts 2 and 3 are on the ballot for the November 8, 2022 general election and are at the heart of this dispute.[3] Between 2012 and 2022, District 3 included Clayton, DeKalb, Fulton, and Rockdale Counties.[4] According to 2010 Census data of which the Court took judicial notice, the population of District 3 was 52.02% Black (including those who identified as another race in addition to Black).[5] The residency districts were redrawn in 2022, after the 2020 Decennial Census, pursuant to Georgia Senate Bill 472. 156th Gen. Assemb., Reg. Sess. (Ga. 2022). District 3 is now comprised of Clayton, DeKalb, and Fulton

---

[3]   Trial Tr. 438:3–11 (Barnes); PX-66 (Barnes Decl.), at 10.

[4]   PX-2, at 1 (2012 PSC map).

[5]   *Id.* at 2 (population data for 2012 PSC map); PX-8 (Popick Rpt.), at 16 (tbl.3).

Counties.[6] The population was 48.79% Black and 9.88% Hispanic (including Black Hispanics).[7]

PSC Chairperson Tricia Pridemore testified that the PSC has three primary roles—ensuring the "safety, reliability and affordability of utilities."[8] PSC decisions affect the lives of every Georgian because they determine how much consumers pay for utilities and whether utility providers may pass certain costs on to their consumers.[9] For example, the PSC sets residential, commercial, and industrial utility rates.[10] It regulates aspects of Georgia Power, including what the company charges customers, and electric energy generation and transmission.[11] On the telecommunications side, the PSC regulates pole attachments and landlines. It also has some jurisdiction over connectivity and rural broadband internet connectivity.[12]

---

[6]   PX-3, at 1 (2022 PSC map).

[7]   *Id.* at 2 (population data for 2022 PSC map).

[8]   Trial Tr. 388:19–21 (Pridemore).

[9]   PX-36 (PSC website printout), at 2; PX-98, at 13 (Eaton Tr. 83:11–18); PX-103, at 8 (Shaw Tr. 37:20–21).

[10]  Trial Tr. 390:2–6 (Pridemore).

[11]  *Id.* 388:24–389:2 (Pridemore).

[12]  *Id.* 389:18–21 (Pridemore).

The PSC hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders to come to a decision. It decides utility rates that affect all ratepayers throughout Georgia. The PSC can also assess fines and administer federal funds for pipeline safety across Georgia.[13] The PSC is therefore "an administrative body" that performs both "quasi-legislative" and "quasi-judicial" functions "by virtue of the express powers conferred upon it by the General Assembly." *Tamiami Trail Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 213 Ga. 418, 428 (1957) (citations omitted).[14]

### B.   Census Data and Georgia's Demographics

Based on the 2020 Census, there are 10,711,908 Georgians. Of those, 50.1% identify as non-Hispanic White; 33.0% identify as "any part" Black (meaning Black alone or in combination with another race); and 16.9% identify as members of other racial groups.[15] According to data from the Secretary of State, Georgia had 7,004,034 active voters as of December 2021. Of those, 53.1% identified as White;

---

13   ECF 121-3 (Joint Stip.), ¶¶ 1, 14–17, 19.

14   Trial Tr. 412:3–4 (Pridemore); ECF 121-3 (Joint Stip.), ¶¶ 14–15; PX-98, at 14–15 (Eaton Tr. 85:18–25).

15   ECF 121-3 (Joint Stip.), ¶ 4.

29.4% identified as Black; 12.1% identified as members of another racial group; and, for 8.8%, their race was unknown.[16]

Further, American Community Survey (ACS) and 2020 Census data show significant continuing disparities between the socioeconomic circumstances of Black and White Georgians. Per capita income for Black Georgians is $24,215, while per capita income for White Georgians is almost double that, at $40,348.[17] The poverty rate for Black Georgians is more than twice that of White Georgians— 18.8% compared to 9%.[18]

Georgia has an unemployment rate of 4.8% for those in the labor force who are at least 16 years old. The rate is 3.8% for non-Hispanic Whites and 6.9% for Blacks.[19] The median household income in Georgia is $61,980. For households headed by non-Hispanic Whites, the median income is $71,790. It is just $47,096 for Black-headed households.[20] Sixty-four percent of all households in Georgia own their own homes. Among households headed by non-Hispanic Whites, 75.1%

---

[16]   *Id.* ¶ 6.

[17]   ECF 57 (Mot. for Judicial Notice), ¶ 8. The Court granted Plaintiffs' motion for judicial notice of various census data. ECF 97 (SJM Order), at 1.

[18]   ECF 57 (Mot. for Judicial Notice), ¶ 6.

[19]   *Id.* ¶ 5.

[20]   *Id.* ¶ 7.

are homeowners and 24.9% are renters. For Black-headed households, only 47.5% own their own homes and 52.5% rent.[21] For all households in Georgia, 11.2% receive Supplemental Nutrition Assistance Program (SNAP) benefits (also known as food stamps). Of non-Hispanic White-headed households, 6.5% receive SNAP benefits. That percentage is over three times higher—20.3%—for Black-headed households.[22] Black Georgians are also less likely than White Georgians to have graduated high school or obtained a college degree.[23]

### C.   The Plaintiffs

The Plaintiffs are Black voters who reside in PSC District 3 and who voted in recent PSC elections.[24] Although each testified that, in their experience, race plays a role in Georgia elections,[25] none have been prevented from casting a vote in Georgia because of their race.[26]

---

[21]   *Id.* ¶ 9.

[22]   *Id.* ¶ 10.

[23]   *Id.* ¶¶ 3-4.

[24]   *Id.* ¶ 2.

[25]   Trial Tr. 60:2–61:10 (Woodall), 321:12–21 (McCorkle), 479:10–480:4 (Rose), 545:16–25 (Mosley).

[26]   ECF 121-3 (Joint Stip.), ¶ 3. *See also* Trial Tr. 97:2–4 (Woodall), 502:12–4 (Rose).

Plaintiff Richard Rose is the president of the NAACP's Atlanta chapter.[27] In that role, he regularly attends community meetings with Black Georgians. Rose also fields calls from Black Georgians and maintains contact with political leaders in the Black community.[28] He is aware of issues particular to the Black community that he believes fall within the PSC's purview.[29]

Plaintiff Wanda Mosley is the national field director at Black Voters Matter Fund, which is based in Atlanta. Prior to that, she served as the organization's senior state coordinator in Georgia.[30] In that role, Mosley was responsible for organizing and registering Black voters and conducting outreach in Black communities, which has provided her an understanding of issues that are important to Black Georgians.[31]

Plaintiff James Woodall is a minister and former president of the Georgia NAACP.[32] Woodall testified that, during his tenure with the NAACP, his top priority was understanding the concerns of Black Georgians, so he regularly

---

[27] Trial Tr. 469:12–13, 470:1–3.

[28] *Id.* 471:24–472:20.

[29] *Id.* 472:21–23.

[30] *Id.* 517:1–2, 520:13–14, 520:24–521:3.

[31] *Id.* 522:10–13.

[32] *Id.* 45:11–18.

attended meetings where Black Georgians voiced their issues.[33] Woodall's engagement with Black Georgians makes him aware of issues that fall within the PSC's purview and that have a disproportionate effect on Black Georgians.[34]

Plaintiff Brionté McCorkle is executive director of Georgia Conservation Voters, a nonprofit organization that advocates for environmental justice and organizes and mobilizes communities around environmental justice issues.[35] She has had significant involvement with the PSC and has attended PSC hearings.[36] Her work has provided her with an understanding of the particularized needs of Black Georgians when it comes to issues that fall within the PSC's purview.[37]

The Court found each Plaintiff to be credible when it comes to identifying and understanding how matters within the PSC's jurisdiction affect the Black community.[38]

---

[33] *Id.* 47:9–48:11.

[34] *Id.* 48:12–14, 54:12–22.

[35] *Id.* 261:3–262:2, 262:11–18.

[36] *Id.* 274:25–276:21, 279:15–20, 277:11–15.

[37] *Id.* 279:25–281:9.

[38] At a bench trial, "it is the exclusive province of the judge . . . to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).

### D.      The Defendant

Defendant Brad Raffensperger (the Secretary) was sued in his official capacity as the Secretary of State for the State of Georgia.[39] He is Georgia's chief election official and is a nonvoting member of the State Election Board. O.C.G.A. §§ 21-2-50(b), 21-2-30(d). The Election Board must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2). Among his other duties, the Secretary is responsible for certifying the results of PSC elections.[40]

### E.      The Experts

The parties presented three experts—two testifying for Plaintiffs and one for the Secretary—who evaluated mass voting behavior in Georgia and opined on voting disparities and the reasons for those disparities.

#### 1.      Stephen J. Popick, Ph.D.

Plaintiffs offered Dr. Stephen Popick to discuss the statistical analysis of election data.[41] From 2006 to 2012, Dr. Popick worked in the Voting Rights Section

---

[39]   ECF 1 (Compl.), ¶ 10.

[40]   Trial Tr. 446:3–5, 446:21–24 (Barnes).

[41]   *Id.* 165:3–6, 166:9–12.

of the Civil Rights Division at the U.S. Department of Justice.[42] Here, Dr. Popick conducted a racial-bloc voting analysis of PSC election contests from 2012 to 2020 to ascertain whether voting in Georgia was racially polarized.[43] He has conducted hundreds of such analyses on thousands of individual elections.[44] Dr. Popick referred to this as the "separate electorates test," which predicts whether Black voters would have elected a different candidate if the election were held only amongst Black voters as opposed to Black and White voters together.[45]

Dr. Popick found strong evidence of racial polarization in PSC elections and concluded that "Black voters were cohesive in their support of the same candidate in each election," and "White voters were cohesive around a different candidate in each election, and that the candidate preferred by White voters won 11 out of 11 times."[46] Since 2012, Black voters have voted as a bloc at rates ranging from 79.18 to 97.84%.[47] During that same time frame, White voters also voted as a bloc

---

[42]  *Id.* 160:8–12.

[43]  *Id.* 166:17–20.

In *Gingles*, the Supreme Court used the terms "racial bloc" and "racial polarization" interchangeably. *Thornburg v. Gingles*, 478 U.S. 30, 53 n.21 (1986).

[44]  Trial Tr. 183:17–23.

[45]  *Id.* 182:17–21.

[46]  *Id.* 168:16–22, 197:12–19.

[47]  PX-8 (Popick Rpt.), at 11.

at rates ranging from 75.72 to 87.51%.[48] In each of the six most recent general and runoff elections for PSC commissioners, Black voters supported the same candidate at a rate greater than 94%.[49] Despite this strong cohesion, the Black-preferred candidate lost in all elections despite the Black-preferred candidate going to a runoff in two of those elections.[50] Dr. Popick testified that, in all of his years of experience, his analysis of the PSC elections in Georgia since 2012 "is one of the clearest examples of racially polarized voting" he has ever seen.[51]

The Court finds Dr. Popick's opinions and conclusions to be highly persuasive and compelling evidence of racial polarization in PSC elections.

### 2.    Bernard Fraga, Ph.D.

Plaintiffs also offered the testimony of Dr. Bernard Fraga, an expert in political data analysis.[52] Dr. Fraga testified that Georgia's method of conducting PSC elections involves several practices that enhance the opportunity for the dilution of Black votes, including a statewide method of election despite the existence of residency districts, a majority-vote and runoff requirement, and

---

[48]  *Id.* at 12.

[49]  Trial Tr. 198:1–11; PX-8 (Popick Rpt.), at 11.

[50]  Trial Tr. 197:18–20.

[51]  *Id.* 183:20–23, 198:12–17.

[52]  *Id.* 571:23–572:3.

staggered terms and numbered seats, which Dr. Fraga believes are an "anti-single shot" mechanism.[53]

Dr. Fraga testified that Georgia's combination of a statewide election with numbered seats and residency districts is quite unusual.[54] He opined that this practice institutionalizes a form of vote dilution by allowing the State's majority-White population to dilute the votes of any majority-Black residency district in voting for the commissioner from that district.[55] And, because elections are staggered, a minority group has less of an opportunity to concentrate its voting strength behind a candidate of choice.[56]

Dr. Fraga also testified as to whether members of the minority group have been denied access to a candidate slating process. He views the system of gubernatorial appointments employed in Georgia for PSC vacancies as an informal slating process, which confers an incumbency advantage on the person

---

[53]  *Id.* 574:3–9; ECF 121-3 (Joint Stip.), ¶ 13.

"Single-shot voting" occurs when a minority is able to win some at-large seats, but only "if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles,* 478 U.S. at 38 n.5.

[54]  Trial Tr. 574:18–575:1, 575:16–25.

[55]  *Id.* 576:1–11.

[56]  *Id.* 577:15–24.

appointed for the open position, although the incumbency advantage has decreased over time.[57] Dr. Fraga looked at gubernatorial appointments to the PSC from 1996 through 2020.[58] Of those, only one (David Burgess) was Black.[59] Black appointees therefore comprised only 20% of the total appointments during that time. This is an underrepresentation in comparison to Black Georgians' 32.1% share of the citizen voting age population (CVAP).[60] Based on this analysis, Dr. Fraga concluded that Black Georgians are excluded from the informal slating process and, therefore, are less likely to enjoy the benefits of incumbency.[61]

Dr. Fraga also testified on "the[] lingering effects of discrimination manifesting in lower rates of participation in the electoral process."[62] For example, there was an approximately 5% to 11% voter turnout gap between White voters and Black voters in each general and runoff election from 2016 through 2021.[63] Dr. Fraga attributes that gap, and the lower rate of political participation by Black

---

[57]  *Id.* 589:22–590:8, 590:16–20, 611:20–612:7.

[58]  *Id.* 590:9–15; PX-5 (Fraga Rpt.), at 14.

[59]  Trial Tr. 591:16–20; PX-5 (Fraga Rpt.), at 14.

[60]  Trial Tr. 591:24–592:2; PX-5 (Fraga Rpt.), at 5, 15.

[61]  Trial Tr. 592:3–10; PX-5 (Fraga Rpt.), at 15.

[62]  Trial Tr. 585:14–18.

[63]  *Id.* 579:22–583:23; PX-5 (Fraga Rpt.), at 6.

voters, to the lingering effects of discrimination.[64] He also found that Black Georgians donate to candidates at a lower rate than White Georgians.[65] Eighty percent of individual donors were White, but less than 10% were Black.[66]

Dr. Fraga found that Black candidates are substantially less likely to win office in non-judicial statewide elections for the PSC and other offices than White candidates.[67] He examined the 164 statewide Georgia elections that occurred between 1972 and 2021, and only four Black candidates won during that time.[68] The four successful Black candidates won a total of eight separate elections—4.9% of the total. Raphael Warnock was elected U.S. Senator in 2020; Mike Thurmond was elected Commissioner of Labor in 1998, 2002, and 2006; Thurbert Baker was elected Georgia Attorney General in 1998, 2002, and 2006; and David Burgess was elected to the PSC in 2000.[69] Thus, despite comprising 32.1% of the CVAP in Georgia, Black candidates were only successful 4.9% of the time. Of the twelve major-party Black candidates to enter the primary process for U.S. Senate and

---

[64] Trial Tr. 583:24–584:4.

[65] *Id.* 584:5–12.

[66] *Id.* 585:3–9; PX-5 (Fraga Rpt.), at 10.

[67] Trial Tr. 585:19–586:3; PX-5 (Fraga Rpt.), at 4, 11–13.

[68] Trial Tr. 586:4–13; PX-5 (Fraga Rpt.), at 11–12.

[69] Trial Tr. 587:8–19; PX-5 (Fraga Rpt.), at 11–12.

Governor since 2006, only two made it to the general election ballot.[70] Dr. Fraga concluded that Black Georgians are underrepresented in statewide offices and statewide elections.[71]

The Court found Dr. Fraga's analysis, opinions, and conclusions to be highly persuasive and entitled to great weight.

### 3.   Michael Barber, Ph.D.

The Secretary presented Dr. Michael Barber as an expert in political science, the interplay between racial and political polarization, and statistical analysis.[72] Dr. Barber testified that Black voters consistently prefer Democratic candidates regardless of the race of the candidate.[73] He generally found that Black voters supported Democratic candidates between 86% and 93% of the time, compared with less than 40% for White voters.[74] Dr. Barber did not examine PSC elections at all and could not speak to the effect of race or partisanship in those contests.[75]

---

[70]   Trial Tr. 588:10–589:2; PX-5 (Fraga Rpt.), at 12.

[71]   Trial Tr. 588:6–9; PX-5 (Fraga Rpt.), at 11–12.

[72]   Trial Tr. 625:7–13, 627:22–628:1.

[73]   *Id.* 639:2–14; DX-28 (Barber Rpt.), at 6–10.

[74]   DX-28 (Barber Rpt.), at 9.

[75]   Trial Tr. 705:8–10, 17–19.

The Court generally credits Dr. Barber's analysis but finds it of limited utility in this case. Dr. Barber did not consider the impact of race on party affiliation, which was a crucial omission. Indeed, Dr. Barber conceded that his model did not account for factors that may determine partisanship, including race or racial identity.[76] This omission is surprising in light of his own prior scholarship, which concluded that "race is the strongest predictor" of a person's actual partisan affiliation.[77]

Plaintiffs called Dr. Fraga back to the stand to rebut Dr. Barber's testimony. Dr. Fraga opined that it is impossible to separate racial identity from partisan affiliation because "everything related to party, in part, is due to race, not the other way around."[78] Dr. Fraga criticized Dr. Barber's failure to account for the large volume of political science research showing that race or racial identity is a key determinant of an individual's party affiliation.[79] By failing to consider what

---

[76]   *Id.* 697:23–698:7.

[77]   PX-111 (Michael Barber & Jeremy Pope, *Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public*, Am. Pol. Res. (2022), at 4–5). *See also* Trial Tr. 701:6–702:8, 702:23–704:17.

[78]   Trial Tr. 760:20–761:16.

[79]   *Id.* 759:5–761:3.

causes party identification, Dr. Fraga opined, Dr. Barber's attempt to disentangle race and party is inherently flawed.[80]

The Court finds that the interplay between race and partisanship is difficult if not impossible to disentangle. But, as discussed further in its Conclusions of Law, the Court is unconvinced that such disentangling is necessary or even relevant to the vote dilution analysis.

### F.    The Commissioners

Each of the current PSC commissioners testified live or by deposition during the trial. The Court highlights only the portions of their testimony that are relevant to the Court's analysis.

Tricia Pridemore, commissioner for District 5, is the PSC chairperson.[81] She testified that it takes a majority vote of the commissioners to raise utility rates and decide Integrated Resource Plan cases.[82] She also testified that the PSC has a consumer affairs group that works for all five commissioners to field issues raised by consumers, which prevents preferential treatment of certain commissioners

---

[80]    *Id.* 761:17–763:7.

[81]    *Id.* 352:13–20.

[82]    *Id.* 400:21–23, 412:5–10.

and districts.[83] Pridemore does not believe that Black ratepayers have different needs than White ratepayers.[84]

In her opinion, statewide, at-large elections "provide centralization of thought for energy and utility policy," as commissioners avoid fighting over decisions such as more or less favorable rates, where to locate new plants and energy facilities, or which districts receive broadband or lower pole attachment rates.[85] She believes the current structure allows commissioners to "work in the best interest of the whole state" and to use the existing transmission, pipeline, and telecommunication systems to "maximize the needs for the state."[86] Pridemore believes that the statewide nature of its elections allows the PSC to keep utility rates below the national average and helps drive the State's economic development, although she provided no evidence of any correlation.[87]

Pridemore opposes single-member districts, which she believes would introduce favoritism and politics into utility regulation.[88] She believes it would be

---

[83] *Id.* 391:5–6, 11–12, 393:18–24.

[84] *Id.* 418:21–419:1, 422:20–21.

[85] *Id.* 386:23–387:12.

[86] *Id.* 387:13–17.

[87] *Id.* 387:17–22.

[88] *Id.* 397:19–21.

"detrimental to how the state operates and oversees utility regulation" for commissioners to be elected by district instead of statewide.[89]

The Court finds Pridemore's testimony credible concerning the inner workings and functions of the PSC—matters that relate to her core responsibilities as chairperson. However, her lay opinions regarding the effect of changing from statewide to district-based elections were speculative and are not afforded much weight.

Charles Eaton is a former commissioner of District 3, where Plaintiffs reside.[90] In 2006, he defeated the only Black commissioner up to that point in the District 3 PSC runoff election. Although the Black incumbent—David Burgess—received more votes in the general election, he lost to Eaton in the runoff.[91] Even in the runoff, though, Burgess won a majority of the votes in each of the counties that comprised District 3.[92] In other words, Eaton would not have won the District

---

[89]   *Id.* 396:13–14.

[90]   ECF 121-3 (Joint Stip.), ¶ 3; PX-98, at 2 (Eaton Tr. 18:4–7).
       Eaton testified by deposition. PX-104 (Eaton video deposition clips).

[91]   PX-98, at 11 (Eaton Tr. 71:3–72:1).
       The Court overrules the Secretary's Fed. R. Evid. 602 and 701 objections. Eaton is competent to testify and has personal knowledge of election results related to his own candidacy.

[92]   PX-98, at 11, 12 (Eaton Tr. 73:15–17, 77:5–8).

3 election if it had been a single-member district.[93] Nor would he have won

reelection in 2012 or 2018 if the elections had been by single-member district.[94]

Indeed, in every PSC election, Eaton was not the candidate of choice for the voters

of District 3.[95]

Timothy Echols is the commissioner from District 2.[96] He believes the

purpose of the residency districts for PSC commissioners is "[t]o make sure that

the state is fully represented geographically."[97] Echols believes that the General

Assembly "wanted to make sure that rural parts of the state had representation

and that metro Atlanta didn't dominate politics in Georgia."[98] In his view, energy

regulation is "the least partisan of all politics, probably, in any state."[99]

---

[93]   *Id.* at 11 (Eaton Tr. 72:2–73:20).

[94]   *Id.* at 4–5, 10–11 (Eaton Tr. 34:23–36:1, 38:3–16, 69:18–70:24).

    Although it is unclear whether the Secretary's objections are limited to specific portions of this testimony, the Court similarly overrules the Secretary's Rule 602 and 701 objections. Indeed, counsel for the Secretary conceded during trial that there was no dispute that the counties in District 3 voted for Eaton's opponent in the 2018 election. Trial Tr. 152:10–20.

[95]   PX-98, at 13 (Eaton Tr. 79:18–25).

[96]   PX-99, at 2 , 13 (Echols Tr. 20:18–21:1, 52:22–24).

    Echols testified by deposition. PX-105 (Echols video deposition clips).

[97]   PX-99, at 14, 16 (Echols Tr. 54:19–22, 56:9–15).

[98]   *Id.* at 16 (Echols Tr. 56:25–57:7).

[99]   *Id.* at 56 (Echols Tr. 160:5-8). *See also generally id.* (Echols Tr. 159:8–160:8).

Jason Shaw, the commissioner from District 1, testified that he was appointed to the PSC in 2018.[100] There was no application process for the position; he was simply contacted by the governor about the possible appointment.[101] Likewise, Lauren McDonald, the commissioner from District 4, was first appointed to the PSC in 1998.[102] As with Shaw, McDonald did not apply for the position but was contacted by the governor and asked to accept the appointment.[103] He believes the residency districts were created to ensure that the PSC represents all parts of Georgia.[104] Nothing about his day-to-day work would change if he were elected only by the voters of District 4, except that his workload would be reduced due to fewer phone calls from constituents in other districts.[105]

---

The Secretary's Rule 403 and 701 objections are overruled. Echols may express his lay opinion on these issues.

[100] PX-103, at 6 (Shaw Tr. 32:20–33:2).

[101] *Id.* at 9 (Shaw Tr. 40:13–22).

[102] PX-101, at 3–4, 6 (McDonald Tr. 25:13–21, 27:17–28:2, 28:17–18, 44:11-14); PX-107 (McDonald video deposition clips).

[103] PX-101, at 3–4 (McDonald Tr. 25:13–28:2).

[104] *Id.* at 18 (McDonald Tr. 92:5–13).

Plaintiffs' foundation objection is overruled. McDonald may testify as to his personal opinion.

[105] *Id.* at 13 (McDonald Tr. 62:1–7).

Terrell Johnson is the current commissioner from District 3, where Plaintiffs reside.[106] Governor Kemp appointed Johnson to fill the vacancy in 2021 when Eaton was appointed to the bench.[107] Johnson is only the second Black person to serve on the PSC.[108] Like Shaw and McDonald, he did not apply for appointment but was contacted by a member of the governor's staff.[109] He had never considered running for the PSC, though he does not believe that the job requires any specialized knowledge in power or energy.[110] None of his duties would change if he were elected only by the residents of District 3.[111]

Like the testimony of Pridemore, the Court finds the testimony of each of the remaining commissioners to be credible on matters within their personal knowledge.

---

[106] PX-100, at 7 (Johnson Tr. 32:20–33:10).

Johnson testified by deposition. PX-106 (Johnson video deposition clips).

[107] PX-100, at 7 (Johnson Tr. 32:20–33:10); PX-35 (July 21, 2021 Press Release by the Office of the Governor); Aug. 26, 2021 Executive Order 1 *available at* https://gov.georgia.gov/ executive-action/executive-orders/2021-executive-orders.

[108] ECF 121-3 (Joint Stip.), ¶ 1; PX-100, at 10 (Johnson Tr. 40:11–17).

[109] PX-100, at 9 (Johnson Tr. 37:24–39:10).

[110] *Id.* at 14 (Johnson Tr. 61:1–4).

[111] *Id.* at 11 (Johnson Tr. 49:20-50:5).

### G.     The District 3 Candidates

Plaintiffs presented the testimony of two former candidates for PSC District 3, both of whom were unsuccessful. Lindy Miller challenged Eaton in 2018.[112] She won every county in District 3 but lost the election statewide.[113] Miller testified that, based on the economic data, there are "many more low-income Black rate payers than high-income Black rate payers and [a] disproportionate number of low-income Black rate payers [relative to] low-income White rate payers in Georgia."[114] She does not believe the PSC has been responsive to the needs of low-income Black voters.[115] She does not believe that the commissioners had "openly advocat[ed] or highlight[ed] issues that were important to Black communities, like energy burden, for example," or reducing the fees customers were being charged in connection with Georgia Power's construction of nuclear power facilities.[116]

---

[112]   ECF 130-3, at 5, 31 (Miller Tr. 5:9–12, 31:2–10).

Miller testified by video deposition. PX-110.

[113]   ECF 130-3, at 33 (Miller Tr. 33:21–25).

[114]   *Id.* at 52 (Miller Tr. 52:13–17). *See generally id.* at 51–53 (Miller Tr. 51:21–53:6).

[115]   *Id.* at 24, 28–30 (Miller Tr. 24:8–16, 28:14–30:19).

[116]   *Id.* at 27 (Miller Tr. 27:4–19). Ms. Miller described an "energy burden" as "what percent of your gross household income [ ] you spend on energy costs." *Id.* at 18 (Miller Tr. 18:6–8).

Miller testified to her experience in running a statewide election campaign and the difficulties that entails.[117] In her view, the statewide election of commissioners creates an "accountability" question.[118] Although a candidate must live in a particular district to run for the PSC and presumably has relationships and networks in that district, that person must win votes from those outside the district who may not relate to or experience the issues facing lower-income or Black populations.[119]

Chandra Farley lives in Atlanta and lost in the 2022 Democratic primary for PSC District 3.[120] Farley also discussed the disproportionate effect that "energy burden" has on Black households because they are more likely to be low-income.[121] According to Farley, the PSC is regularly provided with information relating to energy equity and has the ability to lessen the energy burden on Black Georgians, but it has failed to do so.[122] For example, she and others unsuccessfully

---

[117]  *Id.* at 34–36 (Miller Tr. 34:13–36:19).

[118]  *Id.* at 12, 24–25 (Miller Tr. 12:6–8, 24:8–25:19).

[119]  *Id.* at 36–38 (Miller Tr. 36:20–38:3).

[120]  Trial Tr. 99:14–19, 124:5–7, 131:16–132:3.

[121]  *Id.* 109:4–16.

[122]  *Id.* 110:17–111:18, 113:24–116:4.

lobbied the PSC to extend the Covid-related moratorium on utility disconnections.[123]

Although the Court generally found Miller's and Farley's testimony credible, it affords little weight to their lay opinions on matters relevant to the Court's determination.

## III.   Conclusions of Law

This Court must conduct an "intensely local appraisal" of the facts to determine what result is compelled by the VRA under the totality of the circumstances. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (cleaned up). This involves a "searching practical evaluation of the 'past and present reality.'" *Id.* (quoting Senate Rpt. at 30, 1982 USCCAN 177, 208). The Court is confident that it has done exactly that.

### A.    Vote Dilution Claims Under the Voting Rights Act

Section 2 of the VRA prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . ." 52 U.S.C. § 10301(a). Vote dilution occurs if, based on the totality of circumstances, members of that protected class "have less opportunity than other members of the electorate to participate in the

---

[123]  *Id.* 117:7–121:20.

political process and to elect representatives of their choice." *Id.* § 10301(b). Members of the class are not entitled to proportional representation, only equal access to participate in the political process. *Id.*

The Supreme Court has outlined three preconditions that Plaintiffs must show to establish a vote-dilution claim: (1) the minority group must be large and geographically compact enough to form a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the minority group must show that the majority votes sufficiently as a bloc to generally defeat the minority group's preferred candidate. *Gingles*, 478 U.S. at 50–51.

Once a court is satisfied that these preconditions are met, it must evaluate several factors that were identified in the Senate Report accompanying the 1982 VRA amendment (the Senate Report). *Id.* at 44–45. The so-called "Senate Factors" are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single

shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.      whether political campaigns have been characterized by overt or subtle racial appeals;

7.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

8.      whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

9.      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990) (Kravitch, J.,

specially concurring) (citing Senate Rpt. at 28–29, 1982 USCCAN 206–07); *see also*

*Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1289 (11th Cir.

2020) (same). Vote dilution is highly likely where these factors are present.

*Solomon*, 899 F.2d at 1015; *see also Gingles,* 478 U.S. at 45 (concluding that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims") (footnote omitted).

The Supreme Court has instructed lower courts to weigh Senate Factors 2 and 7 more heavily: "If present, the other factors . . . are supportive of, but *not essential to,* a minority voter's claim." *Gingles*, 478 U.S. at 48 n.15 (emphasis in original); *see also City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1555 (11th Cir. 1987) (*Carrollton NAACP*) (reversing the district court's judgment for the defendants because it failed to sufficiently consider racial bloc voting and racial polarization).

The Secretary argues that Plaintiffs' votes are not being diluted "on account of race or color" because, as Dr. Barber testified, the polarization that exists in Georgia elections is the result of partisanship rather than race.[124] The Court's rejection of this argument is more fully developed in its analysis of Senate Factor 2 below, but it warrants a preface here.

Plaintiffs do not need to show that their votes have been diluted because of purposeful discrimination. It is the *result* of the challenged practice—not the intent

---

[124] *See, e.g.*, Trial Tr. 833:3–834:6 (Def.'s closing); ECF 121-2 (Def.'s Stmt. of the Case), at 3.

behind it—that matters. *Gingles,* 478 U.S. at 35–36; *see also Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (emphasizing that "Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone"). Thus, even if race and partisanship are highly correlated and hard to disentangle, the fact remains that there is a disproportionate—and dilutive—effect on Black voters.

But more importantly, nothing in the VRA requires a plaintiff to control for every possible covariant to ensure that the discriminatory effect is caused solely or even predominantly by race as opposed to some other factor. Race and partisanship are correlated because Black voters may perceive that the issues that matter to them are more likely to be addressed by a particular party or candidate. In other words, they are not selecting Democratic candidates because they are Democrats; they are selecting Democratic candidates because they perceive, rightly or wrongly, that those candidates will be more responsive to issues that concern Black voters. This is supported by Dr. Fraga's expert testimony that race is a key factor in determining party affiliation.[125]

The Secretary's argument is flawed because it asks the Court to introduce a factor into the vote dilution analysis that is simply not supported by the law. A

---

[125]   Trial Tr. 759:5–761:3.

high correlation between race and partisanship does not *undermine* a Section 2 claim, it is *necessary* to it. The minority voting group must be politically cohesive, which is a *Gingles* prerequisite, and the best (albeit imperfect) proxy for political cohesion is partisan alignment. We expect politically cohesive groups to vote in corresponding patterns.

To determine whether a practice dilutes the right to vote "on account of race," then, this Court chooses to stay within the confines of the *Gingles* preconditions and the Senate Factors. *See Gingles*, 478 U.S. at 48–51; *Solomon*, 899 F.2d at 1013–16 (Kravitch, J., concurring). The Secretary cannot point to a single case establishing that, even if those factors are satisfied, a plaintiff must still prove that race independent of partisanship explains the discriminatory effect.[126] That is not the law, and this Court will not impose such a requirement.

### B.    The *Gingles* Preconditions Are Met.

The Court finds that Plaintiffs carried their burden of showing that the *Gingles* preconditions are satisfied. This Court found at summary judgment that

---

[126] *See, e.g.*, Trial Tr. 841:11–17, 860:22–862:15 (Def.'s closing) (citing the opinion by Judge Tjoflat, joined by one other judge, in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994), and *Alabama State Conf. of the NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803 (N.D. Ala. Feb. 5, 2020), involving elections of judges).

Plaintiffs largely satisfied the three *Gingles* preconditions.[127] The evidence at trial only reinforced that finding, so the Court need only summarize its original *Gingles* analysis here.

As to geography and compactness, it was undisputed that Black voters are a sufficiently large and geographically compact group in current-day Georgia to constitute at least one single-member district in which they would have the potential to elect their representative of choice in district-based PSC elections. *Gingles*, 478 U.S. at 50; *Wright*, 979 F.3d at 1303.[128] Plaintiffs further showed that Black voters are politically cohesive.[129] *Gingles*, 478 U.S. at 51. The Secretary agreed that Black voters have been politically cohesive in general elections for PSC commissioners since 2012.[130] Plaintiffs also established racial-bloc voting by the White majority that enables that majority to defeat Black-preferred candidates, further supported by the trial testimony of Dr. Stephen Popick.[131] *Id.*

---

[127]   *See generally* ECF 97 (SJM Order).

[128]   *Id.* at 24–27.

[129]   *Id.* at 27–29.

[130]   ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 6; ECF 121-3 (Joint Stip.), ¶¶ 9–10.

[131]   ECF 97 (SJM Order), at 29–32; ECF 121-3 (Joint Stip.), ¶ 12.

**C.      The Senate Factors Compel a Finding of Vote Dilution.**

Of the nine Senate Factors, courts are to weigh Senate Factors 2 and 7 more heavily in the vote dilution analysis. *Gingles*, 478 U.S. at 48 n.15; *see also Carrollton NAACP*, 829 F.2d at 1555. The Court will therefore address those two factors first.

**1.      Racial Polarization in Elections (Senate Factor 2)**

Senate Factor 2 concerns the extent to which voting in the jurisdiction is racially polarized, which is "[t]he surest indication of race-conscious politics," and the "the keystone of a dilution case." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566, 1567 (11th Cir. 1984); *accord Wright*, 979 F.3d at 1305. The Court has already found—and the parties do not dispute—that voting in Georgia is polarized.[132]

As previewed above, the Secretary argues that partisanship better explains this polarization, and therefore any dilution occurs on account of party rather than race. But the Court is heavily persuaded by Dr. Fraga's testimony that it is impossible to separate race from politics in current-day Georgia, even if that were required under the VRA. As Dr. Fraga made clear, race likely drives political party

---

[132]  ECF 97 (SJM Order), at 29–32; ECF 121-3 (Joint Stip.), ¶ 9; Trial Tr. 841:7–9 (Pls.' closing).

affiliation, not the other way around.[133] Even the Secretary's expert, Dr. Barber, conceded that race is a significant factor in determining vote choice.[134] His own scholarship tells us that race is the "strongest predictor" of partisan identification—even more so than one's political views.[135]

The Secretary's position is facially inconsistent with *Gingles*, which requires Plaintiffs to show that voting is both racially polarized *and* politically cohesive. This necessarily means that the correlation between race and partisan voting must be high, or else there would be no discernable evidence of cohesive bloc voting. And Plaintiffs here easily proved both racial polarization and political cohesion. Indeed, they showed that the racial polarization found to exist in the *Gingles* case itself is exceeded by the racial polarization in recent PSC general elections.[136]

Dr. Popick, who has analyzed racial bloc voting in thousands of individual elections in his professional career, credibly and compellingly testified that his analysis of the PSC general elections since 2012 shows "one of the clearest

---

[133]  Trial Tr. 760:20–761:16.

[134]  *Id.* 705:20–24, 706:6–12.

[135]  *Id.* 701:6–702:8. *See also* PX-111 (*Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public*).

[136]  Trial Tr. 806:16–807:9 (Pls.' closing); ECF 144 (Pls.' proposed findings), ¶ 550 & tbl.

examples of racially polarized voting" he has ever seen.[137] And that racial polarization is far more stark than partisan identification alone would predict.[138] Racially polarized voting in Georgia increased after 2016 but partisan identification did not.[139] Racial polarization exists even in elections that do not feature a Republican-Democrat matchup.[140] In fact, political cohesion by White voters was the strongest in the 2014 District 1 election where there was no Democratic candidate and the Black-preferred candidate was a Black Libertarian.[141] This contest showed even higher political cohesion among Black voters (82.44%) than the contest featuring a Black Democratic candidate for District 4 (81.29%).[142]

This does not mean that partisan division is never relevant to a vote dilution analysis. For example, courts must consider whether the White majority votes as a bloc or whether that vote is fractured along political lines. *See Gingles*, 478 U.S. at

---

[137]   Trial Tr. 183:20–23, 198:12–17.

[138]   *Id.* 765:15–767:4 (Fraga).

[139]   Trial Tr. 767:25–769:19 (Fraga). *Compare* PX-8 (Popick Rpt.), at 11–12 *with* DX-28 (Barber Rpt.), at 7.

[140]   Trial Tr. 695:9–16 (Barber), 769:20–770:16 (Fraga).

[141]   *Id.* 767:5–24 (Fraga); PX-6 (Fraga Rebuttal Rpt.), at 7.

[142]   PX-8 (Popick Rpt.), at 11.

48 n.15 ("[I]f difficulty in electing and White bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates."). Where the White majority vote is fractured, some White votes would align with Black votes and allow the Black-preferred candidate to prevail. So, while a plaintiff claiming vote dilution could meet the political cohesion requirement, that scenario would not be sufficient to demonstrate racial-bloc voting.

But here, Plaintiffs have proven both political cohesion and racial polarization in PSC elections. The Secretary has not offered any evidence of an alternate explanation for why minority-preferred candidates are less successful, such as "organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent." *Uno v. City of Holyoke*, 72 F.3d 973, 983, 983 n.4 (1st Cir. 1995) (citing *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (Tjoflat, J.)). Senate Factor 2 weighs heavily in Plaintiffs' favor.

### 2.    Election of Minorities to Public Office (Senate Factor 7)

Senate Factor 7 looks at the extent to which members of the minority group have been elected to public office in the jurisdiction. While the other Senate Factors

focus on the effects on minority voters and their ability to participate in the political process, this one focuses on the race of the candidates for office.[143]

There is no dispute that, outside of the unique context of judicial elections, Georgia has elected few Black officials statewide. Nor is there dispute that the lack of diversity among the members of the PSC has been and continues to be substantial. There have been five Black candidates for the PSC in the seven most recent elections, including two Black candidates in 2014. Every time, the Black candidate lost to a White candidate.[144] The Secretary rightly points out that, for the upcoming November 2022 election, both major-party candidates for PSC District 3 are Black.[145] But that race—and even Georgia's U.S. Senate race, which also features two Black candidates[146]—will not significantly alter the overall paucity of Black candidates who have been elected to statewide public office in Georgia. Analyzing 164 statewide elections over a 50-year timeframe, Dr. Fraga found that

---

[143] The Secretary claims, without any supporting authority, that this factor is of limited utility. *See, e.g.*, ECF 144 (Def.'s proposed findings), ¶ 181. The Secretary's position is directly contrary to precedent, which prioritizes Senate Factors 2 and 7 in the totality-of-the-circumstances analysis. *Gingles*, 478 U.S. at 48 n.15; *Carrollton NAACP*, 829 F.2d at 1555.

[144] Trial Tr. 589:10–17 (Fraga); PX-5 (Fraga Rpt.), at 12–13.

[145] Trial Tr. 132:1–21 (Farley).

[146] *Id.* 754:18–755:10 (Rose).

Black candidates won only eight races—less than 5% of the total.[147] Even assuming a Black candidate wins both the District 3 and U.S. Senate races in November 2022, the total would increase to only 6%. This is substantially lower than the CVAP, the Black voting population, and the total Black population in Georgia.[148]

It is true, as the Secretary highlights, that Black-preferred candidates have won some recent statewide elections in Georgia. For example, in the 2020 general elections, Black-preferred candidates were successful in the presidential race and two U.S. Senate races.[149] But Senate Factor 7 asks courts to consider the election of minority candidates, not minority-preferred candidates, as a barometer for the racial environment. This factor weighs in Plaintiffs' favor.

### 3.  History of Official Discrimination (Senate Factor 1)

This factor looks at "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process." *Solomon,* 899 F.2d at 1015 (Kravitch, J., specially concurring). Past discrimination has lingering effects on voter behavior because it "may cause [B]lacks to register

---

[147]  *Id.* 585:19–586:13 (Fraga); PX-5 (Fraga Rpt.), at 4, 11–13.

[148]  ECF 121-3 (Joint Stip.), ¶¶ 4–6.

[149]  *Id.* ¶ 11.

or vote in lower numbers than [W]hites" and "may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *Marengo Cnty. Comm'n*, 731 F.2d at 1567.

The Court finds no need to belabor its discussion of Senate Factor 1 because it is undisputed that Georgia has a "well-documented history of discrimination against its Black citizens."[150] Some may argue that Georgia's history should not be held against it forever and that this factor should therefore not carry much weight. But the Supreme Court instructs this Court to consider Georgia's history of discrimination in evaluating the totality of the circumstances for a VRA claim, and the Court finds that Senate Factor 1 is satisfied.

### 4.    Voting Practices that May Enhance Opportunities for Discrimination (Senate Factor 3)

This factor examines "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Solomon*, 899 F.2d at 1015 (Kravitch, J., specially concurring).

---

[150]   Trial Tr. 842:15–17 (Def.'s closing); ECF 121-3 (Joint Stip.), ¶ 8.

Dr. Fraga persuasively testified that Georgia's unique PSC election procedures enhance the opportunity for discrimination against Black Georgians, including a statewide election with residency districts; the majority-vote/runoff requirement; and "anti-single shot" staggered terms with numbered seats.[151] He testified that PSC elections are "textbook examples" of Senate Factor 3 because they mirror the specific policies called out in the Senate Report.[152]

Large election districts can enhance the opportunity for discrimination by increasing the cost of campaigning. *See, e.g.*, *Marengo Cnty. Comm'n*, 731 F.2d at 1570 (recognizing that large, rural area made countywide campaigns expensive). The financial barriers to entry are particularly problematic in light of the economic disparities proven at trial.[153] Majority-vote/runoff requirements can also create opportunities for vote dilution in contrast to a plurality-win system. Under the latter, members of the minority group may be able to consolidate their votes behind one candidate while the majority group splits its votes among several different candidates. If votes are split in this manner under a majority-vote requirement, a runoff takes place, and the majority has a second opportunity to

---

[151]  Trial Tr. 574:3–9.

[152]  *Id.* 573:21–574:2.

[153]  *See supra* Section II.B.

defeat the minority's preferred candidate. *City of Rome v. United States,* 446 U.S. 156, 183–84 (1980), *superseded by statute on other grounds as stated in Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 209–11 (2009); *United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1536–37 (11th Cir. 1984). *See also LULAC v. Clements*, 986 F.2d 728, 749 (5th Cir. 1993) ("Majority vote requirements can obstruct the election of minority candidates by giving [W]hite voting majorities a 'second shot' at minority candidates who have only mustered a plurality of the votes in the first election.") (citations omitted). Finally, Georgia's staggered terms for PSC commissioners also work as an anti-single shot mechanism and thereby enhance the opportunity for discrimination. *City of Rome*, 446 U.S. at 184-85, 185 n.21.

The Court finds Dr. Fraga's testimony on this point compelling and concludes that, by employing this unique aggregation of statewide, at-large elections for PSC commissioners, with requirements for a majority vote, residency districts, and staggered terms with numbered seats, Georgia uses electoral practices that enhance the opportunity for vote dilution. Senate Factor 3 weighs in Plaintiffs' favor.

### 5.   Slating Processes (Senate Factor 4)

The fourth Senate Factor examines whether members of the minority group have been denied access to any candidate slating process. Slating is "a process in

which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991) (citing *Overton v. City of Austin*, 871 F.2d 529, 534 (5th Cir. 1989) (per curiam)).

There is no formal candidate slating process in Georgia. But Dr. Fraga characterized the use of gubernatorial appointments to fill vacancies on the PSC (which is required by statute, O.C.G.A. § 46-2-4) as an "informal slating process" that confers an incumbency advantage on candidates who are appointed.[154] Echols and Shaw both testified that their incumbency made it easier to raise funds and run statewide.[155]

The Court is not persuaded in the PSC election context that gubernatorial appointments act as an informal slating process, even if the appointments confer some incumbency advantage. Of the five appointments Dr. Fraga examined, three of those commissioners were defeated in their post-appointment elections.[156]

---

[154] Trial Tr. 590:4–22. *See generally supra* Section II.E.2.

[155] PX-99, at 24 (Echols Tr. 71:15–22); PX-103, at 11, 13 (Shaw Tr. 44:18–45:21, 54:20–24).
The Secretary's Rule 701 objection to Shaw's testimony is overruled.

[156] Trial Tr. 611:13–16.

Even if the Court were to accept that appointments constitute an informal slating process for PSC members, the Court does not find that Black candidates have necessarily been excluded from it—at least not in recent years. Of the six PSC appointments between 1996 and 2022, two have been Black. While Plaintiffs are skeptical of Johnson's appointment because it occurred during the pendency of this litigation, the Court declines to discount it. Senate Factor 4 does not weigh in Plaintiffs' favor.

### 6.    Effects of Discrimination (Senate Factor 5)

Senate Factor 5 looks at the extent to which members of the minority group bear the effects of discrimination that hinder their ability to participate effectively. But "the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation." *Marengo Cnty. Comm'n*, 731 F.2d at 1569. Instead, the burden is on "those who deny the causal nexus to show that the cause is something else." *Id.*

The Senate Report explains the rationale and the nature of the inquiry for this factor:

> [D]isproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of Black participation in politics is depressed, plaintiffs need not prove any further causal

> nexus between their disparate socio-economic status and
> the depressed level of political participation.

Senate Rpt. at 29 n.114, 1982 USCCAN 206 (citations omitted); *see also Gingles,* 478

U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where

minority group members suffer effects of prior discrimination such as inferior

education, poor employment opportunities, and low incomes.").

The evidence at trial demonstrated that Black Georgians still suffer from the

effects of segregation and discrimination. Dr. Fraga testified that Black voters

turnout at lower rates and donate to campaigns at lower rates because of the

lingering economic disparities caused by historical discrimination.[157] Income per

capita for Blacks is only 60% of that for Whites; the median household income for

Black-headed homes is 66% of that for Whites; the poverty rate is twice as high;

the unemployment rate is close to twice that of Whites; the rate of homeownership

is lower; and the rate of receiving benefits under the SNAP is more than three

times higher.[158]

---

[157] Trial Tr. 583:24–585:9 (Fraga); PX-5 (Fraga Rpt.), at 6, 9–11.

[158] Trial Tr. 736:6–14 (Barber); DX-49 (Barber Rebut. Rpt.), at 8 (indicating an income gap of approximately $23,000 between Black and white Georgia households); ECF 57 (Mot. Jdl. Notice) ¶¶ 3, 5, 6, 7, 8, 10. *See also supra* Section II.B.

Even the Secretary's expert, Dr. Barber, reached similar conclusions in his scholarly work, finding "large and persistent gaps in voter turnout by race" and concluding that "[B]lack citizens are much less likely to vote and much more likely to live in local communities where fewer individuals vote than [W]hites."[159] Dr. Barber concluded that Black citizens are more than three times as likely to live in an area where voter turnout is consistently low, which can perpetuate political inequality along racial lines.[160] Senate Factor 5 weighs in Plaintiffs' favor.

### 7.  Racial Appeals in Political Campaigns (Senate Factor 6)

Senate Factor 6 examines whether political campaigns have been characterized by overt or subtle racial appeals. The parties agree that racial appeals in statewide political campaigns are relevant to this factor.[161] The Court interprets this factor to encompass political campaign advertisements in Georgia generally; the type of campaign to which they relate is relevant to the weight this evidence carries.[162]

---

[159]  Trial Tr. 668:19–25 (Barber).

[160]  *Id.* 668:7–669:25 (Barber); PX-37 (Michael Barber & John B. Holbein, *410 Million Voting Records Show That Minority Citizens, Young People, and Democrats Are at a Profound Disadvantage at the Ballot Box*).

[161]  *Id.* 464:14–465:20 (colloquy).

[162]  *Id.* 465:21–24 (colloquy).

Witnesses testified to seeing political ads or statements made during a political campaign that they characterized as racial appeals. Some of the political ads shown were overtly racial in nature and disturbing, even if not sponsored by the candidates themselves. But several of the ads were more subtle, and reasonable people could disagree over whether they were racial appeals at all. The Court does not question Plaintiffs' sincere beliefs about what constitutes a racial appeal, but these ads and statements do not carry the weight Plaintiffs seek to place on them. On balance, while there was some evidence of racial appeals made during political campaigns in statewide Georgia races generally, there was no evidence of such appeals in PSC campaigns. Senate Factor 6 does not weigh in Plaintiffs' favor.

### 8.   Responsiveness of Elected Officials (Senate Factor 8)

Senate Factor 8 concerns the responsiveness (or lack thereof) of elected officials to the particularized needs of the members of the minority group. Unresponsiveness is "evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power." *Marengo Cnty. Comm'n*, 731 F.2d at 1572. This factor is "of limited importance" both because of its subjectivity and Section 2's focus on the ability to participate in the political process itself. *Id.* Even if officials are responsive, that does not necessarily equate to equal electoral opportunity. *Id.*

As evidence of the PSC's purported lack of responsiveness to Black voters, Plaintiffs point to testimony from the current commissioners expressing their views that the Black community does not have specialized needs when it comes to matters within the PSC's jurisdiction.[163] McDonald, for instance, believes that income status is the issue.[164]

Plaintiffs testified that some PSC issues disproportionately affect Black Georgians.[165] These issues include high utility rates and energy burden; the location of power plants; the utility disconnection moratorium; and cost overruns related to the construction of Georgia Power's nuclear power plant.[166] Plaintiff McCorkle testified that the City of Atlanta—which is in PSC District 3—is home to communities that endure the highest energy burden in Georgia.[167] But Pridemore testified credibly that the decision to lift the moratorium involved a number of

---

[163] Trial Tr. 418:21–419:1, 421:19–422:1 (Pridemore); PX-99, at 28, 30 (Echols Tr. 85:10–20, 91:3–8); PX-100, at 12 (Johnson Tr. 55:12–18); PX-101, at 18 (McDonald 94:7–18); PX-103, at 18 (Shaw Tr. 70:21–71:3).

[164] PX-101, at 18 (McDonald 94:7–95:23).

[165] Trial Tr. 55:8–23, 62:6–21 (Woodall); *id.* 281:10–13, 314:7–13, 334:13–335:23 (McCorkle); *id.* 475:6–25, 480:5–20 (Rose); *id.* 536:21–537:6, 559:10–560:6 (Mosley).

[166] *Id.* 49:7–50:13, 52:15–53:16 (Woodall); *id.* 284:19–285:13 (McCorkle); *id.* 472:21–473:9 (Rose); *id.* 522:14–18 (Mosley).

[167] *Id.* 300:7–15 (McCorkle).

competing policy interests.[168] Echols similarly testified that continuing the moratorium would have "put people in a greater [financial] difficulty down the road."[169]

The issues identified by Plaintiffs are important ones and they are inherently tied to income and poverty levels, which disproportionately affect Black Georgians given the continuing effects of discrimination on socio-economic factors.[170] But Senate Factor 8 focuses on a lack of responsiveness, not disproportionate effect, and the Court concludes that it requires something more than an outsized effect correlated with race. Plaintiffs have not presented sufficient evidence here. Senate Factor 8 does not weigh in Plaintiffs' favor.

### 9.    Policy Justifications for the Voting Practice (Senate Factor 9)

This final Senate Factor considers whether the policy underlying Georgia's use of the voting standard, practice, or procedure at issue is "tenuous." Senate Report at 29, 1982 USCCAN 207; *see also Houston Laws.' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 426–27 (1991) ("[W]e believe that the State's interest in maintaining

---

[168]   *Id.* 416:17–418:23 (Pridemore).

[169]   PX-99, at 42 (Echols Tr. 115:23–116:6). *See also* PX-101, at 19–20 (McDonald Tr. 98:13–99:8); PX-103, at 17 (Shaw Tr. 66:14–67:4).

[170]   *See, e.g.*, Trial Tr. 422:17–21 (Pridemore); PX-101, at 18 (McDonald 94:7–95:23); *see also supra* Section II.B.

an electoral system . . . is a legitimate factor to be considered by courts among the 'totality of circumstances.'").

The Court expected the Secretary at trial to offer robust evidence explaining why Georgia's method of selecting PSC members was thoughtfully contemplated by the General Assembly, or that it otherwise furthered some concrete interest that was documented and provable. Perhaps a policy statement, or arguments buried in legislative history, might have articulated an explanation for why this particular electoral mechanism makes sense for Georgia. But the only evidence the Court heard to this point came from the lay opinions of the commissioners, most notably Pridemore.[171]

Although not herself an expert on electoral structure and function, Pridemore nonetheless opined that statewide elections serve to (1) avoid conflict over the location of energy and infrastructure; (2) avoid having different utility rates for different districts; (3) avoid potential favoritism by the consumer affairs staff; and (4) maintain the federal and state pipeline safety programs.[172] But the Court finds Pridemore's testimony on these points unpersuasive, not because the

---

[171] Trial Tr. 390:13–19 (ruling making clear Pridemore was providing lay opinion testimony).

[172] Trial *Id.* 386:23–388:14, 390:22–392:16, 402:2–9 (Pridemore).

Court questions her sincere beliefs, but because they were not tethered to any objective data and they lacked foundation entirely. In fact, it appeared to the Court based on its close observation of Pridemore's testimony at trial that the justifications she gave for the PSC's electoral structure were developed in preparation for her testimony and were not preconceived.

The Secretary's counsel argued in closing that Georgia had an interest in maintaining its electoral structure to guarantee a "linkage" between the commissioners' jurisdiction and electoral base.[173] Counsel's argument is not evidence, of course, but the Court will address it nonetheless.

It is no doubt important to maintain the linkage between officials' jurisdiction and their electoral base, which preserves accountability and reduces the incentive to favor certain constituents. *See S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281, 1296–97 (11th Cir. 1995) (en banc). But that decision, on which the Secretary relies, was focused on judicial elections, and the Eleventh Circuit has not extended its application beyond that unique context. *Wright*, 979 F.3d at 1297; *Davis v. Chiles*, 139 F.3d 1414, 1423–24 (11th Cir. 1998). It makes sense that the state would not want judges—who are supposed to be impartial

---

[173]  *Id.* 836:4–837:2, 857:24–858:3 (Def.'s closing).

neutrals—to favor their own constituents. Although the PSC's functions are considered both "quasi-legislative" and "quasi-judicial," it is by and large an administrative body with policy-making responsibilities that make it qualitatively different than courts.

Even crediting the Secretary's linkage concern, which the Court does find deserves some weight, it does not outweigh the interests of Black Georgians in not having their votes for PSC commissioners diluted. *Houston Laws.' Ass'n*, 501 U.S. at 427 ("Because the State's interest . . . is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution."). Senate Factor 9 weighs in Plaintiffs' favor.

In sum, six of the nine Senate Factors weigh in Plaintiffs' favor, including the most important Factors, 2 and 7. This Court concludes that Georgia's statewide, at-large system for electing PSC members dilutes the votes of Black Georgians in violation of the VRA.

### D.   The Secretary's Statutory Interpretation Argument Fails.

The Secretary argues that the statewide, at-large election of PSC members is not a "standard, practice, or procedure" within the meaning of Section 2 because

the State itself cannot be viewed as a "district."[174] Statewide election is not a districting plan, the Secretary argues, but rather a choice made by the sovereign state "about how it will regulate utilities" in Georgia.[175]

This Court has already ruled that nothing in the VRA suggests that a party lacks standing when the challenge is to a statewide versus political subdivision election, nor has the Secretary presented a persuasive argument for why the VRA exempts statewide at-large elections from its scope.[176] But more importantly, the Secretary's argument is foreclosed by the plain language of Section 2, which applies any time "it is shown that the political processes leading to nomination or election *in the State or political subdivision* are not equally open to participation by members" of a protected class.  52 U.S.C. § 10301(b) (emphasis added). The statute clearly addresses elections held at the state-level and the district-level, and the Secretary has provided no authority to suggest that this language means

---

[174]  ECF 121-2 (Def.'s Stmt. of the Case), at 2. The Secretary raised this issue for the first time in the parties' proposed pretrial order. *See also* Trial Tr. 27:23–28:11 (Def.'s opening). Plaintiffs asserted that this argument was waived because the Secretary did not raise it in his Answer or motion to dismiss. *Id.* 825:10–14 (Pls.' closing). The Court finds it unnecessary to wade into the issue of waiver because the Secretary's position is substantively foreclosed by the plain language of the statute.

[175]  Trial Tr. 832:4–8 (Def.'s closing).

[176]  ECF 36 (MTD Order), at 20–21.

anything other than what it explicitly says. Nor does the Secretary's status as an agent of a "sovereign" shift this analysis. So long as PSC members are elected by popular vote, those elections must comply with the VRA regardless of whether they are conducted at the state or political subdivision level.

### E.   Plaintiffs' Proposed Remedy

Under Eleventh Circuit precedent, Plaintiffs must offer a viable remedy to establish the first *Gingles* prerequisite. *Nipper*, 39 F.3d at 1530–31; *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Davis,* 139 F.3d at 1419–20 ("In assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan.") (citing *Houston Laws.' Ass'n*, 501 U.S. at 426); *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998) (same).

Plaintiffs seek to convert PSC elections from statewide, at-large residency districts to single-member districts.[177] Under the map presented by Plaintiffs, proposed District 1 (covering Clayton, DeKalb, Fayette, part of Fulton, Henry, Newton, and Rockdale Counties) would be a majority-Black district, with slightly

---

[177] *See, e.g.*, ECF 1 (Compl.), ¶ 18; PX-8 (Popick Rpt.), at 19–20; PX-50, at 1 (Pls.' Illustrative Plan).

over 54% of the voting-age population being Black.[178] This proposed District 1 overlaps in large part with existing PSC District 3.[179]

Single-member districting is a standard remedy for a Section 2 violation caused by at-large elections. *See, e.g.*, *Gingles*, 478 U.S. at 50; *see also id.* at 50 n.17 ("The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (where "the challenged system is at-large voting, just as in *Gingles*[,] the adequate alternative electoral system is simply single-member districting, which is a workable regime and an available remedy"). Courts must impose single-member districts unless they "can articulate such a singular combination of unique factors" that a different result is justified. *Chapman v. Meier*, 420 U.S. 1, 21 (1975) (cleaned up); *accord Wise v. Lipscomb*, 437 U.S. 535, 540–41 (1978); *Connor v. Johnson*, 402 U.S. 690, 692 (1971) (per curiam).

The Secretary has conceded that there is nothing "facially problematic" with the proposed map submitted by Plaintiffs and that "it's exactly the kind of

---

[178] PX-50, at 2 (population data for Pls' Illustrative Plan).

[179] PX-2, at 1 (2012 PSC Map); PX-8 (Popick Rpt.), at 15–18.

evidence that you could put forward to show the feasibility of a remedy" if this case did not involve a "sovereign."[180] The Secretary also acknowledged at summary judgment that the Section 2 injury alleged by Plaintiffs is "one that has been accepted by courts since the inception" of the VRA; however, he argued that Plaintiffs failed to *prove* the existence of that injury.[181] At the summary judgment stage, the Court agreed.[182] But Plaintiffs have now proven their case.

The Court previously declined to enter judgment in favor of Plaintiffs on the Secretary's Third and Fourth Affirmative Defenses, which respectively assert that Plaintiffs lack constitutional and statutory standing. The Court declined ruling at that time only because of the open question concerning the viability of Plaintiffs' proposed remedy.[183] Having now concluded that it is, Defendants' Third and Fourth Affirmative Defenses are rejected.

The Secretary's Eighth Affirmative Defense asserts that Plaintiffs' proposed remedy "will result in a violation of the U.S. Constitution because Plaintiffs'

---

[180]   ECF 35 (MTD H'g Tr.), 40:12–24.

[181]   ECF 88 (Def.'s SJM Reply), at 2.

[182]   ECF 97 (SJM Order), at 9–12.

[183]   *Id.* at 12.

proposed remedies require the alteration of the form of government of the State of Georgia."[184] The Court disagrees.

The Georgia Constitution currently provides, "[t]he filling of vacancies and manner and time of election of members of the [PSC] shall be as provided by law." GA. CONST. art. IV, § 1, ¶ I(c). The statewide, at-large method of election is prescribed by statute, not the Georgia Constitution. O.C.G.A. § 46-2-1(a); *Cox v. Barber*, 275 Ga. 415, 415 (2002). Further, and as discussed above, the history of the Georgia constitutional provision concerning the PSC makes clear that the requirement that commissioners be "elected by the people" was intended only to require that they be elected rather than appointed by the governor as originally had been done.[185]

This interpretation is also consistent with adjacent provisions of the Georgia Constitution relating to other constitutional boards and commissions. Members of the State Board of Pardons and Paroles shall be "appointed by the Governor." GA. CONST. art. IV, § II, ¶ I. Members of the State Personnel Board shall also be "appointed by the Governor." GA. CONST. art. IV, § III, ¶ I(a). Members of the State Transportation Board shall be "elected by a majority vote of the members of the

---

[184]  ECF 37 (Ans.), Eighth Aff. Defense.

[185]  *See supra* Section II.A.

House of Representatives and Senate." GA. CONST. art. IV, § IV, ¶ I(a). By contrast, the Georgia Constitution leaves the "manner" of PSC elections to the General Assembly, which opted for statewide, at-large elections.

Nothing in the Court's order requires a change to Georgia's constitution; it does, however, require a change to the manner in which PSC commissioners are elected. The constitutional requirements that the PSC have five members, that they be elected, and that they serve six-year staggered terms will be unaffected by using single-member voting districts as the *manner* for those elections. The Court rejects the Secretary's Eighth Affirmative Defense.

### F.    Timing

Georgia has significant interests "in conducting an efficient election [and] maintaining order," because "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)).

It is now August, and the PSC elections for Districts 2 and 3 are on the November 8, 2022 ballot.[186] The Court specifically conducted the trial in this action

---

[186]  O.C.G.A. § 46-2-1(d), § 46-2-4; ECF 110-1, at 9 (2022 State Elections & Voter Registration Calendar).

sufficiently in advance of the November election so that Plaintiffs could be afforded relief in the event they prevailed in the Court's ruling on a complete record.[187] Michael Barnes, who runs the State's Center for Election Systems, testified at trial that there would be little disruption to the State's preparation for or conduct of the November 2022 general election if the Court directed that the PSC races be removed from the ballots for that election before August 12, 2022, while the draft ballots were still being prepared by his office.[188] This Order is entered sufficiently in advance of that deadline to minimize the disruption to the electoral process and the Secretary's operations.

During the preliminary injunction hearing, counsel for the Secretary made clear the State's position on what would happen under Georgia law in the event the Court enjoined the PSC races on the November 2022 ballots: The commissioners currently holding the positions for Districts 2 and 3 (Echols and

---

[187]   ECF 112 (PI Order), at 9.

[188]   Trial Tr. 441:18–444:9 (Barnes); ECF 108, at 24–25 (PI H'g Tr. 23:11–23, 24:14–25:25).

Johnson) would "holdover" in those positions "until such time as there was an election."[189] The Court agrees with the Secretary's analysis under Georgia law.

The concerns raised by *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006), – that courts generally "should not enjoin state election laws in the period close to an election"—are not present here. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022). In *Purcell*, the preliminary injunction was issued one month before the election and without adequate time to develop a factual record. 549 U.S. at 5–6. The Court's ruling here is not preliminary. It is a permanent injunction, entered after a full trial, on a complete record, with factual findings and conclusions of law. As a result, the Court finds no impediment to enjoining the Secretary from conducting elections for PSC Districts 2 and 3 in November. This Order issues in sufficient time to present little disruption to the State.

While delaying elections for Districts 2 and 3 until a later date will regrettably cause disruption to the candidates currently running for those offices, the Court does not find that such disruption outweighs the important VRA interests that are implicated, for the reasons discussed in this Order. And there is

---

[189] ECF 108, at 6 (PI H'g Tr. 5:19–7:5) (relying on *Clark v. Deal*, 298 Ga. 893 (2016); *Kanitra v. City of Greensboro*, 296 Ga. 674 (2015); and *Garcia v. Miller*, 261 Ga. 531 (1991)).

no evidence in the record suggesting that the Court's injunction will cause disruption to voters themselves.

## IV.   Conclusion

This Order should not be interpreted to find that statewide, at-large elections violate Section 2 of the Voting Rights Act in all circumstances and at any point in time. Rather, the Court has followed its mandate under *Gingles* of conducting an "intensely local appraisal" of the facts to determine what result is compelled under the totality of the circumstances for Georgia today. And that appraisal, in this Court's view, compels only one result.

The Secretary is **ENJOINED** from preparing ballots for the November 8, 2022 election that include contests for PSC Districts 2 and 3; from administering any future elections for vacancies on the PSC using the statewide, at-large method currently prescribed by O.C.G.A. § 46-2-1, *et seq.*; and from certifying the election of any PSC commissioner elected using this method.

The Court is cognizant of the fact that the General Assembly next meets in regular session in January 2023. Consequently, this Order shall remain in effect until a method for conducting such elections that complies with Section 2 is enacted by the General Assembly and approved by the Court, or is otherwise adopted by the Court should the General Assembly fail to enact such a method.

The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Plaintiffs.

Within 30 days after entry of this Order, Plaintiffs are **DIRECTED** to file a motion in support of their claim under 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e) for attorneys' fees and expenses.

**SO ORDERED** this 5th day of August, 2022.

_____
Steven D. Grimberg
United States District Court Judge