# UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF GEORGIA
**2211 UNITED STATES COURTHOUSE
75 TED TURNER DRIVE, SW
ATLANTA, GEORGIA 30303-3361**

**KEVIN P. WEIMER
DISTRICT COURT EXECUTIVE
AND CLERK OF COURT**

**DOCKETING SECTION
404-215-1655**

August 8, 2022

Clerk's Office
U.S. Court of Appeals
Eleventh Circuit
56 Forsyth Street, NW
Atlanta, GA 30303

> **U.S.D.C. No.:** 1:20-cv-2921-SDG
> **U.S.C.A. No.:** 00-00000-00
> **In re:** Richard Rose et al v. Brad Raffensperger

Enclosed are documents regarding an appeal in this matter. Please acknowledge receipt on the enclosed copy of this letter.

| | |
|---|---|
| **X** | **Certified copies of the Notice of Appeal, Clerk's Judgment, Order and Docket Sheet appealed enclosed.** |
| _____ | This is not the first notice of appeal. Other notices were filed on: . |
| _____ | There is no transcript. |
| **X** | **The court reporter is Alicia B. Bagley.** |
| _____ | There is sealed material as described below: . |
| _____ | Other: . |
| **X** | **Fees paid electronically on 8/8/22. (Receipt# AGANDC-11980417)** |
| _____ | Appellant has been GRA leave to proceed *in forma pauperis*. |
| _____ | This is a bankruptcy appeal. The Bankruptcy Judge is . |
| _____ | The Magistrate Judge is . |
| **X** | **The District Judge is Steven D. Grimberg.** |
| _____ | This is a **DEATH PENALTY** appeal. |

Sincerely,

Kevin P. Weimer
District Court Executive
and Clerk of Court

By: /s/ P. McClam
Deputy Clerk

4months,APPEAL,AVEXH,EXH,SDGLC1,SUBMDJ

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: <u>1:20–cv–02921–SDG</u>

| | |
|---|---|
| Rose et al v. Raffensperger | Date Filed: 07/14/2020 |
| Assigned to: Judge Steven D. Grimberg | Jury Demand: None |
| Cause: 52:10301 Denial or abridgement of right to vote on | Nature of Suit: 441 Civil Rights: Voting |
| account of race or color | Jurisdiction: Federal Question |

**<u>Plaintiff</u>**

**Richard Rose**
*an individual*

represented by **Bryan Ludington Sells**
The Law Office of Bryan L. Sells, LLC
P.O. Box 5493
1226 Springdale Road, NE
Atlanta, GA 31107–0493
404–480–4212
Email: <u>bryan@bryansellslaw.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicolas L. Martinez**
Bartlit Beck –IL
Suite 300
54 West Hubbard Street
Chicago, IL 60654
312–494–4401
Fax: 312–494–4440
Email: <u>nicolas.martinez@bartlit–beck.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wesley A. Morrissette**
Bartlit Beck –IL
Suite 300
54 West Hubbard Street
Chicago, IL 60654
312–494–4400
Fax: 312–494–4440
Email: <u>wesley.morrissette@bartlit–beck.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Brionte McCorkle**
*an individual*

represented by **Bryan Ludington Sells**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

1

Nicolas L. Martinez
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Wesley A. Morrissette
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Wanda Mosley** | represented by | **Bryan Ludington Sells** |
| *an individual* | | (See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nicolas L. Martinez
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Wesley A. Morrissette
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **James Major Woodall** | represented by | **Bryan Ludington Sells** |
| | | (See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nicolas L. Martinez
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Wesley A. Morrissette
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Brad Raffensperger**
*in his official capacity as Secretary of*
*State of the State of Georgia*

represented by **Bryan Francis Jacoutot**
Taylor English Duma LLP
Suite 200
1600 Parkwood Circle
Atlanta, GA 30339
770–434–6868
Fax: 770–434–7376
Email: bjacoutot@taylorenglish.com
*ATTORNEY TO BE NOTICED*

**Bryan P. Tyson**
Taylor English Duma LLP
Suite 200
1600 Parkwood Circle
Atlanta, GA 30339
770–434–6868
Fax: 770–434–7376
Email: btyson@taylorenglish.com
*ATTORNEY TO BE NOTICED*

**Charlene S McGowan**
Office of the Georgia Attorney General
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
404–458–3658
Email: cmcgowan@law.ga.gov
*ATTORNEY TO BE NOTICED*

**Diane Festin LaRoss**
Taylor English Duma LLP
Suite 200
1600 Parkwood Circle
Atlanta, GA 30339
678–336–7169
Email: dlaross@taylorenglish.com
*ATTORNEY TO BE NOTICED*

**Loree Anne Paradise**
Taylor English Duma LLP
Suite 200
1600 Parkwood Circle
Atlanta, GA 30339
770–434–6868
Fax: 770–434–7376
Email: lap@gobergroup.com
*ATTORNEY TO BE NOTICED*

**Amicus**

represented by

3

**United States of America**
U.S. Department of Justice
150 M St., NE
Room 8.135
Washington, DC 20530

**Janie Allison (Jaye) Sitton**
Office of the United States Attorney
Civil Rights Division
950 Penn. Ave. NW
Washington, DC 20530
202–305–4143
Email: jaye.sitton@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 07/14/2020 | 1 | | COMPLAINT (Filing fee $400.00, receipt number AGANDC–9909368) filed by James Major Woodall, Richard Rose, Brionte McCorkle and Wanda Mosley. (Attachments: # 1 Exhibit –1 –2010 Census QT–P5, # 2 Exhibit –2 –2010 Census Table P10, # 3 Exhibit –3 –Illustrative Plan 1, # 4 Civil Cover Sheet)(eop) Please visit our website at http://www.gand.uscourts.gov/commonly–used–forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. Modified text and date fied on 7/15/2020 (eop). (Entered: 07/15/2020) |
| 07/14/2020 | 3 | | Electronic Summons Issued as to Brad Raffensperger. (eop) (Entered: 07/15/2020) |
| 07/15/2020 | 2 | | FIFTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 7/10/20. (eop) (Entered: 07/15/2020) |
| 07/16/2020 | 4 | | Return of Service Executed by Richard Rose, Brionte McCorkle, James Major Woodall, Wanda Mosley. All Defendants. (Sells, Bryan) (Entered: 07/16/2020) |
| 07/16/2020 | 5 | | APPLICATION for Admission of Nicolas L. Martinez Pro Hac Vice (Application fee $ 150, receipt number AGANDC–9921421).by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) Documents for this entry are not available for viewing outside the courthouse. (Entered: 07/16/2020) |
| 07/16/2020 | 6 | | APPLICATION for Admission of Wesley A. Morrissette Pro Hac Vice (Application fee $ 150, receipt number AGANDC–9921435).by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) Documents for this entry are not available for viewing outside the courthouse. (Entered: 07/16/2020) |
| 07/16/2020 | 7 | | ORDER REASSIGNING CASE. Case reassigned to Judge Steven D. Grimberg for all further proceedings. Judge Charles A. Pannell, Jr. no longer assigned to case. **NOTICE TO ALL COUNSEL OF RECORD: The Judge designation in the civil action number assigned to this case has been changed to 1:20–cv–02921–SDG.** Please make note of this change in order to facilitate the docketing of pleadings in this case. Signed by Judge Charles A. Pannell, Jr. on 7/16/2020. (tcc) (Entered: 07/16/2020) |
| 07/17/2020 | 8 | | STANDING ORDER Regarding Civil Litigation. Signed by Judge Steven D. Grimberg on July 17, 2020. (ash) (Entered: 07/17/2020) |

4

| 07/17/2020 | 9 | | CERTIFICATE of Compliance re 8 Order (Sells, Bryan) (Entered: 07/17/2020) |
|---|---|---|---|
| 07/20/2020 | | | APPROVAL by Clerks Office re: 5 APPLICATION for Admission of Nicolas L. Martinez Pro Hac Vice (Application fee $ 150, receipt number AGANDC−9921421).. Attorney Nicolas L. Martinez added appearing on behalf of Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (cdg) (Entered: 07/20/2020) |
| 07/20/2020 | | | APPROVAL by Clerks Office re: 6 APPLICATION for Admission of Wesley A. Morrissette Pro Hac Vice (Application fee $ 150, receipt number AGANDC−9921435).. Attorney Wesley A. Morrissette added appearing on behalf of Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (cdg) (Entered: 07/20/2020) |
| 07/21/2020 | 10 | | ORDER granting 5 Application for Admission Pro Hac Vice for Nicolas L. Martinez. Signed by Judge Steven D. Grimberg on 7/21/2020. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(rjs) (Entered: 07/21/2020) |
| 07/21/2020 | | | Clerk's Certificate of Mailing to Nicolas L. Martinez re 10 Order on Application for Admission PHV. (rjs) (Entered: 07/21/2020) |
| 07/21/2020 | 11 | | ORDER granting 6 Application for Admission Pro Hac Vice for Wesley A. Morrissette. Signed by Judge Steven D. Grimberg on 7/21/2020. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(rjs) (Entered: 07/21/2020) |
| 07/21/2020 | | | Clerk's Certificate of Mailing to Wesley A. Morrissette re 11 Order on Application for Admission PHV. (rjs) (Entered: 07/21/2020) |
| 07/30/2020 | 12 | | Certificate of Interested Persons by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 07/30/2020) |
| 07/30/2020 | 13 | | CERTIFICATE of Compliance re 8 Order (Martinez, Nicolas) (Entered: 07/30/2020) |
| 07/30/2020 | 14 | | CERTIFICATE of Compliance re 8 Order (Morrissette, Wesley) (Entered: 07/30/2020) |
| 07/31/2020 | 15 | | NOTICE of Appearance by Bryan P. Tyson on behalf of Brad Raffensperger (Tyson, Bryan) (Entered: 07/31/2020) |
| 07/31/2020 | 16 | | NOTICE of Appearance by Bryan Francis Jacoutot on behalf of Brad Raffensperger (Jacoutot, Bryan) (Entered: 07/31/2020) |
| 07/31/2020 | 17 | | Consent MOTION for Extension of Time to File Answer re 1 Complaint,, by Brad Raffensperger. (Attachments: # 1 Text of Proposed Order)(Tyson, Bryan) (Entered: 07/31/2020) |
| 07/31/2020 | 18 | | CERTIFICATE of Compliance re 8 Order (Tyson, Bryan) (Entered: 07/31/2020) |
| 07/31/2020 | 19 | | ORDER granting 17 Motion for Extension of Time to Answer re 1 Complaint. Brad Raffensperger Answer due 8/14/2020. Signed by Judge Steven D. |

5

| | | | |
|---|---|---|---|
| | | | Grimberg on 7/31/2020. (bdb) (Entered: 07/31/2020) |
| 07/31/2020 | 20 | | CERTIFICATE of Compliance re 8 Order (Jacoutot, Bryan) (Entered: 07/31/2020) |
| 08/04/2020 | 21 | | SIXTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 08/03/2020. (dgs) (ADI) (Entered: 08/04/2020) |
| 08/14/2020 | 22 | | MOTION to Dismiss *Plaintiffs' Complaint* with Brief In Support by Brad Raffensperger. (Attachments: # 1 Brief in Support)(Tyson, Bryan) (Entered: 08/14/2020) |
| 08/27/2020 | 23 | | RESPONSE in Opposition re 22 MOTION to Dismiss *Plaintiffs' Complaint* filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Martinez, Nicolas) (Entered: 08/27/2020) |
| 09/02/2020 | 24 | | SEVENTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 9/1/2020. (ddm) (ADI) (Entered: 09/02/2020) |
| 09/04/2020 | 25 | | NOTICE of Appearance by Charlene S McGowan on behalf of Brad Raffensperger (McGowan, Charlene) (Entered: 09/04/2020) |
| 09/09/2020 | | | Submission of 22 MOTION to Dismiss *Plaintiffs' Complaint*, to District Judge Steven D. Grimberg. (bdb) (Entered: 09/09/2020) |
| 09/10/2020 | 26 | | REPLY to Response to Motion re 22 MOTION to Dismiss *Plaintiffs' Complaint* filed by Brad Raffensperger. (Tyson, Bryan) (Entered: 09/10/2020) |
| 09/29/2020 | 27 | | EIGHTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 09/28/2020. (adg) (ADI) (Entered: 09/29/2020) |
| 10/16/2020 | 28 | | NOTICE SETTING ORAL ARGUMENT: The Court has set a hearing for Tuesday, December 8, 2020 at 10:00 a.m. before the Honorable Steven D. Grimberg, in Courtroom 1707, Richard B. Russell Federal Building, 75 Ted Turner Drive, S.W., Atlanta, Georgia 30303 for argument on Defendant's 22 Motion to Dismiss. Due to the current public health emergency, the parties may appear in person or via remote audio and video means, at their preference. Signed by Judge Steven D. Grimberg on 10/16/2020. (jed) (Entered: 10/16/2020) |
| 11/30/2020 | 29 | | Request for Leave of Absence for the following date(s): 12/13,12/14,12/15,12/16, and 12/17, by Bryan Ludington Sells. (Sells, Bryan) (Entered: 11/30/2020) |
| 12/01/2020 | 30 | | Notice for Leave of Absence for the following date(s): 1/16/21 – 1/23/21, by Bryan P. Tyson. (Tyson, Bryan) Modified on 12/2/2020 to edit text (jed). (Entered: 12/01/2020) |
| 12/04/2020 | 31 | | Request for Leave of Absence for the following date(s): 1/10/21, 1/11/21, 1/12/21, 1/13/21, 1/14/21, 1/15/21, 1/16/21, 1/17/21, 1/18/21, by Nicolas L. |

| | | | |
|---|---|---|---|
| | | | Martinez. (Martinez, Nicolas) (Entered: 12/04/2020) |
| 12/04/2020 | 32 | | Request for Leave of Absence for the following date(s): 12/22/20, 12/23/20, 12/24/20, 12/25/20, 12/26/20, 12/27/20, 12/28/20, 12/29/20, 12/30/20, 12/31/20, 1/1/21, by Wesley A. Morrissette. (Morrissette, Wesley) (Entered: 12/04/2020) |
| 12/08/2020 | 33 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Motion Hearing held on 12/8/2020. Oral Argument held on Defendant's 22 Motion to Dismiss. After hearing from both parties, the Court has taken the motion under advisement. A written order will follow at a later date. (Court Reporter Alicia Bagley) (jed) (Entered: 12/08/2020) |
| 12/09/2020 | 34 | | NINTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 12/08/2020. (aaq) (ADI) (Entered: 12/09/2020) |
| 12/11/2020 | 35 | | TRANSCRIPT of the Defendant's Motion to Dismiss Hearing Proceedings held on December 8, 2020, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2021. Redacted Transcript Deadline set for 1/11/2021. Release of Transcript Restriction set for 3/11/2021. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 12/11/2020) |
| 01/05/2021 | 36 | | OPINION AND ORDER denying the Secretary's 22 Motion to Dismiss. The Secretary is DIRECTED to answer the Complaint within 21 days after entry of this Order. The parties shall conduct their Rule 26(f) conference within 14 days after the Secretary answers. Discovery shall commence and the parties shall serve their initial disclosures and submit a Joint Preliminary Report and Discovery Plan within 30 days after the Secretary files his answer. Plaintiffs' request that discovery begin notwithstanding the pendency of the Secretary's motion to dismiss, which was submitted to Chambers pursuant to the Court's Standing Order, is DENIED AS MOOT. Signed by Judge Steven D. Grimberg on 1/5/2020. (jed) (Entered: 01/05/2021) |
| 01/26/2021 | 37 | | ANSWER to 1 COMPLAINT by Brad Raffensperger. Discovery ends on 6/25/2021.(Tyson, Bryan) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 01/26/2021) |
| 01/28/2021 | 38 | | TENTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 01/27/2021. (ddm) (ADI) (Entered: 01/28/2021) |
| 02/09/2021 | 39 | | JOINT PRELIMINARY REPORT AND DISCOVERY PLAN filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order (Proposed Order))(Martinez, Nicolas) (Entered: 02/09/2021) |

| 02/09/2021 | 40 | | SCHEDULING ORDER: re: 39 Joint Preliminary Report and Discovery Plan. Initial Disclosures – 2/25/2021. Discovery begins on 2/25/2021. Last day to add parties – 3/29/2021. Last day to serve opening expert reports – 4/21/2021. Last day to serve rebuttal expert reports – 6/4/2021. Last day to serve replies to rebuttal expert reports – 6/4/2021. Last day to serve replies to rebuttal expert reports – 6/25/2021. Discovery ends on 6/25/2021. Summary Judgment Motions due by 7/9/2021. Last day to file brief in response to motions for summary judgment – 7/23/2021. Last day to file reply brief in support of motions for summary judgment – 7/30/2021. Last day to file Daubert motions – 7/26/2021. Proposed Pretrial Order due by 7/26/2021. Pretrial Conference – TBD. Signed by Judge Steven D. Grimberg on 02/09/2021. (bdb) (Entered: 02/09/2021) |
| 02/25/2021 | 41 | | CERTIFICATE OF SERVICE *for Plaintiffs' Initial Disclosures and Plaintiffs' First Set of Requests for Production* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Martinez, Nicolas) (Entered: 02/25/2021) |
| 02/26/2021 | 42 | | CERTIFICATE OF SERVICE *for Plaintiffs' First Set of Interrogatories* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Martinez, Nicolas) (Entered: 02/26/2021) |
| 03/01/2021 | 43 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service for Defendant's Initial Disclosures* by Brad Raffensperger.(Tyson, Bryan) (Entered: 03/01/2021) |
| 03/03/2021 | | | NOTICE of TELECONFERENCE Hearing: Teleconference set for 3/8/2021 at 10:00 AM before Judge Steven D. Grimberg. No courtroom. Connection instructions have been emailed to the parties. (ash) (Entered: 03/03/2021) |
| 03/08/2021 | 44 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Telephone Conference held on 3/8/2021. Teleconference held regarding discovery dispute submitted by Plaintiffs to the Court pursuant to its Standing Order. The Court DENIED Plaintiffs' request to compel Defendant to comply with the notice requirement of Rule 5.1(a) of the Federal Rules of Civil Procedure. The Court GRANTED Plaintiffs leave to notify the federal government if they believe it's appropriate. (Attachments: # 1 Attachment #1, # 2 Attachment #2) (Court Reporter Alicia Bagley)(rlb) (Entered: 03/08/2021) |
| 03/09/2021 | 45 | | NOTICE of Appearance by Loree Anne Paradise on behalf of Brad Raffensperger (Paradise, Loree Anne) (Entered: 03/09/2021) |
| 03/09/2021 | 46 | | NOTICE by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall – *Notice of Constitutional Question* (Martinez, Nicolas) (Entered: 03/09/2021) |
| 03/10/2021 | 47 | | ELEVENTH AMENDMENT TO GENERAL ORDER 20–01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID–19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 03/09/2021 (mmc) (ADI) (Entered: 03/10/2021) |
| 03/11/2021 | 48 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service for Defendant's First Set of Interrogatories and Request for Production to each Plaintiff* by Brad Raffensperger.(Tyson, Bryan) (Entered: 03/11/2021) |

| 03/25/2021 | 49 | | Request for Leave of Absence for the following date(s): 4/11/21 – 4/16/21, by Bryan Ludington Sells. (Sells, Bryan) Modified on 3/26/2021 to edit text. (aaq). (Entered: 03/25/2021) |
|---|---|---|---|
| 03/29/2021 | 50 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service of Defendants Responses to Plaintiffs First Set of Interrogatories and Requests for Production* by Brad Raffensperger.(Tyson, Bryan) (Entered: 03/29/2021) |
| 04/01/2021 | 51 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service of Defendants Supplemental Responses to Plaintiffs First Set of Interrogatories* by Brad Raffensperger.(Tyson, Bryan) (Entered: 04/01/2021) |
| 04/09/2021 | 52 | | CERTIFICATE OF SERVICE re 48 Certificate of Service *of the defendant's first set of interrogatories and requests for production* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 04/09/2021) |
| 04/21/2021 | 53 | | CERTIFICATE OF SERVICE *of Expert Disclosures* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 04/21/2021) |
| 05/21/2021 | 54 | | CERTIFICATE OF SERVICE *of Discovery Materials* by Brad Raffensperger.(Tyson, Bryan) (Entered: 05/21/2021) |
| 05/25/2021 | 55 | | CERTIFICATE OF SERVICE *of the plaintiffs' first set of requests for admissions, second set of interrogatories, and second set of requests for production* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 05/25/2021) |
| 05/27/2021 | 56 | | First MOTION for Partial Summary Judgment by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit 1: the defendant's initial disclosures, # 2 Exhibit 2: voter registration records, # 3 Statement of Material Facts)(Sells, Bryan) ––Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.–– (Entered: 05/27/2021) |
| 05/28/2021 | 57 | | MOTION for Judicial Notice of Census Data by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit 1: census data)(Sells, Bryan) (Entered: 05/28/2021) |
| 05/28/2021 | 58 | | CERTIFICATE OF SERVICE *of the Plaintiffs' First Supplemental Disclosures* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 05/28/2021) |
| 06/04/2021 | 59 | | CERTIFICATE OF SERVICE *of the Plaintiffs' Expert Rebuttal Report* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 06/04/2021) |
| 06/08/2021 | 60 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service for Defendant's Notices of Deposition served on June 8, 2021* by Brad Raffensperger.(Tyson, Bryan) (Entered: 06/08/2021) |
| 06/11/2021 | 61 | | RESPONSE re 57 MOTION for Judicial Notice of Census Data filed by Brad Raffensperger. (Tyson, Bryan) (Entered: 06/11/2021) |

| 06/17/2021 | | | NOTICE of TELECONFERENCE Hearing: Discovery Dispute Hearing set for 6/21/2021 at 04:00 PM before Judge Steven D. Grimberg. No courtroom. The connection instructions have been emailed to the parties. (ash) (Entered: 06/17/2021) |
|---|---|---|---|
| 06/17/2021 | 62 | | RESPONSE re 56 First MOTION for Partial Summary Judgment filed by Brad Raffensperger. (Attachments: # 1 Statement of Material Facts – Defendant's Response)(Tyson, Bryan) (Entered: 06/17/2021) |
| 06/21/2021 | 63 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Telephone Conference held on 6/21/2021 regarding discovery dispute submitted by Plaintiffs to the Court pursuant to its Standing Order. The Court GRANTED in PART and DENIED in PART Plaintiffs' request to compel compliance with third party subpoenas served on Atlanta Gas Light Company ("AGL") and Georgia Power. Counsel for AGL and Georgia Power participated in the conference. The Court ORDERED AGL and Georgia Power to generate and produce the list of customers who were served with shut off notices and those that entered into payment plans following the lift of the COVID–related moratorium, as requested by Plaintiff, to the extent this information is in the non–party's possession, custody, and control. The Court DENIED WITHOUT PREJUIDICE Plaintiff's request for the production of documents as vague, overbroad, and unduly burdensome. The Court ORDERED the parties to confer to resolve the statutory confidentiality issue raised by counsel for AGL and present the Court with a proposed order, if necessary. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Attachment 3) (Court Reporter Alicia Bagley)(bdb) (Entered: 06/22/2021) |
| 06/22/2021 | 64 | | Consent MOTION for Extension of Time to Complete Discovery with Brief In Support by Brad Raffensperger. (Attachments: # 1 Text of Proposed Order)(Tyson, Bryan) (Entered: 06/22/2021) |
| 06/23/2021 | 65 | | ORDER granting 64 Parties' Consent Motion for Extension of Time to Complete Discovery. Discovery ends on 6/29/2021. The prior scheduling order [ECF 40] is modified to allow the deposition of Commissioner Echols on June 29, 2021. Signed by Judge Steven D. Grimberg on 06/23/2021. (bdb) (Entered: 06/23/2021) |
| 06/24/2021 | 66 | | CERTIFICATE OF SERVICE *of the Plaintiffs' Second Supplemental Disclosures* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 06/24/2021) |
| 06/24/2021 | 67 | | CERTIFICATE OF SERVICE *Rule 5.4 Certificate of Service for Defendant's Responses to Plaintiffs' First Set of Requests for Admission and Second Set of Interrogatories and Requests for Production* by Brad Raffensperger.(Tyson, Bryan) (Entered: 06/24/2021) |
| 06/28/2021 | 68 | | REPLY to Response to Motion re 56 First MOTION for Partial Summary Judgment filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 06/28/2021) |
| 06/28/2021 | | | Submission of the 57 MOTION for Judicial Notice of Census Data , and 56 First MOTION for Partial Summary Judgment to District Judge Steven D. Grimberg. (aaq) (Entered: 06/28/2021) |
| 07/02/2021 | 69 | | |

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT of the Teleconference Hearing Proceedings held on March 8, 2021, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/23/2021. Redacted Transcript Deadline set for 8/2/2021. Release of Transcript Restriction set for 9/30/2021. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 07/02/2021) |
| 07/02/2021 | 70 | | TRANSCRIPT of the Teleconference Hearing Proceedings held on June 21, 2021, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/23/2021. Redacted Transcript Deadline set for 8/2/2021. Release of Transcript Restriction set for 9/30/2021. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Additional attachment(s) added on 8/16/2021: # 2 Verification of Financial Arrangements) (kac). (Entered: 07/02/2021) |
| 07/09/2021 | 71 | | DEPOSITION of Tricia Pridemore taken on 3–11–21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 72 | | DEPOSITION of Charles Eaton, Jr. taken on 3–12–21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 73 | | DEPOSITION of Lauren McDonald, Jr. taken on 6–16–21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 74 | | DEPOSITION of Brionte McCorkle taken on 6–23–21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 75 | | DEPOSITION of Richard Rose taken on 6–23–21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 76 | | DEPOSITION of James Woodall taken on June 14, 2021 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 77 | | DEPOSITION of Wanda Mosley taken on June 14, 2021 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 78 | | NOTICE Of Filing of Deposition Transcript by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (Attachments: # 1 deposition transcript of Dr. Michael J. Barber)(Sells, Bryan) (Entered: 07/09/2021) |
| 07/09/2021 | 79 | | Second MOTION for Partial Summary Judgment by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit 3 – Defendants Stipulated Facts, # 2 Exhibit 4 – Defendants Supplemental Responses to Plaintiffs First Set of Interrogatories, # 3 Exhibit 5 – Defendants Responses to Plaintiffs First Set of Requests for Admission, # 4 Exhibit 6 – Expert Report of Dr. Stephen J. Popick, # 5 Plaintiffs' Second Statement of Undisputed Material Facts)(Sells, Bryan) ––Please refer to |

11

| | | | |
|---|---|---|---|
| | | | http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.–– Modified on 7/13/2021 to edit Motion (jkb). (Entered: 07/09/2021) |
| 07/09/2021 | 80 | | MOTION for Summary Judgment with Brief In Support by Brad Raffensperger. (Attachments: # 1 Brief, # 2 Statement of Material Facts, # 3 Exhibit A to Statement of Material Facts – Barber Report, # 4 Exhibit B to Statement of Material Facts – Fraga Rebuttal Report)(Tyson, Bryan) ––Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.–– (Entered: 07/09/2021) |
| 07/23/2021 | 81 | | DEPOSITION of Stephen J. Popick, Ph.D. taken on 6/18/21 by Brad Raffensperger.(Tyson, Bryan) (Entered: 07/23/2021) |
| 07/23/2021 | 82 | | DEPOSITION of Bernard Fraga, Ph.D. taken on 6/22/21 by Brad Raffensperger. (Attachments: # 1 Exhibit 1–7, # 2 Exhibit 8, Part 1, # 3 Exhibit 8, Part 2, # 4 Exhibit 9–10)(Tyson, Bryan) (Entered: 07/23/2021) |
| 07/23/2021 | 83 | | NOTICE Of Filing of Deposition Transcript by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (Attachments: # 1 Deposition of Jason Shaw)(Sells, Bryan) (Entered: 07/23/2021) |
| 07/23/2021 | 84 | | RESPONSE in Opposition re 80 MOTION for Summary Judgment filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit 7: election returns, # 2 Exhibit 8: expert report of Dr. Barnard L. Fraga, # 3 Exhibit 9: racial appeals, # 4 plaintiffs' response to defendant's statement of undisputed material facts, # 5 plaintiffs' statement of additional facts)(Sells, Bryan) (Entered: 07/23/2021) |
| 07/23/2021 | 85 | | RESPONSE in Opposition re 79 Motion for Partial Summary Judgment filed by Brad Raffensperger. (Attachments: # 1 Statement of Material Facts Response to Plaintiffs' Second Statement of Material Facts, # 2 Statement of Material Facts Statement of Additional Material Facts Which Present a Genuine Issue for Trial)(Tyson, Bryan) (Entered: 07/23/2021) |
| 07/28/2021 | 86 | | STATEMENT OF INTEREST OF THE UNITED STATES UNDER THE VOTING RIGHTS ACT, Amicus Curiae APPEARANCE entered by Janie Allison (Jaye) Sitton on behalf of United States of America. (Sitton, Janie) Modified on 7/30/2021 (jkb). (Entered: 07/28/2021) |
| 07/30/2021 | 87 | | REPLY to Response to Motion re 79 Motion for Partial Summary Judgment filed by Brionte McCorkle, Wanda Mosley, Richard Rose, United States of America, James Major Woodall. (Attachments: # 1 Plaintiffs' Reply in Support of their Second Statement of Undisputed Material Facts, # 2 Plaintiffs' Response to Defendant's Statement of Additional Material Facts)(Sells, Bryan) (Entered: 07/30/2021) |
| 07/30/2021 | 88 | | REPLY to Response to Motion re 80 MOTION for Summary Judgment filed by Brad Raffensperger. (Attachments: # 1 Statement of Material Facts Defendant's Response to Plaintiffs' Statement of Additional Material Facts)(Tyson, Bryan) (Entered: 07/30/2021) |
| 08/02/2021 | | | NOTICE of TELECONFERENCE HEARING: Discovery Dispute Hearing set for 8/3/2021 at 03:00 PM before Judge Steven D. Grimberg. No courtroom. The |

| | | | |
|---|---|---|---|
| | | | connection instructions have been emailed to the parties. (ash) (Entered: 08/02/2021) |
| 08/03/2021 | | | Submission of 79 Motion for Partial Summary Judgment, 80 MOTION for Summary Judgment, to District Judge Steven D. Grimberg. (jkb) (Entered: 08/03/2021) |
| 08/03/2021 | 89 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Teleconference with the parties concerning Plaintiffs' request to take two identified depositions after the close of discovery. After taking the request and arguments of counsel under advisement, the Court DENIES WITHOUT PREJUDICE Plaintiffs' request. Plaintiffs are granted leave to renew their request after the Court rules on dispositive motions. (Court Reporter Alicia Bagley)(jkb) (Entered: 08/04/2021) |
| 08/30/2021 | 90 | | ORDER Setting Oral Argument 80 MOTION for Summary Judgment , 79 Motion for Partial Summary Judgment, 56 First MOTION for Partial Summary Judgment. Argument on the pending motions will be limited to forty–five (45) minutes for each side. Motion Hearing set for 11/8/2021 at 10:00 AM in ATLA Courtroom 1707 before Judge Steven D. Grimberg. Due to the current public health emergency, the parties may appear in person or via remote audio and video means, at their preference. Signed by Judge Steven D. Grimberg on 08/30/2021. (jkb) (Entered: 08/30/2021) |
| 09/28/2021 | 91 | | Consent MOTION for Protective Order by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit Stipulated Protective Order)(Martinez, Nicolas) (Entered: 09/28/2021) |
| 09/30/2021 | 92 | | ORDER granting 91 Motion for Protective Order. Signed by Judge Steven D. Grimberg on 09/30/2021. (jkb) (Entered: 09/30/2021) |
| 11/04/2021 | 93 | | Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom *on November 8, 2021* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order)(Sells, Bryan) (Entered: 11/04/2021) |
| 11/05/2021 | 94 | | ORDER granting 93 Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom on 11/08/2021 at 10:00 a.m.. Nicolas L. Martinez: cell phone with camera and laptop computer. Wesley A. Morrissette: cell phone with camera and laptop computer. Signed by Judge Steven D. Grimberg on 11/05/2021. (jkb) (Entered: 11/05/2021) |
| 11/08/2021 | 95 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Oral Argument held on Plaintiff's First Motion for Partial Summary Judgment 56 , Plaintiff's Second Motion for Partial Summary Judgment 79 , and Defendant's Motion for Summary Judgment 80 . After hearing from both sides, the Court has taken the motions under advisement. A written order will follow at a later date. (Court Reporter Alicia Bagley)(jkb) (Entered: 11/08/2021) |
| 11/29/2021 | 96 | | TRANSCRIPT of the Motions Hearing Proceedings held on November 8, 2021, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. |

| | | | |
|---|---|---|---|
| | | | After that date it may be obtained through PACER. Redaction Request due 12/20/2021. Redacted Transcript Deadline set for 12/30/2021. Release of Transcript Restriction set for 2/28/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 11/29/2021) |
| 01/24/2022 | 97 | | OPINION AND ORDER granting in part and denying in part 56 Motion for Partial Summary Judgment; granting 57 Motion for Judicial Notice of Census Data; granting in part and denying in part 79 Motion for Partial Summary Judgment; denying 80 Motion for Summary Judgment. Within seven days after entry of this Order, the parties are DIRECTED to file a joint scheduling proposal, to include pre–trial deadlines, a proposed time frame for trial (including an estimated length of the trial), and post– trial deadlines. The joint proposal may note areas of disagreement. Following receipt and review of the joint scheduling proposal, the Court will enter a trial order or schedule a conference for further discussion. Signed by Judge Steven D. Grimberg on 01/24/2022. (jkb) (Entered: 01/24/2022) |
| 01/31/2022 | 98 | | NOTICE by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall re 97 Order on Motion for Partial Summary Judgment,,,, Order on Motion for Miscellaneous Relief,,,,,,,, Order on Motion for Summary Judgment,,, *Joint Scheduling Proposal* (Martinez, Nicolas) (Entered: 01/31/2022) |
| 02/01/2022 | 99 | | SCHEDULING ORDER: re: 39 Joint Preliminary Report and Discovery Plan, 98 Joint scheduling proposal, Motions due by 5/31/2022. Proposed Pretrial Order due by 6/2/2022. Signed by Judge Steven D. Grimberg on 02/01/2022. (jkb) (Entered: 02/01/2022) |
| 02/03/2022 | 100 | | ORDER, Bench Trial set for 6/27/2022 at 09:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg., Pretrial Conference set for 6/21/2022 at 02:00 PM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. The pretrial deadlines are as set forth in the Court's 02/01/2022Scheduling Order 99. Signed by Judge Steven D. Grimberg on 02/03/2022. (jkb) (Entered: 02/03/2022) |
| 02/03/2022 | 101 | | MOTION for Preliminary Injunction by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 02/03/2022) |
| 02/09/2022 | 102 | | NOTICE of Hearing on Motion re: 101 MOTION for Preliminary Injunction. Motion Hearing set for February 25, 2022 at 11:00 AM in ATLA Courtroom 1707 before Judge Steven D. Grimberg. Defendant shall have through February 23, 2022 to file a response to Plaintiff's Motion for Preliminary Injunction. (ash) (Entered: 02/09/2022) |
| 02/10/2022 | 103 | | Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order)(Sells, Bryan) (Entered: 02/10/2022) |
| 02/14/2022 | 104 | | ORDER granting 103 Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom on 02/25/2022 at 11:00 am. Signed by Judge Steven D. Grimberg on 02/14/2022. (jkb) (Entered: 02/14/2022) |
| 02/16/2022 | | | NOTICE Resetting Time of Motion Hearing. The time of the motion hearing scheduled for February 25, 2022 is reset to 10:00 a.m. (ash) (Entered: 02/16/2022) |

| 02/23/2022 | 105 | | RESPONSE in Opposition re 101 MOTION for Preliminary Injunction filed by Brad Raffensperger. (Attachments: # 1 Exhibit A – Order in Merrill v. Milligan, # 2 Exhibit B – Hearing Transcript Vol. 2 – Afternoon of Feb. 8, 2022)(Tyson, Bryan) (Entered: 02/23/2022) |
|---|---|---|---|
| 02/24/2022 | 106 | | REPLY to Response to Motion re 101 MOTION for Preliminary Injunction filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Martinez, Nicolas) (Entered: 02/24/2022) |
| 02/24/2022 | | | Submission of 101 MOTION for Preliminary Injunction , to District Judge Steven D. Grimberg. (jkb) (Entered: 02/24/2022) |
| 02/25/2022 | 107 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Motion Hearing held on 2/25/2022 on Plaintiffs Motion for Preliminary Injunction 101 . Witness Michael Barnes appeared remotely and testified. Witnesses Brionte McCorkle and James Woodall, sworn and testified. Plaintiffs exhibits 1–7 tendered and admitted. Plaintiffs motion is taken under advisement. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(jkb) (Entered: 02/28/2022) |
| 03/02/2022 | 108 | | TRANSCRIPT of the Preliminary Injunction Hearing Proceedings held on February 25, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/23/2022. Redacted Transcript Deadline set for 4/4/2022. Release of Transcript Restriction set for 5/31/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 03/02/2022) |
| 03/02/2022 | 109 | | RESPONSE re 107 Motion Hearing, *regarding certification of a question to the Georgia Supreme Court* filed by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 03/02/2022) |
| 03/02/2022 | 110 | | EXHIBITS (Plaintiffs documentary exhibits) admitted and retained at the 107 Motion Hearing, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Exhibit Pla 1, # 2 Exhibit Pla 2, # 3 Exhibit Pla 3, # 4 Exhibit Pla 4, # 5 Exhibit Pla 5, # 6 Exhibit Pla 6, # 7 Exhibit Pla 7)(vs) (Entered: 03/03/2022) |
| 03/03/2022 | 111 | | NOTICE TO COUNSEL OF RECORD for Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS pursuant to Local Rule 79.1D. Re: 110 Plaintiffs Exhibits. (vs) (Entered: 03/03/2022) |
| 03/07/2022 | 112 | | OPINION AND ORDER denying 101 Motion for Preliminary Injunction. Signed by Judge Steven D. Grimberg on 3/7/2022. (bgt) (Entered: 03/07/2022) |
| 03/11/2022 | 113 | | ORAL ORDER: Plaintiffs' request to reopen discovery (see attached) is DENIED. Plaintiffs may, within reasonable limits and subject to objections, examine witnesses and subpoena records relating to SB 472 during the June trial. Ordered by Judge Steven D. Grimberg on March 11, 2022. (ash) (Entered: 03/11/2022) |

| 04/07/2022 | 114 | | CERTIFICATE OF SERVICE *for Commissioners' Objections to Subpoenas* by Brad Raffensperger.(Tyson, Bryan) (Entered: 04/07/2022) |
| 05/04/2022 | | | Plaintiff's documentary exhibits 110 from the Motion Hearing held on February 25, 2022, were destroyed as directed in 111 Exhibit Return Notification (mec) (Entered: 05/04/2022) |
| 05/18/2022 | | | NOTICE re 100 . The time of the Pretrial Conference set for 6/21/2022 in ATLA Courtroom 1706 before Judge Steven D. Grimberg is reset to 3:00 p.m. (ash) (Entered: 05/18/2022) |
| 05/31/2022 | 115 | | CERTIFICATE OF SERVICE *for Defendant's Notice to take the Second Expert Deposition of Stephen Popick, Ph.D.* by Brad Raffensperger.(Tyson, Bryan) (Entered: 05/31/2022) |
| 05/31/2022 | 116 | | MOTION to Exclude Certain Testimony of the Defendant's Expert Witness, Michael J. Barber, Ph.D. by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 05/31/2022) |
| 06/01/2022 | 117 | | CERTIFICATE OF SERVICE *of the Supplemental Report of Stephen J. Popick, Ph.D.* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall.(Sells, Bryan) (Entered: 06/01/2022) |
| 06/01/2022 | 118 | | Second MOTION for Judicial Notice by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit 1: 2020 Census data, # 2 Exhibit 2: Active Voters By Race)(Sells, Bryan) (Entered: 06/01/2022) |
| 06/02/2022 | 119 | | NOTICE of Appearance by Diane Festin LaRoss on behalf of Brad Raffensperger (LaRoss, Diane) (Entered: 06/02/2022) |
| 06/03/2022 | 120 | | CERTIFICATE OF SERVICE *for Dr. Michael Barber's Expert Report in Response to Supplemental Report of Dr. Stephen Popick* by Brad Raffensperger.(Tyson, Bryan) (Entered: 06/03/2022) |
| 06/06/2022 | 121 | | Proposed Pretrial Order by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Exhibit A−1: Plaintiffs' Outline of the Case, # 2 Exhibit A−2: Defendant's Outline of the Case, # 3 Exhibit B: Joint Stipulations, # 4 Exhibit C: Joint Legal Issues to be Tried, # 5 Exhibit D−1: Plaintiffs' Witness List, # 6 Exhibit D−2: Defendant's Witness List, # 7 Exhibit E−1: Plaintiffs' Trial Exhibit List, # 8 Exhibit E−2: Defendant's Trial Exhibit List, # 9 Exhibit F−1: Plaintiffs' Deposition Designations, # 10 Exhibit F−2: Defendant's Deposition Designations)(Sells, Bryan) (Entered: 06/06/2022) |
| 06/13/2022 | 122 | | RESPONSE in Opposition re 116 MOTION to Exclude Certain Testimony of the Defendant's Expert Witness, Michael J. Barber, Ph.D. filed by Brad Raffensperger. (Tyson, Bryan) (Entered: 06/13/2022) |
| 06/15/2022 | 123 | | RESPONSE re 118 Second MOTION for Judicial Notice filed by Brad Raffensperger. (Tyson, Bryan) (Entered: 06/15/2022) |
| 06/20/2022 | 124 | | Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom *at the Pretrial Conference* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order)(Sells, Bryan) (Entered: 06/20/2022) |

| 06/21/2022 | 125 | | ORDER granting 124 Motion to Bring Electronic Equipment in the Courtroom on 6/21/2022 at 3:00 p.m. Signed by Judge Steven D. Grimberg on 6/21/2022. (dmb) (Entered: 06/21/2022) |
| 06/21/2022 | 127 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: denying 116 Motion to Exclude; granting 118 Motion for Judicial Notice; Pretrial Conference held on 6/21/2022. (Court Reporter Alicia Bagley)(dmb) (Entered: 06/22/2022) |
| 06/22/2022 | 126 | | Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom *for Trial* by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order)(Sells, Bryan) (Entered: 06/22/2022) |
| 06/23/2022 | 128 | | ORDER granting 126 Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom on 06/24/2022–07/01/2022. (See order for specifics). Signed by Judge Steven D. Grimberg on 06/23/2022. (jkb) (Entered: 06/23/2022) |
| 06/24/2022 | 129 | | Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Attachments: # 1 Text of Proposed Order)(Martinez, Nicolas) (Entered: 06/24/2022) |
| 06/26/2022 | 130 | | NOTICE Of Filing of Deposition Transcripts by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (Attachments: # 1 Deposition of Terrell Fitz Johnson, Sr., # 2 Deposition of Timothy G. Echols, # 3 Deposition of Lindy Miller)(Sells, Bryan) (Entered: 06/26/2022) |
| 06/27/2022 | 131 | | NOTICE Of Filing Amended Attachment E–1 to the Proposed Joint Pretrial Order by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall (Attachments: # 1 Amended Attachment E–1 to the Proposed Joint Pretrial Order)(Sells, Bryan) (Entered: 06/27/2022) |
| 06/27/2022 | 132 | | ORDER granting 129 Motion to Bring Audio/Visual/Electronic Equipment in the Courtroom on 06/27/2022 through 07/01/2022. (See Order for specifics). Signed by Judge Steven D. Grimberg on 06/27/2022. (jkb) (Entered: 06/27/2022) |
| 06/27/2022 | 133 | | ORDER denying 116 Motion to Exclude Certain Testimony of the Defendant's ExpertWitness Michael J. Barber, Ph.D. ; granting 118 Motion for Judicial Notice. IT IS HEREBY ORDERED that the parties Proposed Pretrial Order 121 , as modified by the Courts verbal rulings during the June 21, 2022 pretrial conference and this Order, constitutes the pretrial order for this case. Signed by Judge Steven D. Grimberg on 06/27/2022. (jkb) (Entered: 06/27/2022) |
| 06/27/2022 | 134 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Bench Trial begun on 6/27/2022. The rule of sequestration was invoked. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(jkb) (Entered: 06/28/2022) |
| 06/28/2022 | 135 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Bench Trial continued on 6/28/2022. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(jkb) (Entered: 06/29/2022) |
| 06/29/2022 | 136 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Bench Trial continued on 6/29/2022. Plaintiffs' exhibits PX 5, 7, 11–12 (redacted), 14, |

| | | | |
|---|---|---|---|
| | | | 15 (redacted), 26, 28, 30, 36, 50, 66, 69–71, 86, 90–92, and 97 tendered and admitted. Defendant's exhibits DX 18, 38–39 tendered and admitted. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(jkb) (Entered: 06/30/2022) |
| 06/30/2022 | 137 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Bench Trial continued on 6/30/2022.Court will reconvene 7/1/2022 at 9:30am. Defendant's Exhibits DX 28 and 49 and Plaintiff's exhibits 111–113 tendered and admitted. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(dmb) (Entered: 07/01/2022) |
| 07/01/2022 | 138 | | Minute Entry for proceedings held before Judge Steven D. Grimberg: Bench Trial concluded on 7/1/2022. The parties are ordered to file their Finding of Facts and Conclusions of Law by 7/11/2022. Plaintiffs' exhibits 98–110 tendered and admitted. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley)(dmb) (Entered: 07/01/2022) |
| 07/05/2022 | 139 | | TRANSCRIPT of the Bench Trial Hearing Proceedings (Volume 1–A) held on June 27, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/26/2022. Redacted Transcript Deadline set for 8/5/2022. Release of Transcript Restriction set for 10/3/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) Modified on 7/5/2022 (kac). (Entered: 07/05/2022) |
| 07/05/2022 | 140 | | TRANSCRIPT of the Bench Trial Hearing Proceedings (Volume 2–A) held on June 28, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/26/2022. Redacted Transcript Deadline set for 8/5/2022. Release of Transcript Restriction set for 10/3/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) Modified on 7/5/2022 (kac). (Entered: 07/05/2022) |
| 07/05/2022 | 141 | | TRANSCRIPT of the Bench Trial Hearing Proceedings (Volume 3–A) held on June 29, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/26/2022. Redacted Transcript Deadline set for 8/5/2022. Release of Transcript Restriction set for 10/3/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 07/05/2022) |
| 07/05/2022 | 142 | | |

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT of the Bench Trial Hearing Proceedings (Volume 4) held on June 30, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/26/2022. Redacted Transcript Deadline set for 8/5/2022. Release of Transcript Restriction set for 10/3/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 07/05/2022) |
| 07/05/2022 | 143 | | TRANSCRIPT of the Bench Hearing Proceedings (Volume 5) held on July 1, 2022, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory–court–reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/26/2022. Redacted Transcript Deadline set for 8/5/2022. Release of Transcript Restriction set for 10/3/2022. (Attachments: # 1 Notice of Filing of Official Transcript) (kac) (Entered: 07/05/2022) |
| 07/05/2022 | | | Notification of Docket Correction re: 139 Transcript, 140 Transcript. Modified docket entry text. (kac) (Entered: 07/05/2022) |
| 07/11/2022 | 144 | | Proposed Findings of Fact by Brad Raffensperger. (Tyson, Bryan) (Entered: 07/11/2022) |
| 07/11/2022 | 145 | | Proposed Findings of Fact by Brionte McCorkle, Wanda Mosley, Richard Rose, James Major Woodall. (Sells, Bryan) (Entered: 07/12/2022) |
| 07/11/2022 | 146 | | EXHIBITS (Plaintiff's Exhibits: PX 1–12, 14–15, 21, 23–27, 35–37, 39–45, 49–58, 60–75, 77–86, 88, 90–95, 97–103, 111–113) admitted and retained at the 134 Bench Trial – Begun, 135 Bench Trial – Continued, 136 Bench Trial – Continued, 137 Bench Trial – Continued, 138 Bench Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 21, # 16 Exhibit 23, # 17 Exhibit 24, # 18 Exhibit 25, # 19 Exhibit 26, # 20 Exhibit 27, # 21 Exhibit 35, # 22 Exhibit 36, # 23 Exhibit 37, # 24 Exhibit 39, # 25 Exhibit 40, # 26 Exhibit 41, # 27 Exhibit 42, # 28 Exhibit 43, # 29 Exhibit 44, # 30 Exhibit 45, # 31 Exhibit 49, # 32 Exhibit 50, # 33 Exhibit 51, # 34 Exhibit 52, # 35 Exhibit 53, # 36 Exhibit 54, # 37 Exhibit 55, # 38 Exhibit 56, # 39 Exhibit 57, # 40 Exhibit 58, # 41 Exhibit 61, # 42 Exhibit 62, # 43 Exhibit 63, # 44 Exhibit 64, # 45 Exhibit 65, # 46 Exhibit 66, # 47 Exhibit 67, # 48 Exhibit 68, # 49 Exhibit 69, # 50 Exhibit 70, # 51 Exhibit 71, # 52 Exhibit 72, # 53 Exhibit 73, # 54 Exhibit 74, # 55 Exhibit 75, # 56 Exhibit 77, # 57 Exhibit 78, # 58 Exhibit 79, # 59 Exhibit 80, # 60 Exhibit 81, # 61 Exhibit 82, # 62 Exhibit 83, # 63 Exhibit 84, # 64 Exhibit 85, # 65 Exhibit 86, # 66 Exhibit 88, # 67 Exhibit 90, # 68 Exhibit 91, # 69 Exhibit 92, # 70 Exhibit 93, # 71 Exhibit 94, # 72 Exhibit 95, # 73 Exhibit 97, # 74 Exhibit 98, |

19

| | | | |
|---|---|---|---|
| | | | # <u>75</u> Exhibit 99, # <u>76</u> Exhibit 100, # <u>77</u> Exhibit 101, # <u>78</u> Exhibit 102, # <u>79</u> Exhibit 103, # <u>80</u> Exhibit 111, # <u>81</u> Exhibit 112, # <u>82</u> Exhibit 113)(ane) (Additional attachment(s) added on 7/18/2022: # <u>83</u> Exhibit 60) (ane). (Additional attachment(s) added on 7/20/2022: # <u>84</u> Exhibit 15) (ane). (Entered: 07/18/2022) |
| 07/11/2022 | <u>147</u> | | EXHIBITS (Defendant's Exhibits: DX 18, 28, 37, 38, 39, 40) admitted and retained at the <u>134</u> Bench Trial – Begun, <u>135</u> Bench Trial – Continued, <u>136</u> Bench Trial – Continued, <u>137</u> Bench Trial – Continued, <u>138</u> Bench Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # <u>1</u> Exhibit 18, # <u>2</u> Exhibit 28, # <u>3</u> Exhibit 37, # <u>4</u> Exhibit 38, # <u>5</u> Exhibit 39, # <u>6</u> Exhibit 49)(ane) (Entered: 07/18/2022) |
| 07/11/2022 | <u>148</u> | | EXHIBITS AUDIO/VIDEO (Plaintiff's Exhibits (2 Flash Drives): PX 28–30, 32–33, 96, 104–110) admitted and retained at the <u>134</u> Bench Trial – Begun, <u>135</u> Bench Trial – Continued, <u>136</u> Bench Trial – Continued, <u>137</u> Bench Trial – Continued, <u>138</u> Bench Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit)(ane) (Entered: 07/18/2022) |
| 07/18/2022 | <u>149</u> | | NOTICE TO COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS pursuant to Local Rule 79.1D. Re: <u>146</u> Exhibits.(ane) (Entered: 07/18/2022) |
| 07/18/2022 | <u>150</u> | | NOTICE TO COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS pursuant to Local Rule 79.1D. Re: <u>147</u> Exhibits. (ane) (Entered: 07/18/2022) |
| 08/05/2022 | <u>151</u> | | OPINION AND ORDER. The Secretary is ENJOINED from preparing ballots for the November 8, 2022 election that include contests for PSC Districts 2 and 3; from administering any future elections for vacancies on the PSC using the statewide, at–large method currently prescribed by O.C.G.A. § 46–2–1, et seq.; and from certifying the election of any PSC commissioner elected using this method. The Clerk is DIRECTED to enter JUDGMENT in favor of Plaintiffs. (see Order for further details). Signed by Judge Steven D. Grimberg on August 5, 2022. (ash) (Entered: 08/05/2022) |
| 08/08/2022 | <u>152</u> | | NOTICE OF APPEAL as to <u>36</u> Order on Motion to Dismiss,, <u>97</u> Order on Motion for Partial Summary Judgment,,,, Order on Motion for Miscellaneous Relief,,,,,,, Order on Motion for Summary Judgment,,, <u>151</u> Order,, by Brad Raffensperger. Filing fee $ 505, receipt number AGANDC–11980417. Transcript Order Form due on 8/22/2022 (Tyson, Bryan) (Entered: 08/08/2022) |
| 08/08/2022 | <u>153</u> | | USCA Appeal Transmission Letter to 11th Circuit re: <u>152</u> Notice of Appeal, filed by Brad Raffensperger. (pjm) (Entered: 08/08/2022) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD ROSE, *et al.*,

    Plaintiffs,

             v.

BRAD RAFFENSPERGER, in his capacity as
Secretary of State of the State of Georgia,

    Defendant.

Civil Action No.
1:20-cv-02921-SDG

## <u>OPINION AND ORDER</u>

The Georgia Public Service Commission is responsible for supervising and regulating common carriers, railroads, and public utilities. Plaintiffs are African-American voters registered to vote in the State of Georgia.[1] They bring this official-capacity suit against the Georgia Secretary of State, challenging the state-wide, at-large method of electing members of the Commission. Plaintiffs assert that system inhibits black voters' ability to elect their preferred candidates and dilutes black voting strength in violation of Section 2 of the Voting Rights Act. The Secretary moved to dismiss [ECF 22]. After full briefing, and with the benefit of oral argument, the Court concludes that Plaintiffs' detailed allegations are sufficient at

---

[1] The Complaint appears to use the terms "black" and "African American" interchangeably. *See generally* ECF 1. As a result, this Order employs both terms in the same manner.

this stage of the litigation to demonstrate standing and state a claim. The Secretary's motion is therefore **DENIED**.

## I.    Background

At the motion to dismiss stage, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of Plaintiffs.[2] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999). Accordingly, the following factual description is drawn from the Complaint's well-pleaded allegations.

Plaintiffs are four residents of Fulton County who are registered Georgia voters.[3] They are all African American.[4] On July 14, 2020, they filed suit under Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301.[5] This section states, in part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." The only Defendant is Brad Raffensperger, who is sued solely in his official

---

[2]    The Secretary argues that this precept does not apply to his contention that Plaintiffs lack standing. This issue is discussed *infra* at Section III.B.1.

[3]    ECF 1, ¶¶ 6–9.

[4]    *Id.*

[5]    *Id.*

capacity as the Georgia Secretary of State.[6] The Secretary is "the chief election official" for Georgia and "is responsible for administering elections for members" of the Commission.[7]

The existence of the Commission is enshrined in the Georgia Constitution: "There shall be a Public Service Commission for the regulation of utilities which shall consist of five members who shall be elected by the people." Ga. Const. art. IV, § 1, ¶ I(a).[8] Relevant to this litigation, the Georgia Constitution also dictates that "[t]he filling of vacancies and manner and time of election of members of the [C]ommission shall be as provided by law." *Id.* ¶ I(c).[9] The "manner and time" of such elections is dictated by statute. O.C.G.A. § 46-2-1, *et seq.*[10] Commissioners have been selected through state-wide elections since 1906.[11] That same year, the successful gubernatorial candidate ran on a platform of "reforming the railroad commission and disenfranchising" black voters.[12]

---

[6]  *Id.* ¶ 10

[7]  *Id.* (citations omitted).

[8]  *Id.* ¶ 11.

[9]  *Id.* ¶ 13.

[10]  *Id.*

[11]  *Id.* ¶ 2.

[12]  *Id.* ¶ 25.

Commissioners are elected "at large" by all Georgia voters in partisan elections; they serve six-year staggered terms.[13] Among their other duties, the commissioners regulate the rates that electric, natural gas, and telephone companies may charge in Georgia.[14] Even though the commissioners are elected at-large, they must be residents of one of five Commission districts prescribed by statute:[15]

> [M]embers elected to the commission shall be required to be residents of one of five Public Service Commission Districts as hereafter provided, but each member of the commission shall be elected state wide by the qualified voters of this state who are entitled to vote for members of the General Assembly.

O.C.G.A. § 46-2-1(a). A commissioner must continue to live in the district from which that person was elected throughout the six-year term. *Id.* § 46-2-1(b).

Plaintiffs contend that there is an "informal slating process" for membership on the Commission "that operates by gubernatorial appointment."[16] Save for the

---

[13]  *Id.* ¶ 11 (citing Ga. const. art. IV, § 1, ¶ I; O.C.G.A. § 46-2-1).

Although not spelled out in the Complaint, "at large" means "[e]lected officials chosen by the voters of the State as a whole rather than from separate congressional or legislative districts." *At large*, BLACK'S LAW DICTIONARY (6th ed.))

[14]  ECF 1, ¶ 13.

[15]  *Id.* ¶ 12.

[16]  *Id.* ¶ 29.

three-year period between 1999 and 2002, African Americans have allegedly been denied access to that slating process.[17] To date, the only African American ever to have served as a commissioner—David L. Burgess—was appointed in 1999 by then-governor Roy Barnes.[18] With the benefit of incumbency resulting from that appointment, Burgess was elected to the position in 2000.[19] He served only one full term before being defeated in the 2006 election.[20] In part as a result of this history, Plaintiffs plead that the Commission "has not been responsive to the particularized needs of African American residents of Georgia."[21]

Plaintiffs claim that the staggered terms, a majority-vote requirement, and "unusually large voting districts" (that is to say, no voting districts save for the entire State of Georgia) exacerbate the opportunities for discrimination against African Americans in elections for commissioners.[22] The Complaint is not entirely

---

[17] *Id.*

[18] *Id.* ¶¶ 2, 31–33.

[19] *Id.* ¶ 33.

[20] *Id.*

[21] *Id.* ¶ 34.

[22] *Id.* ¶ 28.

During oral argument, counsel for Plaintiffs made clear that they are not challenging the residency requirements for candidates to the Commission. ECF 35, at 20–21 (indicating Plaintiffs are not alleging the residency districts dilute their votes).

clear about whether this alleged discrimination is against voters like Plaintiffs, or black candidates who run for a position on the Commission, or both.[23] Given that this case is at the motion to dismiss stage, and interpreting the Complaint in the light most favorable to Plaintiffs, the Court treats the allegation as referring to discrimination against black voters (including Plaintiffs).

Plaintiffs also make the following relevant allegations:

- As of the 2010 Census, Georgia's voting-age population was 62.3% white, 29.7% black, and 8% members of other racial groups.[24] The percentage of black voting-age residents had increased to 32.3% as of a 2018 survey.[25]

- If elections for commissioner were based on five single-member districts rather than at-large, African Americans would be "sufficiently numerous and geographically compact" to make up "a majority of the voting-age population in at least one single-member district."[26]

- African American voters are "politically cohesive" when voting for members of the Commission: They supported "their preferred candidates with greater than 80 percent of their votes" in every election between 2012 and 2018.[27]

---

[23]   ECF 1, ¶ 28.

[24]   *Id.* ¶ 15.

[25]   *Id.* ¶ 16.

[26]   *Id.* ¶ 18.

[27]   *Id.* ¶¶ 20–21.

- Conversely, white voters voted sufficiently as a block to generally enable them to defeat the candidate preferred by black voters in every election for members of the Commission between 2012 and 2018.[28]

- In addition to Georgia's "long and extensive history of voting discrimination against African Americans," these numerical disparities in voting preferences reflect that "[v]oting in elections for members of the Public Service Commission is polarized along racial lines."[29]

Although Plaintiffs do not expressly plead that they have been unable to elect their preferred candidates, they do contend that their votes have been and will continue to be improperly diluted because of the at-large method of electing Commission members.[30] They therefore seek a judgment declaring that this method of electing members of the Commission violates Section 2 of the Voting Rights Act of 1965, as amended (the VRA), and an order enjoining the Secretary from employing this method in future elections and directing him to administer such elections in a manner that complies with Section 2.[31]

---

[28] *Id.* ¶¶ 22–23.

[29] *Id.* ¶ 24 (quoting *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) ("Georgia's history of [racial] discrimination has been rehashed so many times that the Court can all but take judicial notice thereof.") (alteration in original) (internal quotation marks omitted)), ¶ 26.

[30] *Id.* ¶ 36 (Claim One).

[31] *Id.* at 10–11 (*ad damnum* clause).

On August 14, 2020, the Secretary moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1), arguing that Plaintiffs lack standing, and under Rule 12(b)(6), for failure to state a claim.[32] Plaintiffs opposed the motion on August 27, 2020.[33] The Secretary filed his response on September 10, 2020.[34] The Court heard argument on December 8, 2020. The Secretary's motion is thus ripe for consideration.

## II.     Standard of Review

### A.      Rule 12(b)(1)

Rule 12(b)(1) permits a party to raise the defense of lack of subject matter jurisdiction by motion. This includes a challenge to standing. "'Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).'" *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). Article III of the Constitution limits federal courts to consideration of cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing "is an essential and

---

[32]   ECF 22.

[33]   ECF 23.

[34]   ECF 26.

unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has held that standing contains three elements: (1) an actual or imminent injury-in-fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by the court. *Id.* at 560–61. The Secretary asserts that Plaintiffs have failed to establish all three aspects.[35]

### B.    Rule 12(b)(6)

The Secretary also argues that Plaintiffs have failed to state a claim.[36] Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must [ ] contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna*

---

[35]    ECF 22-1, at 4–15.

[36]    *Id.* at 16–19.

*Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). A complaint fails to state a claim when it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted) (citation omitted). *See also Iqbal*, 556 U.S. at 680–85; *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1187–88 (11th Cir. 2002) (stating that "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts will not prevent dismissal") (citation omitted).

A complaint must present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 556). While well-pleaded facts are accepted as true at this stage, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011), this principle does not apply to legal conclusions, *Iqbal*, 556 U.S. at 678.

## III. Discussion

Because of the inquiry applicable to claims made under the VRA, the Secretary's standing and failure-to-state-a-claim arguments are not entirely analytically distinct. For instance, redressability is a necessary element of standing, but showing that the claimed injury has a remedy is also an element of stating a claim for violation of Section 2. Accordingly, the Court first addresses the

framework for establishing a VRA claim and then proceeds to assess whether Plaintiffs have standing and have satisfied Rule 12(b)(6) under that framework.

### A. The Voting Rights Act

Subsection (a) of Section 2 of the VRA prohibits (among other things) standards, practices, and procedures that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* at § 10301(b). The statute does not, however, create an entitlement to proportional representation for members of a protected class. *Id.*

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first interpreted Section 2 after Congress amended it in 1982. The amendment emphasized that the focus must be on the *results* of the challenged standards, practices, and procedures—not on whether those processes had been adopted

because of discriminatory intent. *Id.* at 35–36.[37] Under *Gingles*, plaintiffs must show

that they have satisfied three prerequisites to make out a vote dilution claim:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Id.* at 50–51 (emphasis in original) (footnotes omitted) (citations omitted). Despite

*Gingles*'s focus on multi-member districts, in *Voinovich v. Quilter*, 507 U.S. 146, 153

(1993), the Supreme Court made clear that single-member districts can also dilute

minority voting strength and thereby violate Section 2. And, while at-large

---

[37] "Under the results test, the inquiry is more direct: past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984) (footnote omitted) (citation omitted).

elections do not *per se* violate Section 2, they can do so if (under the totality of the circumstances) they "result in unequal access to the electoral process." *Gingles*, 478 U.S. at 46.

In addition to applying the *Gingles* factors, courts generally must also consider several factors—identified in the Senate Report accompanying the 1982 VRA amendment—that can be relevant to Section 2 claims. *Gingles*, 478 U.S. at 44–45. As later explained by the Eleventh Circuit, the Senate Report factors that will "typically establish" a violation of Section 2 are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,[38] or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

---

[38] "Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles*, 478 U.S. at 38 n.5 (internal quotation marks omitted) (citations omitted).

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990). Further, two additional circumstances may be probative of a Section 2 violation:

[W]hether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

[W]hether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 1016. The *Gingles* court concluded that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims." 478 U.S. at 45 (footnote omitted). The Eleventh Circuit has emphasized that Section 2, as amended, is "a constitutional exercise of congressional enforcement power

under the Fourteenth and Fifteenth Amendments." *Marengo Cnty. Comm'n*, 731 F.2d at 1550.

### B.   Standing

Because a challenge to standing implicates the Court's subject matter jurisdiction, such a challenge can be brought under Rule 12(b)(1). *Stalley*, 524 F.3d at 1232. Here, the Secretary asserts that, under this rule, the Court "is not limited to the four corners of the Complaint" in determining whether standing exists.[39] He also argues that the Court need not treat Plaintiffs' well-pleaded allegations as true under 12(b)(1).[40] While this may be true when a defendant raises a *factual* challenge to pleading, the same is not the case when only a *facial* challenge has been made.

"A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Stalley*, 524 F.3d at 1232. The Eleventh Circuit has described the difference between the two types of challenges:

> A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, ***and the allegations in his complaint are taken as true for the purposes of the motion***. By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction

---

[39]   ECF 22-1, at 5.

[40]   *Id*. at 5–6.

> using material extrinsic from the pleadings, such as
> affidavits or testimony.

*Id.* at 1232–33 (internal quotation marks omitted) (citations omitted) (emphasis

added). Thus, a factual attack is a jurisdictional challenge based on extrinsic

evidence. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003)

("Appellees' motion to dismiss was a factual attack because it relied on extrinsic

evidence and did not assert lack of subject matter jurisdiction solely on the basis

of the pleadings."). A facial attack is subject to the familiar maxim that a

complaint's well-pleaded allegations be accepted as true. *Am. Dental Ass'n,* 605

F.3d at 1289 (citing *Twombly*, 550 U.S. at 570).

> ### 1. The Secretary makes a facial challenge to Plaintiffs' alleged lack of standing.

Here, the Secretary has not supplied any declarations or pointed to any

extrinsic evidence suggesting that Plaintiffs lack standing. He instead leans only

on the allegations in the Complaint to make his arguments.[41] Despite his insistence

---

[41]   *Id.* at 5–6; ECF 26, at 2–3.

During oral argument, counsel for the Secretary attempted to clarify that this
point was limited to his arguments concerning the history of the Commission.
ECF 35, at 5. If so, the Secretary's briefing did not make that clear—something
counsel acknowledged during argument. *Id.* at 11–12. The Court does not
construe the Secretary's factual descriptions of Georgia's and other states'
public service commissions as resorting to extrinsic evidence. Rather, they are

that the Court not treat Plaintiffs' well-pleaded allegations as true for purposes of assessing standing, there is no basis for the Court to adopt this position when the Secretary has only made a facial challenge to the Complaint. *Id.*

Moreover, even if the Secretary had pointed to extrinsic evidence, the Court still would not be required to adopt the analysis he proposes. When a movant raises a factual attack on subject matter jurisdiction, the district court can dismiss based on any of the following grounds: "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981)). Accordingly, the Court looks only to the Complaint and assumes the truth of its well-pleaded allegations for purposes of the Secretary's challenge to Plaintiffs' standing. *FindWhat Inv'r Grp.*, 658 F.3d at 1296; *Bryant*, 187 F.3d at 1274.

### 2.     Injury-in-Fact

The first element of standing requires plaintiffs to show that they have suffered (or are about to suffer) an injury-in-fact. *Lujan*, 504 U.S. at 560. Plaintiffs

---

all based on state constitutions, statutes, and case law—legal authorities on which courts regularly rely.

allege that they have been, and will continue to be, injured because of the dilution of their votes through Georgia's use of at-large elections for members of the Commission.[42] Plaintiffs assert that this method impairs their ability (and that of other African Americans) to elect their preferred candidates as commissioners.[43] The Secretary argues that this is insufficient to establish an injury-in-fact because commissioners are elected on a state-wide basis rather than from specific districts.[44] He describes the Complaint as a "challenge [to] the decision of the state legislature about how to structure its constitutional commissions. Plaintiffs also do not explain how a *statewide* election for a *statewide* office could result in any dilutive effect on their vote whatsoever."[45]

Plaintiffs respond that they have adequately pleaded injury because they have "suffered the personal harm of having their voting strength diluted on account of their race."[46] They contend that Georgia's at-large election of commissioners is a "standard, practice, or procedure" that denies or abridges their

---

[42]  *See generally* ECF 1.

[43]  *See, e.g.*, *id.* ¶¶ 20–23.

[44]  ECF 22-1, at 8–12.

[45]  *Id.* at 8–9.

[46]  ECF 23, at 7.

right to vote because of their race—in violation of Section 2.[47] The Secretary replies that district residency requirements apply only to candidates for election to the Commission, not voters.[48] Since, in his view, voters themselves have not been "cracked" or "packed" into districts that result in the dilution of their votes, Plaintiffs have not suffered any injury.[49]

### i.    Aggrieved persons

Under the VRA, an "aggrieved person" may initiate a statutory action to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. 52 U.S.C. § 10302. To demonstrate an injury-in-fact for purposes of a vote dilution claim, Plaintiffs must show that they (1) reside and are registered voters in districts where alleged dilution occurred, and (2) are members of a protected class whose voting strength was diluted. *Broward Citizens for Fair Dists. v. Broward Cnty.*, No. 12-60317-CIV, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012) (collecting cases).

---

[47] *Id.*

[48] ECF 26, at 4.

[49] *Id.* at 4–5.

"Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins." *Gill v. Whitford*, 138 S. Ct. 1916, 1924 (2018) (internal quotation marks omitted) (citations omitted).

Plaintiffs here easily meet these criteria. They are all African Americans who reside and are registered to vote in Fulton County, Georgia.[50] They assert that black voting strength throughout the State of Georgia is diluted because of the at-large system used to elect members of the Commission.[51] At the motion to dismiss stage, this is sufficient to establish constitutional standing.

### ii. State-wide, at-large elections

During oral argument, counsel for the Secretary urged that sovereigns (*i.e.*, states) are different from political subdivisions, such as districts, when it comes to the VRA.[52] Counsel also asserted that the Supreme Court has not held that state-wide, at-large, non-districted elections are covered by Section 2. But the cases the Secretary points to cannot support his conclusion that such election systems are automatically exempt from Section 2's prohibition against vote dilution.[53] Nor is there anything in the language of Section 2 itself that prohibits

---

[50] ECF 1, ¶¶ 6–9.

[51] *See generally* ECF 1.

[52] *See, e.g.*, ECF 35, at 4, 13–17.

[53] ECF 22-1, at 7–12 (citing, *inter alia*, *Gill*, 138 S. Ct. 1916 (alleged partisan gerrymander in legislative districting); *Voinovich*, 507 U.S. 146 (challenge to redistricting plan that allegedly packed black voters into legislative districts); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) (challenge to order in which candidates appear on ballot in a state's general elections); *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (vote dilution claim concerning election of county and circuit judges); and *Wright v. Sumter Cnty. Bd. of Elections*

the type of claim Plaintiffs are bringing. That is, nothing in the VRA suggests that a party challenging the at-large election of candidates to a board or commission lacks standing when the election is conducted on a state-wide basis rather than at the level of a district or county, or other political subdivision. In fact, Section 2's prohibitions expressly apply to standards, practices, and procedures "imposed or applied" by any *State*. 52 U.S.C. § 10301(a). As counsel for Plaintiffs emphasized during oral argument, if Congress had intended to exempt an entire category of voting procedures from scrutiny under the VRA, it could have done so.[54] Counsel for the Secretary acknowledged that the express question of whether state-wide, at-large elections can cause impermissible vote dilution appears to be one of first impression.[55] This is not to suggest that Plaintiffs will necessarily succeed on their

---

*& Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018) (concluding after bench trial that at-large districts for county board of education diluted black voting strength in violation of Section 2).

In *Nipper*, the Eleventh Circuit concluded that the plaintiffs' claims were not redressable since a remedy would have impaired Florida's interest in maintaining its judicial election scheme. Accordingly, this case is discussed further below in connection with the Secretary's failure to state a claim arguments. *See infra* Section III.C.2.

[54] ECF 35, at 18.

[55] *Id.* at 11.

claim. Rather, this simply reflects the Court's conclusion that there is nothing in the statute or relevant case law that dooms Plaintiffs' case at its inception.

In *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994), a significant Eleventh Circuit VRA case, the plaintiffs challenged the system used to elect county and circuit court judges in a specific Florida judicial circuit. They argued that the use of an at-large election system diluted their voting strength in violation of Section 2 and the Fourteenth and Fifteenth Amendments. After a five-day bench trial, the district court dismissed the plaintiffs' VRA and constitutional claims. Plaintiffs appealed only with regard to the Section 2 claim. In a fractured, *en banc* opinion,[56] the Court of Appeals affirmed. The dissent noted that *all* of the judges participating in the decision agreed that black voters were unable to elect candidates of their choice — *i.e.*, that they had sustained an injury under Section 2 — while a majority of those judges concluded that harm could not be redressed. *Nipper*, 39 F.3d at 1547 (Hatchett, J., dissenting). Here, Plaintiffs have similarly identified an injury-in-fact. Whether they have sufficiently alleged that this injury is redressable is discussed further below.[57]

---

[56] Four judges concurred in parts of the lead opinion written by then-Chief Judge Tjoflat. Two judges dissented. Three recused themselves from consideration of the case.

[57] *See infra* Section III.B.3.

### iii. Claims of vote dilution and racial gerrymandering require distinct analyses.

The Secretary's argument that Plaintiffs cannot attack the state-wide, at-large Commissioner-election system also conflates two separate lines of analysis without providing any authority for this Court to apply the theories of one to the facts of the other. It is therefore important to be clear about what, exactly, Plaintiffs have alleged. They do not claim that the State of Georgia has improperly subjected them to racial classifications in violation of equal protection or any other principal (one line of analysis). They are not making a claim about racial gerrymandering. Instead, Plaintiffs contend that, by failing to conduct elections for members of the Commission based on single-member districts, the strength of their votes has been diluted in violation of Section 2 (a separate line of analysis).

This distinction between racial gerrymandering cases and vote dilution claims matters for two reasons. First, and as discussed above, the *Gingles* and Senate Report factors applicable to vote dilution claims **require** that the State consider race to some extent when evaluating electoral procedures so that the voting rights of protected classes are not denied or abridged. 52 U.S.C. § 10301(a). *See also, e.g.*, *Gingles*, 478 U.S. 30; *Voinovich*, 507 U.S. 146; *Solomon*, 899 F.2d 1012; *Marengo Cnty. Comm'n*, 731 F.2d at 1561 ("Section 2 is not meant to create race-

conscious voting but to attack the discriminatory results of such voting where it is present."). The failure to satisfy those factors results in the injury of vote dilution.

Second, if Plaintiffs' claim were that they had improperly been subject to a racial gerrymander, it is clear that they would *not* have standing. That is because an improper gerrymander can *only* exist where voters have been drawn into districts. As the Supreme Court has noted, "[w]ith respect to racial gerrymandering . . . electoral districting violates the Equal Protection Clause when (1) race is the dominant and controlling or predominant consideration in deciding to place a significant number of voters within or without a particular district." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015) (internal quotation marks omitted) (citations omitted). As such, a racial gerrymandering claim can only apply "to the boundaries of individual districts. . . . It does not apply to a State considered as an undifferentiated 'whole.' We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id.* at 262–63 (emphasis in original) (citations omitted). *See also United States v Hays*, 515 U.S. 737, 744–45 (1995) (discussing harm suffered by voter placed in a racially gerrymandered district as denial of equal treatment because of "the legislature's reliance on racial criteria"). But the Secretary has not pointed to any case law

applying a similar conclusion to dispose of a vote-dilution claim—particularly at the motion to dismiss stage.

It is also clear that plaintiffs who allege their votes have been diluted because of at-large elections at a district level do have standing. *See generally Broward Citizens*, 2012 WL 1110053, at *2–*3. *See also Solomon*, 899 F.2d at 1018 n.7 ("So long as the potential exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act.") (Kravitch, J. specially concurring) (citing *Gingles*, 478 U.S. at 50 n.17). At the motion to dismiss stage, at least one district court has held that allegations of vote dilution because of state-wide, at-large elections were sufficient to show standing. *Ala. State Conference of the NAACP v. Alabama* (hereinafter, *Alabama NAACP*), Case No. 2:16-cv-731-WKW-SMD, ECF 45, Mem. Op. & Order at 16–17 (M.D. Ala. Aug. 31, 2017) (addressing motion to dismiss challenge to at-large election of Alabama appellate judges; finding allegations that the plaintiffs were residents of and registered voters in Alabama and members of a protected class, who had alleged their electoral strength had been diluted, were sufficient to plead an injury-in-fact).

### iv. The cases on which the Secretary relies are not controlling at the motion to dismiss stage.

The Secretary also relies on the recent Eleventh Circuit case, *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), to argue that "the alleged dilution of 'black voting strength' on a statewide level is not an allegation that any individual vote is diminished."[58] This Court does not read *Jacobson* quite so broadly. In that case, the Court of Appeals considered a challenge, brought by various voters and organizations, to a Florida law dictating the order in which candidates appear on the ballot in the state's general elections. The district court enjoined Florida's secretary of state from preparing ballots in compliance with the law. The appellate court concluded—after the district court had conducted a bench trial—that the voters and organizations lacked standing because they had not *proved* an injury-in-fact. *Id.* at 1241.[59]

The Eleventh Circuit noted that two of the three plaintiff voters did not provide any testimony at all, let alone testimony about their alleged injuries. *Id.* at

---

[58]   ECF 22-1, at 10.

The Secretary's opening brief cites the original version of the Court of Appeals' decision, which was later withdrawn and replaced with the version cited in this Order.

[59]   The *Jacobson* court alternatively held that the case presented a non-justiciable political question. 974 F.3d at 1242.

1246. The voter who did testify did not identify "any difficulty in voting for her preferred candidate or otherwise participating in the political process." *Id.* The plaintiff organizations did not show that they had been injured because they did not provide evidence that one of their members would be injured by the statute or show how they were forced to divert resources away from anything in order to combat the effects of the statute. *Id.* at 1249–50. This failure of proof by itself supports the Court's conclusion that it should not rely on *Jacobson* to dispose of this action at the motion to dismiss stage. *Id.* at 1247 ("Insofar as Jacobson argues that the ballot statute will injure her by diluting her vote relative to the votes of Republicans, she failed to prove any such injury.").

The Court does, however, have some doubt about Plaintiffs' ultimate ability to *prove* that they have suffered an injury-in-fact (for many of the reasons articulated by the Secretary). But, even counsel for the Secretary conceded during oral argument that VRA claims are consistently viewed as mixed questions of law and fact.[60] The Secretary also acknowledges that, under *Jacobson*, vote dilution can be an injury.[61] Accordingly, it is not appropriate to dispose of this case at its infancy. Viewing the well-pleaded allegations in the Complaint in the light most

---

[60]   ECF 35, at 5.

[61]   *Id.* at 6.

favorable to Plaintiffs, the Court concludes that they have sufficiently alleged that they suffered an injury-in-fact. If Plaintiffs fail to adduce evidence in support of those allegations, the Secretary remains free to reassert his standing arguments at a later stage of the case. *Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.") (citations omitted).

### 3.    Traceability and redressability

The remaining elements of the standing analysis are traceability and redressability. Traceability refers to the "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560 (indicating that, for standing, a plaintiff's "injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court") (alterations and omissions in original) (internal quotation marks omitted) (citation omitted). Closely related is the concept of redressability. To show redressability, "it must be likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted) (citation omitted).

The Secretary contends that Plaintiffs' injuries are not traceable to him because the Commission districts are designed by the Georgia General Assembly.[62] Plaintiffs counter that the Secretary is responsible for administering the offending elections and certifying their results, thereby establishing causation.[63]

The Secretary also attacks the remedy Plaintiffs seek as part of both his standing argument and his failure to state a claim argument. In connection with redressability for standing purposes, the Secretary argues that the declaratory judgment and injunction Plaintiffs seek would not remedy their alleged harm because Georgia's governor "would simply appoint a replacement to any election that is not administered by the Secretary."[64] Plaintiffs respond that the Secretary is Georgia's "chief election official" and is responsible for administering elections for

---

[62]   ECF 22-1, at 12.

[63]   ECF 23, at 11.

[64]   ECF 22-1, at 15 (citing O.C.G.A. § 46-2-4).

members of the Commission.[65] They thus assert that the Secretary is the proper defendant.

Here, although the governor could appoint a person to fill a vacancy (or vacancies) on the Commission, Georgia law dictates that such appointment extends only to the "next regular general election." O.C.G.A. § 46-2-4. The Secretary is the chair of the State Election Board, which has responsibility to "formulate, adopt, and promulgate such rules and regulations, *consistent with law*, as will be conducive to the fair, legal, and orderly conduct of primaries and elections . . . ." O.C.G.A. §§ 21-2-30(d), -31(2) (emphasis added). This includes, as it must, compliance with Section 2. Since the Secretary is the person responsible for administering elections, O.C.G.A. § 21-2-50(b), Plaintiffs' injuries are traceable to him and injunctive relief directed against him concerning the administration of elections for the Commission consistent with Section 2 would redress the harm Plaintiffs have allegedly suffered. At the pleading stage, this is enough.

In *Grizzle v. Kemp*, the Court of Appeals considered a challenge to a Georgia anti-nepotism law that (among other things) prohibited immediate family of members of local boards of education from also serving as members of that board.

---

[65]    ECF 23, at 10–11.

634 F.3d 1314 (11th Cir. 2011). The plaintiffs asserted that the law violated their
First and Fourteenth Amendment rights. *Id.* at 1317. The district court entered a
preliminary injunction against the Secretary and the Republican Party, prohibiting
them from enforcing a portion of the law. *Id.* at 1318. The Secretary asserted that
he was an improper party to the case because he was not responsible for
qualifying, challenging, or certifying candidates for local boards of education. *Id.*
The court disagreed:

> As the Secretary of State is the chairperson of the State
> Election Board and the State Election Board is charged
> with enforcing Georgia's election code under state law,
> we conclude that the Secretary of State is a proper party
> in this action for injunctive and declaratory relief
> pursuant to *Ex Parte Young*.

*Id.* at 1316. Further, "[a] state official is subject to suit in his official capacity when
his office imbues him with the responsibility to enforce the law or laws at issue in
the suit." *Id.* at 1319 (citing *Ex Parte Young*, 209 U.S. 123, 161 (1908)).

That is precisely the situation here. Plaintiffs seek prospective declaratory
and injunctive relief against the Secretary.[66] Further support for Plaintiffs'
assertion that the Secretary is the correct defendant comes from *Alabama NAACP*.
There, the district court, in discussing the State of Alabama's sovereign immunity

---

[66]   *See generally* ECF 1, at 10–11 (*ad damnum* clause).

argument, indicated that the Alabama Secretary of State was still an appropriate

defendant against whom the plaintiffs could maintain the action:

> There is no question that the Attorney General may sue
> on behalf of voters under the enforcement provision of
> the VRA, and it is clear that other state defendants may
> be sued for prospective, injunctive relief under *Ex Parte
> Young*, 209 U.S. 123 (1908). Because the Secretary of State
> has been named, the suit will proceed regardless of the
> outcome of this discussion. The sole question here is
> whether the State of Alabama may be sued by a private
> litigant under Section 2 of the VRA.

M.D. Ala. Case No. 2:16-cv-731-WKW-SMD, ECF 45, at 18 n.7. Plaintiffs here have

adequately alleged that their injuries are traceable to the Secretary.

In contesting redressability, the Secretary relies heavily on *Jacobson* and

*Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019), arguing that ordering

relief against him would do nothing because "the law remains in effect with

respect to all non-parties to this suit."[67] He has not, however, stated that he lacks

the authority to ensure that elections for members of the Commission take place

consistent with Section 2. In *Jacobson*, the Florida Secretary of State could not

redress the plaintiffs' alleged injuries because she was not responsible for

enforcing the challenged law. 974 F.3d at 1241–42 (noting county officials

---

[67]   ECF 22-1, at 15. *See generally id.* at 14–15.

independent of the secretary were responsible for placing candidates on the ballot in the prescribed order). *Lewis* is not even a voting rights case—it dealt with an equal protection challenge to minimum-wage rates in Alabama. There, the harm the plaintiffs allegedly suffered was not traceable to the Alabama Attorney General or redressable through the declaratory and injunctive relief they sought against him. 944 F.3d at 1292. The Court does not, therefore, find *Jacobson* or *Lewis* persuasive at this stage and reiterates that Plaintiffs have adequately pleaded traceability and redressability. However, they must still adduce competent evidence of those elements in order to survive summary judgment or a directed verdict at trial. *Lujan*, 504 U.S. at 561.

### C.     Failure to State a Claim

In addition to the redressability issues discussed above, the Secretary asserts that Plaintiffs have failed to state a claim because they cannot satisfy the first *Gingles* requirement. Similar to his redressability argument, he states that the "requested relief is beyond the capacity of federal courts to fashion."[68] Plaintiffs respond that the remedy to their injuries is employment of a single-member districting system for elections to the Commission.[69] In fact, they assert that such

---

[68]   *Id.* at 16.

[69]   ECF 23, at 14.

a system is the *required* remedy for the harm they have suffered.[70] The Secretary

counters that the Court does not have the power to order relief affecting

"a sovereign power's right to choose its form of government."[71]

As the Eleventh Circuit has noted,

> [v]oting rights cases are inherently fact-intensive,
> particularly those section 2 vote dilution claims alleging
> that, due to the operation of a challenged voting scheme,
> minority voters are denied an equal opportunity to
> participate in the political process and to elect
> representatives of their choice. In such cases, courts must
> conduct a "searching practical evaluation of the 'past and
> present reality'" of the electoral system's operation.

*Nipper*, 39 F.3d at 1498 (Tjoflat, J. opinion) (quoting *Gingles*, 478 U.S. at 45). This

makes disposition of Plaintiffs' claim at this stage inappropriate.

### 1. The relief Plaintiffs seek is not prohibited as a matter of law.

Under *Nipper,* the relief Plaintiffs seek for violations of Section 2 is part of

the *prima facie* case they must make. 39 F.3d at 1530–31 ("The inquiries into remedy

and liability, therefore, cannot be separated: A district court must determine as

part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy

in the particular context of the challenged system."). Based largely on cases

---

[70]   *Id*.; ECF 35, at 27–28.

[71]   ECF 26, at 7.

involving judicial elections, the Secretary asserts that the Court lacks the authority to require Georgia to employ single-member districts for elections to the Commission.

### i.  Judicial elections

To support his argument, the Secretary relies on *Nipper* itself. 39 F.3d 1494. There, the allegations about the method of electing circuit and county judges were similar to those made here: the judges were elected through a county- or circuit-wide, at-large process; the judges had to reside in the county or circuit they represented; the judges' terms were staggered; and the governor had the authority to appoint someone to fill a mid-term vacancy. *Id.* at 1498–99 (Tjoflat, J., opinion). No black person had ever served on one of the relevant courts without first having been appointed to fill a vacancy. *Id.* at 1499. Distinctively, however, Florida employed a merit selection system to fill vacancies for trial judges. This process was enacted through changes to the Florida constitution that

> were clearly designed to eliminate the vices of partisan, electoral politics from the process of selecting state court judges. The goal of merit selection of judges, naturally, is to insulate them from popular pressure and to make them more willing to decide an unpopular case fairly and impartially while, at the same time, raising the level of qualifications of judicial officers.

*Id.* at 1501. Thus, "[t]he maintenance of the linkage between a trial court judge's territorial jurisdiction and electoral base serves to preserve judicial accountability" and helps preserve judicial independence. *Id.* at 1543, 1544.

It is clear that Section 2 applies to judicial elections, even if federal courts' power to fashion appropriate remedies may be more limited than in other vote dilution contexts. *Chisom v. Roemer*, 501 U.S. 380, 384 (1991) ("We hold that the coverage provided by the 1982 amendment is coextensive with the coverage provided by the [VRA] prior to 1982 and that judicial elections are embraced within that coverage."). Given the particularities tied to the election of judges, and the states' interest in maintaining judicial independence and accountability, *see, e.g.*, *Nipper*, 39 F.3d at 1542–47,[72] the Court does not consider *Nipper* to foreclose its authority at the motion to dismiss stage to award the type of remedy Plaintiffs seek. Although the Commission is established in the Georgia constitution, elections for its members are governed by statute. The Secretary has not put

---

[72] This portion of Chief Judge Tjoflat's *Nipper* opinion was endorsed in the four-judge concurrence written by Judge Edmondson. 39 F.3d at 1547 ("I understand Part V of the Chief Judge's opinion to conclude that each of the remedies discussed is precluded given the State's interest in and right to formulate its own judicial system. I concur in this conclusion, which I see as the holding of this case.") (Edmondson, J. concurring in opinion in part and concurring in judgment).

forward any argument that would permit the Court to conclude *as a matter of law* that Georgia has the same type of interest in the structure of an administrative agency as it does in one of the three primary branches of government—despite counsel's suggestion during argument that the Commission has both quasi-judicial and quasi-legislative functions.[73]

The Secretary also relies on the district court's opinion in *Alabama NAACP*—issued after a six-day bench trial—to support his contention that the Court cannot grant Plaintiffs the relief they seek.[74] Case No. 2:16-cv-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938 (M.D. Ala. Feb. 5, 2020). In *Alabama NAACP*, the plaintiffs challenged Alabama's method of conducting state-wide, at-large elections for appellate court judges. *See generally id.* Moreover, the judicial elections system was "[a]t its core . . . about Alabama's choice of the form of its government, specifically the judicial branch." *Id.* at *36. At the pleading stage, however, the district court denied the defendants' Rule 12(b)(6) motion and concluded that a plaintiff need only show the facial plausibility of the sought-after remedy, consistent with

---

[73] *See, e.g.*, *Nipper*, 39 F.3d at 1534–35 ("Trial court judges, on the other hand [in contrast to legislators], are neither elected to be responsive to their constituents nor expected to pursue an agenda on behalf of a particular group.") (Tjoflat, J., opinion) (footnote omitted).

[74] ECF 22-1, at 16–18.

traditional pleading standards. M.D. Ala. Case No. 2:16-cv-731-WKW-SMD, ECF 45, Aug. 31, 2017 Mem. Op. & Order at 6–7 (citing *Iqbal*, 556 U.S. at 678). *See generally id.* at 6–14. The court further noted:

> Defendants may very well prove that subdistricting cannot work in this context. But dismissing Plaintiffs' case, without giving them a chance to conduct discovery and adduce evidence, would require the authority of nothing less than a spotted-dog case. Because no such case exists, the court cannot conclude, as a matter of law, that subdistricting *never* can be employed as a remedy in a vote dilution challenge to a state system of appellate judicial elections.

*Id.* at 13–14.[75] Here, counsel for the Secretary conceded during oral argument that the single-member districts proposed by Plaintiffs would be "very compelling evidence" if the Court had the power to award such relief.[76] *See, e.g., Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (where "the challenged system is at-large voting, just as in *Gingles*[,] the adequate alternative electoral system is simply single-member districting, which is a workable regime and an available remedy.").

---

[75]  According to that most trusted of reference resources, Wikipedia, a "spotted dog case" is a term used in Alabama to refer to "a precedent whose facts are 'on all fours' with the case at hand." *Commanding precedent*, https://en.wikipedia.org/wiki/Commanding_precedent (last visited Dec. 17, 2020).

[76]  ECF 35, at 40.

Thus, even in the cases on which the Secretary relies, judicial elections were treated somewhat differently from vote-dilution challenges concerning other elected offices.[77] Both *Nipper* and *Alabama NAACP* were decided after bench trials. *Nipper*, 39 F.3d at 1497 (five-day bench trial); *Alabama NAACP*, 2020 U.S. Dist. LEXIS 18938, at *10 (six-day bench trial). And, in *Alabama NAACP*, the district court, after extensive analysis, rejected the very argument the Secretary urges this Court to adopt.

Based on the allegations in the Complaint and at this stage of the litigation, the Court finds more persuasive the factual parallels between the instant action and *Solomon*, 899 F.2d 1012. There the plaintiffs challenged the method of electing county commission and school board members as violative of Section 2. The officials served staggered terms and had to run from the district in which they lived, but the elections were on a county-wide, at-large basis. *Id.* at 1013–14. The plaintiffs asserted that the court should direct the county to be divided into five single-member districts for voting purposes, so that African Americans would be a majority in one of the districts. *Id.* at 1014. An *en banc* Eleventh Circuit concluded that the plaintiffs had satisfied the three *Gingles* factors, but were equally divided

---

[77] Counsel for Plaintiffs also made note of this point during oral argument. ECF 35, at 22–23.

on the "legal effect of proving those factors," and remanded the case to the district court with instructions. *Id.* at 1013.

Similarly here, Plaintiffs allege that members of the Commission are elected "at large" by all Georgia voters in partisan elections; serve six-year staggered terms; and must be residents of one of five districts.[78] These factors, according to Plaintiffs, contribute to the dilution of their votes, which is prohibited by Section 2.[79] The Court of Appeals' decision in *Solomon* makes clear that such allegations can state a claim.

What's more, and as counsel for the Secretary noted during oral argument, the *Gingles* factors present mixed questions of law and fact.[80] *See also Solomon*, 899 F.2d at 1017 n.6. This makes it particularly inappropriate to foreclose at the pleading stage Plaintiffs' opportunity to prove their claims. Section 2 expressly requires the Court to consider the "totality of the circumstances" in determining whether a violation has occurred. 52 U.S.C. § 10301(b). Without a factual record, the Court declines the Secretary's invitation to hold that, because elections for the

---

[78] ECF 1, ¶¶ 11–12.

[79] *See generally* ECF 1.

[80] ECF 35, at 5.

Commission purportedly implicate Georgia's chosen form of government, the Court lacks the power to award the relief Plaintiffs seek.

### ii. Sovereigns v. subdivisions

During oral argument, counsel for the Secretary emphasized that "sovereigns" (*i.e.*, the State of Georgia) must be treated differently from political subdivisions for purposes of Section 2 claims.[81] But, as noted above and by counsel for Plaintiffs, nothing in the language of Section 2 itself supports that position.[82] On its face, the statute applies equally to *states* and their political subdivisions. 52 U.S.C. § 10301. The adoption of the Fourteenth and Fifteenth Amendments overrode any sovereign immunity to which states themselves might otherwise have been constitutionally entitled—and Section 2 is a valid expression of congressional enforcement power under those amendments. *Marengo Cnty. Comm'n*, 731 F.2d at 1557–61.

Thus, the suggestion that the Court lacks the power to remedy the harm Plaintiffs allegedly suffered cannot pass muster at this stage. "No government entity has a 'vested right' to continue practices validly prohibited by Congress." *Id.* at 1554. The Secretary has not presented any basis for why—especially at the

---

[81]  *See, e.g., id.* at 13–17.

[82]  *Id.* at 24.

motion to dismiss stage—this Court should essentially exempt "sovereigns" from

the same vote dilution analyses that clearly apply to their political subdivisions.

> The states have an important interest in determining their election practices. But Congress could reasonably conclude that practices with discriminatory results had to be prohibited to reduce the risk of constitutional violations and the perpetuation of past violations. . . .
>
> The Voting Rights Act does not conflict with any provision of the Constitution that protects individual rights from impairment by Congress and the states. The only interests that section 2 arguably impairs are the states' interests in adopting electoral practices that have a discriminatory result. Such a state interest is a contradiction in terms.

*Id.* at 1561, 1562 n.27.

The Court does have concerns about its ability to impose on the State of

Georgia the remedy Plaintiffs seek.[83] But, Plaintiffs have sufficiently alleged that

their proposed remedy is facially plausible and that is all that is required at this

point. *Iqbal*, 556 U.S. at 678.

### 2.    The remaining *Gingles* and Senate Report factors

Because the Secretary has only challenged Plaintiffs' purported inability to

satisfy the first *Gingles* factor, the Court does not extensively address the second

---

[83]    *See, e.g.*, *id.* at 26–30.

and third factors or the Senate Report factors. Some mention of them is, however, warranted.

Plaintiffs allege that black voters are politically cohesive and that white-majority votes are sufficient to block them from electing their candidates of choice to the Commission.[84] *Gingles*, 478 U.S. 50–51. They plead that they are a sufficiently compact and numerous group and that they would constitute a majority in one district (which proposed district encompasses the county where Plaintiffs reside).[85] Plaintiffs' additional allegations line up with the Senate Report factors as well.[86] Sitting by designation and writing for the unanimous panel in *Marengo County Commission*, Judge John Minor Wisdom wrote that "[t]he history of discriminatory voting practices is far too complex for any court to conclude that a statute was ***not*** enacted with discriminatory intent simply because blacks could not vote when the statute was adopted." 731 F.2d at 1552 n.10 (emphasis added).[87] While intent is not a necessary component of Plaintiffs' claim, it can serve as

---

[84]  ECF 1, ¶¶ 20–23.

[85]  *Id.* ¶¶ 18–19; ECF 1-3 (illustrative districting plan showing one majority-minority district).

[86]  *Compare* ECF 1, ¶¶ 11–35 *with Solomon*, 899 F.2d at 1015–16.

[87]  At the time of the *Marengo County Commission* decision, Judge Wisdom was a Senior Circuit Judge for the Fifth Circuit Court of Appeals.

circumstantial evidence when the voting procedure at issue has a discriminatory result. *Id.* (citation omitted). Given Plaintiffs' allegations about the timing of the shift to the state-wide election of members of the Commission, the Complaint plausibly suggests that the change was made with the intent to discriminate.

The *Gingles* factors are necessary prerequisites to proving a vote dilution claim. *Nipper*, 39 F.3d at 1513. That said, the Complaint contains sufficient factual allegations to plausibly demonstrate the existence of the remaining *Gingles* factors and many of the Senate Report factors. *Twombly*, 550 U.S. at 570; *Am. Dental Ass'n*, 605 F.3d at 1289. This does not, however, diminish Plaintiffs' obligation to come forward with sufficient evidence at the summary judgment stage and trial to prove those factors.

### D.    Sovereign Immunity

Finally, the Secretary asserts that, if this action is construed as one against the State of Georgia, Plaintiffs' claims should be barred by sovereign immunity.[88] The Eleventh Amendment to the United States Constitution prohibits, among other things, suits against a State by a citizen of that state. *See, e.g.*, *Ala. NAACP*, 949 F.3d 647, 649 (11th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890)).

---

[88]    ECF 22-1, at 19–20.

Under the Fourteenth Amendment, however, Congress can abrogate states' sovereign immunity to redress discriminatory state action when it unequivocally expresses the intent to do so. *Id.* at 649–50.

In his opening brief, the Secretary argues that Section 2 should not be interpreted to abrogate Georgia's immunity from suit because that would have "massive implications for our system of government."[89] In support of his contention, the Secretary points to the recent Eleventh Circuit decision in *Alabama NAACP*.[90] The problem with this argument—as counsel for the Secretary has acknowledged—is that it relies on the *dissenting* opinion. The majority in *Alabama NAACP* clearly held that Section 2 abrogates the states' sovereign immunity:

> By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial discrimination in voting. Because the Fifteenth Amendment permits this intrusion, Alabama is not immune from suit under § 2 of the VRA. Nor is § 2 any great indignity to the State. Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process."

*Id.* at 655 (footnote omitted) (citing *Marengo Cnty. Comm'n*, 731 F.2d at 1561). This holding is consistent with that court's earlier decision in *Marengo County*

---

[89]   *Id.* at 20.

[90]   *Id.*

*Commission*. 731 F.2d at 1560–61 ("The Civil War Amendments overrode state autonomy apparently embodied in the Tenth and Eleventh Amendments."). Accordingly, the Secretary's sovereign immunity argument is foreclosed by binding Eleventh Circuit precedent that this Court must follow.

## IV.   Conclusion

The Secretary's motion to dismiss [ECF 22] is **DENIED**. The Secretary is **DIRECTED** to answer the Complaint within 21 days after entry of this Order. The parties shall conduct their Rule 26(f) conference within 14 days after the Secretary answers. Discovery shall commence and the parties shall serve their initial disclosures and submit a Joint Preliminary Report and Discovery Plan within 30 days after the Secretary files his answer. Plaintiffs' request that discovery begin notwithstanding the pendency of the Secretary's motion to dismiss, which was submitted to Chambers pursuant to the Court's Standing Order, is **DENIED AS MOOT**. If the parties are unable to agree on a proposed timeline for discovery and

dispositive motions, they should memorialize their respective positions in the Joint Preliminary Report and Discovery Plan.

**SO ORDERED** this the 5th day of January 2021.

Steven D. Grimberg
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD ROSE, *et al.*,

     Plaintiffs,

         v.

BRAD RAFFENSPERGER, in his capacity as
Secretary of State of the State of Georgia,

     Defendant.

Civil Action No.
1:20-cv-02921-SDG

## OPINION AND ORDER

This case presents the novel question of whether there can be vote dilution in violation of Section 2 of the Voting Rights Act (VRA) when the challenged election is held on a statewide basis. On the parties' cross-motions for summary judgment, the Court concludes that certain disputes of material issues of fact require a trial and preclude complete resolution at this stage. After careful consideration of the parties' briefing, and with the benefit of oral argument, the Court **DENIES** Defendant's motion for summary judgment [ECF 80] and **GRANTS in part** and **DENIES in part** Plaintiffs' partial motions for summary judgment [ECF 56; ECF 79]. Plaintiffs' Motion for Judicial Notice of Census Data [ECF 57] is **GRANTED**.

## I.      Background

The Georgia Public Service Commission (the Commission) exists by virtue

of the State Constitution:

> There shall be a Public Service Commission for the
> regulation of utilities which shall consist of five members
> who shall be elected by the people.

GA. CONST. ART. IV, § 1, ¶ I(a) (2021). The commissioners serve terms of six years.

*Id.* The Georgia Constitution also dictates that "[t]he filling of vacancies and

manner and time of election of members of the [Commission] shall be as provided

by law." GA. CONST. ART. IV, § 1, ¶ I(c). The method of election is therefore

prescribed by statute. O.C.G.A. § 46-2-1. Commissioners' terms are staggered, and

general elections take place every two years. *Id.* § 46-2-1(d). Each commissioner is

required to live in one of five residence districts, but "each member of the

commission shall be elected state wide by the qualified voters of this state who are

entitled to vote for members of the General Assembly." O.C.G.A. § 46-2-1(a).

A commissioner must continue to live in that particular district throughout the

term. *Id.* § 46-2-1(b).

Plaintiffs are residents of and registered voters in Fulton County, Georgia.[1] They are all African American.[2] The sole Defendant is Brad Raffensperger, sued in his official capacity as the Georgia Secretary of State.[3] On July 14, 2020, Plaintiffs filed suit asserting that the method of electing members of the Commission causes improper dilution of their votes.[4] They seek a declaratory judgment that this violates Section 2 and an order directing the Secretary to administer Commission elections in a manner that complies with the VRA.[5]

On May 27, 2021, Plaintiffs moved for partial summary judgment on certain of the Secretary's affirmative defenses.[6] The Secretary opposed the motion and Plaintiffs replied.[7] After the close of discovery, on July 9, Plaintiffs filed a second motion for partial summary judgment on the Secretary's remaining affirmative defenses and the *Gingles* prerequisites.[8] The Secretary opposed this motion

---

[1]  ECF 62-1 (Def.'s Resp. to Pls.' SUMF), No. 1.

[2]  *Id.*

[3]  ECF 1 (Compl.), ¶ 10.

[4]  *See generally* ECF 1 (Compl.).

[5]  *Id.* at 10–11 (*ad damnum* clause).

[6]  ECF 56 (Pls.' First MSJ) (First, Second, Fourth, Fifth, and Sixth Defenses).

[7]  ECF 62 (Def.'s Resp. to Pls.' First MSJ); ECF 68 (Pls.' Reply on First MSJ).

[8]  ECF 79 (Pls.' Second MSJ) (Third, Seventh, Eighth, Ninth, and Tenth Defenses).

(in most respects), and Plaintiffs replied.[9] Also on July 9, the Secretary filed his own motion for summary judgment.[10] Plaintiffs opposed, and the Secretary filed a reply.[11] On July 28, the United States filed an *amicus* brief.[12] The Court heard argument on November 8.[13] The basis for the Court's rulings follows.

## II.    Applicable Law

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either

---

[9]    ECF 85 (Def.'s Resp. to Pls.' Second MSJ); ECF 87 (Pls.' Reply on Second MSJ).

[10]   ECF 80 (Def.'s MSJ).

[11]   ECF 84 (Pls.' Resp. to Def.'s MSJ); ECF 88 (Def.'s Reply on MSJ).

[12]   ECF 86 (U.S. Stmt. of Interest).

[13]   ECF 95 (minute entry); ECF 96 (Nov. 8, 2021 H'g Tr.).

(1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

**B.    The Voting Rights Act**

Section 2 of the VRA prohibits practices that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). Section 2 does not, however, create an entitlement to proportional representation for members of a protected class. *Id.*

**1.    *Gingles***

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first interpreted Section 2 after Congress amended it in 1982. The amendment emphasized that a court's focus must be on the *results* of the challenged practices rather than the intent behind their adoption. *Id.* at 35–36. Under *Gingles*, plaintiffs must satisfy three prerequisites to establish a vote-dilution claim:

> ***First***, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. ***Second***, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. ***Third***, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Id.* at 50–51 (second emphasis in original) (footnotes omitted) (citations omitted).

While at-large elections are not *per se* violations of Section 2, they are impermissible if under the totality of the circumstances they "result in unequal access to the electoral process." *Id.* at 46.

### 2. Senate Factors

In addition to the three *Gingles* prerequisites, courts must generally consider several factors that were identified in the Senate Report accompanying the 1982 VRA amendment. *Id.* at 44–45. These Senate Factors are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,[14] or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990) (Kravitch, J.

specially concurring). Two additional factors may also be probative:

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

---

[14] "Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles*, 478 U.S. at 38 n.5 (internal quotation marks omitted) (citations omitted).

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 1016. These "Senate Factors" will "typically establish" a Section 2 violation.

*Id.* at 1015. *See also Gingles,* 478 U.S. at 45 (concluding that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims") (footnote omitted). Ultimately, *Gingles* "calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes." *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998).

## III. Discussion

The Court first addresses whether (1) Plaintiffs have suffered a harm that gives them standing to sue and (2) the Secretary is the proper Defendant. The Court next considers the existence of an appropriate remedy, which is at the heart of the parties' dispute. Third, the Court assesses whether Plaintiffs have carried their burden to establish the three *Gingles* prerequisites. Finally, the Court examines the Secretary's affirmative defenses.

### A. Injury, Standing, and the Proposed Remedy

Constitutional standing is a necessary element of every case invoking federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Its existence is a threshold issue. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir.

2019) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting."). Moreover, in order to carry their initial burden under *Gingles*, Plaintiffs must show that the challenged practice is tied to the injury sought to be remedied. *Gingles*, 478 U.S. at 50 n.17. And the proposed remedy must itself be feasible: If there is no feasible remedy, there can be no injury. *Davis v. Chiles*, 139 F.3d 1414, 1419–20. *See also id.* at 1423 ("[A] plaintiff must propose a viable and proper remedy in order to establish a prima facie case under Section Two.") (citations omitted). Here, the Secretary argues that Plaintiffs lack both statutory and constitutional standing because their injury is a partisan one, and the proposed remedy impermissible.[15]

### 1.   The Nature of Plaintiffs' Injury

The parties agree that Plaintiffs *allege* they are being injured by the at-large method of electing members of the Commission because this system dilutes the strength of their votes.[16] But the Secretary argues that, because members of the Commission are elected on a statewide basis, Plaintiffs' only injury is that they do

---

[15]   *See, e.g.*, ECF 80-1 (Def.'s MSJ), at 4–14. *See also* ECF 37 (Ans.), at 2 (Third and Fourth Defenses).

[16]   ECF 1 (Compl.), ¶ 36; ECF 80-1 (Def.'s MSJ), at 6.

not like the outcome.[17] Thus, his Third and Fourth Affirmative Defenses respectively assert that Plaintiffs lack constitutional and statutory standing.[18] Plaintiffs counter that they are entitled to summary judgment on these defenses.[19]

Adopting the Secretary's interpretation would amount to a *per se* rule that vote dilution in violation of Section 2 can *never* take place on a statewide-level. Section 2, however, applies to both states and their political subdivisions, 52 U.S.C. § 10301(a). The Court finds no basis to adopt a blanket rule that vote dilution can never occur at a statewide level. Nor has the Secretary pointed to any case law that requires such an interpretation, although the Secretary is quick to note that neither Plaintiffs nor the United States have pointed to any case law supporting their interpretation either.[20]

If the Commission were a countywide commission rather than a statewide elected body, there would be little question that the current at-large method of elections could cause an injury for purposes of Section 2 and constitutional standing. *See, e.g.*, *Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 421

---

[17]  ECF 80-1 (Def.'s MSJ), at 7–8.

[18]  ECF 37 (Ans.), at 2.

[19]  ECF 56 (Pls.' First MSJ), at 1, 7–9 (Fourth Defense); ECF 79 (Pls.' Second MSJ), at 1, 8–10 (Third Defense).

[20]  ECF 88 (Def.'s Reply on MSJ), at 3.

(1991) (concluding Section 2 applied to at-large, district-wide electoral scheme used for the election of trial judges in Texas); *Gingles*, 478 U.S. at 46–47 (recognizing that multimember districts and at-large voting schemes may dilute the votes of racial minorities); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1550 (11th Cir. 1984) (concluding district court was clearly erroneous in holding that the county's at-large system had no discriminatory results). In fact, the Secretary concedes that the Section 2 injury *alleged* by Plaintiffs is "one that has been accepted by courts since the inception" of the VRA, although the Secretary asserts they have failed to *prove* the existence of that injury.[21]

The Court agrees with the United States' assertion that statewide vote dilution of the type alleged here is a cognizable injury under Section 2.[22] There is no legal basis to distinguish between States and their political subdivisions based on the language of Section 2. Plaintiffs must still, however, propose a viable remedy (without which they will lack the necessary injury for standing purposes).

To the extent the Secretary seeks summary judgment because Plaintiffs' vote-dilution injury is not cognizable and they therefore lack standing, his motion is **DENIED**. However, Plaintiffs' motions are **DENIED** to the extent they seek

---

[21]   ECF 88 (Def.'s Reply on MSJ), at 2.

[22]   ECF 86 (U.S. Stmt. of Interest), at 5–10.

summary judgment on the Secretary's Third and Fourth Affirmative Defenses because, if Plaintiffs are unable to establish after trial that their proposed remedy is feasible, they will not have shown the existence of an injury. *Davis*, 139 F.3d at 1419–20. Those defenses therefore remain viable.

### 2. The Secretary as Defendant

For a plaintiff to have constitutional standing, his alleged injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations in original) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Further, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citing *Simon*, 426 U.S. at 38, 43, 96).

The Secretary argues that he is not the proper Defendant because an order enjoining him from administering elections for members of the Commission and directing him to comply with Section 2 would not redress Plaintiffs' purported injury.[23] The Secretary declares that, under such an injunction, the Governor could simply continuously appoint people to vacant positions on the Commission since

---

[23] ECF 80-1 (Def.'s MSJ), at 10–14. *See also* ECF 37 (Ans.), at 1 (Second Defense).

the Secretary would be unable to administer elections for those positions.[24] Plaintiffs counter that the Secretary conceded the issue of whether he is a proper party by failing to identify any missing but necessary parties in his initial disclosures or the joint preliminary report.[25]

This is the same basic argument the Secretary made at the motion to dismiss stage, which was rejected by the Court.[26] At the time, the Secretary served as the Chair of the State Election Board, which was responsible for adopting rules and regulations governing the conduct and administration of elections. O.C.G.A. §§ 21-2-30(d), -31(2) (2008). But that statute was amended, effective March 25, 2021. Act of Mar. 25, 2021, 2021 Ga. Laws Act 9 (S.B. 202). The Secretary is no longer Chair, and is only an *ex officio*, nonvoting member of the State Election Board. O.C.G.A. § 21-2-30(a), (d) (2021). The question before the Court is whether these changes mean that the Secretary is no longer a necessary or sufficient Defendant.

Although the parties disagree about the scope of the Secretary's current duties,[27] he or his office remain responsible for (among other things) qualifying

---

24   ECF 80-1 (Def.'s MSJ), at 11–12.

25   ECF 56 (Pls.' First MSJ), at 6.

26   ECF 36 (Jan. 5, 2021 Op. & Order), at 29–33.

27   *See, e.g.*, ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 2.

certain candidates for elections, including political-body and independent candidates for the Commission; building the databases used to create absentee ballots and program voting machines; and certifying election results.[28] The Secretary also co-signs the commission ultimately issued to the winner of an election for the Commission.[29] *See generally* O.C.G.A. § 21-2-50(a) (2019).

The Secretary admits that his proffered hypothetical—in which the Governor simply appoints commissioners to fill vacancies, *ad infinitum*—would violate the Georgia constitutional provision that requires members of the Commission to be "elected by the people."[30] GA. CONST. ART. 4, § 1, ¶ I. Georgia law provides that the Governor shall appoint a person to fill any vacancy on the Commission, and that such person shall "hold his office until the next regular general election." O.C.G.A. § 46-2-4. The Court presumes that the Governor will abide by his State and Federal constitutional duties. Therefore, the Court will not credit counsel's hypothetical as providing any reasonable basis to conclude that the Secretary is not the proper Defendant in this action.

---

[28]   ECF 79-1 (Def.'s Stipulated Facts), ¶¶ 1–2, 4.

[29]   *Id.* ¶ 5.

[30]   ECF 80-1 (Def.'s MSJ), at 13–14.

If Georgia's current method of electing members of the Commission violates Section 2 and the Secretary is enjoined from conducting elections under that process, the cause of Plaintiffs' alleged vote-dilution injury will be stopped. This is enough under *Lujan* for purposes of traceability and redressability. 504 U.S. at 561. Nothing about such an injunction would prevent the next regular election from taking place as the Secretary pontificates.[31] Rather, under this scenario, the election would take place, with the Secretary certifying the results, using a method that complies with Section 2—whether that method is developed by the Georgia General Assembly or this Court. *See, e.g., Perry v. Perez*, 565 U.S. 388, 391–92 (2012) (per curiam) (noting that, when the Texas legislature failed to enact new redistricting plans after the 2010 census, "[i]t thus fell to the District Court in Texas to devise interim plans for the State's" elections) (citation omitted).

The changes in Georgia's election law do not, therefore, alter the conclusion the Court reached at the motion to dismiss stage.[32] The Secretary's motion is **DENIED** as to (1) redressability to the extent he argues he is the incorrect Defendant and (2) the argument that Plaintiffs' injury is not cognizable. Plaintiffs'

---

[31]   ECF 88 (Def.'s Reply on MSJ), at 6.

[32]   ECF 36 (Jan. 5, 2021 Op. & Order), at 28–33.

first motion for summary judgment is **GRANTED** to the extent it seeks judgment on the Secretary's Second Affirmative Defense.

### 3. Plaintiffs' Proposed Remedy

"In assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan." *Davis*, 139 F.3d at 1419–20 (citing *Houston Lawyers' Ass'n*, 501 U.S. at 426). *See also Brooks*, 158 F.3d at 1239 (same). The Eleventh Circuit has, however, cautioned that "[i]mplicit in th[e] first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government . . . ." *Davis*, 139 F.3d at 1421 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (plurality opinion)). *Cf. Holder v. Hall*, 512 U.S. 874 (1994) (plurality opinion) (concluding a plaintiff cannot maintain a Section 2 action against the size of a government body).

Plaintiffs' proposed remedy is therefore relevant to both the first *Gingles* prerequisite and the totality-of-the-circumstances analysis. This does not mean, however, that the Court must rule on whether Plaintiffs have satisfied the remedy portion of the first prerequisite for the case to advance to trial. *See, e.g., Brooks*, 158 F.3d at 1240 (finding no error in district court's conclusion—after bench trial—that the harm that would result from plaintiffs' proposed remedy was "too great to

justify ordering such a system" and that the plaintiffs had therefore failed to establish the first prerequisite); *Ala. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Alabama* (*Alabama NAACP*), Case No. 2:16-cv-731-WKW, 2020 WL 583803, at *4, *37 (M.D. Ala. Feb. 5, 2020) (concluding after six-day bench trial that the plaintiffs had failed to meet the first prerequisite because they had not shown "that a feasible remedy can be fashioned"). The Court concludes that summary judgment on matters related to Plaintiffs' proposed remedy is inappropriate.

### i.    The State's Interests

The Secretary's Eighth Affirmative Defense asserts that the relief Plaintiffs seek would "result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the alteration of the form of government of the State of Georgia."[33] His discovery responses further explained that this defense is based on Georgia's sovereignty under the Guaranty Clause of the U.S. Constitution (Art. IV, § 4) and the Tenth Amendment since (he argues) Plaintiffs' proposed remedy would require a change in Georgia's Constitution.[34] Thus, the Secretary contends that a remedy requiring the election of Commission members through

---

[33]    ECF 37, at 2 (Eighth Defense).

[34]    ECF 85-1 (Def.'s Response to Pls.' SUMF), ¶ 4.

districts rather than at-large would force a new form of government on the State and "fundamentally alter[ ] the nature that [the] sovereign state has set up [for] its constitutional commissions to govern utilities."[35] He compares this case to *Holder v. Hall*, 512 U.S. 874, in which the Supreme Court held that Section 2 cannot be used to change the size of a government body.[36]

The Secretary further argues that, "given the unique interests of the State in the design of the [Commission]," Plaintiffs cannot demonstrate a permissible remedy to their alleged injury.[37] He asserts that members of the Commission exercise authority over and "take calls from constituents across" the entire State.[38] Accordingly, he concludes that the "unique nature of the structure and purpose" of the Commission—including its quasi-judicial function—"is furthered by statewide elections" of its members.[39]

---

[35]  ECF 80-1 (Def.'s MSJ), at 16.

[36]  *Id.* at 18. *See generally id.* at 18–20.

[37]  *Id.* at 16 (citing *Nipper*, 39 F.3d at 1530–31 (plurality opinion)). *See also* ECF 37 (Ans.), at 2 (Eighth Defense).

[38]  ECF 80-1 (Def.'s MSJ), at 16–17.

[39]  *Id.* at 18. The order denying the motion to dismiss addresses the Secretary's arguments that the Court should apply judicial-elections cases. *See generally* ECF 36 (Jan. 5, 2021 Op. & Order), at 34–39.

The Secretary acknowledges, however, that the precise issue in this case is one of first impression.[40] He also accepts that the State's interests are a factor to be considered "in weighing the totality of the circumstances,"[41] so they are not a *per se* bar to Plaintiffs' preferred remedy. "Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution." *Houston Lawyers' Ass'n*, 501 U.S. at 427 (concluding that a state's interest in maintaining its electoral system is properly considered under the totality of the circumstances).

Plaintiffs contest the factual and legal predicates on which the Secretary's arguments are based.[42] They assert that summary judgment in favor of the Secretary is inappropriate and that there remain disputed issues of fact.[43] The United States' *amicus* brief also asserts that the Secretary misapplies *Holder* because

---

[40]   ECF 80-1 (Def.'s MSJ), at 18.

[41]   *Id.* at 17–18 (citing *Brnovich*, 594 U.S. ___, 141 S. Ct. 2321, 2339–40 (2021)).

[42]   ECF 79 (Pls.' Second MSJ), at 11–14.

[43]   ECF 84 (Pls.' Resp. to Def.'s MSJ), at 11. *See generally id.* at 9–16.

nothing in Plaintiffs' proposed plan requires a change in the number of commissioners.[44]

The Court concludes that these matters, including the State's interests in maintaining its current form of electing members to the Commission, involve disputed issues of material fact that cannot be resolved on the parties' cross-motions for summary judgment. However, questions of first impression on Georgia law are also involved, so some additional discussion is warranted.

### ii.    The State's Chosen Form of Government

All Georgia voters currently may vote for each member of the Commission. O.C.G.A. § 46-2-1(a). Plaintiffs' proposed remedy would change that system such that voters would only be eligible to vote for the one member of the Commission for the particular voting district in which the voter resides.[45] The Secretary asserts that implementing such a system would impermissibly force the State to adopt a new form of government.[46] Plaintiffs' briefing does not tackle this issue head on, focusing primarily on the Secretary's arguments about the State's specific interests

---

[44]   ECF 86 (U.S. Stmt. of Interest), at 10–13.

[45]   ECF 80-1 (Def.'s MSJ), at 18; ECF 84 (Pls.' Response to Def.'s MSJ), at 9–11. *See also* ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

[46]   ECF 80-1 (Def.'s MSJ), at 15–16; ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

in maintaining the current system.[47] However, the parties ably addressed this point during oral argument.[48]

In effect, the issue centers on the meaning of the phrase "elected by the people" in the constitutional provision establishing the Commission. GA. CONST. ART. IV, § 1, ¶ I(a). The phrase is not used elsewhere in the Georgia Constitution in a similar context from which the Court might glean meaning. Nor has the Court found, or the parties pointed to, any case law on point. Does "elected by the people" mean that Georgia's Constitution requires all eligible voters in the State to have the opportunity to vote for each member of the Commission, or is that outcome only dictated by the statute (O.C.G.A. § 46-2-1(a)), which requires members of the Commission to be elected statewide? Stated somewhat differently, does implementing Plaintiffs' proposed remedy require abrogating the State Constitution? The parties disagree sharply about the answer.

During oral argument, the Secretary urged this Court to certify the issue to the Georgia Supreme Court.[49] Plaintiffs counter that this is unnecessary because the answer is irrelevant—no matter its interpretation, the State Constitution

---

[47]   ECF 84 (Pls.' Response to Def.'s MSJ), at 10–16.

[48]   *See generally* ECF 96 (Nov. 8, 2021 H'g Tr.).

[49]   ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

cannot override Section 2.[50] While Plaintiffs' point about Section 2 is well taken, it certainly does not make the answer immaterial. Whether the at-large election of members of the Commission is required by the Georgia Constitution or only by statute bears on the totality-of-the-circumstances analysis the Court must undertake. It could affect, for example, the weight the Court should place on the State's interests in maintaining its current form of electing members of the Commission. *Davis*, 139 F.3d at 1421. Clarity on these issues may be necessary for the Court to assess the totality of the circumstances.

Given the issues that remain to be presented at trial, however, the Court cannot conclude that certification is required at this stage. The Georgia Supreme Court does not "give advisory opinions or respond to certified questions that are anticipatory in nature." *GEICO Indem. Co. v. Whiteside*, 311 Ga. 346, 346 n.1 (2021) (citing *CSX Transp. v. City of Garden City,* 279 Ga. 655, 658 n.5 (2005)). It is possible this Court may be able to rule after trial without needing to certify any questions. Ga. Sup. Ct. R. 46 (permitting certification of legal questions to that court when "it

---

[50] ECF 96 (Nov. 8, 2021 H'g Tr.), at 39–41 (citing *City of Rome v. United States*, 446 U.S. 156 (1980), abrogated on other grounds as stated in *Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 209–11 (2009); *Marengo Cnty. Comm'n*, 731 F.2d 1546). *See also* ECF 84 (Pls.' Resp. to Def.'s MSJ), at 13 (citing S. Rep. No. 97-417, at 29 n.117 (1982); *Hous. Laws.' Ass'n*, 501 U.S. at 427; *Marengo Cnty. Comm'n*, 731 F.2d at 1571).

shall appear [to the certifying court] . . . that there are involved in any proceeding before it questions or propositions of the laws of this State *which are determinative of said cause* and there are no clear controlling precedents in the appellate court decisions of this State") (emphasis added). Waiting until after trial to assess whether certification is appropriate will obviate the risk of presenting questions that ultimately may not be dispositive. Moreover, it would provide the Georgia Supreme Court with a complete record to consider in ruling on any questions that this Court does certify. *See, e.g.*, Ga. Sup. Ct. R. 47 ("The Court certifying to this Court a question of law shall formulate the question and cause the question to be certified and transmitted to this Court, *together with copies of such parts of the record and briefs in the case as the certifying Court deems relevant*.") (emphasis added).

### 4. Summary

Georgia's interests in maintaining the at-large method of election of members of the Commission (and thus the appropriateness of the remedy sought by Plaintiffs) cannot be determined on summary judgment. Accordingly, the Court **DENIES** Plaintiffs' request for judgment in its favor on the Secretary's Eighth Affirmative Defense. It is also therefore improper to conclude as a matter

of law that Plaintiffs suffered no injury and thus lack standing. The Court **DENIES**

the Secretary's Motion for Summary Judgment.

### B.    The *Gingles* Prerequisites

The Supreme Court has made clear that the three part test of *Gingles* is a

threshold that a plaintiff must meet in order to maintain a section 2 claim. *Solomon*,

899 F.2d at 1017 (Kravitch, J. specially concurring). These requirements

> present mixed questions of law and fact. Initially, the
> district court must make findings of fact concerning the
> polity's demographics and actual voting patterns in
> particular elections. The subsequent determination of the
> legal inferences to be drawn from those facts, however,
> involve questions of law and the application of legal
> standards.

*Id.* at 1017 n.6. Accordingly, while those factual issues that are not in dispute are

appropriately resolved here, the inferences to be drawn from them under the

totality of the circumstances are not. They must await trial. As discussed below,

unless otherwise noted, the parties do not dispute the following facts, which

establish that Plaintiffs have satisfied the three basic *Gingles* prerequisites.

### 1.    Geography and Compactness

Under the first *Gingles* prerequisite, "the minority group must be able to

demonstrate that it is sufficiently large and geographically compact to constitute

a majority in a single-member district." *Gingles*, 478 U.S. at 50. *See also Wright v.*

*Sumter Cnty. Bd. of Elecs. & Registration*, 979 F.3d 1282, 1303 (11th Cir. 2020) (citing *Gingles*, 478 U.S. at 106). The minority group must have the potential to elect its representative of choice in a single-member district. *Wright*, 979 F.3d at 1303 (emphasis added) (citing *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

Demographic information maintained by the Secretary's office shows that 29.95% of Georgia's electorate is "Black, not of Hispanic origin."[51] These voters are sufficiently numerous and geographically compact to form a majority in at least one single-member district in a five-district plan for the election of Commission members.[52] The illustrative plan proposed by Plaintiffs also shows—and the Secretary acknowledges—that the creation of such a district is possible.[53] Accordingly, the parties agree to all the necessary facts to establish this part of the first *Gingles* prerequisite.

---

[51] ECF 79-1 (Def.'s Stipulated Facts), ¶ 10.

[52] ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 5.

[53] ECF 1-3 (Pls.' Illustrative Districting Plan); ECF 35 (Dec. 8, 2020 H'g Tr.), at 40 (counsel for the Secretary acknowledging Plaintiffs' proposed map draws a majority-minority district).

Plaintiffs further contend that, had their proposed plan been in effect since 2012, it would have allowed Black voters to elect a candidate of their choice in at least one district.[54] The Secretary disputes this assertion.[55]

As the Court reads *Gingles* and its progeny, to satisfy the first prerequisite Plaintiffs need not prove their candidate of choice *would* have been elected. They have put forward enough facts—that the Secretary does not dispute—to establish that their proposed single-member, majority-minority district would give African Americans the **potential** to elect their representative of choice to the Commission. This is sufficient to satisfy the first prerequisite of geography and compactness. *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.") (emphasis in original); *see also Solomon*, 899 F.2d at 1018 n.7 (Kravitch, J. specially concurring) ("So long as the *potential* exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act.") (citing *Gingles*, 478 U.S. at 50 n.17) (emphasis added).

---

[54]   ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 9.

[55]   *Id.*

Plaintiffs are therefore entitled to summary judgment in their favor on the first *Gingles* prerequisite of geography and compactness because they have shown that African Americans are sufficiently large and geographically compact to constitute a majority in a single-member district. The Secretary may present evidence at trial about the inferences the Court should draw from these facts under the totality of the circumstances.

### 2.  Political Cohesiveness

The second *Gingles* prerequisite is that "the minority group . . . show that it is politically cohesive." 478 U.S. at 50. The parties agree that Black voters have been politically cohesive in general elections for members of the Commission since 2012.[56] In fact, Plaintiffs' expert concluded—and the Secretary does not dispute— that such cohesion was present in all general and runoff elections for seats on the Commission from 2012 through the present.[57]

However, the Secretary asserts that there are "no particularized needs of the Black community in the context of utility regulation, because each ratepayer is treated the same and the process of ratemaking is applied statewide."[58] The

---

[56]  ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 6.

[57]  *Id.*, No. 11.

[58]  ECF 79-1 (Def.'s Stipulated Facts), ¶ 8.

Secretary further argues that determining the causes of the polarization—racial or partisan—are inappropriate for resolution on summary judgment.[59]

The Court does not view this second prerequisite as requiring an assessment of the *relevancy* of political cohesion as applied to the functions of the Commission, nor the *causes* of polarization. Rather, the weight to be afforded to this *Gingles* prerequisite and the conclusions to be drawn from it should be part of the totality-of-the-circumstances analysis under the Senate Factors. *Gingles*, 478 U.S. at 37 (identifying extent of racial polarization in elections under second Senate Factor); *Solomon*, 899 F.2d at 1015 (Kravitch, J. specially concurring) (same). *See also Nipper v. Smith*, 39 F.3d 1494, 1497 (11th Cir. 1994) (Tjoflat, J. opinion) (noting Supreme Court and Eleventh Circuit have not yet determined under a totality analysis "whether section 2 plaintiffs . . . must demonstrate that their diminished opportunity to participate in the political process and to elect representatives of their choice is being caused by the interaction of racial bias in the voting community and the challenged scheme") (omission in original).

Plaintiffs are therefore entitled to summary judgment on the second *Gingles* prerequisite. In so ruling, the Court draws no conclusions or inferences about why

---

[59]   ECF 85 (Def.'s Resp. to Pls.' Second MSJ), at 12–14.

candidates of choice were not elected, the causes of polarization, nor even the relevancy of these facts given the functions of the Commission.[60] The parties remain free to present evidence on these issues at trial.

### 3.     Racial Bloc Voting

The third *Gingles* prerequisite requires that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed — usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citations omitted).

The parties agree that, since 2012, of the 25 candidates for the Commission whose race was known, four were Black.[61] Candidates preferred by Black voters in those elections were (1) not supported by the majority of white voters and (2) defeated,[62] though such candidates are not themselves necessarily Black.[63] General elections for Commission members during that time were polarized along

---

[60]  *Id.* at 14 (arguing the Eleventh Circuit has held it is improper to resolve such issues at summary judgment).

[61]  ECF 79-1 (Def.'s Stipulated Facts), ¶ 11.

[62]  ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 7.

[63]  *See, e.g.*, ECF 79-4 (Popick Expert Report), at 13 (identifying race of black-preferred candidates).

racial lines.[64] White voters thus vote sufficiently as a bloc in Commission elections to have defeated the Black-preferred candidate in every election since 2012.[65]

The parties also agree that their experts appropriately used a statistical estimating method called Ecological Inference (EI) to determine the existence of polarization in voting.[66] The EI method shows "significant polarization" in Georgia elections,[67] but the parties resolutely disagree about the cause(s). The Secretary attributes it to partisanship.[68] Plaintiffs counter that race heavily informs a voter's partisan preferences.[69] Plaintiffs also argue that the reason for the polarization is not relevant to an analysis of the *Gingles* prerequisites.[70]

In *Gingles*, the Supreme Court treated the terms "racial bloc" and "racial polarization" as interchangeable. 478 U.S. at 53 n.21. While the *extent* of racial polarization is one of the Senate Factors, *id.* at 55, the *existence* of racial-block voting is part of the *Gingles* third prerequisite. In establishing this prerequisite, "the

---

[64]   ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 8.

[65]   *Id.*, No. 13.

[66]   ECF 87-2 (Pls.' Resp. to Def.'s SAMF), No. 1.

[67]   *Id.*, No. 2.

[68]   *See generally* ECF 80-3 (Barber Expert Report).

[69]   *See generally* ECF 80-4 (Fraga Rebuttal Report).

[70]   ECF 87-2 (Pls.' Resp. to Def.'s SAMF), Nos. 3–7, 9–10.

minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives." *Id.* at 51.

> [T]he question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting.

*Id.* at 56 (citations omitted).

Further, the plurality opinion in *Gingles* concluded that, "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. ***It means simply that the race of voters correlates with the selection of a certain candidate or candidates***; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* at 51 (emphasis added). Thus, four justices concluded that the existence of political polarization does not negate the import of racial-bloc voting. *See also generally Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (emphasizing that "Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone"); *Davis*, 139 F.3d 1414 (not requiring racial bias to be the cause of racial bloc

voting to establish the *Gingles* factors). Thus, the Court does not interpret the applicable case law as requiring proof of intentional racial bias on the part of the electorate to satisfy the third prerequisite under *Gingles*.

The Court concludes that Plaintiffs have shown the existence of racial-bloc voting as a matter of law, and entry of summary judgment in favor of Plaintiffs on the third *Gingles* prerequisite is appropriate. However, given the "discrete inquiries" necessary under the Senate Factors to assess "legally significant" racial polarization and the extent of such polarization, those elements and the weight they should receive must be examined at trial.

### 4. Summary

Plaintiffs' motions for summary judgment are **GRANTED** with respect to the three basic *Gingles* factors—(1) geography and compactness, (2) political cohesiveness, and (3) racial bloc voting. The causes of polarization, including the effects of partisanship, will be examined as part of the totality-of-the-circumstances analysis at trial, as will Plaintiffs' proposed remedy and injury.

### C. The Secretary's Affirmative Defenses

Plaintiffs' motions for summary judgment challenge all of the Secretary's affirmative defenses. Those defenses are:

1. The allegations in Plaintiffs' Complaint fail to state a claim upon which relief may be granted.

2. Plaintiffs' claims are barred for failure to name necessary and indispensable parties.

3. Plaintiffs lack constitutional standing to bring this action.

4. Plaintiffs lack statutory standing to bring this action.

5. Plaintiffs' federal claim against Defendant is barred by the Eleventh Amendment to the United States Constitution.

6. Plaintiffs' claim is barred by sovereign immunity.

7. Plaintiffs' Complaint requests relief that will result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the use of race as a predominate factor in the redistricting process, which is prohibited by the Equal Protection Clause of the Fourteenth Amendment.

8. Plaintiffs' Complaint requests relief that will result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the alteration of the form of government of the State of Georgia.

9. Defendant denies that Plaintiffs have been subjected to the deprivation of any right, privilege, or immunity under the Constitution or laws of the United States.[71]

The Secretary's Tenth Affirmative Defense is actually a reservation of rights: "Defendant reserves the right to amend its defenses and to add additional ones, including lack of subject matter jurisdiction based on the mootness or ripeness

---

[71] ECF 37 (Ans.), at 1–3.

doctrines, as further information becomes available in discovery."[72] The Secretary has withdrawn his Seventh, Ninth, and Tenth Affirmative Defenses,[73] and the Court has already addressed the Second, Third, Fourth, and Eighth Affirmative Defenses above. The Court addresses the Secretary's remaining affirmative defenses (First, Fifth, and Sixth) *seriatim*.

### 1.  First Affirmative Defense: Failure to State a Claim

The Court has already ruled that Plaintiffs' Complaint withstood dismissal under Rule 12(b)(6).[74] Discovery is now complete. The Secretary's contention that Plaintiffs' first summary judgment motion was premature is therefore moot. The Secretary's argument about why the Court's Motion to Dismiss Order did not dispose of this defense is that the denial was "on an exceedingly charitable standard of review," and surviving summary judgment is different.[75] That is true but somewhat beside the point. As Plaintiffs point out, whether a party has failed to state a claim is determined based on the face of the pleading. To withstand dismissal under Rule 12(b)(6), "a ***complaint*** must [ ] contain sufficient factual

---

[72]  *Id.* at 3.

[73]  ECF 85, at 7 n.3.

[74]  ECF 36 (Jan. 5, 2021 Op. & Order).

[75]  ECF 62 (Def.'s Resp. to Pls.' First MSJ), at 2–3.

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court has already ruled on the sufficiency of the Complaint, so the Secretary's First Affirmative Defense is moot and judgment in favor of Plaintiffs on that defense is appropriate. The Court **GRANTS** Plaintiffs' motion for summary judgment on the Secretary's First Affirmative Defense. This, of course, has no bearing on the burden Plaintiffs must carry to prevail at trial.

### 2. Fifth and Sixth Affirmative Defenses: Eleventh Amendment and Sovereign Immunity

The Court understands that the Secretary has maintained these defenses to preserve them for appellate review, since the Court has already rejected them.[76]

To reiterate, Supreme Court and Circuit precedent compel this Court to find that (1) private plaintiffs have standing to sue under Section 2; (2) such causes of action are not barred by the Eleventh Amendment; and (3) Section 2 is a valid exercise of congressional power under the Fourteenth and Fifteenth Amendments, overriding states' sovereign immunity. The Court **GRANTS** summary judgment in favor of Plaintiffs on the Secretary's Fifth and Sixth Affirmative Defenses.

---

[76] ECF 36 (Jan. 5, 2021 Op. & Order), at 41, 44–46.

## IV.    Conclusion

The Court **DENIES** Defendant's motion for summary judgment [ECF 80] in its entirety and **GRANTS in part** and **DENIES in part** Plaintiffs' partial motions for summary judgment [ECF 56; ECF 79]. Plaintiffs' motions are **GRANTED** with regard to the *Gingles* prerequisites of (1) geography and compactness; (2) political cohesiveness; and (3) racial bloc voting [ECF 79, at 15–19]. To the extent that Plaintiffs' proposed remedy is considered part of the first *Gingles* prerequisite, Plaintiffs' motions are **DENIED**. Neither Plaintiffs nor the Secretary [ECF 80-1, at 15–21] are entitled to summary judgment on that issue.

Plaintiffs' motions are **GRANTED** as to the Secretary's First and Second Affirmative Defenses [ECF 56, at 5–6].

Plaintiffs' motions are **DENIED** as to the Secretary's Third and Fourth Affirmative Defenses [ECF 56, at 7–9; ECF 79, at 8–10].

Plaintiffs' motions are **GRANTED** as to the Secretary's Fifth, Sixth, and Seventh Affirmative Defenses [ECF 56, at 9–10; ECF 79, at 8].

Plaintiffs' motions are **DENIED** as to the Secretary's Eighth Affirmative Defense [ECF 79, at 10–14].

Plaintiffs' motions are **GRANTED** as to the Secretary's Ninth and Tenth Affirmative Defenses [ECF 79, at 7].

Finally, Plaintiffs separately move the Court to take judicial notice of certain census data that they assert is relevant to the fifth Senate Factor.[77] While the Secretary does not believe the data is relevant to the resolution of this case, he does not oppose the Court taking judicial notice of the data itself.[78] Accordingly, Plaintiffs' Motion for Judicial Notice of Census Data [ECF 57] is **GRANTED**.

Within seven days after entry of this Order, the parties are **DIRECTED** to file a joint scheduling proposal, to include pre-trial deadlines, a proposed timeframe for trial (including an estimated length of the trial), and post-trial deadlines. The joint proposal may note areas of disagreement. Following receipt and review of the joint scheduling proposal, the Court will enter a trial order or schedule a conference for further discussion.

**SO ORDERED** this 24th day of January, 2022.

Steven D. Grimberg
United States District Court Judge

---

[77]   ECF 57 (Pls.' Mot. for Judicial Notice), at 2.

[78]   ECF 61 (Def.'s Resp. to Pls.' Mot. for Judicial Notice).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

RICHARD ROSE, BRIONTÉ MCCORKLE, WANDA MOSLEY, and JAMES WOODALL,

    Plaintiffs,

            v.

BRAD RAFFENSPERGER, *in his official capacity as Secretary of State of the State of Georgia*,

    Defendant.

Civil Action No.
1:20-cv-02921-SDG

## OPINION AND ORDER

Since 1906, commissioners on the Public Service Commission for the State of Georgia have been elected on a statewide, at-large basis. Today, the Court finds that this method of election unlawfully dilutes the votes of Black citizens under Section 2 of the Voting Rights Act of 1965 and must change.

The Secretary of State is hereby **ENJOINED** from preparing ballots for the November 8, 2022 election that include contests for Districts 2 and 3 of the Public Service Commission (PSC); from administering any future elections for vacancies on the PSC using the statewide, at-large method; and from certifying the election of any PSC commissioner who is elected using such method.

## I. Procedural Posture

Plaintiffs filed this lawsuit against the Georgia Secretary of State in July 2020, alleging a violation of Section 2 under the Voting Rights Act (VRA), 52 U.S.C. § 10301. In January 2022, the Court ruled on the parties' competing motions for summary judgment. In its order, the Court concluded that the totality-of-the-circumstances analysis necessary to resolve Plaintiffs' Section 2 claim, including the feasibility of their proposed remedy, required factual findings to be made after a trial.[1]

The Court therefore conducted a five-day bench trial, from June 27 to July 1, 2022. Following the trial, and at the Court's direction, each side filed Proposed Findings of Fact and Conclusions of Law.[2] In a bench trial, this court "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). In vote dilution cases, the Eleventh Circuit has further required that district courts "explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning." *Johnson v. Hamrick*, 196 F.3d 1216, 1223 (11th Cir. 1999) (quoting *Cross v. Baxter*, 604 F.2d 875, 879 (5th Cir. 1979)). Having presided over the bench trial, evaluated the credibility of the witnesses,

---

[1]  *See generally* ECF 97 (Summary Judgment Motions (SJM) Order).

[2]  ECF 144 (Def.'s proposed findings); ECF 145 (Pls.' proposed findings).

and carefully considered the evidence and the record in its entirety, the Court makes the following factual findings and legal conclusions.

## II. Factual Findings

### A. The Structure and Function of the PSC

The Court finds it necessary, as a preliminary matter, to explain how the PSC developed over the last 140 years. That history not only underscores the importance of Plaintiffs' claim, but it also provides context for the Court's conclusion that their proposed remedy is feasible.

The 1877 Georgia Constitution conferred "[t]he power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs" on the Georgia General Assembly. GA. CONST. art. IV, § 2, ¶ I (1877). In 1879, the General Assembly adopted an act concerning the regulation of railroad freight and passenger tariffs, which created the Railroad Commission and provided that three commissioners—appointed by the governor and confirmed by the state senate—would carry out the act's provisions. 1878 Ga. Laws 125 (Law No. 269, *Reg. of Freight & Passenger Tariffs*). Commissioners served a six-year term, and appointments were staggered to ensure that a new commissioner would be appointed every two years. *Id.* § I.

In 1906, the General Assembly changed the method of selecting commissioners to require that they be "elected by the electors of the whole State, who are entitled to vote for members of the General Assembly." 1906 Ga. Laws 100, § 1 (Law No. 453, *Election of R.R. Comm'rs*) (the 1906 Act). The following year, the General Assembly added two commissioners, bringing the total to five. 1907 Ga. Laws 72, § 1 (Law No. 223, R.R. *Comm'n, Membership, Powers, etc.*) (the 1907 Act). The commissioners were to be "elected by the qualified voters of Georgia as prescribed" in the 1906 Act. *Id.*

The General Assembly changed the name of the Railroad Commission to the Public Service Commission in 1922 and expanded its powers and duties. 1922 Ga. Laws 143 (Law No. 539, *R.R. Comm'n Changed to Pub. Serv. Comm'n*). In 1945, the Georgia Constitution was amended to confer on the General Assembly, among other things, the "power and authority of regulating . . . public utilities." GA. CONST. art. IV, § I, ¶ I (1945). The amendment enshrined members of the PSC as constitutional officers who "shall be elected by the people." GA. CONST. art. IV, § IV, ¶ III (1945). The terms of the commissioners remained six years and staggered, as they always had been. *Id.* It was left to the General Assembly to determine the "manner and time of election" of commissioners. *Id.*

Prior to 1998, the Georgia Code provided that any voter in Georgia entitled to vote for members of the General Assembly could vote for members of the PSC, and that election procedures were to be held "under the same rules and regulations as apply to the election of the Governor." 1998 Ga. Laws 1530 (Law No. 978, *Pub. Util. & Pub. Transp.—Pub. Serv. Comm'n; Election of Members; Dist.*) (amending O.C.G.A. § 46-2-1). This formulation of who was entitled to vote for members of the PSC was consistent with the structure employed in the 1906 and 1907 Acts: "elected by the electors of the whole State" and "elected by the qualified voters of Georgia."

In 1998, the General Assembly amended the Georgia Code to require members of the PSC to reside in one of five districts, but the members would continue to be elected by statewide vote. *Id.* at 1531 (adding O.C.G.A. § 46-2-1(a)). Commissioners' terms remained six years and were staggered as prescribed by the State Constitution, although the code amendment altered the method applied to create the stagger. *Id.* (adding O.C.G.A. § 46-2-1(d)). There is no indication from the revision to the statute that the General Assembly intended any change to who would be permitted to vote for PSC members.

Thus, while the Georgia Constitution guarantees that PSC commissioners must be elected by popular vote, what constitutes an election "by the people" is

left to the discretion of the General Assembly. By statute, the General Assembly

has decided that PSC elections are to be held using the same rules and regulations

applied to gubernatorial elections; that general elections must take place every two

years; and that one commissioner must live in each of the five residency districts

for which they are seeking office for at least 12 months prior to the election and

throughout the six-year term. O.C.G.A. § 46-2-1.

The seats from PSC Districts 2 and 3 are on the ballot for the November 8,

2022 general election and are at the heart of this dispute.[3] Between 2012 and 2022,

District 3 included Clayton, DeKalb, Fulton, and Rockdale Counties.[4] According

to 2010 Census data of which the Court took judicial notice, the population of

District 3 was 52.02% Black (including those who identified as another race in

addition to Black).[5] The residency districts were redrawn in 2022, after the 2020

Decennial Census, pursuant to Georgia Senate Bill 472. 156th Gen. Assemb., Reg.

Sess. (Ga. 2022). District 3 is now comprised of Clayton, DeKalb, and Fulton

---

[3]    Trial Tr. 438:3–11 (Barnes); PX-66 (Barnes Decl.), at 10.

[4]    PX-2, at 1 (2012 PSC map).

[5]    *Id.* at 2 (population data for 2012 PSC map); PX-8 (Popick Rpt.), at 16 (tbl.3).

Counties.[6] The population was 48.79% Black and 9.88% Hispanic (including Black Hispanics).[7]

PSC Chairperson Tricia Pridemore testified that the PSC has three primary roles—ensuring the "safety, reliability and affordability of utilities."[8] PSC decisions affect the lives of every Georgian because they determine how much consumers pay for utilities and whether utility providers may pass certain costs on to their consumers.[9] For example, the PSC sets residential, commercial, and industrial utility rates.[10] It regulates aspects of Georgia Power, including what the company charges customers, and electric energy generation and transmission.[11] On the telecommunications side, the PSC regulates pole attachments and landlines. It also has some jurisdiction over connectivity and rural broadband internet connectivity.[12]

---

[6]   PX-3, at 1 (2022 PSC map).

[7]   *Id.* at 2 (population data for 2022 PSC map).

[8]   Trial Tr. 388:19–21 (Pridemore).

[9]   PX-36 (PSC website printout), at 2; PX-98, at 13 (Eaton Tr. 83:11–18); PX-103, at 8 (Shaw Tr. 37:20–21).

[10]  Trial Tr. 390:2–6 (Pridemore).

[11]  *Id.* 388:24–389:2 (Pridemore).

[12]  *Id.* 389:18–21 (Pridemore).

The PSC hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders to come to a decision. It decides utility rates that affect all ratepayers throughout Georgia. The PSC can also assess fines and administer federal funds for pipeline safety across Georgia.[13] The PSC is therefore "an administrative body" that performs both "quasi-legislative" and "quasi-judicial" functions "by virtue of the express powers conferred upon it by the General Assembly." *Tamiami Trail Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 213 Ga. 418, 428 (1957) (citations omitted).[14]

### B. Census Data and Georgia's Demographics

Based on the 2020 Census, there are 10,711,908 Georgians. Of those, 50.1% identify as non-Hispanic White; 33.0% identify as "any part" Black (meaning Black alone or in combination with another race); and 16.9% identify as members of other racial groups.[15] According to data from the Secretary of State, Georgia had 7,004,034 active voters as of December 2021. Of those, 53.1% identified as White;

---

[13]  ECF 121-3 (Joint Stip.), ¶¶ 1, 14–17, 19.

[14]  Trial Tr. 412:3–4 (Pridemore); ECF 121-3 (Joint Stip.), ¶¶ 14–15; PX-98, at 14–15 (Eaton Tr. 85:18–25).

[15]  ECF 121-3 (Joint Stip.), ¶ 4.

29.4% identified as Black; 12.1% identified as members of another racial group; and, for 8.8%, their race was unknown.[16]

Further, American Community Survey (ACS) and 2020 Census data show significant continuing disparities between the socioeconomic circumstances of Black and White Georgians. Per capita income for Black Georgians is $24,215, while per capita income for White Georgians is almost double that, at $40,348.[17] The poverty rate for Black Georgians is more than twice that of White Georgians — 18.8% compared to 9%.[18]

Georgia has an unemployment rate of 4.8% for those in the labor force who are at least 16 years old. The rate is 3.8% for non-Hispanic Whites and 6.9% for Blacks.[19] The median household income in Georgia is $61,980. For households headed by non-Hispanic Whites, the median income is $71,790. It is just $47,096 for Black-headed households.[20] Sixty-four percent of all households in Georgia own their own homes. Among households headed by non-Hispanic Whites, 75.1%

---

[16]  *Id.* ¶ 6.

[17]  ECF 57 (Mot. for Judicial Notice), ¶ 8. The Court granted Plaintiffs' motion for judicial notice of various census data. ECF 97 (SJM Order), at 1.

[18]  ECF 57 (Mot. for Judicial Notice), ¶ 6.

[19]  *Id.* ¶ 5.

[20]  *Id.* ¶ 7.

are homeowners and 24.9% are renters. For Black-headed households, only 47.5% own their own homes and 52.5% rent.[21] For all households in Georgia, 11.2% receive Supplemental Nutrition Assistance Program (SNAP) benefits (also known as food stamps). Of non-Hispanic White-headed households, 6.5% receive SNAP benefits. That percentage is over three times higher—20.3%—for Black-headed households.[22] Black Georgians are also less likely than White Georgians to have graduated high school or obtained a college degree.[23]

### C.    The Plaintiffs

The Plaintiffs are Black voters who reside in PSC District 3 and who voted in recent PSC elections.[24] Although each testified that, in their experience, race plays a role in Georgia elections,[25] none have been prevented from casting a vote in Georgia because of their race.[26]

---

[21]   *Id.* ¶ 9.

[22]   *Id.* ¶ 10.

[23]   *Id.* ¶¶ 3-4.

[24]   *Id.* ¶ 2.

[25]   Trial Tr. 60:2–61:10 (Woodall), 321:12–21 (McCorkle), 479:10–480:4 (Rose), 545:16–25 (Mosley).

[26]   ECF 121-3 (Joint Stip.), ¶ 3. *See also* Trial Tr. 97:2–4 (Woodall), 502:12–4 (Rose).

Plaintiff Richard Rose is the president of the NAACP's Atlanta chapter.[27] In that role, he regularly attends community meetings with Black Georgians. Rose also fields calls from Black Georgians and maintains contact with political leaders in the Black community.[28] He is aware of issues particular to the Black community that he believes fall within the PSC's purview.[29]

Plaintiff Wanda Mosley is the national field director at Black Voters Matter Fund, which is based in Atlanta. Prior to that, she served as the organization's senior state coordinator in Georgia.[30] In that role, Mosley was responsible for organizing and registering Black voters and conducting outreach in Black communities, which has provided her an understanding of issues that are important to Black Georgians.[31]

Plaintiff James Woodall is a minister and former president of the Georgia NAACP.[32] Woodall testified that, during his tenure with the NAACP, his top priority was understanding the concerns of Black Georgians, so he regularly

---

[27] Trial Tr. 469:12–13, 470:1–3.

[28] *Id.* 471:24–472:20.

[29] *Id.* 472:21–23.

[30] *Id.* 517:1–2, 520:13–14, 520:24–521:3.

[31] *Id.* 522:10–13.

[32] *Id.* 45:11–18.

attended meetings where Black Georgians voiced their issues.[33] Woodall's engagement with Black Georgians makes him aware of issues that fall within the PSC's purview and that have a disproportionate effect on Black Georgians.[34]

Plaintiff Brionté McCorkle is executive director of Georgia Conservation Voters, a nonprofit organization that advocates for environmental justice and organizes and mobilizes communities around environmental justice issues.[35] She has had significant involvement with the PSC and has attended PSC hearings.[36] Her work has provided her with an understanding of the particularized needs of Black Georgians when it comes to issues that fall within the PSC's purview.[37]

The Court found each Plaintiff to be credible when it comes to identifying and understanding how matters within the PSC's jurisdiction affect the Black community.[38]

---

[33] *Id.* 47:9–48:11.

[34] *Id.* 48:12–14, 54:12–22.

[35] *Id.* 261:3–262:2, 262:11–18.

[36] *Id.* 274:25–276:21, 279:15–20, 277:11–15.

[37] *Id.* 279:25–281:9.

[38] At a bench trial, "it is the exclusive province of the judge . . . to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).

### D.     The Defendant

Defendant Brad Raffensperger (the Secretary) was sued in his official capacity as the Secretary of State for the State of Georgia.[39] He is Georgia's chief election official and is a nonvoting member of the State Election Board. O.C.G.A. §§ 21-2-50(b), 21-2-30(d). The Election Board must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2). Among his other duties, the Secretary is responsible for certifying the results of PSC elections.[40]

### E.     The Experts

The parties presented three experts—two testifying for Plaintiffs and one for the Secretary—who evaluated mass voting behavior in Georgia and opined on voting disparities and the reasons for those disparities.

### 1.     Stephen J. Popick, Ph.D.

Plaintiffs offered Dr. Stephen Popick to discuss the statistical analysis of election data.[41] From 2006 to 2012, Dr. Popick worked in the Voting Rights Section

---

[39]   ECF 1 (Compl.), ¶ 10.

[40]   Trial Tr. 446:3–5, 446:21–24 (Barnes).

[41]   *Id.* 165:3–6, 166:9–12.

of the Civil Rights Division at the U.S. Department of Justice.[42] Here, Dr. Popick conducted a racial-bloc voting analysis of PSC election contests from 2012 to 2020 to ascertain whether voting in Georgia was racially polarized.[43] He has conducted hundreds of such analyses on thousands of individual elections.[44] Dr. Popick referred to this as the "separate electorates test," which predicts whether Black voters would have elected a different candidate if the election were held only amongst Black voters as opposed to Black and White voters together.[45]

Dr. Popick found strong evidence of racial polarization in PSC elections and concluded that "Black voters were cohesive in their support of the same candidate in each election," and "White voters were cohesive around a different candidate in each election, and that the candidate preferred by White voters won 11 out of 11 times."[46] Since 2012, Black voters have voted as a bloc at rates ranging from 79.18 to 97.84%.[47] During that same time frame, White voters also voted as a bloc

---

[42]  *Id.* 160:8–12.

[43]  *Id.* 166:17–20.

  In *Gingles*, the Supreme Court used the terms "racial bloc" and "racial polarization" interchangeably. *Thornburg v. Gingles*, 478 U.S. 30, 53 n.21 (1986).

[44]  Trial Tr. 183:17–23.

[45]  *Id.* 182:17–21.

[46]  *Id.* 168:16–22, 197:12–19.

[47]  PX-8 (Popick Rpt.), at 11.

at rates ranging from 75.72 to 87.51%.[48] In each of the six most recent general and runoff elections for PSC commissioners, Black voters supported the same candidate at a rate greater than 94%.[49] Despite this strong cohesion, the Black-preferred candidate lost in all elections despite the Black-preferred candidate going to a runoff in two of those elections.[50] Dr. Popick testified that, in all of his years of experience, his analysis of the PSC elections in Georgia since 2012 "is one of the clearest examples of racially polarized voting" he has ever seen.[51]

The Court finds Dr. Popick's opinions and conclusions to be highly persuasive and compelling evidence of racial polarization in PSC elections.

### 2. Bernard Fraga, Ph.D.

Plaintiffs also offered the testimony of Dr. Bernard Fraga, an expert in political data analysis.[52] Dr. Fraga testified that Georgia's method of conducting PSC elections involves several practices that enhance the opportunity for the dilution of Black votes, including a statewide method of election despite the existence of residency districts, a majority-vote and runoff requirement, and

---

[48] *Id.* at 12.

[49] Trial Tr. 198:1–11; PX-8 (Popick Rpt.), at 11.

[50] Trial Tr. 197:18–20.

[51] *Id.* 183:20–23, 198:12–17.

[52] *Id.* 571:23–572:3.

staggered terms and numbered seats, which Dr. Fraga believes are an "anti-single shot" mechanism.[53]

Dr. Fraga testified that Georgia's combination of a statewide election with numbered seats and residency districts is quite unusual.[54] He opined that this practice institutionalizes a form of vote dilution by allowing the State's majority-White population to dilute the votes of any majority-Black residency district in voting for the commissioner from that district.[55] And, because elections are staggered, a minority group has less of an opportunity to concentrate its voting strength behind a candidate of choice.[56]

Dr. Fraga also testified as to whether members of the minority group have been denied access to a candidate slating process. He views the system of gubernatorial appointments employed in Georgia for PSC vacancies as an informal slating process, which confers an incumbency advantage on the person

---

[53] *Id.* 574:3–9; ECF 121-3 (Joint Stip.), ¶ 13.

"Single-shot voting" occurs when a minority is able to win some at-large seats, but only "if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles,* 478 U.S. at 38 n.5.

[54] Trial Tr. 574:18–575:1, 575:16–25.

[55] *Id.* 576:1–11.

[56] *Id.* 577:15–24.

appointed for the open position, although the incumbency advantage has decreased over time.[57] Dr. Fraga looked at gubernatorial appointments to the PSC from 1996 through 2020.[58] Of those, only one (David Burgess) was Black.[59] Black appointees therefore comprised only 20% of the total appointments during that time. This is an underrepresentation in comparison to Black Georgians' 32.1% share of the citizen voting age population (CVAP).[60] Based on this analysis, Dr. Fraga concluded that Black Georgians are excluded from the informal slating process and, therefore, are less likely to enjoy the benefits of incumbency.[61]

Dr. Fraga also testified on "the[] lingering effects of discrimination manifesting in lower rates of participation in the electoral process."[62] For example, there was an approximately 5% to 11% voter turnout gap between White voters and Black voters in each general and runoff election from 2016 through 2021.[63] Dr. Fraga attributes that gap, and the lower rate of political participation by Black

---

[57] *Id.* 589:22–590:8, 590:16–20, 611:20–612:7.

[58] *Id.* 590:9–15; PX-5 (Fraga Rpt.), at 14.

[59] Trial Tr. 591:16–20; PX-5 (Fraga Rpt.), at 14.

[60] Trial Tr. 591:24–592:2; PX-5 (Fraga Rpt.), at 5, 15.

[61] Trial Tr. 592:3–10; PX-5 (Fraga Rpt.), at 15.

[62] Trial Tr. 585:14–18.

[63] *Id.* 579:22–583:23; PX-5 (Fraga Rpt.), at 6.

voters, to the lingering effects of discrimination.[64] He also found that Black Georgians donate to candidates at a lower rate than White Georgians.[65] Eighty percent of individual donors were White, but less than 10% were Black.[66]

Dr. Fraga found that Black candidates are substantially less likely to win office in non-judicial statewide elections for the PSC and other offices than White candidates.[67] He examined the 164 statewide Georgia elections that occurred between 1972 and 2021, and only four Black candidates won during that time.[68] The four successful Black candidates won a total of eight separate elections—4.9% of the total. Raphael Warnock was elected U.S. Senator in 2020; Mike Thurmond was elected Commissioner of Labor in 1998, 2002, and 2006; Thurbert Baker was elected Georgia Attorney General in 1998, 2002, and 2006; and David Burgess was elected to the PSC in 2000.[69] Thus, despite comprising 32.1% of the CVAP in Georgia, Black candidates were only successful 4.9% of the time. Of the twelve major-party Black candidates to enter the primary process for U.S. Senate and

---

[64] Trial Tr. 583:24–584:4.

[65] *Id.* 584:5–12.

[66] *Id.* 585:3–9; PX-5 (Fraga Rpt.), at 10.

[67] Trial Tr. 585:19–586:3; PX-5 (Fraga Rpt.), at 4, 11–13.

[68] Trial Tr. 586:4–13; PX-5 (Fraga Rpt.), at 11–12.

[69] Trial Tr. 587:8–19; PX-5 (Fraga Rpt.), at 11–12.

Governor since 2006, only two made it to the general election ballot.[70] Dr. Fraga concluded that Black Georgians are underrepresented in statewide offices and statewide elections.[71]

The Court found Dr. Fraga's analysis, opinions, and conclusions to be highly persuasive and entitled to great weight.

### 3. Michael Barber, Ph.D.

The Secretary presented Dr. Michael Barber as an expert in political science, the interplay between racial and political polarization, and statistical analysis.[72] Dr. Barber testified that Black voters consistently prefer Democratic candidates regardless of the race of the candidate.[73] He generally found that Black voters supported Democratic candidates between 86% and 93% of the time, compared with less than 40% for White voters.[74] Dr. Barber did not examine PSC elections at all and could not speak to the effect of race or partisanship in those contests.[75]

---

[70] Trial Tr. 588:10–589:2; PX-5 (Fraga Rpt.), at 12.

[71] Trial Tr. 588:6–9; PX-5 (Fraga Rpt.), at 11–12.

[72] Trial Tr. 625:7–13, 627:22–628:1.

[73] *Id.* 639:2–14; DX-28 (Barber Rpt.), at 6–10.

[74] DX-28 (Barber Rpt.), at 9.

[75] Trial Tr. 705:8–10, 17–19.

The Court generally credits Dr. Barber's analysis but finds it of limited utility in this case. Dr. Barber did not consider the impact of race on party affiliation, which was a crucial omission. Indeed, Dr. Barber conceded that his model did not account for factors that may determine partisanship, including race or racial identity.[76] This omission is surprising in light of his own prior scholarship, which concluded that "race is the strongest predictor" of a person's actual partisan affiliation.[77]

Plaintiffs called Dr. Fraga back to the stand to rebut Dr. Barber's testimony. Dr. Fraga opined that it is impossible to separate racial identity from partisan affiliation because "everything related to party, in part, is due to race, not the other way around."[78] Dr. Fraga criticized Dr. Barber's failure to account for the large volume of political science research showing that race or racial identity is a key determinant of an individual's party affiliation.[79] By failing to consider what

---

[76] *Id.* 697:23–698:7.

[77] PX-111 (Michael Barber & Jeremy Pope, *Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public*, Am. Pol. Res. (2022), at 4–5). *See also* Trial Tr. 701:6–702:8, 702:23–704:17.

[78] Trial Tr. 760:20–761:16.

[79] *Id.* 759:5–761:3.

causes party identification, Dr. Fraga opined, Dr. Barber's attempt to disentangle race and party is inherently flawed.[80]

The Court finds that the interplay between race and partisanship is difficult if not impossible to disentangle. But, as discussed further in its Conclusions of Law, the Court is unconvinced that such disentangling is necessary or even relevant to the vote dilution analysis.

### F.        The Commissioners

Each of the current PSC commissioners testified live or by deposition during the trial. The Court highlights only the portions of their testimony that are relevant to the Court's analysis.

Tricia Pridemore, commissioner for District 5, is the PSC chairperson.[81] She testified that it takes a majority vote of the commissioners to raise utility rates and decide Integrated Resource Plan cases.[82] She also testified that the PSC has a consumer affairs group that works for all five commissioners to field issues raised by consumers, which prevents preferential treatment of certain commissioners

---

[80]    *Id.* 761:17–763:7.

[81]    *Id.* 352:13–20.

[82]    *Id.* 400:21–23, 412:5–10.

and districts.[83] Pridemore does not believe that Black ratepayers have different needs than White ratepayers.[84]

In her opinion, statewide, at-large elections "provide centralization of thought for energy and utility policy," as commissioners avoid fighting over decisions such as more or less favorable rates, where to locate new plants and energy facilities, or which districts receive broadband or lower pole attachment rates.[85] She believes the current structure allows commissioners to "work in the best interest of the whole state" and to use the existing transmission, pipeline, and telecommunication systems to "maximize the needs for the state."[86] Pridemore believes that the statewide nature of its elections allows the PSC to keep utility rates below the national average and helps drive the State's economic development, although she provided no evidence of any correlation.[87]

Pridemore opposes single-member districts, which she believes would introduce favoritism and politics into utility regulation.[88] She believes it would be

---

[83]  *Id.* 391:5–6, 11–12, 393:18–24.

[84]  *Id.* 418:21–419:1, 422:20–21.

[85]  *Id.* 386:23–387:12.

[86]  *Id.* 387:13–17.

[87]  *Id.* 387:17–22.

[88]  *Id.* 397:19–21.

"detrimental to how the state operates and oversees utility regulation" for commissioners to be elected by district instead of statewide.[89]

The Court finds Pridemore's testimony credible concerning the inner workings and functions of the PSC—matters that relate to her core responsibilities as chairperson. However, her lay opinions regarding the effect of changing from statewide to district-based elections were speculative and are not afforded much weight.

Charles Eaton is a former commissioner of District 3, where Plaintiffs reside.[90] In 2006, he defeated the only Black commissioner up to that point in the District 3 PSC runoff election. Although the Black incumbent—David Burgess— received more votes in the general election, he lost to Eaton in the runoff.[91] Even in the runoff, though, Burgess won a majority of the votes in each of the counties that comprised District 3.[92] In other words, Eaton would not have won the District

---

[89]   *Id.* 396:13–14.

[90]   ECF 121-3 (Joint Stip.), ¶ 3; PX-98, at 2 (Eaton Tr. 18:4–7).

    Eaton testified by deposition. PX-104 (Eaton video deposition clips).

[91]   PX-98, at 11 (Eaton Tr. 71:3–72:1).

    The Court overrules the Secretary's Fed. R. Evid. 602 and 701 objections. Eaton is competent to testify and has personal knowledge of election results related to his own candidacy.

[92]   PX-98, at 11, 12 (Eaton Tr. 73:15–17, 77:5–8).

3 election if it had been a single-member district.[93] Nor would he have won

reelection in 2012 or 2018 if the elections had been by single-member district.[94]

Indeed, in every PSC election, Eaton was not the candidate of choice for the voters

of District 3.[95]

Timothy Echols is the commissioner from District 2.[96] He believes the

purpose of the residency districts for PSC commissioners is "[t]o make sure that

the state is fully represented geographically."[97] Echols believes that the General

Assembly "wanted to make sure that rural parts of the state had representation

and that metro Atlanta didn't dominate politics in Georgia."[98] In his view, energy

regulation is "the least partisan of all politics, probably, in any state."[99]

---

[93]   *Id.* at 11 (Eaton Tr. 72:2–73:20).

[94]   *Id.* at 4–5, 10–11 (Eaton Tr. 34:23–36:1, 38:3–16, 69:18–70:24).

Although it is unclear whether the Secretary's objections are limited to specific portions of this testimony, the Court similarly overrules the Secretary's Rule 602 and 701 objections. Indeed, counsel for the Secretary conceded during trial that there was no dispute that the counties in District 3 voted for Eaton's opponent in the 2018 election. Trial Tr. 152:10–20.

[95]   PX-98, at 13 (Eaton Tr. 79:18–25).

[96]   PX-99, at 2 , 13 (Echols Tr. 20:18–21:1, 52:22–24).

Echols testified by deposition. PX-105 (Echols video deposition clips).

[97]   PX-99, at 14, 16 (Echols Tr. 54:19–22, 56:9–15).

[98]   *Id.* at 16 (Echols Tr. 56:25–57:7).

[99]   *Id.* at 56 (Echols Tr. 160:5-8). *See also generally id.* (Echols Tr. 159:8–160:8).

Jason Shaw, the commissioner from District 1, testified that he was appointed to the PSC in 2018.[100] There was no application process for the position; he was simply contacted by the governor about the possible appointment.[101] Likewise, Lauren McDonald, the commissioner from District 4, was first appointed to the PSC in 1998.[102] As with Shaw, McDonald did not apply for the position but was contacted by the governor and asked to accept the appointment.[103] He believes the residency districts were created to ensure that the PSC represents all parts of Georgia.[104] Nothing about his day-to-day work would change if he were elected only by the voters of District 4, except that his workload would be reduced due to fewer phone calls from constituents in other districts.[105]

---

The Secretary's Rule 403 and 701 objections are overruled. Echols may express his lay opinion on these issues.

[100] PX-103, at 6 (Shaw Tr. 32:20–33:2).

[101] *Id.* at 9 (Shaw Tr. 40:13–22).

[102] PX-101, at 3–4, 6 (McDonald Tr. 25:13–21, 27:17–28:2, 28:17–18, 44:11-14); PX-107 (McDonald video deposition clips).

[103] PX-101, at 3–4 (McDonald Tr. 25:13–28:2).

[104] *Id.* at 18 (McDonald Tr. 92:5–13).

Plaintiffs' foundation objection is overruled. McDonald may testify as to his personal opinion.

[105] *Id.* at 13 (McDonald Tr. 62:1–7).

Terrell Johnson is the current commissioner from District 3, where Plaintiffs reside.[106] Governor Kemp appointed Johnson to fill the vacancy in 2021 when Eaton was appointed to the bench.[107] Johnson is only the second Black person to serve on the PSC.[108] Like Shaw and McDonald, he did not apply for appointment but was contacted by a member of the governor's staff.[109] He had never considered running for the PSC, though he does not believe that the job requires any specialized knowledge in power or energy.[110] None of his duties would change if he were elected only by the residents of District 3.[111]

Like the testimony of Pridemore, the Court finds the testimony of each of the remaining commissioners to be credible on matters within their personal knowledge.

---

[106] PX-100, at 7 (Johnson Tr. 32:20–33:10).

Johnson testified by deposition. PX-106 (Johnson video deposition clips).

[107] PX-100, at 7 (Johnson Tr. 32:20–33:10); PX-35 (July 21, 2021 Press Release by the Office of the Governor); Aug. 26, 2021 Executive Order 1 *available at* https://gov.georgia.gov/ executive-action/executive-orders/2021-executive-orders.

[108] ECF 121-3 (Joint Stip.), ¶ 1; PX-100, at 10 (Johnson Tr. 40:11–17).

[109] PX-100, at 9 (Johnson Tr. 37:24–39:10).

[110] *Id.* at 14 (Johnson Tr. 61:1–4).

[111] *Id.* at 11 (Johnson Tr. 49:20-50:5).

### G.    The District 3 Candidates

Plaintiffs presented the testimony of two former candidates for PSC District 3, both of whom were unsuccessful. Lindy Miller challenged Eaton in 2018.[112] She won every county in District 3 but lost the election statewide.[113] Miller testified that, based on the economic data, there are "many more low-income Black rate payers than high-income Black rate payers and [a] disproportionate number of low-income Black rate payers [relative to] low-income White rate payers in Georgia."[114] She does not believe the PSC has been responsive to the needs of low-income Black voters.[115] She does not believe that the commissioners had "openly advocat[ed] or highlight[ed] issues that were important to Black communities, like energy burden, for example," or reducing the fees customers were being charged in connection with Georgia Power's construction of nuclear power facilities.[116]

---

[112]  ECF 130-3, at 5, 31 (Miller Tr. 5:9–12, 31:2–10).

Miller testified by video deposition. PX-110.

[113]  ECF 130-3, at 33 (Miller Tr. 33:21–25).

[114]  *Id.* at 52 (Miller Tr. 52:13–17). *See generally id.* at 51–53 (Miller Tr. 51:21–53:6).

[115]  *Id.* at 24, 28–30 (Miller Tr. 24:8–16, 28:14–30:19).

[116]  *Id.* at 27 (Miller Tr. 27:4–19). Ms. Miller described an "energy burden" as "what percent of your gross household income [ ] you spend on energy costs." *Id.* at 18 (Miller Tr. 18:6–8).

Miller testified to her experience in running a statewide election campaign and the difficulties that entails.[117] In her view, the statewide election of commissioners creates an "accountability" question.[118] Although a candidate must live in a particular district to run for the PSC and presumably has relationships and networks in that district, that person must win votes from those outside the district who may not relate to or experience the issues facing lower-income or Black populations.[119]

Chandra Farley lives in Atlanta and lost in the 2022 Democratic primary for PSC District 3.[120] Farley also discussed the disproportionate effect that "energy burden" has on Black households because they are more likely to be low-income.[121] According to Farley, the PSC is regularly provided with information relating to energy equity and has the ability to lessen the energy burden on Black Georgians, but it has failed to do so.[122] For example, she and others unsuccessfully

---

[117]  *Id.* at 34–36 (Miller Tr. 34:13–36:19).

[118]  *Id.* at 12, 24–25 (Miller Tr. 12:6–8, 24:8–25:19).

[119]  *Id.* at 36–38 (Miller Tr. 36:20–38:3).

[120]  Trial Tr. 99:14–19, 124:5–7, 131:16–132:3.

[121]  *Id.* 109:4–16.

[122]  *Id.* 110:17–111:18, 113:24–116:4.

lobbied the PSC to extend the Covid-related moratorium on utility disconnections.[123]

Although the Court generally found Miller's and Farley's testimony credible, it affords little weight to their lay opinions on matters relevant to the Court's determination.

## III. Conclusions of Law

This Court must conduct an "intensely local appraisal" of the facts to determine what result is compelled by the VRA under the totality of the circumstances. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (cleaned up). This involves a "searching practical evaluation of the 'past and present reality.'" *Id.* (quoting Senate Rpt. at 30, 1982 USCCAN 177, 208). The Court is confident that it has done exactly that.

### A. Vote Dilution Claims Under the Voting Rights Act

Section 2 of the VRA prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . ." 52 U.S.C. § 10301(a). Vote dilution occurs if, based on the totality of circumstances, members of that protected class "have less opportunity than other members of the electorate to participate in the

---

[123] *Id.* 117:7–121:20.

political process and to elect representatives of their choice." *Id.* § 10301(b). Members of the class are not entitled to proportional representation, only equal access to participate in the political process. *Id.*

The Supreme Court has outlined three preconditions that Plaintiffs must show to establish a vote-dilution claim: (1) the minority group must be large and geographically compact enough to form a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the minority group must show that the majority votes sufficiently as a bloc to generally defeat the minority group's preferred candidate. *Gingles*, 478 U.S. at 50–51.

Once a court is satisfied that these preconditions are met, it must evaluate several factors that were identified in the Senate Report accompanying the 1982 VRA amendment (the Senate Report). *Id.* at 44–45. The so-called "Senate Factors" are:

1.    the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2.    the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.    the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single

shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.      whether political campaigns have been characterized by overt or subtle racial appeals;

7.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

8.      whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

9.      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990) (Kravitch, J.,

specially concurring) (citing Senate Rpt. at 28–29, 1982 USCCAN 206–07); *see also*

*Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1289 (11th Cir.

2020) (same). Vote dilution is highly likely where these factors are present.

*Solomon*, 899 F.2d at 1015; *see also Gingles,* 478 U.S. at 45 (concluding that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims") (footnote omitted).

The Supreme Court has instructed lower courts to weigh Senate Factors 2 and 7 more heavily: "If present, the other factors . . . are supportive of, but *not essential to,* a minority voter's claim." *Gingles*, 478 U.S. at 48 n.15 (emphasis in original); *see also City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1555 (11th Cir. 1987) (*Carrollton NAACP*) (reversing the district court's judgment for the defendants because it failed to sufficiently consider racial bloc voting and racial polarization).

The Secretary argues that Plaintiffs' votes are not being diluted "on account of race or color" because, as Dr. Barber testified, the polarization that exists in Georgia elections is the result of partisanship rather than race.[124] The Court's rejection of this argument is more fully developed in its analysis of Senate Factor 2 below, but it warrants a preface here.

Plaintiffs do not need to show that their votes have been diluted because of purposeful discrimination. It is the *result* of the challenged practice—not the intent

---

[124]  *See, e.g.*, Trial Tr. 833:3–834:6 (Def.'s closing); ECF 121-2 (Def.'s Stmt. of the Case), at 3.

behind it — that matters. *Gingles,* 478 U.S. at 35–36; *see also Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (emphasizing that "Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone"). Thus, even if race and partisanship are highly correlated and hard to disentangle, the fact remains that there is a disproportionate — and dilutive — effect on Black voters.

But more importantly, nothing in the VRA requires a plaintiff to control for every possible covariant to ensure that the discriminatory effect is caused solely or even predominantly by race as opposed to some other factor. Race and partisanship are correlated because Black voters may perceive that the issues that matter to them are more likely to be addressed by a particular party or candidate. In other words, they are not selecting Democratic candidates because they are Democrats; they are selecting Democratic candidates because they perceive, rightly or wrongly, that those candidates will be more responsive to issues that concern Black voters. This is supported by Dr. Fraga's expert testimony that race is a key factor in determining party affiliation.[125]

The Secretary's argument is flawed because it asks the Court to introduce a factor into the vote dilution analysis that is simply not supported by the law. A

---

[125] Trial Tr. 759:5–761:3.

high correlation between race and partisanship does not *undermine* a Section 2 claim, it is *necessary* to it. The minority voting group must be politically cohesive, which is a *Gingles* prerequisite, and the best (albeit imperfect) proxy for political cohesion is partisan alignment. We expect politically cohesive groups to vote in corresponding patterns.

To determine whether a practice dilutes the right to vote "on account of race," then, this Court chooses to stay within the confines of the *Gingles* preconditions and the Senate Factors. *See Gingles*, 478 U.S. at 48–51; *Solomon*, 899 F.2d at 1013–16 (Kravitch, J., concurring). The Secretary cannot point to a single case establishing that, even if those factors are satisfied, a plaintiff must still prove that race independent of partisanship explains the discriminatory effect.[126] That is not the law, and this Court will not impose such a requirement.

### B. The *Gingles* Preconditions Are Met.

The Court finds that Plaintiffs carried their burden of showing that the *Gingles* preconditions are satisfied. This Court found at summary judgment that

---

[126] *See, e.g.*, Trial Tr. 841:11–17, 860:22–862:15 (Def.'s closing) (citing the opinion by Judge Tjoflat, joined by one other judge, in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994), and *Alabama State Conf. of the NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803 (N.D. Ala. Feb. 5, 2020), involving elections of judges).

Plaintiffs largely satisfied the three *Gingles* preconditions.[127] The evidence at trial only reinforced that finding, so the Court need only summarize its original *Gingles* analysis here.

As to geography and compactness, it was undisputed that Black voters are a sufficiently large and geographically compact group in current-day Georgia to constitute at least one single-member district in which they would have the potential to elect their representative of choice in district-based PSC elections. *Gingles*, 478 U.S. at 50; *Wright*, 979 F.3d at 1303.[128] Plaintiffs further showed that Black voters are politically cohesive.[129] *Gingles*, 478 U.S. at 51. The Secretary agreed that Black voters have been politically cohesive in general elections for PSC commissioners since 2012.[130] Plaintiffs also established racial-bloc voting by the White majority that enables that majority to defeat Black-preferred candidates, further supported by the trial testimony of Dr. Stephen Popick.[131] *Id.*

---

[127]  *See generally* ECF 97 (SJM Order).

[128]  *Id.* at 24–27.

[129]  *Id.* at 27–29.

[130]  ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 6; ECF 121-3 (Joint Stip.), ¶¶ 9–10.

[131]  ECF 97 (SJM Order), at 29–32; ECF 121-3 (Joint Stip.), ¶ 12.

### C. The Senate Factors Compel a Finding of Vote Dilution.

Of the nine Senate Factors, courts are to weigh Senate Factors 2 and 7 more heavily in the vote dilution analysis. *Gingles*, 478 U.S. at 48 n.15; *see also Carrollton NAACP*, 829 F.2d at 1555. The Court will therefore address those two factors first.

#### 1. Racial Polarization in Elections (Senate Factor 2)

Senate Factor 2 concerns the extent to which voting in the jurisdiction is racially polarized, which is "[t]he surest indication of race-conscious politics," and the "the keystone of a dilution case." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566, 1567 (11th Cir. 1984); *accord Wright*, 979 F.3d at 1305. The Court has already found—and the parties do not dispute—that voting in Georgia is polarized.[132]

As previewed above, the Secretary argues that partisanship better explains this polarization, and therefore any dilution occurs on account of party rather than race. But the Court is heavily persuaded by Dr. Fraga's testimony that it is impossible to separate race from politics in current-day Georgia, even if that were required under the VRA. As Dr. Fraga made clear, race likely drives political party

---

[132] ECF 97 (SJM Order), at 29–32; ECF 121-3 (Joint Stip.), ¶ 9; Trial Tr. 841:7–9 (Pls.' closing).

affiliation, not the other way around.[133] Even the Secretary's expert, Dr. Barber, conceded that race is a significant factor in determining vote choice.[134] His own scholarship tells us that race is the "strongest predictor" of partisan identification—even more so than one's political views.[135]

The Secretary's position is facially inconsistent with *Gingles*, which requires Plaintiffs to show that voting is both racially polarized *and* politically cohesive. This necessarily means that the correlation between race and partisan voting must be high, or else there would be no discernable evidence of cohesive bloc voting. And Plaintiffs here easily proved both racial polarization and political cohesion. Indeed, they showed that the racial polarization found to exist in the *Gingles* case itself is exceeded by the racial polarization in recent PSC general elections.[136]

Dr. Popick, who has analyzed racial bloc voting in thousands of individual elections in his professional career, credibly and compellingly testified that his analysis of the PSC general elections since 2012 shows "one of the clearest

---

[133]  Trial Tr. 760:20–761:16.

[134]  *Id.* 705:20–24, 706:6–12.

[135]  *Id.* 701:6–702:8. *See also* PX-111 (*Groups, Behaviors, and Issues as Cues of Partisan Attachments in the Public*).

[136]  Trial Tr. 806:16–807:9 (Pls.' closing); ECF 144 (Pls.' proposed findings), ¶ 550 & tbl.

examples of racially polarized voting" he has ever seen.[137] And that racial polarization is far more stark than partisan identification alone would predict.[138] Racially polarized voting in Georgia increased after 2016 but partisan identification did not.[139] Racial polarization exists even in elections that do not feature a Republican-Democrat matchup.[140] In fact, political cohesion by White voters was the strongest in the 2014 District 1 election where there was no Democratic candidate and the Black-preferred candidate was a Black Libertarian.[141] This contest showed even higher political cohesion among Black voters (82.44%) than the contest featuring a Black Democratic candidate for District 4 (81.29%).[142]

This does not mean that partisan division is never relevant to a vote dilution analysis. For example, courts must consider whether the White majority votes as a bloc or whether that vote is fractured along political lines. *See Gingles*, 478 U.S. at

---

[137]  Trial Tr. 183:20–23, 198:12–17.

[138]  *Id.* 765:15–767:4 (Fraga).

[139]  Trial Tr. 767:25–769:19 (Fraga). *Compare* PX-8 (Popick Rpt.), at 11–12 *with* DX-28 (Barber Rpt.), at 7.

[140]  Trial Tr. 695:9–16 (Barber), 769:20–770:16 (Fraga).

[141]  *Id.* 767:5–24 (Fraga); PX-6 (Fraga Rebuttal Rpt.), at 7.

[142]  PX-8 (Popick Rpt.), at 11.

48 n.15 ("[I]f difficulty in electing and White bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates."). Where the White majority vote is fractured, some White votes would align with Black votes and allow the Black-preferred candidate to prevail. So, while a plaintiff claiming vote dilution could meet the political cohesion requirement, that scenario would not be sufficient to demonstrate racial-bloc voting.

But here, Plaintiffs have proven both political cohesion and racial polarization in PSC elections. The Secretary has not offered any evidence of an alternate explanation for why minority-preferred candidates are less successful, such as "organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent." *Uno v. City of Holyoke*, 72 F.3d 973, 983, 983 n.4 (1st Cir. 1995) (citing *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (Tjoflat, J.)). Senate Factor 2 weighs heavily in Plaintiffs' favor.

### 2. Election of Minorities to Public Office (Senate Factor 7)

Senate Factor 7 looks at the extent to which members of the minority group have been elected to public office in the jurisdiction. While the other Senate Factors

focus on the effects on minority voters and their ability to participate in the political process, this one focuses on the race of the candidates for office.[143]

There is no dispute that, outside of the unique context of judicial elections, Georgia has elected few Black officials statewide. Nor is there dispute that the lack of diversity among the members of the PSC has been and continues to be substantial. There have been five Black candidates for the PSC in the seven most recent elections, including two Black candidates in 2014. Every time, the Black candidate lost to a White candidate.[144] The Secretary rightly points out that, for the upcoming November 2022 election, both major-party candidates for PSC District 3 are Black.[145] But that race—and even Georgia's U.S. Senate race, which also features two Black candidates[146]—will not significantly alter the overall paucity of Black candidates who have been elected to statewide public office in Georgia. Analyzing 164 statewide elections over a 50-year timeframe, Dr. Fraga found that

---

[143] The Secretary claims, without any supporting authority, that this factor is of limited utility. *See, e.g.*, ECF 144 (Def.'s proposed findings), ¶ 181. The Secretary's position is directly contrary to precedent, which prioritizes Senate Factors 2 and 7 in the totality-of-the-circumstances analysis. *Gingles*, 478 U.S. at 48 n.15; *Carrollton NAACP*, 829 F.2d at 1555.

[144] Trial Tr. 589:10–17 (Fraga); PX-5 (Fraga Rpt.), at 12–13.

[145] Trial Tr. 132:1–21 (Farley).

[146] *Id.* 754:18–755:10 (Rose).

Black candidates won only eight races—less than 5% of the total.[147] Even assuming a Black candidate wins both the District 3 and U.S. Senate races in November 2022, the total would increase to only 6%. This is substantially lower than the CVAP, the Black voting population, and the total Black population in Georgia.[148]

It is true, as the Secretary highlights, that Black-preferred candidates have won some recent statewide elections in Georgia. For example, in the 2020 general elections, Black-preferred candidates were successful in the presidential race and two U.S. Senate races.[149] But Senate Factor 7 asks courts to consider the election of minority candidates, not minority-preferred candidates, as a barometer for the racial environment. This factor weighs in Plaintiffs' favor.

### 3. History of Official Discrimination (Senate Factor 1)

This factor looks at "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process." *Solomon,* 899 F.2d at 1015 (Kravitch, J., specially concurring). Past discrimination has lingering effects on voter behavior because it "may cause [B]lacks to register

---

[147] *Id.* 585:19–586:13 (Fraga); PX-5 (Fraga Rpt.), at 4, 11–13.

[148] ECF 121-3 (Joint Stip.), ¶¶ 4–6.

[149] *Id.* ¶ 11.

or vote in lower numbers than [W]hites" and "may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *Marengo Cnty. Comm'n*, 731 F.2d at 1567.

The Court finds no need to belabor its discussion of Senate Factor 1 because it is undisputed that Georgia has a "well-documented history of discrimination against its Black citizens."[150] Some may argue that Georgia's history should not be held against it forever and that this factor should therefore not carry much weight. But the Supreme Court instructs this Court to consider Georgia's history of discrimination in evaluating the totality of the circumstances for a VRA claim, and the Court finds that Senate Factor 1 is satisfied.

### 4. Voting Practices that May Enhance Opportunities for Discrimination (Senate Factor 3)

This factor examines "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Solomon*, 899 F.2d at 1015 (Kravitch, J., specially concurring).

---

[150] Trial Tr. 842:15–17 (Def.'s closing); ECF 121-3 (Joint Stip.), ¶ 8.

Dr. Fraga persuasively testified that Georgia's unique PSC election procedures enhance the opportunity for discrimination against Black Georgians, including a statewide election with residency districts; the majority-vote/runoff requirement; and "anti-single shot" staggered terms with numbered seats.[151] He testified that PSC elections are "textbook examples" of Senate Factor 3 because they mirror the specific policies called out in the Senate Report.[152]

Large election districts can enhance the opportunity for discrimination by increasing the cost of campaigning. *See, e.g., Marengo Cnty. Comm'n*, 731 F.2d at 1570 (recognizing that large, rural area made countywide campaigns expensive). The financial barriers to entry are particularly problematic in light of the economic disparities proven at trial.[153] Majority-vote/runoff requirements can also create opportunities for vote dilution in contrast to a plurality-win system. Under the latter, members of the minority group may be able to consolidate their votes behind one candidate while the majority group splits its votes among several different candidates. If votes are split in this manner under a majority-vote requirement, a runoff takes place, and the majority has a second opportunity to

---

[151]  Trial Tr. 574:3–9.

[152]  *Id.* 573:21–574:2.

[153]  *See supra* Section II.B.

defeat the minority's preferred candidate. *City of Rome v. United States,* 446 U.S. 156, 183–84 (1980), *superseded by statute on other grounds as stated in Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 209–11 (2009); *United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1536–37 (11th Cir. 1984). *See also LULAC v. Clements*, 986 F.2d 728, 749 (5th Cir. 1993) ("Majority vote requirements can obstruct the election of minority candidates by giving [W]hite voting majorities a 'second shot' at minority candidates who have only mustered a plurality of the votes in the first election.") (citations omitted). Finally, Georgia's staggered terms for PSC commissioners also work as an anti-single shot mechanism and thereby enhance the opportunity for discrimination. *City of Rome*, 446 U.S. at 184-85, 185 n.21.

The Court finds Dr. Fraga's testimony on this point compelling and concludes that, by employing this unique aggregation of statewide, at-large elections for PSC commissioners, with requirements for a majority vote, residency districts, and staggered terms with numbered seats, Georgia uses electoral practices that enhance the opportunity for vote dilution. Senate Factor 3 weighs in Plaintiffs' favor.

### 5. Slating Processes (Senate Factor 4)

The fourth Senate Factor examines whether members of the minority group have been denied access to any candidate slating process. Slating is "a process in

which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991) (citing *Overton v. City of Austin*, 871 F.2d 529, 534 (5th Cir. 1989) (per curiam)).

There is no formal candidate slating process in Georgia. But Dr. Fraga characterized the use of gubernatorial appointments to fill vacancies on the PSC (which is required by statute, O.C.G.A. § 46-2-4) as an "informal slating process" that confers an incumbency advantage on candidates who are appointed.[154] Echols and Shaw both testified that their incumbency made it easier to raise funds and run statewide.[155]

The Court is not persuaded in the PSC election context that gubernatorial appointments act as an informal slating process, even if the appointments confer some incumbency advantage. Of the five appointments Dr. Fraga examined, three of those commissioners were defeated in their post-appointment elections.[156]

---

[154] Trial Tr. 590:4–22. *See generally supra* Section II.E.2.

[155] PX-99, at 24 (Echols Tr. 71:15–22); PX-103, at 11, 13 (Shaw Tr. 44:18–45:21, 54:20-24).

The Secretary's Rule 701 objection to Shaw's testimony is overruled.

[156] Trial Tr. 611:13–16.

Even if the Court were to accept that appointments constitute an informal slating process for PSC members, the Court does not find that Black candidates have necessarily been excluded from it—at least not in recent years. Of the six PSC appointments between 1996 and 2022, two have been Black. While Plaintiffs are skeptical of Johnson's appointment because it occurred during the pendency of this litigation, the Court declines to discount it. Senate Factor 4 does not weigh in Plaintiffs' favor.

### 6. Effects of Discrimination (Senate Factor 5)

Senate Factor 5 looks at the extent to which members of the minority group bear the effects of discrimination that hinder their ability to participate effectively. But "the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation." *Marengo Cnty. Comm'n*, 731 F.2d at 1569. Instead, the burden is on "those who deny the causal nexus to show that the cause is something else." *Id.*

The Senate Report explains the rationale and the nature of the inquiry for this factor:

> [D]isproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of Black participation in politics is depressed, plaintiffs need not prove any further causal

> nexus between their disparate socio-economic status and
> the depressed level of political participation.

Senate Rpt. at 29 n.114, 1982 USCCAN 206 (citations omitted); *see also Gingles,* 478

U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where

minority group members suffer effects of prior discrimination such as inferior

education, poor employment opportunities, and low incomes.").

The evidence at trial demonstrated that Black Georgians still suffer from the

effects of segregation and discrimination. Dr. Fraga testified that Black voters

turnout at lower rates and donate to campaigns at lower rates because of the

lingering economic disparities caused by historical discrimination.[157] Income per

capita for Blacks is only 60% of that for Whites; the median household income for

Black-headed homes is 66% of that for Whites; the poverty rate is twice as high;

the unemployment rate is close to twice that of Whites; the rate of homeownership

is lower; and the rate of receiving benefits under the SNAP is more than three

times higher.[158]

---

[157] Trial Tr. 583:24–585:9 (Fraga); PX-5 (Fraga Rpt.), at 6, 9–11.

[158] Trial Tr. 736:6–14 (Barber); DX-49 (Barber Rebut. Rpt.), at 8 (indicating an income gap of approximately $23,000 between Black and white Georgia households); ECF 57 (Mot. Jdl. Notice) ¶¶ 3, 5, 6, 7, 8, 10. *See also supra* Section II.B.

Even the Secretary's expert, Dr. Barber, reached similar conclusions in his scholarly work, finding "large and persistent gaps in voter turnout by race" and concluding that "[B]lack citizens are much less likely to vote and much more likely to live in local communities where fewer individuals vote than [W]hites."[159] Dr. Barber concluded that Black citizens are more than three times as likely to live in an area where voter turnout is consistently low, which can perpetuate political inequality along racial lines.[160] Senate Factor 5 weighs in Plaintiffs' favor.

### 7. Racial Appeals in Political Campaigns (Senate Factor 6)

Senate Factor 6 examines whether political campaigns have been characterized by overt or subtle racial appeals. The parties agree that racial appeals in statewide political campaigns are relevant to this factor.[161] The Court interprets this factor to encompass political campaign advertisements in Georgia generally; the type of campaign to which they relate is relevant to the weight this evidence carries.[162]

---

[159] Trial Tr. 668:19–25 (Barber).

[160] *Id.* 668:7–669:25 (Barber); PX-37 (Michael Barber & John B. Holbein, *410 Million Voting Records Show That Minority Citizens, Young People, and Democrats Are at a Profound Disadvantage at the Ballot Box*).

[161] *Id.* 464:14–465:20 (colloquy).

[162] *Id.* 465:21–24 (colloquy).

Witnesses testified to seeing political ads or statements made during a political campaign that they characterized as racial appeals. Some of the political ads shown were overtly racial in nature and disturbing, even if not sponsored by the candidates themselves. But several of the ads were more subtle, and reasonable people could disagree over whether they were racial appeals at all. The Court does not question Plaintiffs' sincere beliefs about what constitutes a racial appeal, but these ads and statements do not carry the weight Plaintiffs seek to place on them. On balance, while there was some evidence of racial appeals made during political campaigns in statewide Georgia races generally, there was no evidence of such appeals in PSC campaigns. Senate Factor 6 does not weigh in Plaintiffs' favor.

### 8. Responsiveness of Elected Officials (Senate Factor 8)

Senate Factor 8 concerns the responsiveness (or lack thereof) of elected officials to the particularized needs of the members of the minority group. Unresponsiveness is "evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power." *Marengo Cnty. Comm'n*, 731 F.2d at 1572. This factor is "of limited importance" both because of its subjectivity and Section 2's focus on the ability to participate in the political process itself. *Id.* Even if officials are responsive, that does not necessarily equate to equal electoral opportunity. *Id.*

As evidence of the PSC's purported lack of responsiveness to Black voters, Plaintiffs point to testimony from the current commissioners expressing their views that the Black community does not have specialized needs when it comes to matters within the PSC's jurisdiction.[163] McDonald, for instance, believes that income status is the issue.[164]

Plaintiffs testified that some PSC issues disproportionately affect Black Georgians.[165] These issues include high utility rates and energy burden; the location of power plants; the utility disconnection moratorium; and cost overruns related to the construction of Georgia Power's nuclear power plant.[166] Plaintiff McCorkle testified that the City of Atlanta—which is in PSC District 3—is home to communities that endure the highest energy burden in Georgia.[167] But Pridemore testified credibly that the decision to lift the moratorium involved a number of

---

[163] Trial Tr. 418:21–419:1, 421:19–422:1 (Pridemore); PX-99, at 28, 30 (Echols Tr. 85:10–20, 91:3–8); PX-100, at 12 (Johnson Tr. 55:12–18); PX-101, at 18 (McDonald 94:7–18); PX-103, at 18 (Shaw Tr. 70:21–71:3).

[164] PX-101, at 18 (McDonald 94:7–95:23).

[165] Trial Tr. 55:8–23, 62:6–21 (Woodall); *id.* 281:10–13, 314:7–13, 334:13–335:23 (McCorkle); *id.* 475:6–25, 480:5–20 (Rose); *id.* 536:21–537:6, 559:10–560:6 (Mosley).

[166] *Id.* 49:7–50:13, 52:15–53:16 (Woodall); *id.* 284:19–285:13 (McCorkle); *id.* 472:21–473:9 (Rose); *id.* 522:14–18 (Mosley).

[167] *Id.* 300:7–15 (McCorkle).

competing policy interests.[168] Echols similarly testified that continuing the moratorium would have "put people in a greater [financial] difficulty down the road."[169]

The issues identified by Plaintiffs are important ones and they are inherently tied to income and poverty levels, which disproportionately affect Black Georgians given the continuing effects of discrimination on socio-economic factors.[170] But Senate Factor 8 focuses on a lack of responsiveness, not disproportionate effect, and the Court concludes that it requires something more than an outsized effect correlated with race. Plaintiffs have not presented sufficient evidence here. Senate Factor 8 does not weigh in Plaintiffs' favor.

### 9.   Policy Justifications for the Voting Practice (Senate Factor 9)

This final Senate Factor considers whether the policy underlying Georgia's use of the voting standard, practice, or procedure at issue is "tenuous." Senate Report at 29, 1982 USCCAN 207; *see also Houston Laws.' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 426–27 (1991) ("[W]e believe that the State's interest in maintaining

---

[168] *Id.* 416:17–418:23 (Pridemore).

[169] PX-99, at 42 (Echols Tr. 115:23–116:6). *See also* PX-101, at 19–20 (McDonald Tr. 98:13–99:8); PX-103, at 17 (Shaw Tr. 66:14–67:4).

[170] *See, e.g.*, Trial Tr. 422:17–21 (Pridemore); PX-101, at 18 (McDonald 94:7–95:23); *see also supra* Section II.B.

an electoral system . . . is a legitimate factor to be considered by courts among the 'totality of circumstances.'").

The Court expected the Secretary at trial to offer robust evidence explaining why Georgia's method of selecting PSC members was thoughtfully contemplated by the General Assembly, or that it otherwise furthered some concrete interest that was documented and provable. Perhaps a policy statement, or arguments buried in legislative history, might have articulated an explanation for why this particular electoral mechanism makes sense for Georgia. But the only evidence the Court heard to this point came from the lay opinions of the commissioners, most notably Pridemore.[171]

Although not herself an expert on electoral structure and function, Pridemore nonetheless opined that statewide elections serve to (1) avoid conflict over the location of energy and infrastructure; (2) avoid having different utility rates for different districts; (3) avoid potential favoritism by the consumer affairs staff; and (4) maintain the federal and state pipeline safety programs.[172] But the Court finds Pridemore's testimony on these points unpersuasive, not because the

---

[171]  Trial Tr. 390:13–19 (ruling making clear Pridemore was providing lay opinion testimony).

[172]  Trial *Id.* 386:23–388:14, 390:22–392:16, 402:2–9 (Pridemore).

Court questions her sincere beliefs, but because they were not tethered to any objective data and they lacked foundation entirely. In fact, it appeared to the Court based on its close observation of Pridemore's testimony at trial that the justifications she gave for the PSC's electoral structure were developed in preparation for her testimony and were not preconceived.

The Secretary's counsel argued in closing that Georgia had an interest in maintaining its electoral structure to guarantee a "linkage" between the commissioners' jurisdiction and electoral base.[173] Counsel's argument is not evidence, of course, but the Court will address it nonetheless.

It is no doubt important to maintain the linkage between officials' jurisdiction and their electoral base, which preserves accountability and reduces the incentive to favor certain constituents. *See S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281, 1296–97 (11th Cir. 1995) (en banc). But that decision, on which the Secretary relies, was focused on judicial elections, and the Eleventh Circuit has not extended its application beyond that unique context. *Wright*, 979 F.3d at 1297; *Davis v. Chiles*, 139 F.3d 1414, 1423–24 (11th Cir. 1998). It makes sense that the state would not want judges—who are supposed to be impartial

---

[173] *Id.* 836:4–837:2, 857:24–858:3 (Def.'s closing).

neutrals—to favor their own constituents. Although the PSC's functions are considered both "quasi-legislative" and "quasi-judicial," it is by and large an administrative body with policy-making responsibilities that make it qualitatively different than courts.

Even crediting the Secretary's linkage concern, which the Court does find deserves some weight, it does not outweigh the interests of Black Georgians in not having their votes for PSC commissioners diluted. *Houston Laws.' Ass'n*, 501 U.S. at 427 ("Because the State's interest . . . is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution."). Senate Factor 9 weighs in Plaintiffs' favor.

In sum, six of the nine Senate Factors weigh in Plaintiffs' favor, including the most important Factors, 2 and 7. This Court concludes that Georgia's statewide, at-large system for electing PSC members dilutes the votes of Black Georgians in violation of the VRA.

### D.    The Secretary's Statutory Interpretation Argument Fails.

The Secretary argues that the statewide, at-large election of PSC members is not a "standard, practice, or procedure" within the meaning of Section 2 because

the State itself cannot be viewed as a "district."[174] Statewide election is not a districting plan, the Secretary argues, but rather a choice made by the sovereign state "about how it will regulate utilities" in Georgia.[175]

This Court has already ruled that nothing in the VRA suggests that a party lacks standing when the challenge is to a statewide versus political subdivision election, nor has the Secretary presented a persuasive argument for why the VRA exempts statewide at-large elections from its scope.[176] But more importantly, the Secretary's argument is foreclosed by the plain language of Section 2, which applies any time "it is shown that the political processes leading to nomination or election *in the State or political subdivision* are not equally open to participation by members" of a protected class. 52 U.S.C. § 10301(b) (emphasis added). The statute clearly addresses elections held at the state-level and the district-level, and the Secretary has provided no authority to suggest that this language means

---

[174] ECF 121-2 (Def.'s Stmt. of the Case), at 2. The Secretary raised this issue for the first time in the parties' proposed pretrial order. *See also* Trial Tr. 27:23–28:11 (Def.'s opening). Plaintiffs asserted that this argument was waived because the Secretary did not raise it in his Answer or motion to dismiss. *Id.* 825:10–14 (Pls.' closing). The Court finds it unnecessary to wade into the issue of waiver because the Secretary's position is substantively foreclosed by the plain language of the statute.

[175] Trial Tr. 832:4–8 (Def.'s closing).

[176] ECF 36 (MTD Order), at 20–21.

anything other than what it explicitly says. Nor does the Secretary's status as an agent of a "sovereign" shift this analysis. So long as PSC members are elected by popular vote, those elections must comply with the VRA regardless of whether they are conducted at the state or political subdivision level.

### E. Plaintiffs' Proposed Remedy

Under Eleventh Circuit precedent, Plaintiffs must offer a viable remedy to establish the first *Gingles* prerequisite. *Nipper*, 39 F.3d at 1530–31; *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Davis,* 139 F.3d at 1419–20 ("In assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan.") (citing *Houston Laws.' Ass'n*, 501 U.S. at 426); *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998) (same).

Plaintiffs seek to convert PSC elections from statewide, at-large residency districts to single-member districts.[177] Under the map presented by Plaintiffs, proposed District 1 (covering Clayton, DeKalb, Fayette, part of Fulton, Henry, Newton, and Rockdale Counties) would be a majority-Black district, with slightly

---

[177] *See, e.g.*, ECF 1 (Compl.), ¶ 18; PX-8 (Popick Rpt.), at 19–20; PX-50, at 1 (Pls.' Illustrative Plan).

over 54% of the voting-age population being Black.[178] This proposed District 1 overlaps in large part with existing PSC District 3.[179]

Single-member districting is a standard remedy for a Section 2 violation caused by at-large elections. *See, e.g.*, *Gingles*, 478 U.S. at 50; *see also id.* at 50 n.17 ("The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (where "the challenged system is at-large voting, just as in *Gingles*[,] the adequate alternative electoral system is simply single-member districting, which is a workable regime and an available remedy"). Courts must impose single-member districts unless they "can articulate such a singular combination of unique factors" that a different result is justified. *Chapman v. Meier*, 420 U.S. 1, 21 (1975) (cleaned up); *accord Wise v. Lipscomb*, 437 U.S. 535, 540–41 (1978); *Connor v. Johnson*, 402 U.S. 690, 692 (1971) (per curiam).

The Secretary has conceded that there is nothing "facially problematic" with the proposed map submitted by Plaintiffs and that "it's exactly the kind of

---

[178] PX-50, at 2 (population data for Pls' Illustrative Plan).

[179] PX-2, at 1 (2012 PSC Map); PX-8 (Popick Rpt.), at 15–18.

evidence that you could put forward to show the feasibility of a remedy" if this case did not involve a "sovereign."[180] The Secretary also acknowledged at summary judgment that the Section 2 injury alleged by Plaintiffs is "one that has been accepted by courts since the inception" of the VRA; however, he argued that Plaintiffs failed to *prove* the existence of that injury.[181] At the summary judgment stage, the Court agreed.[182] But Plaintiffs have now proven their case.

The Court previously declined to enter judgment in favor of Plaintiffs on the Secretary's Third and Fourth Affirmative Defenses, which respectively assert that Plaintiffs lack constitutional and statutory standing. The Court declined ruling at that time only because of the open question concerning the viability of Plaintiffs' proposed remedy.[183] Having now concluded that it is, Defendants' Third and Fourth Affirmative Defenses are rejected.

The Secretary's Eighth Affirmative Defense asserts that Plaintiffs' proposed remedy "will result in a violation of the U.S. Constitution because Plaintiffs'

---

[180] ECF 35 (MTD H'g Tr.), 40:12–24.

[181] ECF 88 (Def.'s SJM Reply), at 2.

[182] ECF 97 (SJM Order), at 9–12.

[183] *Id.* at 12.

proposed remedies require the alteration of the form of government of the State of Georgia."[184] The Court disagrees.

The Georgia Constitution currently provides, "[t]he filling of vacancies and manner and time of election of members of the [PSC] shall be as provided by law." GA. CONST. art. IV, § 1, ¶ I(c). The statewide, at-large method of election is prescribed by statute, not the Georgia Constitution. O.C.G.A. § 46-2-1(a); *Cox v. Barber*, 275 Ga. 415, 415 (2002). Further, and as discussed above, the history of the Georgia constitutional provision concerning the PSC makes clear that the requirement that commissioners be "elected by the people" was intended only to require that they be elected rather than appointed by the governor as originally had been done.[185]

This interpretation is also consistent with adjacent provisions of the Georgia Constitution relating to other constitutional boards and commissions. Members of the State Board of Pardons and Paroles shall be "appointed by the Governor." GA. CONST. art. IV, § II, ¶ I. Members of the State Personnel Board shall also be "appointed by the Governor." GA. CONST. art. IV, § III, ¶ I(a). Members of the State Transportation Board shall be "elected by a majority vote of the members of the

---

[184]  ECF 37 (Ans.), Eighth Aff. Defense.

[185]  *See supra* Section II.A.

House of Representatives and Senate." GA. CONST. art. IV, § IV, ¶ I(a). By contrast, the Georgia Constitution leaves the "manner" of PSC elections to the General Assembly, which opted for statewide, at-large elections.

Nothing in the Court's order requires a change to Georgia's constitution; it does, however, require a change to the manner in which PSC commissioners are elected. The constitutional requirements that the PSC have five members, that they be elected, and that they serve six-year staggered terms will be unaffected by using single-member voting districts as the *manner* for those elections. The Court rejects the Secretary's Eighth Affirmative Defense.

### F.     Timing

Georgia has significant interests "in conducting an efficient election [and] maintaining order," because "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)).

It is now August, and the PSC elections for Districts 2 and 3 are on the November 8, 2022 ballot.[186] The Court specifically conducted the trial in this action

---

[186]  O.C.G.A. § 46-2-1(d), § 46-2-4; ECF 110-1, at 9 (2022 State Elections & Voter Registration Calendar).

sufficiently in advance of the November election so that Plaintiffs could be afforded relief in the event they prevailed in the Court's ruling on a complete record.[187] Michael Barnes, who runs the State's Center for Election Systems, testified at trial that there would be little disruption to the State's preparation for or conduct of the November 2022 general election if the Court directed that the PSC races be removed from the ballots for that election before August 12, 2022, while the draft ballots were still being prepared by his office.[188] This Order is entered sufficiently in advance of that deadline to minimize the disruption to the electoral process and the Secretary's operations.

During the preliminary injunction hearing, counsel for the Secretary made clear the State's position on what would happen under Georgia law in the event the Court enjoined the PSC races on the November 2022 ballots: The commissioners currently holding the positions for Districts 2 and 3 (Echols and

---

[187] ECF 112 (PI Order), at 9.

[188] Trial Tr. 441:18–444:9 (Barnes); ECF 108, at 24–25 (PI H'g Tr. 23:11–23, 24:14–25:25).

Johnson) would "holdover" in those positions "until such time as there was an election."[189] The Court agrees with the Secretary's analysis under Georgia law.

The concerns raised by *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006), – that courts generally "should not enjoin state election laws in the period close to an election"—are not present here. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022). In *Purcell*, the preliminary injunction was issued one month before the election and without adequate time to develop a factual record. 549 U.S. at 5–6. The Court's ruling here is not preliminary. It is a permanent injunction, entered after a full trial, on a complete record, with factual findings and conclusions of law. As a result, the Court finds no impediment to enjoining the Secretary from conducting elections for PSC Districts 2 and 3 in November. This Order issues in sufficient time to present little disruption to the State.

While delaying elections for Districts 2 and 3 until a later date will regrettably cause disruption to the candidates currently running for those offices, the Court does not find that such disruption outweighs the important VRA interests that are implicated, for the reasons discussed in this Order. And there is

---

[189] ECF 108, at 6 (PI H'g Tr. 5:19–7:5) (relying on *Clark v. Deal*, 298 Ga. 893 (2016); *Kanitra v. City of Greensboro*, 296 Ga. 674 (2015); and *Garcia v. Miller*, 261 Ga. 531 (1991)).

no evidence in the record suggesting that the Court's injunction will cause disruption to voters themselves.

## IV.    Conclusion

This Order should not be interpreted to find that statewide, at-large elections violate Section 2 of the Voting Rights Act in all circumstances and at any point in time. Rather, the Court has followed its mandate under *Gingles* of conducting an "intensely local appraisal" of the facts to determine what result is compelled under the totality of the circumstances for Georgia today. And that appraisal, in this Court's view, compels only one result.

The Secretary is **ENJOINED** from preparing ballots for the November 8, 2022 election that include contests for PSC Districts 2 and 3; from administering any future elections for vacancies on the PSC using the statewide, at-large method currently prescribed by O.C.G.A. § 46-2-1, *et seq.*; and from certifying the election of any PSC commissioner elected using this method.

The Court is cognizant of the fact that the General Assembly next meets in regular session in January 2023. Consequently, this Order shall remain in effect until a method for conducting such elections that complies with Section 2 is enacted by the General Assembly and approved by the Court, or is otherwise adopted by the Court should the General Assembly fail to enact such a method.

The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Plaintiffs.

Within 30 days after entry of this Order, Plaintiffs are **DIRECTED** to file a motion in support of their claim under 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e) for attorneys' fees and expenses.

**SO ORDERED** this 5th day of August, 2022.

Steven D. Grimberg<br>
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

RICHARD ROSE, *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of the State of Georgia,

    *Defendant*.

CIVIL ACTION
CASE NO. 1:20-cv-2921-SDG

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that, pursuant to 28 U.S.C. §§ 1291 and 1292,

Defendant Secretary of State Brad Raffensperger hereby appeals to the U.S.

Court of Appeals for the Eleventh Circuit in the above-captioned case from

the Court's Order and Opinion after trial entered on August 5, 2022 [Doc.

151], the Court's Opinion and Order granting in part and denying in part

motions for summary judgment [Doc. 97], and the Opinion and Order denying

Defendant's Motion to Dismiss [Doc. 36].

Respectfully submitted this 8th day of August, 2022.

           Christopher M. Carr
           Attorney General
           Georgia Bar No. 112505
           Bryan K. Webb

1

Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for Defendant Secretary of
State Brad Raffensperger*

2

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing NOTICE OF APPEAL has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson