In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12593

_____

RICHARD ROSE,
an individual,
BRIONTE MCCORKLE,
an individual,
WANDA MOSLEY,
an individual,
JAMES MAJOR WOODALL,

Plaintiffs-Appellees,

*versus*

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant.

2                        Order of the Court                22-12593

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02921-SDG

_____

Before JORDAN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Brad Raffensperger, the Secretary of State of Georgia, moves for a stay pending appeal of the district court's August 5, 2022, order permanently enjoining him from conducting state-wide elections on November 8, 2022, for Districts 2 and 3 of the Georgia Public Service Commission. The district court's order, rendered following a bench trial and pursuant to § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a)–(b), also decreed that the Commissioners currently representing Districts 2 and 3 (Commissioners Timothy Echols and Terrell Johnson) would continue in those positions as "holdover" officials until such time as an election is held with single-member voting districts. For the reasons which follow, we grant Secretary Raffensperger's motion and stay the district court's permanent injunction pending appeal.

I

The Supreme Court has recently explained that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Committee v. Democratic Nat'l*

*Committee*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U.S. 951 (2014)).  *See also id.* ("[W]hen a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error.").  The cases cited in *Republican Nat'l Committee—Purcell*, *Frank*, and *Veasey*—were less than clear on this point.  The stay in *Purcell* was based on more than just a timing issue, while *Frank* and *Veasey* contained no explanation whatsoever for the Court's rulings.  Nevertheless, the Court's opinion in *Republican Nat'l Committee* has now laid out a relatively clear principle.  *See League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) ("federal district courts ordinarily should not enjoin state election laws in the period close to an election") (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2020) (Kavanaugh, J., concurring)).

Here the district court's permanent injunction, issued about three months before the scheduled election, appears to run counter to the Supreme Court's teaching in *Republican Nat'l Committee*. First, the election is sufficiently close at hand under our recent precedent.  *See League of Women Voters*, 32 F.4th at 1371 (holding that the "*Purcell* principle," as articulated in *Republican Nat'l Committee*, applies when an election is less than four months away). Second, although the mechanics of implementing the injunctive relief may be relatively straightforward, it seems to us that postponing the elections for Districts 2 and 3—and keeping Commissioners

Echols and Johnson in their positions as "holdovers" until elections are held with single-member voting districts—"fundamentally alters the nature" of the upcoming elections. *Cf. Republican Nat'l Committee*, 140 S. Ct. at 1207 ("Extending the date by which ballots may be cast by voters—not just received by the municipal clerks but cast by voters—for an additional six days after the scheduled election day fundamentally alters the nature of the election."). Third, cancellation of the November elections for Districts 2 and 3 has to be done by August 12, 2022, and the permanent injunction was issued too close to that date to allow for meaningful appellate review of the district court's findings of fact and conclusions of law.

The plaintiffs could overcome the *Purcell* principle by demonstrating that their position on the merits is "'entirely clearcut.'" *League of Women Voters*, 32 F.4th at 1372 (quoting *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)). As we have interpreted this burden, Secretary Raffensperger "need only show" that the plaintiffs' position is not entirely clearcut. *See id.* Without expressing any views on the merits of the district court's findings of fact, conclusions of law, and permanent injunctive relief, we note that the legal question presented is one of first impression. As the district court noted in its summary judgment order, "the novel question is whether there can be voter dilution in violation of [§] 2 of the Voting Rights Act . . . when the challenged election is held on a statewide basis." D.E. 97 at 1. When, as here, the question resolved by the district court has not been decided elsewhere, we

22-12593                Order of the Court                     5

cannot say that the plaintiffs' position on the merits is entirely clear-cut.

## II

In her thoughtful dissent, Judge Rosenbaum asserts that Secretary Raffensperger waived any reliance on *Purcell* and its progeny. That is not the way we read the record. As we understand what transpired in the district court, Secretary Raffensperger may have disclaimed any argument that an injunction postponing the elections for Districts 2 and 3 would cause disruption or voter confusion. But he still maintained that there were *Purcell*-type problems because an injunction issued in August would leave no time for plenary appellate review before state officials had to act with respect to the elections.

Secretary Raffensperger raised *Purcell* at trial, *see* D.E. 144 at 65, and the district court expressly addressed *Purcell* in crafting a remedy, concluding that the "concerns raised by [*Purcell*] . . . are not present here." D.E. 151 at 62. And here, in his motion for a stay, Secretary Raffensperger has argued that the "timing of the ruling effectively prevents" him "from obtaining appellate review until after the date for statewide elections has already passed. The current Commissioners will remain in place until such time as there is an election, but [he] is prevented from obtaining appellate review prior to the cancellation of the November elections due to the timeline." Motion to Stay at 16. He has also asserted that "[w]hile the district court correctly analyzed the impact of [*Purcell*] on the disruption to the *mechanics* of the election-administration

6                      Order of the Court                    22-12593

process, . . . it did not consider the impact of ruling so close to the election on voter confidence." *Id. Cf. New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.") (quoting *Purcell*, 549 U.S. at 4).

Judge Rosenbaum also argues that *Purcell* and its progeny likely do not apply in circumstances like these, which involve only a postponement of an election, and she points out that we cite no cases applying the *Purcell* principle in similar scenarios. The latter point is correct, but Judge Rosenbaum also does not cite any cases refusing to apply the *Purcell* principle in analogous circumstances. So we could make the same criticism about her position.

We believe that the principle articulated in *Republican Nat'l Committee* is broad and covers the case before us. But if we are mistaken on this point, the Supreme Court can tell us.

## III

Secretary Raffensperger's motion for a stay is GRANTED.

22-12593               ROSENBAUM, J. dissenting                    1

ROSENBAUM, Circuit Judge, dissenting:

## I.   INTRODUCTION

If everyone in the United States got to vote on who Georgia's U.S. Senators would be, I don't think anyone would think that the system was fair to Georgians.

But Georgia has that type of system for choosing who regulates public utilities.  The Georgia Public Service Commission ("PSC") has five Commissioners, and each one must live in a separate district, meaning a separate part of Georgia.  Yet the entire state votes on each district's Commissioner.  So though the majority of District 3's residents are Black, that majority almost never is able to elect its preferred candidate to the Commission.  In fact, while several Black candidates have run to represent District 3, the District has had only one Black Commissioner ever.  And that Commissioner was the only Black Commissioner ever elected for any PSC district.

In 2020, the Appellees—a group of Black Georgians—sued Georgia Secretary of State Brad Raffensperger, seeking to enjoin this system and to stop the dilution of the votes of Black Georgians. After more than two years of litigation and a bench trial, the district court made detailed findings of fact and comprehensive conclusions of law and determined that the PSC's electoral system violated the Voting Rights Act ("VRA") because it discriminated against Black Georgians and diluted their votes.  The district court temporarily postponed the November 2022 election for Districts 2

2                    ROSENBAUM, J., dissenting                 22-12593

and 3 until the Georgia General Assembly meets in January 2023 to approve a new system.

Today, the Majority stays the district court's injunction based on the *Purcell*[1] principle, which states that changes in election procedures shouldn't be made too close to elections. But Secretary Raffensperger expressly disclaimed any *Purcell* argument that was based on the notion that Georgia would have administrative problems or that voters would suffer confusion as a result of the district court's injunction. By relying on the *Purcell* principle, the Majority obviates the need to engage with the district court's fact-bound analysis and its holding that Georgia's status quo impairs Black Georgians' right to vote. It also extends the *Purcell* principle to an entirely new category of litigation without, in my view, a sufficient explanation. I respectfully dissent.

## II.    PROCEDURAL HISTORY

In this Section, I proceed in three steps. First, I introduce the history of Georgia's Public Service Commission. Second, I provide some factual background about racial economic disparities in Georgia. And third, I review the district-court litigation and the district court's factual findings and conclusions of law.

---

[1] *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (explaining that federal courts ordinarily should not enjoin state election laws "close" to an election).

22-12593               ROSENBAUM, J. dissenting               3

### A.  The Public Service Commission

The Georgia Constitution creates a "Public Service Commission," which regulates utilities.  GA. CONST., art IV, § I(a). The Commission has five members who are "elected by the people" and serve in staggered six-year terms.  *Id.*  The Georgia Constitution further provides that "[t]he filling of vacancies and the manner and time of election of members of the commission shall be as provided by law."  *Id.*(c).

The form and powers of the Commission, as well as its method of selecting members, has changed over time.  The PSC began as the "Railroad Commission" and regulated railroad freights and passenger tariffs.  GA. CONST. art. IV, § 2, ¶ 1 (1877). Georgia law provided that three Commissioners would be appointed by the governor and confirmed by the Senate.  *See* 1878 Ga. Laws 125 (Law No. 269, *Reg. of Freight & Passenger Tariffs*).

In 1906, Georgia changed the law, adding two Commissioners—bringing the body to its present-day total of five—and provided that the commissioners were to be "elected by the qualified voters of the whole state, who are entitled to vote for members of the General Assembly." 1906 Ga. Laws 100, § 1 (Law No. 453, *Election of R.R. Comm'rs*).

In 1928, the General Assembly expanded the Commission's powers to govern utilities and changed its name to the Public Service Commission.  *See* 1922 Ga. Laws 143 (Law No. 539, *R.R. Comm'n Changed to Pub. Serv. Comm'n*).  Not quite twenty years later, in 1945, the Georgia Constitution was amended to grant the

4                 ROSENBAUM, J., dissenting                 22-12593

General Assembly the power to regulate public utilities.   GA. CONST. art., IV, § IV, ¶ III (1945).

Today, the PSC has an expanded set of powers.  The PSC sets residential, commercial, and industrial utility rates and regulates Georgia Power.  And it has jurisdiction over rural broadband internet connectivity.

The PSC is an "administrative body" with both "quasi-legislative" and "quasi-judicial" functions. *Tamiami Trial Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 213 Ga. 418, 428 (1957).  As to its legislative powers, the PSC sets utility rates, administers federal funds for pipeline safety, and holds hearings.  The PSC can also act judicially: it holds evidentiary hearings, makes evidentiary rulings, and administers fines.

Until 1998, the method to elect PSC Commissioners remained unchanged:  the entire electorate could vote for the Commissioners "under the same rules and regulations as apply to the election of the Governor."  1998 Ga. Laws 1530 (Law No. 978, *Pub. Util & Pub. Transp. – Pub. Serv. Comm'n; Election of Members; Dist.*) (amending O.C.G.A. § 46-2-1).

In 1998, Georgia changed the system for electing PSC Commissioners to the one at issue in this case.  Under the present system, Commissioners are elected by a statewide vote but each district is represented by only one Commissioner. *Id.* at 1531.  That is, the entire state of Georgia decides who will be each district's Commissioner. *Id.*  There is also a majority-vote requirement,

22-12593            ROSENBAUM, J. dissenting                    5

with a runoff held if no candidate wins more than 50% of the statewide vote.  The 1998 changes did not affect the six-year term or the staggered nature of the terms.  *Id.*

### B.  Present Day Georgia

With this historical background, we now come to present day Georgia.  As of the 2020 Census, Georgia had approximately 10.7 million people—50.1% non-Hispanic white, 33.0% Black,[2] and 16.9% other racial groups.  In terms of voting age population, Georgia is a little more predominantly white (but not much): 52.8% non-Hispanic white, 31.7% Black,[3] and 15.4% other racial groups.  As the parties agree, unfortunately, "[t]he State of Georgia has a well-documented history of discrimination against its Black citizens."[4]

Despite comprising over 30% of the voting-age population, Black candidates almost never win statewide offices.  As of 2021, only *four* Black candidates had *ever* been elected to statewide office (Senator Raphael Warnock; Mike Thurmond, the three-times-elected Commissioner of Labor; Thurbert Baker, the three-time-elected Attorney General; and David Burgess, elected to the Public Service Commission).  In fact, between 1972 and 2020, Black candidates won only 8 of 164 general elections—or 4.9%—despite comprising almost a third of the electorate.  As to the PSC, only

---

[2] Including 2% of Black Georgians who are multi-racial.

[3] Including 1.4% of Black Georgians who are multi-racial.

[4] Joint Pre-trial Stipulation.  *See* Doc. 121-3 ¶ 8

6                    ROSENBAUM, J., dissenting                    22-12593

one Black Commissioner has ever served, David Burgess—and he was originally appointed.  That happened in 1999.  After that, Burgess narrowly won his first election in 2000 and, despite winning the plurality in the 2006 election, ultimately lost to a white candidate in the runoff election that same year.

While the five districts have equal populations, they are not racially homogenous.  As of the 2015–19 American Community Survey, District 3's Citizen Voting Age Population was 53.4% Black while District 4's share was just 12.94%.

Finally, the district court found that Black Georgians are poorer than white Georgians.  Black Georgians have about half the per-capita income ($24,000 versus $40,000) and twice the poverty rate (18.8% to 9%).

### C.  Procedural History

In July 2020, four Black Georgians—all registered voters and residents of District 3—sued Secretary Raffensperger in his official capacity under Section 2 of the Voting Rights Act.  They alleged that the PSC's selection procedure—five members elected at large in staggered six-year terms—violated the Voting Rights Act because it diluted their votes.  To address this problem, they contended that Black Georgians were numerous enough, geographically compact enough, and politically cohesive enough to constitute a single-member district in a five-district plan.

In January 2021, after the district court denied a motion to dismiss, the case proceeded to discovery.  The parties jointly

submitted a proposed scheduling report, and noting the November 8, 2022, election, they contemplated filing summary-judgment motions in the summer of 2021. At no point during these proceedings did Secretary Raffensperger invoke the *Purcell* principle to argue that the schedule would create problems for the November 2022 election.

In late July 2021, the parties cross-moved for summary judgment. Secretary Raffensperger again didn't invoke the *Purcell* principle.

In January 2022, the district court denied the Secretary's motion and granted the Appellees' motion in part. It concluded that there were genuine issues of fact as to Appellees' standing and Georgia's interests in maintaining the at-large method of electing the PSC. The district court concluded as a matter of law that the *Gingles*[5] prerequisites to maintain a VRA Section 2 claim were satisfied. Given these circumstances, the district court set the case over for a bench trial.

The parties jointly proposed a schedule where the district court would rule on the issues "no later than August 15, 2022,"

---

[5] The Supreme Court identified these factors in *Thornburg v. Gingles*, 478 U.S. 30, 49 (1986). There, it explained that a multimember district can impair a minority group's voting rights only when (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes as a bloc to usually defeat the minority group's preferred candidate. *Id.*

8                    ROSENBAUM, J., dissenting                    22-12593

while Secretary Raffensperger expressly retained "his right to raise the timeliness of imposing a remedy for 2022 as an issue at trial." The Appellees said that they were "available for trial sooner if the Court's schedule permits an earlier date." The district court, without objection, scheduled the bench trial for June 27 through July 1, 2022.

### 1. Preliminary Injunction Hearing

The day after the district court entered the scheduling order, on February 3, 2022—more than ten months before the election—the Appellees moved for a preliminary injunction against qualifying candidates for the 2022 PSC elections. At the hearing on the preliminary injunction, Secretary Raffensperger's counsel spoke about *Purcell*:

> On public interest and equities, I thought I'd just kind of play out the scenarios in my mind. There's like four possible paths I see. You don't enter the injunction and you find for the State, the election processes continue, there's no interruption for voters, we hold the normal elections in 2022 for Public Service Commission. That's kind of Option 1. Easy, no issues there.
>
> **Option 2: You don't enter the injunction the plaintiffs request, but you ultimately side with the plaintiffs after the trial. In that scenario, I think, as you talked about with Mr. Barnes [Director of the Secretary of State's Center for Election Systems], the November**

election could be canceled and a remedial plan figured out at that point.  Obviously, that would be somewhat disruptive for the candidates, but it's a method for resolving what we need to do going forward.  Is it going to be a special election, a special primary?  We can figure out a solution after the finding of liability.

The other option that we have, if you were to enter the injunction, stop, hit pause, as the plaintiffs have said, and then you find for the State after the trial we now have to figure out some sort of remedial structure to conduct statewide special elections which obviously have a cost where every county has to run a special election that could have otherwise been held in the normal course in 2022.

The only other place that really makes sense is if the plaintiffs ultimately do prevail and you enter the injunction we craft a remedial plan then.  But we can also do that if you don't enter the injunction at the conclusion of the trial and I think there's going to be time for that.

The *Purcell* issues the State is concerned about are more trying to address the time period between the conclusion of the trial and the November election. We don't believe there's going to be time, if you find for the plaintiffs after the trial, to then affect and get the general election on the November ballot, there's

not time to do that.  **There is time to stop that election process and then craft a remedy moving forward and so we would suggest that's the more logical and best approach here, to not enter the [preliminary] injunction, let this case proceed and then if you ultimately side with the plaintiffs then craft a remedial plan at that point.**  Meanwhile, the people of Georgia get to have input on the election process.

The district court responded,

Well, let me ask you this because when we set the trial for the end of June it was certainly my intent to reach a resolution on the merits in advance of the November election so that, like you said, if I found in favor of the Secretary, the election proceeded.  **If I found in favor of the plaintiffs, my intent was to enjoin that election from happening.  It's certainly never been my intention, nor is it now, to find a violation of the Voting Rights Act and yet allow the election to proceed anyway.**

"Certainly," Secretary Raffensperger's counsel replied.  In fact, Secretary Raffensperger's counsel recognized that "there's some precedent for that that I think wouldn't necessarily get into *Purcell* land if it's going to be straight don't hold the election in November, so I wanted to mention that."  Finally, counsel conceded that "I would want to note for the record for [Appellees' counsel] that we may appeal based on the merits, but **we won't make an appeal based on**

22-12593                ROSENBAUM, J. dissenting                11

*Purcell* so we can at least get that put down.  If we get to that point.
I wanted to make that clear." The district court denied the prelim-
inary injunction, noting that the bench trial was scheduled for "well
before the general election" and the Appellees didn't face irrepara-
ble harm because "they [would] still have an opportunity to obtain
injunctive relief related to the 2022 election cycle."

## 2. Bench Trial

In June 2022, the district court held a five-day bench trial.
The district court entered its findings of fact and conclusions of law
just a month later, on August 5—well before the August 12 dead-
line in the scheduling order.

Beginning with its findings of fact, the district court evalu-
ated the testimony of the three expert witnesses.  First, the Appel-
lees presented Dr. Stephen Popick, a former member of the Civil
Rights Division of the Department of Justice.  Dr. Popick analyzed
the voting patterns in PSC elections between 2012 and 2020 and
concluded that strong racial polarization existed: Black voters
voted as a bloc between 79.18 and 97.84% of the time.  White vot-
ers, he said, voted together between 75.72 and 87.51% of the time.
Dr. Popick testified "that, in all of his years of experience, his anal-
ysis of the PSC elections in Georgia since 2012 'is one of the clearest
examples of racially polarized voting' he has ever seen."  The dis-
trict court found "Dr. Popick's opinions and conclusions to be
highly persuasive and compelling evidence of racial polarization in
PSC elections."

Next, the Appellees offered Dr. Bernard Fraga, a political data analyst. Dr. Fraga testified that the combination of a statewide election with numbered seats and residency districts was unusual and allowed Georgia's majority-white population to dilute the votes of any majority-Black district. And because the elections were staggered, Dr. Fraga said, the minority group members had "less of an opportunity to concentrate [their] voting strength behind a candidate of choice." In other words, the staggered structure amplified the problem. The district court found "Dr. Fraga's analysis, opinions, and conclusions to be highly persuasive and entitled to great weight."

Finally, Secretary Raffensperger offered Dr. Michael Barber, a political science expert. Dr. Barber testified that Black voters preferred Democratic candidates (86 to 93% of the time) while white voters did not (voting for Democratic candidates less than 40% of the time). Dr. Barber didn't analyze the results of any PSC elections. The district court "generally credit[ed]" Dr. Barber's analysis but found it "of limited utility" because Dr. Barber "did not consider the impact of race on party affiliation," even though his own research concluded that "race is the strongest predictor" of partisan affiliation.

The district court applied these factual findings to the law and concluded that the PSC at-large districts violated Section 2 of the Voting Rights Act. The district court correctly explained that a Section 2 claim proceeds in two steps: first, plaintiffs must prove that the three *Gingles* preconditions are satisfied. Second, the

district court explained, it must evaluate the totality of the circumstances using the nine factors that the Senate outlined in the 1982 Voting Rights Act amendment—the "Senate Factors."

As to the first step, the district court concluded, based on the summary-judgment record, that the Appellees had established the three *Gingles* preconditions were satisfied:  Black Georgians were numerous enough to constitute a majority of a single-member district, Black Georgians were politically cohesive, and the white majority voted as a bloc to usually defeat the Black-preferred candidate.  Next, the court turned to the Senate Factors and found that six of the nine weighed in the Appellees' favor.

The district court concluded that Senate Factor 1—the History of Official Discrimination—weighed in favor of the Appellees because Secretary Raffensperger had stipulated that Georgia had a well-documented history of racial discrimination against Black citizens.

As to Senate Factor 2 (Racial Polarization), the district court, relying on Dr. Fraga's testimony, determined that a high degree of racial polarization existed in elections.  Although the district court considered Secretary Raffensperger's alternate position that the PSC election results reflect only partisan polarization, the court rejected that view.  As the district court explained, under *Gingles*, the Appellees had to show that voting was politically cohesive.  So of course, that necessarily would also show polarization along partisan lines to some degree because a showing of political cohesion,

by definition, would require a showing that the voters are voting for the same candidate.

In any event, the district court added that racially polarized voting increased in Georgia after 2016, but partisan identification did not. The district court concluded that white voters voted as a bloc even in races when no Democratic candidate appeared on the ballot. So for example, in a race between a Republican and a (Black-preferred) Libertarian candidate, white voters defeated the Black-preferred candidate.

The district court reasoned, if the white majority vote fractured along partisan lines—some whites voted with the Blacks and some did not—then the Appellees wouldn't be able to state a Section 2 claim because they wouldn't be able to show racial-bloc voting. But here, the district court said, the Appellees had shown *both* political cohesion *and* racial polarization in PSC elections, and Secretary Raffensperger hadn't shown—let alone offered—an alternate explanation for why Black-preferred candidates had been less successful, like "organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent." Senate Factor 2, the district court said, weighed heavily in the Appellees' favor.

As to Senate Factor 3—Voting Practices that Enhanced Opportunities for Discrimination—the district court found Dr. Fraga's analysis persuasive, so it concluded that the factor weighed in the Appellees' favor. Dr. Fraga testified that the unique PSC structure enhanced the opportunity for discrimination because the statewide

district increased the cost of campaigning—especially problematic given the wealth disparities between white and Black Georgians. The district court also highlighted that several aspects of the PSC election system are identical to those listed as causes for concern in the Senate Report: "anti-single shot" rules,[6] staggered terms with numbered seats, and run-off requirements. For instance, the district court said, a majority-vote requirement would allow the majority two chances to elect a preferred candidate—if the Black-preferred candidate won the plurality over two white-preferred candidates, the white-preferred candidate could win in the runoff.[7]

As to Senate Factor 4—Slating Processes—the district court concluded that there was no evidence that Black-preferred candidates suffered from any informal "slating process" conferring an incumbency advantage.

The district court concluded that Senate Factor 5—Effects of Discrimination—weighed in the Appellees' favor because Black Georgians had worse educational and employment opportunities

---

[6] An anti-single shot rule requires that a voter cast votes for as many candidates as there are positions, invalidating all ballots that do not show votes for as many candidates as there are positions. *Nevett v. Sides*, 571 F.2d 209, 217 n.10 (5th Cir. 1978) *superseded by statute as recognized in Jones v. City of Lubbock*, 727 F.2d 364, 369 (5th Cir. 1984). "Minority voters can be disadvantaged by such a rule because it may force them to vote for nonminority candidates, thus depreciating the relative position of minority candidates." *Id.*

[7] Burgess, the only Black Georgian ever elected to the PSC, won the plurality vote but lost to a white-preferred candidate in a runoff in 2006.

and lower income levels and living conditions as a result of past discrimination in Georgia.

As to Senate Factor 6—Racial Appeals in Campaigning—the district court concluded that there wasn't any evidence of such appeals in PSC campaigns and so the factor weighed in favor of Secretary Raffensperger.

The district court determined that Senate Factor 7—Election of Minorities to Public Office—favored the Appellees because very few Black candidates had won statewide office in Georgia either recently or historically. Indeed, Black candidates had won under 5% of races, despite the 30% share of the population.

Next, the district court found that Senate Factor 8—responsiveness of elected officials—weighed in favor of Secretary Raffensperger because there was no evidence that the Commissioners weren't responsive to the concerns of Black citizens.

Finally, the district court concluded that the record contained little evidence as to Senate Factor 9—Policy Justifications for the Voting Practice. Secretary Raffensperger argued that the district-based system was important because it created a "linkage" between the commissioners' jurisdiction and the electoral base. The district court found this argument unconvincing because the "linkage" argument had precedential support for only *judicial* elections and hadn't been extended to quasi-judicial/quasi-legislative bodies like the PSC. Indeed, the district court found important differences between judicial elections and elections for bodies like the PSC.

22-12593          ROSENBAUM, J. dissenting          17

For example, the district court said, while "[i]t makes sense that the state would not want judges—who are supposed to be impartial neutrals—to favor their own constituents . . . the PSC . . . is by and large and administrative body with policy-making responsibilities that make it qualitatively different than courts."

Overall, then, the district court found that six of the nine Senate Factors favored the Appellees, and as *Gingles* requires, it weighted Senate Factors 2 and 7 most heavily. *See Gingles*, 478 U.S. at 49 n.15 ("[T]he most important Senate Report factors bearing on § 2 challenges to multimember districts are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.'"). Viewing the totality of the circumstances, the district court concluded that the PSC election system violated Section 2 of the VRA.

The district court next turned to the Secretary's alternate argument. Secretary Raffensperger argued that the Appellees' proposed remedy—moving to single-member districts—would violate the federal Constitution because it would require alteration of Georgia's form of government. The district court disagreed. It explained that the Georgia Constitution didn't require at-large districts; it required only that PSC members be elected "by the people" and that the manner and time of election of members" be "as provided by law." GA. CONST. art. IV, § 1, ¶ 1(c). Here, the district court said, it was requiring the Georgia General Assembly to

choose only a new method.  It wasn't imposing the Appellees' requested method—single-member districts.

The district court also considered whether enjoining the 2022 PSC election would violate the *Purcell* principle.[8]  And based on the evidence at trial, the district court concluded it would not. As the district court noted, Michael Barnes, the director of Georgia's Center for Election Systems testified that there would be little disruption to Georgia's preparation for or ability to conduct the November 2022 general election, if the court ruled by August 12, 2022, while the ballots were still being drafted.  As to voter confusion, Director Barnes worried only that if the district court ruled *after* August 12—counties may take "proofed ballots" and try to use them "to educate the public about what is on the ballot."  That, according to Director Barnes, would be a problem since, under those circumstances, the contents of the ballots could change given the ongoing litigation.  But, the district court concluded, because it was ruling before August 12, 2022, disruption to Georgia's preparation was not a substantial consideration.

## III.   STANDARD OF REVIEW

We review factual findings in a Section 2 case under the "clearly erroneous" standard set forth in Federal Rule of Civil

---

[8] In his proposed findings of fact and conclusions of law, Secretary Raffensperger said only that the evidence showed that there was potential for cost, confusion, and hardship if there were "any changes in election ballot design past August 12, 2022."

Procedure 52. *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226–27 (11th Cir. 2000) ("All of the district court's findings regarding the probative value assigned to each piece of evidence are reviewed for clear error."). While "Rule 52(a) does not inhibit an appellate court's power to correct errors of law," *see Gingles*, 478 U.S. at 79, "[w]here the district court's understanding of the law is correct, . . . and the record indicates that the court 'engaged in a searching and meaningful evaluation of all the relevant evidence,' and there is 'ample evidence in the record to support the court's conclusion[s],' our review is at an end." *Solomon*, 221 F.3d at 1228 (citing *Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281, 1293 (11th Cir. 1995) (en banc)).

## IV.   DISCUSSION

Secretary Raffensperger seeks a stay of the injunction pending appeal. So I analyze the four *Nken* factors to decide whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009). In my view, he falls short on three of the four. In the course of addressing the Secretary's arguments, I also explain why *Purcell* does not provide a valid reason for us to ignore Georgia's shortcomings on the merits of its motion for a stay.

20                 ROSENBAUM, J., dissenting                 22-12593

### A. *Likelihood of Success on the Merits*

Secretary Raffensperger makes four primary arguments about why he is likely to succeed on the merits of his appeal. First, he contends that the district court erred by not certifying this case to the Georgia Supreme Court. In support of this position, the Secretary asserts that, by failing to certify the case, the district court interfered with Georgia's system of government and wrongly interpreted the Georgia Constitution. Second, Secretary Raffensperger claims that the district court exceeded its authority under the VRA by interfering with Georgia's chosen form of government. Third, the Secretary argues that the district court erred in conflating polarization along *partisan* lines with polarization among *racial* ones. And fourth, he says that the district court erred in ruling too close to the election to allow Georgia to obtain effective appellate review.

Even though Secretary Raffensperger expressly disclaims reliance on the *Purcell* principle, the Majority relies on it, so I discuss that, too.

    1.  <u>The district court did not err in declining to certify a question to the Georgia Supreme Court</u>

Secretary Raffensperger argues that the district court should have certified whether the Georgia Constitution or Georgia statute required the statewide election of districted PSC members. In other words, he suggests that the language in the Georgia Constitution that the PSC be elected "by the people" requires statewide election.

22-12593          Rosenbaum, J. dissenting          21

Federal courts may certify "novel, unsettled questions of state law" to a state's highest court for resolution. *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 79 (1997). Federal district courts in Georgia may certify questions of state law if questions of Georgia law "are determinative of the case and there are no clear controlling precedents in the decisions of the [Georgia] Supreme Court." O.C.G.A. § 15-2-9(a). The decision whether to certify a question "rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). For three reasons, the district court did not abuse its discretion in declining to certify a question here.

First, Secretary Raffensperger did not preserve this argument. To be sure, Secretary Raffensperger orally asked the district court to certify the question at the summary-judgment hearing. But the district court declined to decide the issue until after trial. Secretary Raffensperger never brought up the issue again, didn't renew his oral motion, and didn't include a request in his proposed findings of fact or conclusions of law. As a result, the district court never considered whether to do so. We shouldn't consider an argument that Secretary Raffensperger didn't preserve. *CSX Transp. Inc. v. General Mills, Inc.*, 846 F.3d 1333, 1336–37 (11th Cir. 2017) ("[I]f a party hopes to preserve an argument, it must first clearly present it to the district court in such a way as to afford the district court an opportunity to recognize and rule on it.") (alterations adopted).

22                 ROSENBAUM, J., dissenting                 22-12593

Second, even if he had, the Secretary doesn't sufficiently develop the argument on appeal. He doesn't explain why, under the Voting Rights Act, the court could enjoin the PSC elections if the system of elections was provided by state statute but not if it were prescribed by the state constitution. Indeed, he has abandoned the issue. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

Third, I'm not sure why Georgia could dilute the votes of Black Georgians if it prescribed the system in its Constitution rather than by statute. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 217 (2009) (Thomas, J., concurring in part) ("To be sure, state authority over local elections is not absolute under the Constitution. The Fifteenth Amendment guarantees that the 'right of citizens of the United States to vote shall not be denied or abridged by the United States *or by any State* on account of race, color, or previous condition of servitude,' § 1, and it grants *Congress the authority to 'enforce' these rights 'by appropriate legislation,'* § 2.") (emphasis added). If Georgia passed a constitutional amendment that had the effect of stripping Black Georgians of the franchise, would the VRA really be irrelevant? In any event, the district court did not abuse its discretion because this question isn't outcome determinative, as Georgia statute, not the Georgia constitution, sets forth the election mechanism here.

22-12593                ROSENBAUM, J. dissenting                23

2.  <u>The district court did not "interfere" with Georgia's chosen form of government</u>

Secretary Raffensperger next argues that the district court erred by violating Georgia's sovereignty and altering its form of government.

I agree that federalism is an extremely important constitutional value. *Younger v. Harris*, 401 U.S. 37, 44–45 (1971) ("What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments . . . . It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future."). But federalism doesn't mean "blind deference to 'States' Rights.'" *Id.* And here, the Constitution, through the Fifteenth Amendment, has "render[ed] unconstitutional any federal or state law that would limit a citizen's access to the ballot" on the basis of race. *Nw. Austin Mun. Util Dist.*, 557 U.S. at 217 (Thomas, J., concurring). Section 2 of the Voting Rights Act "seek[s] to implement the Fifteenth Amendment's substantive command." *Id.* at 217–28.

Even assuming that Secretary Raffensperger is right, that the Voting Rights Act doesn't provide federal district courts the power to "alter the form of government," that's not the remedy the district court imposed. The district court didn't, for instance, add a branch of government, or move a power from one branch to another. Nor did it create a new office or impose new requirements on officeholders. And it didn't change how any of the three

24                    ROSENBAUM, J., dissenting                    22-12593

branches must conduct themselves.  Instead, the district court en-
joined a state statute and instructed the state legislature to choose
a new manner of selecting PSC Commissioners.  In so doing, the
district court abided by the Georgia Constitution's directive that
"[t]he filling of vacancies and the manner and time of election of
members of the commission shall be as provided by law."  GA.
CONST., art IV, § I(c).

    3.  The district court did not err in how it weighed evi-
       dence of partisan voter behavior

Secretary Raffensperger next argues that the district court
erred in finding that voting in PSC elections is racially polarized.
Instead, he says, the failure of Black-preferred candidates to win of-
fice is tied to partisanship, not racial-bloc voting.

The district court did not clearly err in concluding that vot-
ing in PSC elections is racially polarized.  The district court found
Dr. Popick—a former DOJ Civil Rights Division analyst who had
performed hundreds of analyses on thousands of elections—to be
highly persuasive.  And Dr. Popick determined that Black voters
and white voters voted in blocs over 75% of the time in PSC elec-
tions between 2012 and 2020.  Not only that, but he described PSC
elections as "one of the clearest examples of racially polarized vot-
ing' he has ever seen."  While the district court "generally" credited
Secretary Raffensperger's expert, Dr. Barber, the district court
noted that Dr. Barber didn't analyze PSC elections at all and didn't
analyze the effect of race on party affiliation.  In other words, Dr.
Barber's analysis had shortcomings in methodology.  And there's

22-12593          ROSENBAUM, J. dissenting          25

nothing showing the district court clearly erred in crediting Dr. Popick over Dr. Barber.

But that's not all. The district court also found that white voters voted in blocs even when the election featured no Democratic candidate. And the district court relied on Dr. Fraga's testimony that, after 2016, racially polarized voting in Georgia increased, but partisan polarization did not. These findings are fatal to Secretary Raffensperger's argument because, if he were right that any apparent racially polarized voting is just a proxy for partisan polarization, we'd expect to see the two metrics vary together.

But even if Secretary Raffensperger were right, that wouldn't change the answer here. As the district court explained, *Gingles* **requires** political cohesion. If the fact that Black voters voted together meant that their polarization was only partisan, not racial, then the second *Gingles* factor—that the minority group has political cohesion—would simultaneously be both a necessary and disqualifying condition because any group that had political cohesion wouldn't be able to show racial polarization (and vice versa). In other words, relief under the VRA would become illusory.

4. The *Purcell* principle isn't about time for appellate review.

Secretary Raffensperger's claim that he cannot obtain adequate appellate review this close to the election fails. He asserts that we should stay the district court's injunction because, in his view, he can't obtain adequate appellate review this close to the

26                    ROSENBAUM, J., dissenting                    22-12593

election.  The Majority embraces this position and characterizes it as a *Purcell* argument.

It is not.  Nowhere do *Purcell* and its progeny mention this argument as part of the *Purcell* principle.  *See Purcell*, 549 U.S. at 4–5.  Nor does the Secretary or the Majority cite any authority for the proposition.  *Purcell* deals with only the administrative burdens on elections and voter confusion that changes too close to an election can create.  *Id.*

And on its own merits, the Secretary's contention—now endorsed by the Majority—proves too much.  Appellate courts are accustomed to reviewing cases like these on an emergency basis.  Plus, appellate review could add years to the process, ensuring that no VRA violation could ever be enjoined, and giving defendants another reason to draw out the proceedings as long as possible.

### 5.  The *Purcell* Principle doesn't change the result

Finally, the Majority—not Secretary Raffensperger—invokes the *Purcell* principle as to the relief the district court imposed here.  Secretary Raffensperger, in fact, explicitly *declines* to invoke the *Purcell* principle on that basis.  He concedes that "he can implement the relief ordered by that date which was provided to the district court months ago."  In his words, "[t]his Motion and this appeal are not based on timing and the administration of elections."  Rather, the Secretary asserts that "the only relevance of *Purcell* . . . to this appeal relates to the Secretary's ability to obtain appellate review of the merits issues."

22-12593          ROSENBAUM, J. dissenting          27

As a reminder, the *Purcell* principle holds that "federal courts ordinarily should not alter state election laws in the period close to an election." *Dem. Nat'l Committee v. Wis. State Leg.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J. concurring).

For six reasons, I disagree that this case raises a disqualifying *Purcell* problem.

*First*, Secretary Raffensperger expressly and purposely waived this argument. He couldn't have waived this argument more if he tried. He didn't raise *Purcell* timing in his motion to dismiss. He didn't raise it in the first joint scheduling order in January 2021. He didn't raise it in his July 2021 motion for summary judgment. In late January 2022, the parties submitted a joint scheduling order requesting a ruling from the Court "no later than August 15," and even there, the Secretary "did not waive his right" to raise the *Purcell* issue only *at trial*.

And after that, in February 2021, the district court held a preliminary-injunction hearing, and the Secretary told the district court "for the record" that Secretary Raffensperger "won't make an appeal based on *Purcell*" and that he "wanted to make that clear." Indeed, based on the Secretary's representations, the district court denied the preliminary injunction in part because it thought that the Appellees would "still have an opportunity to obtain injunctive relief related to the 2022 election cycle." And at trial, Secretary Raffensperger didn't raise *Purcell* either.

28                    ROSENBAUM, J., dissenting                    22-12593

This issue is waived. Secretary Raffensperger told the district court that he wouldn't "make an appeal based on *Purcell*." On appeal, he agrees that he "typically raises *Purcell* issues related to the administration of elections and the attendant difficulties [of] making last-minute changes . . . [but] [t]hat is not the case here." "[I]f a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (cleaned up). We should—indeed must—respect that decision.

Here's a concrete reason why: had the district court known that Secretary Raffensperger was concerned about timing, it might have granted the preliminary injunction in February 2021—well before any *Purcell* concerns would arise. And if the district court knew that Secretary Raffensperger was concerned about voter confusion, it might have analyzed that as a concern (but it didn't know, so it didn't analyze that alleged concern).

The *state* is well-positioned—perhaps the best-positioned—to evaluate and weigh those considerations. Here, Georgia knew about *Purcell* and told the district court that *Purcell* wasn't implicated because it could easily take the PSC District 2 and 3 elections off the ballot and run a special election. *See Campbell*, 26 F.4th at 872 ("[I]t is an abuse of discretion for a court to override a party's deliberate waiver.") (cleaned up & alterations adopted).

*Second*, I'm not sure this even is a *Purcell* case. Unlike in most *Purcell* cases, the injunction isn't changing the rules midstream but rather postponing the election. All the typical

22-12593                    ROSENBAUM, J. dissenting                    29

concerns—that voting has already started, election administrators will be confused, unanticipated consequences will follow—aren't present here.

Secretary Raffensperger even *agrees* with me: he admitted that "there's some precedent for that that I think wouldn't necessarily get into *Purcell* land if it's going to be straight don't hold the election in November." Nor does the Majority Opinion cite a case where the court stayed, on *Purcell* grounds, an order that postponed an election.

This case just isn't like the other *Purcell* cases the Supreme Court has handed down recently. For instance, in *Merrill v. Milligan*, the Supreme Court vacated an injunction requiring Alabama to draw new district lines for the upcoming elections. *Merrill v. Milligan*, 142 S. Ct. 879 (2022). Justice Kavanaugh concurred, explaining that, with primary elections happening the next month, the injunction was a recipe for chaos because (1) candidates didn't know against whom they'd be running (2) which district they'd run in, (3) and state and local officials would need "substantial time to plan for elections." *Id.* at 880 (Kavanaugh, J., concurring).

None of that is present here. Georgia told us so. It conceded that the district court "correctly analyzed the impact of *Purcell* [] on the disruption to the *mechanics* of the election-administration process." The Majority's other cases all involve the *mechanics* of administering an election. *See Republican Nat'l Committee*, 140 S. Ct. at 1206 (when ballots must be received by); *League of Women Voters*, 32 F.4th at 1371 (regulations for ballot drop boxes); *Frank*

v. *Walker*, 574 U.S. 929 (2014) (photo ID rules); *Veasey v. Perry*, 574 U.S. 951 (2014) (same). None involves postponing an election altogether.

The Majority says that "the Supreme Court can tell us" if the Majority is wrong that *Purcell* applies here. Maj. Op. at 3. But that's no answer. *Purcell* cuts off remedies in voting cases when violations have been proven. It is strong medicine. And we should not, on our own, expand its application to preclude remedying a proven voting violation. *Purcell* is a narrow limiting principle, cautioning federal courts against acting in specific circumstances due to specific, articulated concerns—namely, voter confusion and electoral administration. *Purcell*, 549 U.S. at 4–5. The burden is on the Court, if it applies *Purcell* to an entirely new fact pattern, to justify why it is doing so.

*Third*, even if this were a *Purcell* case, the principles implicated weigh lightly here. The *Purcell* principle aims to avoid "voter confusion" and an "incentive [for voters] to remain away from the polls." *Purcell*, 549 U.S. at 4–5.

As to administrative burden, there won't be any burden on Georgia. The district court held—and Secretary Raffensperger hasn't challenged on appeal—that Georgia can hold elections for all other offices without trouble in November 2022, as long as we rule by August 12, 2022. Michael Barnes, the Director of the Secretary of State's Center for Election Systems, testified that he could take the elections for PSC District 2 and 3 seats off the statewide

22-12593               Rosenbaum, J. dissenting                31

ballot and that his "preference" would be that the order be given by August 12, 2022.

As to voter confusion, there won't be any because there won't be an election for PSC Districts 2 and 3 until the Georgia General Assembly picks a new system. In fact, the only evidence in the record cuts against a finding of voter confusion: Director Barnes was worried that, if the district court ruled *after* August 12—when the ballots were finished proofing—"once counties have proofed ballots they may take those proofed ballots and try to use them as sample ballots to provide the public—to educate the public about what is on the ballot." Because the injunction was issued before the ballot was finalized, there are no proofed ballots to be used as samples to confuse voters.

As to the concern that voters will lose confidence in the system if the PSC elections are pulled from the ballot, in my view, just the opposite is true. The district court duly found that the election system for the PSC seats violates the VRA and dilutes Black voters' votes, effectively rendering them meaningless. Ironically, ignoring that problem and failing to require it be remedied is what will cause voters—especially Black Georgians—to lose confidence in the system. In contrast, postponing those elections until a fairer system can be devised will strengthen the public's confidence in the system.

*Fourth*, even if *Purcell* did apply, we are far enough out from an election. We can't just count days and see how far we are from election day. The facts on the ground matter. Here, the injunction

32               ROSENBAUM, J., dissenting               22-12593

at issue *postponed* the election.  Unlike in, for instance, the *League of Women Voters*, the district court's injunction didn't change how votes were counted or collected.  In the *Purcell* cases the Majority Opinion cites, the challenged injunction "fundamentally alter[ed] the nature of the election." *Republican Nat'l Comm.*, 140 S. Ct. at 1206 (staying injunction entered five days before election day).  But canceling an election until there is a new system doesn't "fundamentally alter" *that election*—it just postpones it.  Take *Republican National Committee*.  There, the district court—five days before the election—required that absentee ballots mailed and post-marked after election day be counted (so long as they were received by the municipal clerk by a specific day). *Id.* at 1207.  Five days!  Here, we are more than three months out from the election.

In *League of Women Voters*, on the other hand, the district court—*while voter registration and local elections were ongoing*—enjoined provisions about drop boxes, third-party voter-registration organizations, and provisions prohibiting solicitation near a drop box. *League of Women Voters*, 32 F.4th at 1369–70.  So even though the primary was months away, we said that changing how voters registered and cast their votes was too drastic a remedy. *Id.* at 1371.  For example, the remedy required "re-training poll workers." *Id.*  Of course, that's not the case here.  None of that comes into play since the district court ordered the postponement of the election.

The Majority Opinion cites two unexplained Supreme Court orders, but I'm not sure what lessons we should draw from

22-12593                ROSENBAUM, J. dissenting                    33

those.  In *Veasey*, the Supreme Court denied an application to vacate a stay imposed by the Fifth Circuit on an injunction of Texas's voter ID law.  574 U.S. at 951.  But that concerned the mechanics of qualifying voters in a scheduled, upcoming election—unlike our case.

The Majority also (confusingly) cites to *Frank*, but there, the Supreme Court *vacated* the Seventh Circuit's stay and allowed the district court's injunction—issued just 26 days before the election—to remain.  574 U.S. at 929.  That, if anything, seems to support my view that *Purcell* is inapplicable here.

The Majority says we need to "weigh" an injunction's impact.  But then it does not do that.  *League of Women Voters of Fla., Inc.*, 32 F.4th at 1370 n.4.  Instead, it engages in bean-counting—how many days are we away from the election?  But we must *weigh* the factors, not recite them by rote.  *Cf. Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235 (11th Cir. 2016) ("[P]redominance [in a Rule 23 certification] requires a qualitative assessment too; it is not bean counting[.]").  The district court conducted extensive factfinding and analysis and ultimately chose a measured remedy: letting the state legislature decide.  And there is no record evidence that the decision will cause voter confusion or undue administrative burden.  That weighs in favor of letting that decision stand rather than vacating years of the district court's work.

Fifth, even if we applied Justice Kavanaugh's heightened standard, *Purcell* would not be a roadblock.  As Justice Kavanaugh has explained, *Purcell* does not set forth an absolute principle.

34                    ROSENBAUM, J., dissenting                    22-12593

*Merrill*, 142 S. Ct. at 881 (Kavanaugh, J. concurring). Rather, under his heightened view of the principle, it can be overcome when "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.*

As this dissent explains, the situation here satisfies all these conditions: (i) the Appellees won after a full bench trial (and are likely to win on appeal); (2) their right to vote in the 2022 PSC elections will be irreparably harmed; (3) the Appellees sued *years* before the election; and (4) everyone agrees that the changes are feasible without significant cost. So at least under Justice Kavanaugh's expressed standard, *Purcell* should not change the result here.

Finally, consider this. If plaintiffs can file a case *two years* before the election, win a trial months out from an election, show a violation of their rights before the ballot has even been finalized, obtain an order postponing the election[9] with no administrative

---

[9] In the meantime, there is no change to the status quo, so it is not as though the PSC will be unable to function. Everyone agrees that, under Georgia law, if no election occurs in November, the Commissioners will remain in their office until their successors are elected. The statute provides that Commissioners serve "for terms of office of six years and until the election and qualification of their respective successors." O.C.G.A. § 46-2-1. See also *Kanitra v. City of Greensboro*, 296 Ga. 674, 769 S.E.2d 911, 913 (2015) ("While there is some authority to the contrary, as a general rule, apart from any constitutional

22-12593         Rosenbaum, J. dissenting            35

burden on the state, and still be told that *Purcell* prevents them from receiving the remedy to which they are entitled, then when will *Purcell* ever be inapplicable?

In short, Secretary Raffensperger does not have a likelihood of success on the merits, and the *Purcell* principle doesn't apply.

### B. Irreparable Harm

The second *Nken* factor requires us to consider whether the applicant will be "irreparably injured absent a stay." *Nken*, 556 U.S. at 425–26. Secretary Raffensperger says he will suffer an "irreparable injury" absent a stay because he will be enjoined from conducting this year's elections pursuant to a statute enacted by the legislature.

Our precedent binds me to agree with the Secretary on this point. We have said that when the district court bars "the State from conducting this year's elections pursuant to a statute enacted by the Legislature," unless the statute is unconstitutional, an injunction would "seriously and irreparably harm the State." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020). But this factor isn't the end of the story for two reasons. For one, this is only *one* factor of four. *Nken*, 556 U.S. at 425–46. Given that, in my view, Secretary Raffensperger has an extremely slim, if any, likelihood of success on the merits, I'm skeptical as to this

---

or statutory regulation on the subject, an incumbent of an office may hold over after the conclusion of his or her term until the election and qualification of a successor." (citation omitted)).

36                    ROSENBAUM, J., dissenting                    22-12593

harm. And two, giving this factor a heavy weight would mean, essentially, that states are entitled as a matter of right to stays of illegal but not unconstitutional voting laws on appeal. That cannot be right.

### C. Injury

The third *Nken* factor asks "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Nken*, 556 U.S. at 425–26. Secretary Raffensperger says that the Appellees won't be harmed by a stay because they will—like all other Georgians—be able to vote for Commissioners of Districts 2 and 3. But he gives away the game when he admits that "vote dilution is an injury." In fact, he concedes, "the right to vote is sacred." Indeed.

This case involves "one of the most fundamental rights of our citizens: the right to vote." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). As the district court concluded—after more than two years of litigation and a full bench trial—Georgia's PSC system infringed on Black Georgians' fundamental right to vote. Vote dilution, as Secretary Raffensperger concedes, *is* an injury, and Black Georgians have been injured by the status quo. A stay of the injunction will just perpetuate their injury.

### D. Public Interest

The final *Nken* factor is "where the public interest lies." *Nken*, 556 U.S. at 425–26. This one is easy. On the one hand, we could simply postpone an election for a few months while we determine whether the district court erred in finding that the current

22-12593            ROSENBAUM, J. dissenting            37

system violates the Voting Rights Act.  But if we allow the election to go forward, we run a risk.  If we (as I think likely) determine that the current system violates the Voting Rights Act, then Black Georgians in Districts 2 and 3 are stuck—for the next *six years*, until 2029—with Commissioners whom they didn't have their full role in selecting.

## V.

This is not a close case.  Secretary Raffensperger waived *Purcell*, it doesn't apply to this situation, and it doesn't weigh against staying this injunction.  And Secretary Raffensperger hasn't made a sufficient showing on the *Nken* factors.

I respectfully dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 12, 2022

Christopher Michael Carr
Attorney General's Office
40 CAPITOL SQUARE SW
ATLANTA, GA 30334

Bryan Francis Jacoutot
Taylor English Duma, LLP
1600 PARKWOOD CIR STE 200
ATLANTA, GA 30339

Diane Festin LaRoss
Taylor English Duma, LLP
1600 PARKWOOD CIR STE 200
ATLANTA, GA 30339

Mrs. Charlene S. McGowan
Attorney General's Office
40 CAPITOL SQUARE SW
ATLANTA, GA 30334

Loree Anne Paradise
Taylor English Duma, LLP
1600 PARKWOOD CIR STE 200
ATLANTA, GA 30339

Bryan P. Tyson
Taylor English Duma, LLP
1600 PARKWOOD CIR STE 200
ATLANTA, GA 30339

Appeal Number:  22-12593-J
Case Style:  Richard Rose, et al v. Secretary, State of Georgia
District Court Docket No:  1:20-cv-02921-SDG

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,

unless exempted for good cause. <u>Although not required</u>, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at <u>www.pacer.gov</u>. Information and training materials related to electronic filing are available on the Court's website.

The enclosed order has been ENTERED.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Davina C Burney-Smith, J
Phone #: (404) 335-6183

                                                                    MOT-2 Notice of Court Action